UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

JONATHAN RICHARDSON a.k.a.
AUTUMN CORDELLIONÉ,

              Plaintiff,

v.

COMMISSIONER, INDIANA
DEPARTMENT OF CORRECTION, in her
official capacity,

           Defendant.

Case No. 3:23-cv-135-RLY-CSW

## **EXPERT REPORT OF STEPHEN B. LEVINE, M.D.**

I, Stephen B. Levine, M.D., have been retained by the State of Indiana to provide expert testimony in the above-captioned case, *Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, Indiana Department of Correction*, case no. 3:23-cv-135-RLY-CSW. I have been asked to review various discovery documents and the current medical literature regarding transgender medicine to provide opinions regarding (1) the efficacy of Gender Conforming Surgery ("GCS") and other treatment options for individuals with gender dysphoria, (2) the current medical consensus, if any, concerning GCS, as determined by a review of relevant medical literature, (3) whether an institution's denial of GCS as a treatment option falls within the accepted standards of care for the care of prisoners diagnosed with gender dysphoria, and (4) the state of the plaintiff's medical care and treatment in the Indiana Department of Correction ("IDOC"), as documented in her medical records, which reveal concerning personality disorder comorbidities.

In rendering these opinions, I have reviewed the following documents, in addition to those publications listed in the references portion of this report: the Complaint in this case, the plaintiff's medical records, a summary of the facts underlying the plaintiff's murder conviction, various policies

Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

of the Indiana Department of Correction relating to the care and treatment of transgender prisoners, the expert reports of Randi Ettner and Loren Schechter, among other documents.

## I.    Summary of Opinions

The basis and reasons for each opinion is set forth in the body of this report.

1.    Opinion 1: The determination of whether Gender Conforming Surgery (GCS) is "medically necessary" begins with a patient's desire. Doctors do not recommend GCS to a trans person in the community or in prison who does not initially request it. It then rests on physician belief in vaginoplasty's efficacy in significantly improving gender dysphoria, mental health, and social-vocational function. There is significant debate within the medical community, based on existing evidence, whether these desired effects are often realized. The rates of improvement on these three parameters from successful anatomic restructuring of the genitalia have not been scientifically verified.

2.    Opinion 2: The rate, degree, and duration of long-term harms and benefits remain uncertain after 60 years of genital reconstruction of trans women. Two recent studies, designed to measure mental health benefits, have failed to demonstrate the results that are widely claimed for surgery. Nonetheless, these surgeries are recurrently represented as both safe and effective.

3.    Opinion 3: A refusal by a treatment provider or an institution to offer Gender Conforming Surgery (GCS) is an acceptable difference of medical opinion within the appropriate standard of care for treating individuals with Gender Dysphoria in or outside of prison settings. Many American institutions endorse GCS despite its lack of demonstrated efficacy. Groups that have looked at the existing data supporting GCS have concerns that the rush to surgery may prove to be a medical misadventure.

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

4.    Opinion 4: The plaintiff, who prefers to be referred to as AC, has been provided with both accommodations to her gender identity and hormonal therapy to feminize her body. She considers GCS to be a natural next step in her pursuit of becoming a woman. She desires other feminizing surgery as well. A committee of experienced prison mental health professionals, noting her improved adjustment to being a trans inmate, refused her request to be transferred to a women's prison as "unnecessary." AC remains continuously chronically depressed stemming from her early life adversities, her crime, and self-hatred, but she has gained control of her previous shocking patterns of self-harm. Her other psychiatric diagnoses involve her character—borderline and antisocial personality disorders—that cannot be expected to disappear over time. She is burdened by a serious asthmatic condition.

5.    Opinion 5: The clinicians caring for her may not appreciate the state of science in this arena of care, nor understand the debate within the larger medical community about whether GCS is justifiable as a clear medical necessity.

6.    Opinion 6: WPATH's historical policy recommendations that GCS should be provided to prisoners as in the community were enunciated before any inmate had GCS. It was based on compassion and the fear that these trans-identified women would castrate themselves or suicide, neither of which has occurred since prisons instituted hormonal and social treatments of this group. Critical reviews of the 7th (2012) and 8th (2022) versions of its clinical guidelines have concluded they are of low scientific quality. While entitled Standards of Care, they actually do not meet the higher standards required to employ this scientific phrase; they are guidelines only. While WPATH has long insisted that inmates have access, and immediate access, to all the treatments available to people diagnosed with gender dysphoria living free in the community, prisoners with profoundly adverse backgrounds, chronic psychiatric symptom burdens, and recent consolidation of

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

a trans identity pose ethical management problems that are more fraught than those in the community because of their compromised capacities to cope with life challenges.

7.  Opinion 7: Given the uncertainties and controversies that abound in the field of transgender medicine and concerns about the long-term mental health, functional capacities, and limited life spans of individuals operated upon in the community, there should be far more cautions among prisoners, many of whom, like AC, have serious mental and physical illnesses.  Her functional capacities and mental health when released from prison in a few years cannot be assuredly assessed based on her recent behaviors in prison.

8.  Opinion 8: The number of trans women inmates in the US who have been provided with GCS is likely to be very small, as they are dispersed in various states without any systematic summary available of their post operative adjustment in prison or after their release.  Providing GCS to an inmate with antisocial and borderline personality disorders whose only psychiatric stability has been brought about from incarceration, time to mature, and ongoing psychotherapy constitutes an experiment of one.  With a possible release date within several years, there would be little opportunity to know the long-term outcome.  If the short-term psychological outcome of GCS is poor, a recurrence of self-harm or a suicide attempt would be a considerable risk.

## II.    Credentials

9.  I am Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine.  I maintain an active private outpatient clinical practice treating adolescents and adults. I received my M.D. from Case Western Reserve University in 1967 and completed a psychiatric residency at the University Hospitals of Cleveland in 1973.  I became an Assistant Professor of Psychiatry at Case Western in 1973, became a Full Professor in 1985, and in 2021 was honored to be inducted into the Department of Psychiatry's "Hall of Fame."

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

10.     Since July 1973, my specialties have included psychological problems and conditions relating to individuals' sexuality and sexual relations, therapies for sexual problems, and the relationship between love, intimate relationships, and wider mental health.  In 2005, I received the Masters' and Johnson Lifetime Achievement Award from the Society of Sex Therapy and Research. I am a Distinguished Life Fellow of the American Psychiatric Association.

11.     I have served as a book and manuscript reviewer for numerous professional publications.  I have been the Senior Editor of the first (2003), second (2010), and third (2016) editions of the *Handbook of Clinical Sexuality for Mental Health Professionals*.  In addition to five previously solo-authored books for professionals, I have published *Psychotherapeutic Approaches to Sexual Problems* (2020).  The book has a chapter titled "The Gender Revolution."

12.     In total I have authored or co-authored over 180 journal articles and book chapters, 27 of which deal with the issue of gender dysphoria.  I was an invited member of a Cochrane Collaboration subcommittee that sought to publish a review of the scientific literature on the effectiveness of puberty blocking hormones and cross-sex hormones for adolescents with gender dysphoria.  Cochrane Reviews are a well-respected cornerstone of evidence-based practice, comprising a systematic review that aims to identify, appraise, and synthesize all the empirical evidence that meets pre-specified eligibility criteria in response to a particular research question.

13.     I first encountered a patient suffering what we would now call gender dysphoria in July 1973.  In 1974, I founded the Case Western Reserve University Gender Identity Clinic.  I have served as co-director or director of that clinic since that time.  Across the years, our Clinic treated hundreds of patients who were experiencing a transgender identity.  An occasional child was seen during this era.  I was the primary psychiatric caregiver for several dozen of our patients and supervisor of the work of other therapists.  In 1993 the Case Western Reserve University Gender

Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

Identity Clinic was renamed, moved to a new location, and became independent of the University. I continue to serve as Co-Director. Currently, I host a monthly conference with professionals from multiple cities who share an interest in understanding transgender identities. For the last several years I have supervised out of town psychotherapists in their work with transgender individuals. I was an early member of the Harry Benjamin International Gender Dysphoria Association (in 2007 it became WPATH) and served as the Chairman of the committee that developed the 5th version of its Standards of Care.

14.     In the course of my five decades of practice treating patients who suffered from gender dysphoria, I have recommended or supported social transition, cross-sex hormones, and surgery for particular patients, but only after extensive diagnostic and psychotherapeutic work.

15.     In 2006, Judge Mark Wolf of the Eastern District of Massachusetts asked me to serve as an independent, court-appointed expert in a litigation involving the treatment of a transgender inmate within the Massachusetts prison system. In that litigation, the U.S. Court of Appeals for the First Circuit in a 2014 (En Banc) opinion cited and relied on my expert testimony. I have been continuously retained by the Massachusetts Department of Corrections as a consultant on the treatment of transgender inmates since 2007. During these years, I helped to establish a gender program, have developed the expertise of its changing leadership, been called upon to evaluate particularly difficult clinical challenges, and generally provide educative commentary during its monthly meetings.

16.     In 2019, I was qualified as an expert and testified concerning the diagnosis, understanding, developmental paths and outcomes, and therapeutic treatment of transgenderism and gender dysphoria, particularly as it relates to children, in the matter of In the Interest of J.A.D.Y.

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

and J.U.D.Y., Case No. DF-15-09887-S, 255th Judicial District, Dallas County, TX (the "Younger litigation").

17.    In 2019, I provided written expert testimony in the landmark case in the *United Kingdom, Bell v. The Tavistock and Portman NHS Foundation Trust.*  I have provided expert testimony in other litigation as listed in my curriculum vitae.

18.    I am regularly requested to speak on the topic of gender dysphoria and have given countless presentations to academic conferences and Departments of Psychiatry around the country. In May 2022, I organized and co-presented a symposium on the management of adolescent-onset transgender identity at the American Psychiatric Association's Annual Meeting.  In the fall of 2023, I provided lectures at two international conferences on gender dysphoria held in the United States. On November 14, 2023, I spoke to a health subcommittee of the French Parliament about gender dysphoria.  Since March 2022, I and co-authors have published four papers on gender dysphoria that have cumulatively been downloaded over 200,000 times throughout the world.

19.    A fuller review of my professional experience, publications, and awards is provided in my curriculum vitae, a copy of which is attached hereto as Exhibit "A."

20.    I am being compensated for my time spent in connection with this case at a rate of $500.00 per hour for preparation of this report, and for my time related to deposition or court testimony.  My compensation is not dependent upon the outcome of this litigation or the substance of my opinions.

III.    **Clinical Description of the Plaintiff Derived from a Chart Review**

21.    Jonathon Richardson, who prefers the unofficial name Autumn Cordellioné, thinks of herself as a woman.  She has been on estradiol and spironolactone since mid-2020, shortly after being officially diagnosed with Gender Dysphoria.  She is now wanting more treatments such as

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

breast augmentation, electrolysis, and genital reconstruction in anticipation of being released in December 2028. As seen in a video recording made in August 2023 during a Prison Rape Elimination Act ("PREA") investigation, AC's completely bald head and face are covered with tattoos. She has no eyebrows other than tattooed ones. Her heavily inked face also contains at least four small red hearts. During this 12-minute video recording AC was calm, possessed, and matter of fact. Her only emotion was gradually emerging sad tears when she said she was accused of murdering her stepdaughter. She made mention of other rape experiences without elaboration other than to say that it is dangerous for inmates to accuse others of such things.

22.    At age 18, the plaintiff married as a man to a six-month pregnant woman whose fetus was fathered by another man. He suffocated the screaming little stepdaughter to death and was sentenced to a variable long sentence. Now 41 years old, 5'11' overweight, facially tattooed, missing fingers and thumb from self-induced burns caused early in his incarceration, he has had an improvement in his behaviors with maturation and various forms of psychotherapy throughout his imprisonment. These likely saved his life.

23.    An egregiously neglected, unloved, abandoned, recurrently physically and sexually abused child and adolescent, he made many (6 by self-report) serious suicide attempts as early as age 12. Taken from his parents, raised in the foster care system until adopted by parents who recurrently abused him, along with his "brother" and "sister," he has had limited capacities to recognize and verbally express his subjective sense of being abused and betrayed. Instead, he has acted out his rage, sadness, and disappointments with aggression to others and via self-harm. As an adolescent this originated with cutting and burning arms with cigarettes and acting out behaviors that resulted in institutionalization. By his report, he spent almost four of his truncated adolescent years in institutions.

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

24.     While the murder was the first crime known to me, the inmate was given two

character disorder diagnoses early on which have been maintained in his records: antisocial

personality disorder and borderline personality disorder.  These are accurate by my reading.  Since

incarcerated, he made attempts at lethal suicide via overdoses and immolation, each of which left

him with permanent disabilities.  While he still carries a diagnosis of epilepsy based on a seizure

while unconscious and another upon recovering in 2008, he is no longer on anticonvulsants.

Throughout his incarceration he has been recognized as chronically depressed, at first with psychotic

features, eventually without psychotic features.  His hallucinations have only once been described in

the chart since 2011; they consisted of hearing the screams of his victim.  Subsequently, he has

struggled with his guilt, his sense that he was a worthless person, and he has been working to find a

way to help others to compensate for the murder.  It has been repeatedly noted that he has little

natural empathy for anyone and has a limited ability to trust inmate friends and at times distrusts his

mental health professionals.

25.     The people he refers to as family members are largely dead from suicide or overdose.

The plaintiff has explained that with each death, he remembers their relationship to one another.

These memories are accompanied by his attempt to realize or to find love for them.  He never can.

The process only seems to reawaken his painful memories.

26.     The inmate has been chronically asthmatic since at least 2008.  While the frequency

of impaired breathing requiring medical intervention beyond his daily bronchodilators has varied

from year to year, in recent years he has had frequent exacerbations requiring unscheduled

interventions.  Decompensations often last for two weeks.  Because the plaintiff has not been

honest about the details of his, and subsequently her, relationship stressors, it is likely that

interpersonal tensions may sometimes cause increases in wheezing.  Asthma is an ongoing disability

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

that frequently interferes with the ability to work in the kitchen. He has been on numerous

treatment regimens over 16 years.

27. The plaintiff has several times mentioned having abnormal sexual thoughts that he

wanted to discuss. One of these was his recurrent imagining himself as a child having sex with an

adult. On another occasion, he spoke briefly about having a three-way sexual experience with his

"wife" and his brother in the back room of a porn shop. He reported that he used to have

homosexual sex in the porn shop as well. When the diagnosis of gender dysphoria was made by a

DOC committee, some expressed the worry that becoming a woman may have represented another

masochistic way to punish himself. At one medical encounter, a physician thought that his leg

symptoms were self-induced. The inmate once reported that he dreamt of rubbing his arm away to

a stub. There is no strong evidence that his occasional impulse to self-harm has been acted out

recently. But he has been burned in the kitchen and prior to that when working with car parts a

heavy brake shoe fell on his hand causing a significant injury. Clinicians should wonder, as did the

initial evaluators, if he continues to have masochistic thoughts, impulses, and behaviors. It is a

reasonable speculation given his crime and his childhood adversities that thoughts of sex with

children may also be occasionally bothering the plaintiff. The concern about sublimated masochism

is a sophisticated psychodynamic, one which is quickly passed over by those who think that the sole

legitimate consideration is the diagnosis of gender dysphoria. One of the reasons not to rush into

GCS is to have the opportunity to explore AC's current ongoing erotic preoccupations. This is to

attain a far better understanding of her motivation for GCS. Since such surgery is irreversible, the

IDOC should have a better understanding of her past and current erotic life in order to judge

whether GCS, considering its inherent surgical risks, has a reasonable chance of benefitting her

psychologically. The need to understand her current erotic and sexual life—for example, the use of

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

her penis for personal comfort, pleasure, and anxiety and sadness reduction, is not something that can be discussed once and be done. Individuals such as AC who have little trust in others and who are not used to sharing such intimate details must be recognized as vulnerable to poor judgments in complex circumstances. This is another reason why correctional professionals charged with the health and safety of inmates need to be cautious. We recognize that there is more to every person than can be captured by a diagnosis of gender dysphoria. In keeping with the principle throughout Medicine that care must be individualized to the patient's circumstances, AC has other highly relevant diagnoses of character, mood regulation, lung disease, and social anxiety, all of which come to bear on the decision about GCS. We must not confuse the fact that surgery can be done for a person with gender dysphoria with the questions should it be done and when.

28.     Thus, the sexual history remains to be clarified. It would be prudent to clarify AC's private erotic thoughts in the future. The inmate has told numerous people that he is bisexual. JR acknowledged being raped singly or by groups in 2005, 2008, 2016, and 2022. AC was interviewed about the 2005 incident in August 2023. When new to a cell, a much larger inmate told AC that he wanted to have oral sex. JR refused was hit and then acceded to the experience two days in a row in their cell. On the third day, in a more public space, JR ineffectively stabbed the man during an altercation. JR has never seen the man since. JR never reported his rape experiences since that would have put him in mortal danger in his view for being a snitch. He did report the 2005 incident in 2022 when he requested a transfer to a women's prison.

29.     No evidence of gender dysphoria or feminine behaviors was apparent in any of the Indiana prisons that housed JR before he requested evaluation for GD. When evaluated he told a story of cross dressing, sexual abuse, and presenting himself as a girl. His wife divorced him after the murder. In Dr. Ettner's two-hour video interview, she primarily focused on behaviors that

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

indicated feminine-like behaviors which she interpreted as evidence of always being a trans person. Such behaviors, however, may also indicate a hunger for attachment to a nurturing woman. It is well known that many future gay and bisexual men have histories of cross-gender interests and behaviors. Thus Dr. Ettner, who posits that prenatal biological processes create transgender lives and minimizes postnatal adversities as irrelevant, finds certainty that AC was always a trans person. Almost all other advocates of medicalization recognize that disrupted bonding, neglect, and abuse—physical, mental, and sexual, all of which are part of this self-harming adolescent and young adult's life—can be the origins of gender dysphoria and may arise post natally in adversities. In 1966, the originator of transsexual care in the United States, the endocrinologist Harry Benjamin, made this point (Benjamin, 1966).

30.     The inmate has reinvented himself as Autumn. The plaintiff, now living as a trans woman, seems to have lessened the self-hatred that characterized JR for many years. Since making the transition, the issue of self-hatred does not show up in the psychotherapy notes. Autumn has a new purpose in life. However, as late as 6/19/23 in discussing his brief bonding to a 19-year-old who was carrying a surrogate pregnancy, the plaintiff agreed to act as the father of the unborn child. This suggests that "Autumn" can be a flexible identity depending on social, cultural, or interpersonal contexts. The quest for GCS seems to have taken the focus from how to live in the community when released. What skills can lead to gainful employment? What institutions of support for housing can he access? What additional challenges will Autumn face if presenting as a woman for the first time in a community? How will Autumn access medical care if surgery has significant chronic complications? Will Autumn qualify for Medicaid? Whether Autumn receives GCS as an inmate, many more basic survival issues need to be defined, considered, and committed to. JR is said to have earned a GED after dropping out of high school. Providing GCS in prison would force

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

the plaintiff to adapt as a woman post incarceration. Recognizing that this inmate has had many consecutive daily needs for bronchodilator therapy, some of which may have been reactions to anxious interpersonal problems, medical care after discharge is not likely to be as accessible as it has been while in custody.

31.     As the DOC provides numerous accommodations, acknowledges her new identity, and maintains and monitors her estrogen regimen, it likely that the risk of autocastration is close to non-existent. As suicide attempts before and since incarceration seem to have finally receded by self-report and clinical observations, it is not reasonable to assume there is an imminent suicide risk. She seems more stable in recent years, although still an anxious, depressed person with inconstant friendships. This improvement from her former highly problematic state has been gradual with time and psychotherapy and more recently medical transition has seemed to have helped. I do not think she poses an imminent suicide risk. However, she has never been very revealing of her social relationships or her inner life. This leaves clinicians uncertain about her stability. Mental decompensation is not the same as suicide risk. Looking forward to life as a trans woman in and outside of prison is a factor against suicide.

32.     Several years ago, Dr. Ettner and I were on opposite sides of an inmate's request for GCS in Massachusetts, brought by prisoner Katheena Soneeya f/k/a Kenneth Hunt. Dr. Ettner argued in favor of immediate surgery followed by transfer from the hospital to the women's prison. I argued for transfer to the women's facility for six to twelve months prior to GCS to see how she adjusted to being among women. The judge referred to my suggestion as a "soft landing." Dr. Ettner warned of dire consequences of not treating this long-term prisoner with GCS. The judge has not ruled in four years. The inmate has continued without self-castration or a suicide attempt and is still functioning without crisis as of December 2023.

13
Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

## IV.    Scientific Methodologic Problems Concerning Gender Conforming Surgery (GCS) for Community Dwelling Trans Women Throughout the World

33.    After 60 years of increasingly frequent GCS, most surgeon authors begin and end their contributions by highlighting the significant gaps of knowledge that remain concerning anatomic, physiologic, and mental health outcomes of the operation.  Six parameters of evaluation in combination should be used to assess the efficacy of this operation.  The current gaps of knowledge derive from three categories of deficiencies: (1) the absence of repeated measures over time (inadequate follow-up data); (2) the failure to agree upon valid measurement instruments; and (3) inadequate monitoring of long term anatomic and functional consequences.  As a result, an objective risk/benefit ratio for patients is not yet established.  What has been established is a 15-year pattern of increasing performance of vaginoplasties and large wait times for individual patients (Wright e*t al.*, 2023).  The demand for GCS makes it seem that the value of these surgeries is well established. Patients blindly believe the mantra that the operations are "safe and effective."  They believe this because their doctors, having been so taught, believe it.  For instance, in paragraph 23 of his expert report, Dr. Schechter, an esteemed teacher of young surgeons, asserts that surgeries are safe and effective.  While patients are led to trust this widespread cultural belief, physicians who do not know about the complication data consider this to be a scientifically-proven fact.  It provides an example of fashion-based medicine rather than the more trustworthy standard of evidence-based medicine (EBM).  Surgery advances by innovative techniques that are reported in the literature.  Positive outcomes are published more commonly than negative ones.

34.    Patients, clinicians, researchers, and the courts should focus on six outcome parameters when assessing the safety and effectiveness of GCS.  These parameters should be measured at logical intervals employing scientifically validated measurement instruments and honest descriptions of lasting consequences.  The six parameters of evaluation of GCS are:

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

    a.   impact on <u>genital</u> dysphoria.

    b.   impact on <u>gender</u> dysphoria.

    c.   impact on mental health.

    d.   impact on social and vocational function.

    e.   impact on sexual and urinary function

    f.   all-cause mortality.

35.    All may presume that anatomic results are better today than a generation ago because surgical techniques generally improve over time. Three basic GCS techniques are used to create female-appearing genital structures: penile inversion, penile scrotal grafting, and intestinal grafting. Complication rates decrease after surgeons have performed ~50 operations (Ferrando, 2020); they also vary with the technique. There have been over 11,000 papers published on the topic of male to female genital surgery, but most address only a single outcome parameter. A coordinated national effort would be required to achieve an EBM high-quality multifaceted outcome study of GCS in this country. What exists are reports from individual surgical groups in the US and elsewhere. Most centers do not publish their outcomes, however. I will now examine each of the six parameters referencing relatively recent articles.

**36.**    **The impact on <u>genital</u> dysphoria,** that is, distress over the presence of the penis, scrotum and testes, is expected to be universally positive since GCS has been elected by the patient after at least months of consideration. We presume that published satisfaction rates refer to pleasure in the new genital structures and happiness about the absence of male genitalia. Satisfaction rates range from 72% to 92%. Initial dissatisfaction primarily reflects surgical complications. In a 2018 study of 330 patients, the complication rate was 28.9% (Gaither et al, 2018). Dissatisfaction occurred when the anatomic result was disappointing (rare) or problematic in terms of urinary,

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

sensory, vaginal depth, or sexual function.  They reported a reoperation rate of 9%.  Most

complications appeared within four months.  Dreher et al reported complications in 32.5% and a

reoperation rate was 21.7% (Dreher et al, 2018).  In Manrique et al.'s meta-analysis of 46 studies, the

average complication rate was 21%; 87% were satisfied with the functional outcomes; 92% were

satisfied with the aesthetic outcomes.  Each of these numbers summarize a range.  For instance,

between 54% and 84% of patients were able to have an orgasm (Manrique et al, 2018).  Based on

these three 2018 studies, it is apparent that no patient, surgeon, institution, or clinician should expect

GCS to remove distress over existing genital structures in every patient.  Initial relief of genital

dysphoria from the operation over time may evolve into dissatisfaction first based on post operative

complications and transient discomfort and later based on the physiological limitations of the new

structures.  Surgical complication rates are incidence counts rather than descriptions of genital

distress over time.  Some patients undergo genital surgery to eradicate distress only to be distressed

over the appearance or function of their new genitals.  The rate of this phenomenon can't be

discerned with certainty but can be approximated by looking at complications in three time frames:

a.  In the immediate and early post-operative period, injury to bladder, urethra, or rectum,

     abscess, surgical site infection, flap loss, failure of skin graft to take, insufficient vaginal

     cavity depth, urinary stream abnormalities, hematoma, and dehiscence (wound coming apart)

     have been repeatedly described by many authors.  Such studies do not include levels of pain

     and required opioid relief.

b.  In the three- to six-month post-operative period other problems are recognized: spraying of

     urinary stream (1/3 of patients in one report), urethral strictures, bladder infection, rectal

     injuries (4.5%), fistulas and inadequate vaginal depth.  The latter is determined both by the

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

original length achieved during the operation and by the dilatation routine practiced by the patient.

c.  <u>At one year or more</u>, sensory and sexual function problems become apparent.  These are reflected in the inability to have masturbatory or partner-related orgasms.  In 2020, an Italian group reported that 40 of 45 patients reported orgasms and 34 were able to experience penile penetration with a partner at their 12-month follow-up (Ongaro et al, 2020).  Most papers that address orgasm potential only ask the question, "Are you able to attain orgasm?"  They do not ask how orgasm is attained, at what percentage frequency, or whether it is a masturbatory or partner-related orgasm.  Minor surgical revisions are sometimes necessary to correct vaginal opening scarring (4.1% for protuberant clitoris, or labia that do not come together).  Other complications include flap necrosis, rectal and urethral injuries, rectal fistula, vaginal stenosis, and urethral fistula (Drinaine & Santucci, 2020).  Sensory and sexual patterns require repeated measurements over several years because nerves heal slowly, if at all, partner availability and partner-related actual behaviors vary, and over time neovaginal spaces shrink, become stenotic, or develop a stricture.  Each of these complications preclude penetration.  Continuing dilatation may be necessary in those who do not have regular intercourse.  Rectovaginal fistulae and pelvic floor complications can be complications in ensuing years.

37.     In most centers, the use of intestinal grafting is a rescue operation for patients whose initial surgical results were unsatisfactory.  But in other centers, it is the first operation done.  A Stanford group reported on 83 patients done by one surgeon over 22 years.  They provided follow-up by phone that averaged of 2.2 years.  58% had complications of which 83.3% were considered minor.  These problems included introital stricture and excessive protuberance of the new clitoris.

Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

Excessive mucus production occurred in 28.6% but resolved after the first year (Morrison et al 2015). Di Summa's group used intestinal grafting in rescuing 30.2% of their patients who first had penile inversion surgery. The aesthetic and functional outcomes in the successful penile inversion and rectosigmoid groups were the same at 32-month follow-up, but the latter group had significantly reduced pain on penetration (di Summa et al, 2019). The latter symptom is often not commented on when closing of the neovagina is reported.

38.     The results of a 2020 study by Loree et al found that three of the 30 patients undergoing penile inversion vaginoplasty required transfusion. There were 6 (20%) additional complications. Three complications (10%) required reoperation: 1 patient for wound dehiscence on postoperative day 7, 1 for rectal perforation identified on postoperative day 10, and 1 for urethrovaginal fistula. All complications were addressed without sequalae. Twenty of the 30 (66%) patients ultimately underwent revision surgery. Indications for revision were prolapse correction/deepening, labiaplasty, clitoral hood construction/revision, meatal asymmetry, urinary fistula repair, and posterior vaginal flap revision. Twenty-one of 28 (75%) revisions were outpatient surgeries. There were no complications from these revision procedures. Overall satisfaction via survey of 24 patients was 92% (Loree et al, 2020).

39.     As GCS is typically described as safe and effective with a low complication rate by both surgeon authors, recommending physicians, and mental health professionals, one can only wonder how familiar these individuals are with such data. There was no mention of complications in the reports by Drs. Ettner and Schechter. This raises the ethical and legal question of whether patients' consent for GCS meets the standard of informed consent. Signing a form that lists the possible complications the morning of surgery or after one visit to the surgeon may not suffice. When considerable psychiatric diagnoses are present—such as, depression, anxiety, and borderline

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

personality disorder—reasonable clinicians wonder whether inmates or free-living patients can be thought to be truly informed when consenting. This issue has been repeatedly raised with adolescents; adults who can speak cogently are assumed to be able to consent. But desperation or any strong reason to achieve GCS raises this concern.

40.     Here is an edited abstract from a recent surgical review article (Dunford et al, 2021): "Europe, USA, and Thailand favor the penoscrotal technique for vaginoplasty, while the penile inversion (PI) technique predominates in the UK. Primary vaginoplasty using a segment of bowel is less common, and all three techniques have comparable rates of intraoperative rectal injury. The incidence of rectovaginal fistula is reportedly higher in the PI technique. Wound haematoma and vaginal prolapse rates are comparable. Higher rates of clitoral necrosis, urethral meatal stenosis, and wound infection are reported in PI. However, the ability to orgasm, ability to have penetrative sexual intercourse, and satisfaction with aesthetic result are better with PI. <u>The evidence for complications and functional outcomes is low and weak. Standardised nomenclature reporting of adverse events and robust patient-reported outcome measures are lacking. Definitions of adverse events and functional outcomes should be a priority of future research</u>." And here is a typical summary on this topic by surgical groups: "When performed correctly in excellent surgical candidates by skilled surgeons, vaginoplasty can be a rewarding surgical endeavor for the patient and surgeon." (Drinane & Santucci, 2020).

**41.     The impact on <u>gender dysphoria</u>**. Originally GCS was assumed to be a surgical cure of gender dysphoria. This is no longer widely claimed; instead, GCS is simply a patient-requested treatment that is presumed to be ameliorative. The persistence of gender dysphoria after vaginoplasty has not been systematically studied in the same patient at various intervals. Information, however, does exist at various one-time measurements—for example, at one, two, and

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

five years, in many studies. Many reports found diminished or absent gender dysphoria. Dr. Ettner,

for instance, speaks of "amelioration or even cure." She and the many studies that she references do

not share how improved gender dysphoria was measured. Since long wait lists for GCS exist in the

community, surgeons believe that the gender dysphoria will diminish from the operation. One can

see this reflected in many articles that begin and end with the idea that GCS improves gender

dysphoria, even though these papers did not measure the comfort with the self as gendered woman.

This literature simply assumes that GCS is effective at eradicating gender dysphoria and therefore is

medically necessary. The field lacks a valid measurement instrument to assess the evolution of

gender dysphoria or knowledge whether discomfort with the gendered self subjectively changes over

time. Surgeons are likely to assume they have either cured or improved distress associated with the

original diagnosis of gender dysphoria. This is typically based on patient answers to "How are you

doing?" at post-operative visits. The sensibilities of the surgeon are primarily on anatomic healing

and physiological processes rather than in depth subjective psychological and social processes that

might reflect continuing gender dysphoria other than genital dysphoria.

      42.     Dr. Schechter is quite positive about the impact on gender dysphoria from GCS.

Under the heading of "Gender Affirming Surgeries are Safe," he provides no data on anatomic and

functional complications, immediate, short term, or long term. Rather he reminds the reader than

operations on the genitals for other problems are done. Under the heading "Gender Affirming

Surgeries Effectively Treat Gender Dysphoria," he refers to five studies, none of which had a

measure of gender dysphoria. It is not difficult to believe that an operation designed to make the

chest or genitals consonant with one's gender perception would help the desire for a certain genital

appearance, but the question arises for how long? And since there is no measure of gender

dysphoria, everything that is assessed is a surrogate marker for the primary desired outcome—

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

quality of life measures, happiness, sexual dysfunction.  Dr. Schechter does not discuss those who are not benefited.

43.    There are five types of observations that suggest that **gender** dysphoria persists after GCS for an unknown number of patients.  (1) Some seek or obtain additional surgery—augmentation mammoplasty, facial feminization, vocal cord surgery, and other cosmetic enhancements—in hopes of feeling more feminine.  The surgeon who performed GCS may not know of these subsequent operations.  (2) Some detransition after vaginoplasty, a small number of whom ask the surgeon to recreate the appearance of male genitalia (Djordjevic, et al, 2016).  (3) Some with persistent gender dysphoria who state that they are not the woman they thought they would become.  Their initial ambition to be a complete woman morphs into a sad recognition that they are neither a man nor a woman but exist in a third category.  (4) Some file lawsuits against the treatment teams that moved them quickly into surgical care.  (5) Some suicide—most commonly years after GCS at rates much higher than age-matched individuals of either sex.

44.    These considerations are rhetorically masked by repeated claims that the regret rate after GCS is 2% or less (McNamara et al, 2022).  Criticisms of this figure have repeatedly been offered, but this low regret rate after surgery continues to be promulgated.  One illuminating criticism, for example, is that to qualify as "regret" a person has had to tell the surgeon this at a follow up visit, even though it is known that at least 75% of de-transitioned patients do not return to the surgeon and that suicides are not considered to be "regret" (Littman, 2021).  The advertised regret rate of 2% or less does not appear to be reasonable by any human standard.  Its promulgation raises important questions:  who is asking? how is it asked? when it is asked?, what is it that is not regretted (Levine & Abbruzzese, 2023)?  One can imagine that this statement does not qualify as regret: "GCS was necessary for my transformation to living as a complete woman, my former

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

driving ambition. The experience and the results were far from what I expected, but at least I tried. Knowing what I know now, I might have done something different.  I must live for the present and future. I accept that I am doing the best that I can.  I'm older now and understand things differently."  What good is dwelling on my periodic regrets?

45.    In a 2011 study of all patients who had surgery (both trans men and trans women) the suicide rate was 19.1 times the rate among control Swedish population (Dhejne et al, 2011). Subsequent studies also recognize the risk of post GCS suicide.  They note the elevated rates compared with the non transgendered in their countries.  More recent rates, perhaps reflecting the greater acceptance of transgendered persons, range from 3.5 to 6 times higher.  Certainly, those who continue to promulgate the supposed 2% regret rate need to reveal the basis for this claim and cease giving the impression that the vast majority have no regrets.

46.    A prospective pre-1-, 3-, and 5-years' post-surgery survey of 190 Swedish patients who had undergone genital surgery was published in 2017.  Using the Short Form-36 Health Survey (SF-36), which measures Quality of Life (QoL) across eight domains, the patients had a lower QoL than general population on most items at every interval.  QoL improved at one-year post-surgery and then declined to the preoperative level by 5 years (Lindqvist et al, 2017).  Despite these findings, the article's title was "Quality of life improves early after gender reassignment surgery."  This is a typical form of distortion: the title reflects only the positive finding.  Many readers do not read beyond the title and abstract, which also emphasizes the positive results.  The QoL is a surrogate marker for gender dysphoria.

47.    Few biological male inmates in the US have undergone GCS.  No study of them has appeared.  Is it reasonable to assume, as the plaintiff's experts argue, that every inmate who desires

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

this surgery should be expeditiously provided with it because it will ameliorate or cure their gender dysphoria?

48. **The third outcome parameter, impact on mental health of GCS,** has proven particularly problematic for several reasons.

   a. First, to provide evidence how GCS affects mental health, preoperative mental health needs be compared with post-operative mental health using the same objective instruments. This has not been consistently recognized by evaluators. Numerous individual studies and meta-analysis of multiple studies involve small sample sizes, are cross-sectional, and uncontrolled. In 2010 Murad reviewed 28 studies. They concluded "low quality evidence" for positive mental health outcomes (Murad et al, 2010). Recent studies (Bränström & Pachankis 2020, Almazon & Keuroghian, 2021), recognizing the uncertainty of the mental health benefits of GCS, concluded that genital surgery improves mental health. The first study's conclusions were retracted (Kalin, 2020) and the second found both positive and negative indicators. The latter authors failed to mention that that over half of the 27,715 subjects rated their mental health as poor/severe (Miller et al, 2023). An accompanying editorial was far less certain than the original authors (Marano et al, 2021). (While medicine relies on peer review for reassurance that the study's conclusions are likely to be correct, the Bränström & Pachankis retraction is a reminder that those who are considered experts in gender dysphoria treatment either may be biased in favor of the conclusions or not sufficiently methodologically sophisticated to detect flaws in study's methods. This is one of the reasons that systematic studies reject most of the peer reviewed literature in the field.)

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

    b. Second, it is a considerable challenge to decide how to measure mental health.

Researchers could measure psychiatric symptoms such as anxiety, depression, self-harming behaviors, substance abuse, eating disorders, suicidality, quality of life measures, and/or the use of psychiatric care. They may also assess the ability to consistently work and participate in a long-term love relationship.

        i. Compared to non-trans women, mental QoL was significantly impaired in trans women, whereas no differences in physical QoL were found (Brieidenstein, et al, 2019). This finding emerged from a 42% response rate of a survey of 577 who received GCS at one center. Poor response rates are typical of such studies raising the question why so few are willing to participate. The suspicion is that some cannot be located but others, who are still alive, may not being thriving.

    c. Third, such research requires professionals who have inclination, the time, the funding, and the awareness of the need to demonstrate that GCS improves mental health. At this point, American medicine has just assumed GCS improves mental health. Transgendered adult communities are known, through numerous cross-sectional studies, to have significant mental health problems here and in Europe (Liszewski et al, 2018; Henry et al, 2021; Dhejne et al 2016). For example, in a survey of various transgender persons in Sweden, a fifth of the respondents reported poor self-rated health, 53 % reported a disability, and 44 % reported quality of life scores below the median cut-off value of 6 (out of 10) (Zeluf et al, 2016). A related issue, the medical transitioning of adolescents, is now receiving a great deal of attention. Repeated systematic studies of the mental health benefits of hormones analyzed with the principles of EBM have agreed that the benefits are at best uncertain. Nonetheless, providing hormones for

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

youth is still the therapeutic fashion in ~30 states. GCS for adults has not been

subjected to the same level of scrutiny as have interventions for transgender youth.

d.  Fourth, when studies are done, it would be ideal if the follow-up examinations are done

over several times periods—for example, at 1, 3, 5, and 10 years. Current follow-up

studies measure patient reported outcome only once. "No-regret-today" does not

guarantee the absence of future regret. Having undergone genital restructuring, a patient

may be initially reluctant to admit that she continues to have significant mental health

challenges. Surgical success in terms of aesthetics and urinary and orgasmic function is

likely easier to attain than improved mental health because many of those who have

undergone GCS have had significant ongoing mental health challenges throughout their

lives. These include preoperative psychiatric symptoms, impaired social function,

substance use, and high use of psychiatric services.

e.  Fifth, since population studies of mental health have indicated that most people with

psychiatric symptoms do not seek mental health care, scholars of gender medicine

cannot assume that those who do not seek psychiatric services after GCS have much

better lives. Many of my patients accept their lives, however limited, with sentiments

such as, "This is just me." Because of the above limitations, attempts to demonstrate the

positive impact of GCS on mental health have used indirect methods, two of which will

now be discussed.

49.  In 2014, Heylens et al. performed a prospective study of 57 individuals who were

administered the validated SCL-90 (90 item symptom check list) at presentation, after hormone

administration, and after GCS. This type of prospective study is ideal. Hormonal treatment, but not

surgery, significantly increased the scores on the measure. The authors did not separate the trans

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

men from the trans women (Heylens et al, 2014). Some subsequent individual studies could, and others could not, confirm this benefit. The most recent study of hormone administration demonstrated that the most significant finding was that two years of hormone treatment improved satisfaction with appearance. The transgendered 18-year-old women had no mental health benefits. Two of 315 patients suicided during the two-year trial (Chen et al, 2023).

50.     Using the World Health Organization's QoL questionnaire with 100 questions, in 2016 a Brazilian group assessed 47 trans females before and at least one year after genital surgery, finding that psychological state and relationships improved, but physical health and independence deteriorated. QoL deteriorated when surgical complications existed (Cardosa et al, 2016).

51.     Dr. Ettner provided a description of both a normal mental status examination of AC and abnormal psychometric testing. AC's responses to these tests indicated that despite appearing to be without indicators of mental illness during the interview, she bears a moderate degree of clinically significant anxiety, a severe degree of depression, a moderate degree of hopelessness, and a significant pattern of externalization, self-harm, insecure attachment, impaired self-reference, and defensive avoidance. Each of these findings has been observed by the IDOC mental health professionals. Subsequently in her report, Dr. Ettner discussed numerous developmental adversities, including being tied with a leash attached to the ceiling for two weeks. Yet none of these findings documenting poor baseline mental health dampened her recommendation for providing GCS.

52.     **The fourth outcome parameter, the impact on social and vocational function**, has been clarified by public health surveys and by transgender advocates. A limitation of these data is that all individual subjects who identify as transgendered are included without separating trans men from trans women and those who have undergone GCS and those who have not. These

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

groups are described as socially discriminated against, marginalized, and vulnerable to various social ills. They are known to have higher rates of domestic violence victimization, substance abuse, unemployment, being unmarried, dependent on public transportation, having inadequate access to health care, dependent on disability income, engaging in prostitution, and incarceration (Liszewski et al, 2018). These patterns continue to be documented in numerous cross-sectional studies of trans adult mental health in community surveys (Newcomb et al, 2020; Henry et al, 2021; Kattari et al, 2020). Social and vocational function, like other parameters, need to be repeatedly measured as these can change with patients' circumstances. The usual explanation for these diverse social and vocational challenges is the minority stress theory—trans individuals are victims of social discrimination and previously they have incorporated society's prejudices against sexual minorities into their psyches (Lefevor et al, 2019). This hypothesis assumes that there are no inherent mental or emotional problems with being transgendered, an idea that WPATH and the American Psychiatric Association have asserted ipse dixit—without any evidence. These declarations were intended to emotionally and socially support trans-identified persons (Byne et al, 2012, Reed et al, 2016). This idea requires ignoring the studies of the mental health problems of child, adolescents, and adults who first present for psychiatric care (Dhejne et al, 2016). For instance, the incidence of autism is seven-fold greater among trans adolescents and young adults than in the general population (Strang et al, 2018). Autistic patterns, even without gender dysphoria, are typically associated with social and vocational dysfunction. The separation of mental health issues from social and vocational function is important for clarity's sake, although they overlap considerably. It is broadly known in psychiatric practice that that individuals with psychiatric diagnoses can function well in the workplace, even though their symptoms and their relationship problems are clinically

Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

significant. There is a greater degree of psychiatric problems when those diagnoses interfere with

vocational function. This is typically seen among transgendered inmates prior to incarceration.

53.     **The fifth parameter, long term impact on sexual and urinary function,** is

difficult to present accurately because of the privacy that surrounds these topics. Sexual function

begins with the ability of the new genital structures to feel exquisite sensation leading to arousal as

would be expected in a natal adult woman's clitoris, labia, introitus, and vagina. GCS rearranges

neural innervation, and some complain of being satisfied with the external appearance of the

genitalia but not the sensory capacities. For many years of the provision of GCS nothing was

known about post operative sexual function. This was not a concern. Now when figures are

provided that most patients can have orgasm, how those orgasms are attained is not specified. The

possibilities include masturbation via anal and rectal stimulation, vaginal penetration, or external

structure stimulation and, of course, orgasmic attainment with a partner. No mention is made of

vibrator dependence. The latter topic is less well known in part because questions are not asked,

many patients do not have a partner, partners may need considerable time and experience together

prior to learning how to stimulate an orgasm, and some are embarrassed to have genital activity with

another person. This topic is important to consider prior to undergoing GCS because, despite what

some transgendered persons may report, many use their penis for their own and their partner's

pleasure. Pre-operative discussions with mental health professionals, as part of the informed

consent process, should thoroughly cover this topic. This is particularly fraught in prisons where

inmates are loathe to discuss their sexual relationships because of PREA rules and mental health

professionals are fearful of asking for fear of being thought to be too intimate with the inmate. I am

unaware of AC's current orgasmic capacities or how the genitals are stimulated, if at all.

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

54.     Urinary problems can be expected as the urethra in the new female appearing genitalia is shortened.  It may be that this makes recurrent urinary infections more common, causes more spraying of the urinary stream, and predisposes to fistula formation and stricture.  It may be that these problems will be brought to local urologists rather than the GCS surgeon because many operations are done at center far from the patients' homes.  Thus, the surgical literature may not accurately reflect the actual incidence of compromises to the urinary anatomy and function.

55.     **The sixth parameter, all-cause mortality,** has been a worrisome concern based on retrospective studies.  While death from suicide after GCS has received the most attention, the incidence of AIDS, cardiovascular disease, and cancer is also significantly elevated.  In five studies from UK, US, Sweden, Denmark, and Holland, the transgendered, whether before or after GCS, have an earlier average age at death when compared to their countrymen (Jackson et al, 2023 Erlangsen et al, 2023).  This was originally demonstrated in Sweden among all patients who underwent GCS over a 30-year period (Dhenje et al, 2011).  Ten years later, De Blok et al demonstrated an almost double increase in mortality among trans women compared with the general male Dutch population.  This pattern in Holland has not changed in five decades.  The study selected people on hormones, many of whom may have had GCS, but it did not provide information on GCS.  The United States Veterans Health Administration has a large data base that also have demonstrated shorter life spans of those listed as transgendered.  More recent studies from the UK and Denmark have documented the same increase in all-cause mortality.

V.     **Considerations When Dealing with Transgendered Women Inmates**

56.     Routh et al (2017) has aptly labelled the issues with this group of natal male inmates as a conundrum.  The conundrum is best appreciated by two observations.  First, the highest known prevalence of adults with Gender Dysphoria seems to exist among current prison inmates; the

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

incidence of inmates declaring a trans identity has dramatically increased in the last 17 years among

biological males and in the last seven years among female inmates facing long periods of

incarceration. While this statement is based on my experience with the Massachusetts DOC, this is

likely to be true in many other states. Second, the developmental histories, educational attainments,

and interpersonal relationships of many of inmates have been highly problematic—having endured

far more egregious adversities than transgendered persons seeking services in the community.

Inmates have endured parental bonding and attachment difficulties, physical, psychological, and

sexual abuse experiences, parental neglect, domestic violence, divorce, poverty, parental

imprisonment, educational deficiencies, vocational instability, etc. They have high frequency of

adolescent substance abuse, repeated criminality during their youth without substantial vocational

skills.

57.     Male inmates are generally unable to trust their assigned mental health professional:

they resist discussing their developmental histories and prefer not to recognize their anger from their

childhood and adolescent adversities. They are often manipulative, paranoid, and cannot be

depended on to tell the full truth about their past or current life. They tend to externalize blame and

act out, rather than recognize and process what they feel. Inmates end up feeling that no one in the

DOC cares about them and their gender dysphoria (Levine, 2016).

58.     This description applies to the plaintiff in this case, who like many others first

declared a trans identity in prison and provided unverifiable histories of having felt like a girl from

early childhood, cross-dressed with mother or sister's clothes, and were afraid to share their

feminine identifications. Most, also like AC, have not participated regularly or responsibly in a

community program for gender dysphoria. A small number of inmates have been observed to

identify as trans while in custody and de-identify immediately upon release from prison or while still

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

incarcerated. Corrections personnel generally do not know what happens to released prisoners

unless they are returned to custody.

59.    State prison systems' policies about trans inmates vary and evolve at different rates.

Many of these DOC medical and mental health staff groups began with having little confidence in

dealing with this population, limited knowledge about the existing literature, and more importantly,

little awareness of controversies in the field. This becomes relevant because the staff must help the

inmates to have a cogent informed consent process for hormones and GCS. Although inmates are

adults whose brain maturation is assumed to be complete (generally assumed to occur around age 25

years), it is difficult to ascertain whether they can think clearly about the benefits, risks, and social

consequences of GCS while in custody and after release. Because of their age and their ability to

recite some of the known dangers of genital surgery, the legal requirement for informed consent is

assumed. Inmates who passionately desire GCS may not be able to think clearly about the pros and

cons of this intervention. I have repeatedly been told that the complications "will not happen to

me," "that only happens with inexperienced surgeons," or "I don't' care, I just want to be put in that

coffin as a woman." The other limitation to informed consent stems from professionals who do not

have an in depth knowledge of the limitations of GCS in terms of its safety and effectiveness

(Levine et al, 2022). Regardless, informed consent should be processed over time, not a one-time

interview with the surgeon.

60.    Being a plaintiff in a lawsuit forces the transgendered inmate to present herself as

being certain about the desire for and need for GCS, suppressing the ordinarily expected

ambivalence, worries, and conflicts about undergoing this irreversible surgery. Recognizing and

honestly processing the personal wisdom of GCS requires considerable time. Long wait times are

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

prudent in that they give the inmate a chance to reconsider what they have told their mental health professional that they want. Minds do change.

61.     Because of their recurrent problematic behaviors, many inmates would not qualify for GCS if they were in the community (Levine, 2016). AC may be an example of someone who would be delayed in obtaining GCS until she could demonstrate a long period of stable mental health, vocational functioning, absence of substance abuse, and regular attendance with a mental health professional. This inmate's seeming improving mental health in the previous two years may be from maturation alone, from psychotherapy, from improved pulmonary status, from estrogen, from the adventure of transforming her gender presentation, or from a new intimate friendship with another inmate. From Dr. Ettner's battery of four tests, we have another reassurance that her mental health remains impaired by chronic anxiety, depression, and poor coping capacities. No one can be certain that she will be able to cope as a trans woman upon release since she has been in DOC custody for 18 years. Previously, she lived with three sets of parent figures and spent time institutionalized. Her three psychiatric diagnoses (chronic depression, borderline personality disorder, and antisocial personality disorder) and her impulses to harm herself when stressed should never be confidently considered to be no longer relevant. Although the records lack any indication that she is presently suicidal or at risk of imminent self-harm, her psychiatric history makes it such that the possibility of self-harm outside of prison cannot be discounted even if she were to receive GCS. The overt manifestations of her psychiatric disorders may recede but they represent a potential to regress that should never be overlooked. Thus, when WPATH's declaration that all institutionalized persons should have the same opportunities for GCS as community dwellers, this consensus-derived policy of "best practice" does not consider the troubled limited people who become long-term inmates. The question arises whether accommodations to being called Autumn,

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

access to female canteen items, careful monitoring of estrogen therapy, and ongoing psychotherapy

are sufficient options to adequately treat AC's gender dysphoria. Thus far there are no indications

that they have been ineffective. Desire for GCS alone does not indicate inadequate treatment as a

majority of trans-identified inmates at times state that they desire genital or breast surgery. DOC

decisions to provide estrogen predicts that inmates will more seriously consider GCS in the future,

whether or not the law permits it.

62.     If GCS were to be performed, this inmate could not continue to be safely housed

among male inmates. The question would then arise whether she is safety hazard for inmates in a

women's facility. Anecdotal reports have emerged in several states about trans women committing

sexual assaults against natal women inmates.

## VI.   Widespread Medical Uncertainty Regarding GCS Is Evident Given Recent Studies Purporting to Demonstrate Mental Health Benefits for GCS

63.     In 2020, Bränström and Pachankis introduced their work with: "Despite professional

recommendations to consider gender-affirming hormone and surgical interventions for transgender

individuals experiencing gender incongruence, the long-term effect of such interventions on mental

health is largely unknown." In 2021, Almazan and Keuroghlian, stated, "Requests for gender-

affirming surgeries are rapidly increasing among transgendered and gender diverse people. However,

there is limited evidence regarding the mental health benefits of these surgeries." Each of these

studies concluded that GCS (not confined to biological males) improved mental health. Based on

their other contributions to the literature, these four authors are strong advocates for GCS. Their

articles instead suggest the lack of reliable systematic data and thus a widespread uncertainty as to

the efficacy of GCS. Plaintiff's experts seem to disagree that uncertainty about the efficacy of GCS

exists, or at least fail to acknowledge it.

Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

64.     Bränström and Pachankis used data from the Swedish registry of individuals given

hormones and surgery for Gender Dysphoria.  They originally concluded that "the longitudinal

association between gender-affirming surgery and reduced likelihood of mental health treatment

lends support to the decision to provide gender-affirming surgeries to transgender individuals who

seek them."  They claimed their research provided the **first** empirical evidence that gender transition

surgeries had long-term mental health benefits, even though countless surgeons have previously

claimed its benefits.

65.     Nine letters to the editor from MDs and PhDs were quickly submitted to the editor

of the American Journal of Psychiatry after the paper's online appearance in 2019.  These letters

meticulously illuminated the study's methodological limitations, blunders, and possible deceptions.

(The references to these letters can be found listed under the original article in PubMed or in the

August 2020 Am. Journal of Psychiatry.)  These writers agreed that "[t]hese methodological

shortcomings preclude any statement on the suitability of early surgery in persons seeking treatment

for gender noncongruence based on the results presented in this article."  Some noted that these

"errors" could well have been purposeful to support an ideological perspective when they noted,

"people diagnosed with gender incongruence have a dramatically worse overall mental health

outcome after 'transitioning' treatments than the general population, which is, in fact, the answer to

their stated aim and research question, but this (essential) finding is not even referred to in the title

or in the Conclusions of the article."

66.     Other critics asked, "For those whose last surgery was 10 or more years earlier, how

many suicided, died of other causes, or left Sweden prior to study initiation?"  The authors failed to

find out.  "A drop in hospitalizations for suicide attempts alone provides a very incomplete picture.

When the data for such findings are accessible in the Swedish national registers, this omission is

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

glaring. The lack of control subjects, the limited 1-year time frame, and the avoidance of examining

completed suicides and psychiatric hospitalizations are substantial study shortfalls." The study

confirms the strong association between psychiatric morbidity and the experience of incongruity

between gender identity and biological sex. However, the study does not demonstrate that either

hormonal treatment or surgery has ANY effect on this morbidity. It seems that the main message

of this article is that the incidence of mental health problems and suicide attempts are especially

HIGH in the year AFTER the completion of gender-affirming surgery.

67.     Such criticism, including from two independent statisticians who reviewed the paper

after its publication, found that the study's conclusions were not justified, and led to the authors

admitting that more and different research was needed to reach the conclusion that surgical

interventions improved mental health (Kalin, 2020).

68.     Almazan and Keuroghlian used retrospective data from the 2015 US Transgender

Survey, a nonrepresentative convenience sample of 27,715 transgender identified individuals

recruited from transgender advocacy groups (Almazan & Keuroghlian, 2021). 38% of the

respondents identified as nonbinary, 32.5% were trans females, 12.8% of the entire sample had

undergone at least one surgical procedure at least two years previously. The authors compared those

who had a surgery to those who wanted to undergo surgery along five parameters: (1) Past month

psychological distress; (2) Past month binge drinking; (3) Past year tobacco use; (4) Past year suicidal

ideation; and (5) Past year suicide attempt. The surgical group had lower scores for items 1, 3, and

4. They did not differentiate on binge drinking or suicide attempts. The authors called this a

controlled study (sic)! They found that the benefits were greater in those who had undergone all the

surgeries that they desired as opposed to those who had only one surgery. The authors recognized

the data came from self-reports, was cross-sectional, and had no base-line mental health measures.

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

They failed to recognize the absence of subjects who suicided, detransitioned, were not politically involved with advocacy, and those who declined to take the survey. An accompanied editorial in JAMA Surgery expressed pleasure in the conclusion that GCS improved some aspects of mental health but urged caution and additional studies (Marano et al, 2021). The finding that surgery did not improve suicide attempts but improved suicidal ideation calls into question the meaning of the findings. The 2015 US Transgender Survey has been used in numerous studies, all of which have concluded that trans care improves mental health. This methodology and the positive conclusions have been seriously questioned by several authors (D'Angelo et al, 2021: Biggs, 2020).

69.     Health and Human Services (HHS) Medical Review of GCS (aka SRS): In 2016, HHS came under significant pressure to adopt the WPATH Standards of Care as the prevailing guideline for determining medical necessity considerations for gender-affirming surgeries. After conducting a thorough evaluation of over 100 studies of surgery, HHS refused: "Based on our review of the evidence and conversations with the experts and patient advocates, we are aware some providers consult the WPATH 'Standards of Care,' while others have created their own criteria and requirements for surgery, which they think best suit the needs of their patients. As such and given that WPATH acknowledges the 'guidelines' should be flexible, we are not in the position to endorse exclusive use of WPATH for coverage. The Medicare Advantage plans, and Medicare providers can use clinical guidelines they determine useful to inform their determination of whether an item or service is reasonable and necessary." HHS refused to mandate coverage for transgender surgeries, leaving it up to the individual states to decide, due to lack of evidence of long-term benefits.

## VII.    WPATH's "Standards of Care" Are Simply Guidelines

70.     Standards of Care must be based on unbiased objective appraisal of the scientific literature. The current 8th version, the product of a prolonged overdue effort, is more than twice

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

the length of its previous version published in 2012. Both versions have come under EBM scrutiny and have been recognized as biased, inherently contradictory, consensus-based, and erroneously claiming to be evidence-based. The writers of various sections far exceeded the 30% maximum requirement to have those who earn their living by being involved in trans care (Dahlen et al, 2021; Dahlen et al, 2023). Their recommendations do not correspond to their own systematic reviews and the reviews of others. In the US prisons, unlike in other countries, these guidelines seem to have been uncritically accepted. Prisons have long looked for guidance about prescribing hormones, social transition, electrolysis, facial feminization surgery, use of names, orchiectomy, mammoplasty, mastectomies, and GCS. WPATH's 8th version makes these inmate requests to be medically necessary (Coleman et al, 2022). Obviously, prison policy must draw the line in this dogma of, "everything is medically necessary that an individual patient desires." The 8th version makes nine recommendations for inmates most of which had been implemented in US prisons prior to its publication. However, here is the one that is most salient to the plaintiff: "We recommend staff and professionals charged with providing health care to TGD individuals living in institutions recommend and support gender-affirming surgical treatments in accordance with the SOC-8 when sought by the individual, without undue delay."

71.     What is the basis for WPATH's nine recommendations that generally ask prison personnel to think about the treatment of gender dysphoria as it does, among them: make no distinction between the never incarcerated and the currently incarcerated, assume that GCS has well-established benefits, deliver GCS fast or risk terrible inmate consequences, and presume that there is a great experience underpinning their recommendations (pp. S104-109)? In fact, when the 8th version was published in September 2022 few inmates in the US had ever received GCS. What others had written about the special challenges of this population were ignored (Levine, 2016;

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

Osborne & Lawrence, 2018). The 5th edition of the SOC published in 1999 had one paragraph on the topic with the similar recommendations for same treatment in and outside of institutions at a time when prisons were just beginning programs for trans-identified male inmates. Similar to the pronouncements in other sections, the section applied to the institutionalized is also not based on anything resembling EBM.

72.      Given WPATH's flaws, conflicts of interest, and its non-EBM grounding, its influence in transgender medicine is outsized and unwarranted. As Dr. Ettner points out on pages 10-11, the American Medical Association, the Endocrine Society, and the American Psychological Association have relied on WPATH's SOC. Of these three associations, the Endocrine Society and WPATH guidelines on endocrine treatment are largely written by the same individuals. In the arena of standards of care in medicine, the generation of recommendations ideally are not done entirely by those who prescribe these treatments. Methodological experts are required to evaluate the reliability of supportive studies. The listing of American health institutions that support surgical services does not mean that they have based their endorsement upon systematic reviews of the relevant literature. In the hierarchy of EBM, systematic reviews are the high point and expert opinion the low point of reliability of conclusions.

73.      Given that various states, including Indiana, have passed laws restricting GCS, DOC policies about these operations must be reformulated soon. This plaintiff illustrates the reasons for caution about following other institution's policies because the patient population that they are based upon are so profoundly different. In the community, for instance, known murderers are not seen. The specific crime per se does not influence medical care, but certain crimes correlate with life adversities which produce poor coping patterns. The knowledge of an impulsive murder of an infant speaks to JR's lack of impulse control, imprudence, dishonesty, and grossly impaired

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

interpersonal relationship capacities. One can only hope that time, maturation, psychotherapy, and

knowledge of other inmates have combined to dampen these destructive tendencies.

## VIII.    The Concept of Medical Necessity

74.    Defining medical necessity is an essential matter for medical insurance companies.

This policy distinguishes for providers and enrollees the treatments that will and will not be covered.

Medical necessity begins with a judgment that is made by a licensed qualified health professional

who evaluates and treats the patient. This judgment is then affirmed by an insurance company that

decides whether the intervention is to be covered. State and federal laws may mandate specific

coverage and who may make diagnoses. Courts weigh in when disputes exist. The attitude of

government and insurance providers for trans care is rapidly evolving in the US and Europe. An

increasing number of corporate plans, insurance providers, and states are extending coverage to

carefully diagnosed and prepared patients with Gender Dysphoria (Stroumsa & Kirkland, 2020).

GCS is being covered because of the belief that it can meaningfully help the patient psychologically,

if not cure the problem.[1] To transgender advocates, this represents one of many gains in minority

rights. Other states have passed laws prohibiting or limiting hormonal and surgical treatment for

minors and young adults despite the strong recommendations found in WPATH's guidelines. They

view hormonal and surgical treatments as "experimental" despite its years of being performed.

Other gender affirming surgeries are judged to be cosmetic in nature and therefore not medically

necessary.

75.    Patient belief alone does not justify medical necessity, but many advocates and

patients believe GCS is "safe and effective" and feel that doubting this constitutes illegal

---

[1] There is no cure for gender dysphoria. Instead, gender dysphoria is a psychological diagnosis that can be treated. No matter the treatment, the patient remains aware of his or her biological origins and continues to deny those origins.

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

discrimination based on the 8th and 14th amendments to the US constitution. They often repeat that the science is settled (McNamara et al, 2022). The history of this issue was reviewed six years ago (Baker, 2017), before any of the states rescinded GCS for minors.

76. WPATH's new version, which encourages medical and surgical interventions for those who are diagnosed with Gender Dysphoria, stands in stark contrast to many European countries who have rejected its authority. There, hormones and surgery for youth used to have medical necessity, but now these early medical and surgical interventions are prohibited by national policy. UK, Sweden, Norway, Denmark, and Finland have done so, and it appears that Germany, Holland, and France are debating changing their previous endorsement of medical necessity using WPATH guidelines. All of this is based on growing concerns that quickly accessible affirmative treatments have poor long-term results and that numerous systematic reviews of hormone treatment have found the data unconvincing.

77. GCS became *"medically necessary"* in the late 1970s as a policy of the Harry Benjamin International Gender Dysphoria Association (now WPATH) at a biennial meeting. This term was adopted to ease the ethical qualms of endocrinologists and surgeons who recognized that their interventions went against the principle of nonmaleficence—*Above All, Do No Harm.* These physicians were changing normal physiology and anatomy in the absence of disease, a clearly prohibited activity throughout 2500 years of medicine. The justification employed was to listen to the anguish of these people to know this was not simply cosmetic; it was to remove the pain of their incongruent anatomy and sense of self. The use of the term medically necessary meant that the ethical principle of beneficence—*Act in the Best Interests of the Patient*—was more important than a narrow interpretation of nonmaleficence. For the last decade, however, the ethical principle, *Respect for Patient Autonomy,* has been privileged over other considerations. This means that if a person

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

wants GCS, she should have it, if the doctor thinks it is medically safe for her. I have argued that if

the phrase "psychologically beneficial" were substituted for medically necessary there may be less

confusion and contention and more honesty about the hoped-for benefit of surgery (Levine, 2016).

However, this phrase does not resolve the issue of how to negotiate between the conflicts between

these three ethical principles. A fourth principle, medical care must be justly distributed, has

become a civil rights issue because advocates feel they have a right to the medical procedures that

they desire and believe to be safe and effective. Thus, doctors often face a conundrum. A

conundrum occurs when a solution to a problem causes a new problem that is equal to or worse

than the original one.

78. **Criteria for Medical Necessity.** To qualify for medical necessity, a physician

recommends a data-supported (individual and groups of physicians and psychologists interpret the

data differently) procedure that can accomplish one of four goals:

- Prevent death. Individuals with Gender Dysphoria are well known to suicide before and

  after GCS (de Blok et al, 2021; Dhejne et al, 2011). GCS is not now conceived as lifesaving

  but as life enhancing. When patients declare they will suicide without GCS, their desperation

  and manipulation are separately addressed. In the community they are hospitalized if the

  threat seems to be imminent. Inmates are transferred to special watch units where suicide

  risk is closely monitored. When experts declare a prisoner is likely to suicide without GCS,

  they overlook psychiatry's poor track record at prediction of suicide, and what else can be

  done to deal with their depression. Gender Dysphoria does not equal death without GCS.

  Many trans female adults do not desire GCS. There is no systematic evidence that GCS

  prevents suicide, even though patients after it sometimes say, "This operation saved my life."

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

- Prevent complications. Disappointment, despair, depression, and suicidal ideation are likely
  to follow the rejection of a request for GCS as an inmate comes to grips with the obstacles
  in her chosen path.  Some have argued that GCS will prevent genital self-mutilation.
  Mutilation is far more often considered than attempted.  It often is a response to the
  inmate's sense that her identity is being ignored.  Mutilations are desperate manipulations
  that are signs of poor mental health—often at a psychotic level.  Dr. Ettner considers
  autocastrations to be rational acts to limit testosterone production.  She is correct, in part,
  namely, only in that they are often based on the inmate's perception that their needs to
  express their femininity and desires for estrogen are not being adequately attended to.  This
  is not the case with AC whose self-harming, limb limiting destruction has not focused on his
  testes.  Clinicians cannot provide GCS just because the inmate "began the process."  Actual
  attempts to remove the testes by prisoners dramatically decrease when inmates are part of a
  gender identity program.  This has been one of the accomplishments of prison gender
  programs in the last 25 years.

- Relieve pain.  Gender dysphoria is a form of psychological pain.  As represented in court,
  gender dysphoria is a steady state of distress, often described as suffering.  GCS is assumed
  to relieve the dysphoria caused by the presence of male genitalia and to please because of the
  new female genital appearance.  It is anticipated that the inmate will feel more like a natal
  woman and have less gender dysphoria as a result.  It is difficult to quantify or compare the
  pain of genital and gender dysphoria to other forms of psychological distress.  Most pre-
  operative trans females have learned to ignore their penis most of the time even though its
  two functions remind them of their maleness.  Many, in fact, have a history of fathering
  children, being married to a woman, and regularly masturbating with a pleasurable orgasm

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

with the organ they now want removed.  In legal proceedings the pain of gender dysphoria is

(mis)represented as intense, unrelenting, and interfering with the ability to function well.  All

psychiatric conditions have their own forms of pain.  What is unique about the pain of

gender dysphoria is the clinical experience that every form of increased feminization—

electrolysis, female canteen items, wearing make-up, showering alone, hormones—can at

least temporarily ameliorate it, even though none eradicates gender dysphoria.  Each may, in

fact, intensify the need for a next step.  There is no way to compare the subjective pain of

gender dysphoria with the pain and distress that accompanies other psychiatric problems

such as depression, anxiety disorders, substance abuse, and psychosis.  In fact, they overlap,

making unclear how much is due to gender dysphoria and how much has other sources.

- Improved capacity to function.  Many court experts do not find medical necessity and

  readiness for GCS to be difficult judgments to make.  WPATH's guidelines, however, leave

  much room for case-by-case judgments and state that they are intended to be flexible.  In

  prisons, ascertaining medical necessity and readiness for surgery are complicated processes.

  Clinicians are asked to articulate why they feel their patient is ready and whether they have

  worked through their ambivalence about GCS.  "I have no ambivalence" is a sign that the

  inmate is either not being honest, is dangerously without insight, or is in litigation.  Post-

  operative transsexuals in the community report the arduousness of translating their concept

  of the self as a woman into living successfully in this new role.  Their adaptations leave them

  vulnerable to psychiatric decompensations and long-term physical disease risks, some of

  which shorten their expected life span.  In prison, the ability to function well usually is only

  reflected in the absence of disciplinary actions, continuation of work, and maintenance of

  other privileges.  Punishments, acts of aggression, loss of jobs, and transfer to special units

43
Exhibit 32

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

cause concern about the wisdom of GCS. (Plaintiff's records indicate a loss of a job after an

argument with a supervisor). Being happy after GCS is not to be equated with improving

function. Assessing improved social and vocational function among inmates is complicated

because prisoners often did not function well prior to incarceration, and they have limited

vocational challenges in prison. Moreover, prisons enable an institutional cure of substance

abuse which may quickly return upon release from custody. For those in custody for life,

improved capacity to function means only the absence of "tickets" and steady employment

and this varies with the age and temperament of the inmate. Many corrections professionals

have speculated that some inmates violate their probation to get returned to prison because

they fail to function well upon returning to the community. This includes those with gender

dysphoria.

## IX. The Plaintiff Is Receiving Alternative Treatments that Adequately and Effectively Treat Her Dysphoria

79.     Indiana DOC has provided treatments to this inmate for gender dysphoria. A

committee carefully considered the diagnosis and considered some differential diagnostic

considerations. It provided a name change, access to female canteen times, separate showering

times, ongoing psychiatric care with and without indicated medications. All of this followed years of

the inmate providing no indication of a female identity or even feminine or effeminate behaviors.

The emergence of a new identity as a trans person after many years is, of course, not professionally

unheard of, but it does require some skepticism about its stability, utility, and vulnerably to sexual

exploitation including new consensual relationships and rape. Thus, a prudent DOC takes it time to

assess these factors. IDOC has done so and provided close observation of the effects of gender

change. GCS, if accomplished without the complications and consequences discussed above, could

hypothetically relieve AC only of **genital** dysphoria. GCS would not relieve her of gender

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

dysphoria, which cannot be cured.  AC's, like all other human being's, preoccupation with her

genital structure comes and goes.  It is not to be viewed as constant and the source of intense

relentless suffering.  Sex has always been a problem for this inmate.  Getting rid of her genitalia is

just the most recent dramatic solution to her memories of abuse and perhaps other problems

relating to his past impulses.  Removing them cannot possibly extirpate his memories of them and

how they were used by himself and others in harmful ways.  Dr. Ettner's glib rationalization for

quick GCS is based on policy considerations rather than an intimate understanding of JR-to-AC's

profound psychological and physical fragilities.

## X.    Final Thoughts

80.    The complex circumstances of inmates, including the ethical concern about their

ability to provide a legal informed consent, contrast with the simplicity of WPATH instructions for

these individuals.  Dahlen et al in 2021 pointed out the low quality of evidence underlying their

guidelines.  When WPATH's Standards of Care write, "The SOC in their entirety apply to all

transsexual, transgender, and gender nonconforming people, irrespective of their housing situation,"

it is based on compassion, which in turn is predicated on the belief that GCS will meaningfully and

lastingly improve mental health and function.  That those who declare GCS to be medically

necessary often also state that Gender Dysphoria is a serious, biologically caused *medical* disorder.

They assert that it is never an indication of any psychiatric condition.  These assumptions alone are

reasons enough to doubt their recommended clinical judgments.  Certainly, these assumptions do

not characterize this plaintiff's life course.

81.    Assumptions, beliefs, preferred ways of thinking are not to be equated with medical

facts.  Gender Dysphoria has never been proved to be prenatally determined; it has been classified

as a psychiatric problem continuously since the DSM began.  The clinical approach to transgendered

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

inmates privileges the diagnosis of Gender Dysphoria over all other considerations concerning the person's mental health and previous functional capacities. This prioritization carries with it dangers that plaintiff's experts do not discuss.

82.    DSM-5 is a diagnostic, not a treatment, manual. The diagnosis of Gender Dysphoria no more dictates the treatment of this condition with GCS than the diagnosis of depression requires the use of an antidepressant. This diagnosis used to be necessary to qualify for accommodations and hormones in prison settings. But now that many inmates are declaring themselves to be "nonbinary" or "gender non-confirming," they qualify for social and endocrine accommodations without the diagnosis of gender dysphoria. Not so for GCS, which still requires a physician to declare medical necessity. This designation reflects more about the physician's thought processes than it does about the patient's actual need. The self-concepts of transgendered people have been rapidly evolving outside of prisons. In carceral settings, inmates who desire GCS tend to present themselves as binary trans persons. Culture, not otherwise defined, is playing a large role in shaping what trans individuals now want from the medical profession, in and outside of prison.

## XI.    References

1.   McNamara M, Lepore C, Alstott A. Protecting Transgender Health and Challenging Science Denialism in Policy. *N Engl J Med*. 2022;387(21):1919-1921. doi:10.1056/NEJMp2213085.

2.   Dunford, C., Bell, K., & Rashid, T. (2021). Genital Reconstructive Surgery in Male to Female Transgender Patients: A Systematic Review of Primary Surgical Techniques, Complication Profiles, and Functional Outcomes from 1950 to Present Day. *European urology focus*, *7*(2), 464–471. https://doi.org/10.1016/j.euf.2020.01.004

3.   Drinane, J. J., & Santucci, R. (2020). What urologists need to know about male to female genital confirmation surgery (vaginoplasty): techniques, complications and how to deal with them. *Minerva urologica e nefrologica = The Italian journal of urology and nephrology*, *72*(2), 162–172. https://doi.org/10.23736/S0393-2249.20.03618-8

4.   Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery:

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

cohort study in Sweden. *PloS one, 6*(2), e16885.
https://doi.org/10.1371/journal.pone.0016885

5.  Dhejne, C., Van Vlerken, R., Heylens, G., & Arcelus, J. (2016). Mental health and gender
    dysphoria: A review of the literature. *International review of psychiatry (Abingdon, England), 28*(1),
    44–57. https://doi.org/10.3109/09540261.2015.1115753

6.  Almazan, A. N., & Keuroghlian, A. S. (2021). Association Between Gender-Affirming
    Surgeries and Mental Health Outcomes. *JAMA surgery, 156*(7), 611–618.
    https://doi.org/10.1001/jamasurg.2021.0952

7.  Marano, A. A., Louis, M. R., & Coon, D. (2021). Gender-Affirming Surgeries and Improved
    Psychosocial Health Outcomes. *JAMA surgery, 156*(7), 685–687.
    https://doi.org/10.1001/jamasurg.2021.0953

8.  Miller, G. H., Marquez-Velarde, G., Mills, A. R., Hernandez, S. M., Brown, L. E., Mustafa,
    M., & Shircliff, J. E. (2023). Patient" Perceived Level of Clinician Knowledge of Transgender
    Health Care, Self-rated Health, and Psychological Distress Among Transgender Adults.
    *JAMA network open, 6*(5), e2315083. https://doi.org/10.1001/jamanetworkopen.2023.15083

9.  Zeluf, G., Dhejne, C., Orre, C., Nilunger Mannheimer, L., Deogan, C., Höijer, J., & Ekéus
    Thorson, A. (2016). Health, disability and quality of life among trans people in Sweden-a
    web-based survey. *BMC public health, 16*(1), 903. https://doi.org/10.1186/s12889-016-3560-5

10. Breidenstein, A., Hess, J., Hadaschik, B., Teufel, M., & Tagay, S. (2019). Psychosocial
    Resources and Quality of Life in Transgender Women following Gender-Affirming Surgery.
    *The journal of sexual medicine, 16*(10), 1672–1680. https://doi.org/10.1016/j.jsxm.2019.08.007

11. Gaither, T. W., Awad, M. A., Osterberg, E. C., Murphy, G. P., Romero, A., Bowers, M. L., &
    Breyer, B. N. (2018). Postoperative Complications following Primary Penile Inversion
    Vaginoplasty among 330 Male-to-Female Transgender Patients. *The Journal of urology, 199*(3),
    760–765. https://doi.org/10.1016/j.juro.2017.10.013

12. Dreher, P. C., Edwards, D., Hager, S., Dennis, M., Belkoff, A., Mora, J., Tarry, S., & Rumer,
    K. L. (2018). Complications of the neovagina in male-to-female transgender surgery: A
    systematic review and meta-analysis with discussion of management. *Clinical anatomy (New
    York, N.Y.), 31*(2), 191–199. https://doi.org/10.1002/ca.23001

13. Manrique, O. J., Adabi, K., Martinez-Jorge, J., Ciudad, P., Nicoli, F., & Kiranantawat, K.
    (2018). Complications and Patient-Reported Outcomes in Male-to-Female Vaginoplasty-
    Where We Are  Today: A Systematic Review and Meta-Analysis. *Annals of plastic surgery,
    80*(6), 684–691. https://doi.org/10.1097/SAP.0000000000001393

14. Ongaro, L., Garaffa, G., Migliozzi, F., Rizzo, M., Traunero, F., Falcone, M., Bucci, S., Cai,
    T., Palmieri, A., Trombetta, C., & Liguori, G. (2020). Vaginoplasty in Male to Female
    transgenders: single center experience and a narrative review. *International journal of impotence
    research, 33*(7), 726–732. https://doi.org/10.1038/s41443-021-00470-3.

15. Morrison, S. D., Satterwhite, T., Grant, D. W., Kirby, J., Laub, D. R., Sr, & VanMaasdam, J.
    (2015). Long-Term Outcomes of Rectosigmoid Neocolporrhaphy in Male-to-Female

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

Gender Reassignment Surgery. *Plastic and reconstructive surgery*, *136*(2), 386–394.
https://doi.org/10.1097/PRS.0000000000001459

16. di Summa, P. G., Watfa, W., Krähenbühl, S., Schaffer, C., Raffoul, W., & Bauquis, O. (2019).
Colic-Based Transplant in Sexual Reassignment Surgery: Functional Outcomes and
Complications in 43 Consecutive Patients. *The journal of sexual medicine*, *16*(12), 2030–2037.
https://doi.org/10.1016/j.jsxm.2019.09.007 _

17. Loree, J. T., Burke, M. S., Rippe, B., Clarke, S., Moore, S. H., & Loree, T. R. (2020).
Transfeminine Gender Confirmation Surgery with Penile Inversion Vaginoplasty: An Initial
Experience. *Plastic and reconstructive surgery. Global open*, *8*(5), e2873.
https://doi.org/10.1097/GOX.0000000000002873--30 patients

18. Levine SB, Abbruzzese E, (2023) Current concerns about gender affirming therapy in
adolescents" Current Sexual Health Reports, 10.1007/s11930-023-00358-x

19. Liszewski, W., Peebles, J. K., Yeung, H., & Arron, S. (2018). Persons of Nonbinary Gender -
Awareness, Visibility, and Health Disparities. *The New England journal of medicine*, *379*(25),
2391–2393. https://doi.org/10.1056/NEJMp1812005. Lists the evidence of social problems
and vulnerabilities.

20. Newcomb, M. E., Hill, R., Buehler, K., Ryan, D. T., Whitton, S. W., & Mustanski, B. (2020).
High Burden of Mental Health Problems, Substance Use, Violence, and Related
Psychosocial Factors in Transgender, Non-Binary, and Gender Diverse Youth and Young
Adults. *Archives of sexual behavior*, *49*(2), 645–659. https://doi.org/10.1007/s10508-019-
01533-9

21. Henry, R. S., Perrin, P. B., Coston, B. M., & Calton, J. M. (2021). Intimate Partner Violence
and Mental Health Among Transgender/Gender Nonconforming Adults. *Journal of
interpersonal violence*, *36*(7-8), 3374–3399. https://doi.org/10.1177/0886260518775148

22. Kattari, S. K., Bakko, M., Langenderfer-Magruder, L., & Holloway, B. T. (2021).
Transgender and Nonbinary Experiences of Victimization in Health care. *Journal of
interpersonal violence*, *36*(23-24), NP13054–NP13076.
https://doi.org/10.1177/0886260520905091

23. Lefevor, G. T., Boyd-Rogers, C. C., Sprague, B. M., & Janis, R. A. (2019). Health disparities
between genderqueer, transgender, and cisgender individuals: An extension of minority
stress theory. *Journal of counseling psychology*, *66*(4), 385–395.
https://doi.org/10.1037/cou0000339

24. Littman L. (2021). Individuals Treated for Gender Dysphoria with Medical and/or Surgical
Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners. *Archives of
sexual behavior*, *50*(8), 3353–3369. https://doi.org/10.1007/s10508-021-02163-w

25. Baker K. E. (2017). The Future of Transgender Coverage. *The New England journal of medicine*,
*376*(19), 1801–1804. https://doi.org/10.1056/NEJMp1702427

26. Lindqvist, E. K., Sigurjonsson, H., Möllermark, C., Rinder, J., Farnebo, F., & Lundgren, T.
K. (2017). Quality of life improves early after gender reassignment surgery in transgender

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

women. *European journal of plastic surgery*, *40*(3), 223–226. https://doi.org/10.1007/s00238-016-1252-0--190 m to f patients prospectively measured on QoL

27. Murad et al. (2010). Hormone therapy and sex reassignment: A systematic review and metanalysis of the quality of life and psychosocial outcomes. Clinical Endocrinology (Oxford). 72(2): 214-231.

28. Bränström, R., & Pachankis, J. E. (2020). Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study. *The American journal of psychiatry*, *177*(8), 727–734. https://doi.org/10.1176/appi.ajp.2019.19010080

29. Kalin N. H. (2020). Reassessing Mental Health Treatment Utilization Reduction in Transgender Individuals After Gender-Affirming Surgeries: A Comment by the Editor on the Process. *The American journal of psychiatry*, *177*(8), 764. https://doi.org/10.1176/appi.ajp.2020.20060803

30. Liszewski, W., Peebles, J. K., Yeung, H., & Arron, S. (2018). Persons of Nonbinary Gender - Awareness, Visibility, and Health Disparities. *The New England journal of medicine*, *379*(25), 2391–2393. https://doi.org/10.1056/NEJMp1812005. Lists the evidence of social problems and vulnerabilities.

31. Heylens, G., Verroken, C., De Cock, S., T'Sjoen, G., & De Cuypere, G. (2014). Effects of different steps in gender reassignment therapy on psychopathology: a prospective study of persons with a gender identity disorder. *The journal of sexual medicine*, *11*(1), 119–126. https://doi.org/10.1111/jsm.12363.

32. Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A. C., & Olson-Kennedy, J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *The New England journal of medicine*, *388*(3), 240–250. https://doi.org/10.1056/NEJMoa2206297

33. Cardoso da Silva, D., Schwarz, K., Fontanari, A. M., Costa, A. B., Massuda, R., Henriques, A. A., Salvador, J., Silveira, E., Elias Rosito, T., & Lobato, M. I. (2016). WHOQOL-100 Before and After Sex Reassignment Surgery in Brazilian Male-to-Female Transsexual Individuals. *The journal of sexual medicine*, *13*(6), 988–993. https://doi.org/10.1016/j.jsxm.2016.03.370--47

34. Byne, W., Bradley, S. J., Coleman, E., Eyler, A. E., Green, R., Menvielle, E. J., Meyer-Bahlburg, H. F. L., Pleak, R. R., & Tompkins, D. A. (2012). Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder. *Archives of Sexual Behavior, 41*(4), 759–796. https://doi.org/10.1007/s10508-012-9975-x PMID: 22736225.

35. Reed, G. M., Drescher, J., Krueger, R. B., Atalla, E., Cochran, S. D., First, M. B., Cohen-Kettenis, P. T., Arango-de Montis, I., Parish, S. J., Cottler, S., Briken, P., & Saxena, S. (2016). Disorders related to sexuality and gender identity in the ICD-11: revising the ICD-10 classification based on current scientific evidence, best clinical practices, and human rights

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

considerations. *World psychiatry: official journal of the World Psychiatric Association (WPA)*, *15*(3), 205–221. https://doi.org/10.1002/wps.20354

36. Strang, J. F., Janssen, A., Tishelman, A., Leibowitz, S. F., Kenworthy, L., McGuire, J. K., Edwards-Leeper, L., Mazefsky, C. A., Rofey, D., Bascom, J., Caplan, R., Gomez-Lobo, V., Berg, D., Zaks, Z., Wallace, G. L., Wimms, H., Pine-Twaddell, E., Shumer, D., Register-Brown, K., Sadikova, E., … Anthony, L. G. (2018). Revisiting the Link: Evidence of the Rates of Autism in Studies of Gender Diverse Individuals. *Journal of the American Academy of Child and Adolescent Psychiatry*, *57*(11), 885–887. https://doi.org/10.1016/j.jaac.2018.04.023

37. de Blok, C. J., Wiepjes, C. M., van Velzen, D. M., Staphorsius, A. S., Nota, N. M., Gooren, L. J., Kreukels, B. P., & den Heijer, M. (2021). Mortality trends over five decades in adult transgender people receiving hormone treatment: a report from the Amsterdam cohort of gender dysphoria. *The lancet. Diabetes & endocrinology*, *9*(10), 663–670. https://doi.org/10.1016/S2213-8587(21)00185-6

38. Jackson, S. S., Brown, J., Pfeiffer, R. M., Shrewsbury, D., O'Callaghan, S., Berner, A. M., Gadalla, S. M., & Shiels, M. S. (2023). Analysis of Mortality Among Transgender and Gender Diverse Adults in England. *JAMA network open*, *6*(1), e2253687. https://doi.org/10.1001/jamanetworkopen.2022.53687

39. Erlangsen, A., Jacobsen, A. L., Ranning, A., Delamare, A. L., Nordentoft, M., & Frisch, M. (2023). Transgender Identity and Suicide Attempts and Mortality in Denmark. *JAMA*, *329*(24), 2145–2153. https://doi.org/10.1001/jama.2023.8627

40. Routh, D., Abess, G., Makin, D., Stohr, M. K., Hemmens, C., & Yoo, J. (2017). Transgender Inmates in Prisons. *International journal of offender therapy and comparative criminology*, *61*(6), 645–666. https://doi.org/10.1177/0306624X15603745

41. Biggs M. (2020). Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria. *Archives of sexual behavior*, *49*(7), 2227–2229. https://doi.org/10.1007/s10508-020-01743-6

42. D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria. *Archives of sexual behavior*, *50*(1), 7–16. https://doi.org/10.1007/s10508-020-01844-2

43. D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria. *Archives of sexual behavior*, *50*(1), 7–16. https://doi.org/10.1007/s10508-020-01844-2

44. Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: systematic review and quality assessment. *BMJ open*, *11*(4), e048943. https://doi.org/10.1136/bmjopen-2021-048943

45. Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of

Expert Report of Stephen B. Levine, M.D.
*Jonathan Richardson a.k.a. Autumn Cordellioné v. Commissioner, IDOC*
S.D. Ind. 3:23-cv-135-RLY-CSW
January 22, 2024

Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259. https://doi.org/10.1080/26895269.2022.2100644

46. Osborne, C. S., & Lawrence, A. A. (2016). Male Prison Inmates With Gender Dysphoria: When Is Sex Reassignment Surgery Appropriate?. *Archives of sexual behavior*, *45*(7), 1649–1663. https://doi.org/10.1007/s10508-016-0700-z

47. Stroumsa, D., & Kirkland, A. R. (2020). Health Coverage and Care for Transgender People - Threats and Opportunities. *The New England journal of medicine*, *383*(25), 2397–2399. https://doi.org/10.1056/NEJMp2032453

48. Wright, J. D., Chen, L., Suzuki, Y., Matsuo, K., & Hershman, D. L. (2023). National Estimates of Gender-Affirming Surgery in the US. *JAMA network open*, *6*(8), e2330348. https://doi.org/10.1001/jamanetworkopen.2023.30348

49. Benjamin, H. (1966). The Transsexual Phenomenon, New York, The Julien Press of Crown Publishing Group, pp 296