1   Q   Okay.  Trust me when I say that our office

2       understands that prisoners can be a litigious

3       bunch.   Other than these instances and the one you

4       mentioned, have you ever been sued for malpractice

5       before?

6   A   In my private practice, I have never other than the

7       one, that vicarious liability.   For work that I

8       have done, I have never been sued.

9   Q   Okay.   Okay.   It is my understanding that you began

10      consulting for the Massachusetts Department of

11      Correction in or around 2007, is that correct?

12  A   Yes.

13  Q   And it's my understanding that what happened is

14      that you were initially appointed by a court to

15      evaluate a prisoner seeking gender-affirming care,

16      and on the basis of the relationships you developed

17      in that case, the Massacusetts Department of

18      Correction made your role a more permanent

19      consultancy.   Is that a fair summary?

20  A   It's about 90 percent accurate, but let me --

21  Q   Sure.

22  A   Let me give it to you more accurately.   The judge,

23      the federal judge, asked me to be his witness in a

24      case in 2006, and so I did that.   After that case,

25      after my six hours on the stand -- I don't

1  remember -- several months later the Massachusetts

2  prison -- the DOC in Massachusetts reached out to

3  me, and they had 12 prisoners in various

4  institutions, and they sent -- they asked for a

5  consultant for those 12 prisoners with transgender

6  identities, and the consultations on the 12

7  prisoners came back with the same 12

8  recommendations, which is they should immediately

9  have sex reassignment surgery.  And so the DOC was

10  outraged at this, and they hired me to come to

11  Massachusetts and interview those prisoners and

12  give them an individualized treatment plan for 12

13  people.  In the process of doing that, I suggested

14  to them that they needed to have a gender identity

15  clinic.  They needed to take care of these

16  prisoners, not on a one-time consultation basis,

17  but they needed to provide evaluation and therapy

18  for their trans prisoners.

19      And so they agreed to do that.  And in order

20  to do that, they invited me to, on my suggestion,

21  that I gave a six-hour workshop to the mental

22  health faculty of the staff of the prisoner system.

23  And so one day all these people came into the

24  audience, and I spent six hours talking to them

25  about what was known about this phenomenon, and

1    they had volunteers from each of their male prisons

2    to be in the new Gender Identity Clinic there.    And

3    I was appointed the consultant to that clinic, and

4    in the course of years there -- and that would be

5    going on the 17th or 18th year -- I have sort of

6    educated not only their staff, but I have educated

7    their psychiatric directors, so there have been

8    three psychiatrists, three people, who directed

9    those clinics.    And over the years, I have played a

10   role in educating them and overseeing their work,

11   and my oversight is very minor, generally, because

12   I go to a -- I spend two hours once a month during

13   their meetings and comment on their cases and try

14   to get people up to speed in terms of understanding

15   the complexity of the mental lives of prisoners.

16  Q    Okay.

17  A    That's my role.

18  Q    You still serve in that capacity as a consultant to

19       the Massachusetts DOC?

20  A    Yes, I do.

21  Q    Okay.    It sounded like before your involvement

22       these 12 prisoners had all been approved for

23       gender-affirming surgeries?

24  A    Oh, no, no, no, no, no.    Quite the opposite.    They

25       were recommended for sex reassignment surgery by

1    people who didn't work in the prison, and that
2    horrified the prison system.
3  Q  Okay.  So they had been recommended by outside
4    providors to receive gender-affirming surgery?
5  A  Yes.  On the basis of one-to-two-hour visits.
6  Q  Okay.  And did the Massachusetts DOC ask for you to
7    reevaluate these patients?
8  A  That's exactly what they asked me to do, yeah.
9  Q  Did they ask for you to reach a conclusion about
10    whether each of them was appropriate to receive
11    gender-affirming surgery?
12  A  They asked me to create a plan, a treatment plan.
13    They actually thought that none of these people
14    were appropriate for surgery because it wasn't --
15    it wasn't part of the general zeitgeist in those
16    days in prison systems to provide surgery.
17  Q  And of the -- and I assume you -- I'm sorry.  I
18    assume you completed treatment plans for all 12
19    individuals?
20  A  I did.
21  Q  And of the 12 treatment plans you created, did any
22    of those treatment plans conclude or recommend that
23    surgery was appropriate or otherwise recommend
24    surgery?
25  A  Surgery was a possibility in the future.

1   Q   For all 12 of them?

2   A   Well, you know, one of them was near death, you

3       know.  There were 12 different people with 12

4       different, you know, disturbed backgrounds, 12

5       different histories.  And, you see, the initial

6       consultant said that if a person is currently

7       gender dysphoric and wants surgery, they ought to

8       have it.  It was medically necessary.

9   Q   Let me ask the question this way.  In the 12

10      treatment plans you created, did all of these

11      treatment plans leave open the possibility that in

12      the future the prisoners might be able to obtain

13      surgery?

14  A   Again, I said to you I don't have a crystal ball

15      about the future.  I would say the answer to that

16      is likely to be yes.  It left open the possibility

17      if certain -- No. 1, if the law changed, if the

18      person had psychotherapy, if the person -- if the

19      doctors who are dealing with the person -- I should

20      say clinicians dealing with the person had a really

21      good sense of their developmental history and their

22      ability to give informed consent, yes.  Given the

23      fashion that transsexual people outside prison are

24      getting surgery, there was a possibility but not

25      now and not on the basis of a one or two-hour

1    visit.

2  Q  I understand that you may have and have consulted

3     on individual cases for prison systems other than

4     Massachusetts, but have you had the sort of ongoing

5     role for any prison system other than

6     Massachusetts?

7  A  No.  I have been to various prisons, to New Jersey

8     and to Virginia and to California and to Washington

9     State to consult on individual prisoners.

10 Q  All right.  And outside of Massachusetts,

11    approximately how many gender dysphoric prisoners

12    have you been asked to consult on?

13 A  If you take the list that I just gave you and add

14    one to that because in Washington I -- no.  In

15    Washington, over time on two different occasions, I

16    think I was involved with three prisoners.  And in

17    Virginia, there was a -- there was one prisoner,

18    and in New Jersey, there was a prisoner.  In

19    Florida, there was one prisoner.  So, again,

20    excluding Massachusetts where there's a huge number

21    of prisoners, that would be it.

22 Q  So it sounds like we're talking about maybe --

23 A  California two, two in California.

24 Q  So I am not going to hold you to a precise number,

25    but it sounds like we're talking about six or eight

1    different prisoners?

2  A  I would say eight would be the maximum.

3  Q  Okay.  And were these all in the context of

4    litigation?

5  A  No.

6  Q  Okay.

7  A  No, not at all.  Well, some were.

8  Q  Doctor, we're at just about 90 minutes right now.

9    I'm happy to go for a couple more minutes to reach

10    a more natural breaking point if you would like,

11    but I also want to make sure I respect your request

12    for a break every 90 minutes if you'd like to take

13    a break now.

14  A  I would, but it doesn't have to be a long break.  I

15    will be back in one minute, if you don't mind.

16  Q  Well, I have to use the facilities real quick, so

17    why don't we say three or four minutes.

18  A  Okay.  Very good.

19  Q  Thank you very much, Doctor.

20        (A brief recess was taken.)

21  Q  Doctor, of the -- before the break we were talking

22    about individual cases where you had offered

23    consultation concerning gender-affirming care

24    provided to inmates.  Do you recall that?

25  A  Yes.

58

Q    And in a number but not all of these cases -- or a
      number but not all of these cases arose in the
      context of litigation.   Is that a fair statement?

A    Yes.

Q    Okay.   In the cases where you have offered either
      an expert report or testimony concerning
      gender-affirming care to a prisoner, I assume in
      every single case it's been the relevant department
      of correction that's hired you?

A    Yes.   I think the Florida case was a private law
      firm, but maybe the department of corrections hires
      the law firm.

Q    But you testified on behalf of the State in that
      case, is that fair?

A    In Florida?

Q    Yes.

A    I'm not sure.

Q    That's --

A    You know, the legal context -- I keep learning
      about the legal context.   I think the most honest
      answer is I'm not sure.

Q    That's perfectly fair.   The Florida case, is that
      the Keohane case?   Do I have that right?

A    Well, you're not pronouncing it right, but no one
      ever does, so, yes, that's right.

1    Q    It's K-e-o-h-a-n-e.

2    A    I think he pronounces it Keohane, but I'm not sure.

3    Q    I was just spelling it for the court reporter, but

4         I have the spelling right, correct?

5    A    No.   You -- that's right.

6    Q    Okay.   And in these cases, have you ever offered

7         testimony that you believe that gender-affirming

8         care was -- or gender-affirming surgery was

9         appropriate for a prisoner?

10   A    The Virginia case, which is not in the category

11        that you're talking because I think Virginia just

12        asked me what to do with this case, I just remember

13        there was another California case that was not

14        involved with litigation.   I recommended that there

15        was a pathway to surgery relatively soon, but then

16        the patient got discharged from prison.   The inmate

17        got discharged.

18   Q    And you're familiar, I assume, with the Koselik

19        case in Massachusetts?

20   A    Yes.

21   Q    And did you offer testimony in this case that

22        gender-affirming surgery would be appropriate for

23        Ms. Koselik?

24   A    No.   In the testimony, I thought that the

25        adequate -- there was adequate treatment, adequate

|   |   |   |
|---|---|---|
| 1 |   | treatment for her gender dysphoria in the case with |
| 2 |   | 2006.  Subsequently, I was on the committee that |
| 3 |   | approved sex reassignment, vaginoplasty, for this |
| 4 |   | person.  And Koselik has been operated on now and |
| 5 |   | is living in a female prison. |
| 6 | Q | So as part of your role on that committee, you |
| 7 |   | assisted in approving the surgery? |
| 8 | A | Yes.  I voted yes. |
| 9 | Q | Okay.  And when you began that answer, you said |
| 10 |   | that -- I'm paraphrasing you -- but in 2006, you |
| 11 |   | offered testimony that the care that she had been |
| 12 |   | receiving was adequate? |
| 13 | A | Yeah. |
| 14 | Q | Did you misspeak there? |
| 15 | A | No. |
| 16 | Q | I thought it was my understanding that you offered |
| 17 |   | whether or not concerning surgery at the outset you |
| 18 |   | offered testimony that the care she was receiving |
| 19 |   | was inadequate.  Do I have that wrong? |
| 20 | A | You have it wrong. |
| 21 | Q | Okay.  I apologize.  You know that case better than |
| 22 |   | I do, so I'm sorry for that. |
| 23 | A | Well, we will hope so, but it was 2006. |
| 24 | Q | That's fair.  Prior to this litigation, have you |
| 25 |   | ever provided consultation regarding an inmate |

1     incarcerated with the Indiana Department of

2     Correction?

3  A  No.

4  Q  Okay.  Are you aware -- and you may not be -- that

5     before the enactment of the statute that we have

6     challenged in this case the Indiana DOC approved

7     two different inmates to receive gender

8     confirmation surgery?

9  A  I became aware of that two days ago.

10  Q  All right.  And I assume you did not play any role

11     in the evaluation of these two inmates?

12  A  That's correct.

13  Q  Okay.  Okay.  Have you ever personally administered

14     any sort of psychometric or psychological testing

15     to an inmate?  I'm sorry.  Not to an inmate.  To a

16     patient?

17  A  I already told you that in the Case Western Reserve

18     in our evaluation process over many, many years,

19     these psychological tests were an integral part of

20     the evaluation.

21  Q  Sure.

22  A  Yes.  And did I -- maybe I misunderstood the

23     question.  You said did I ever, and the answer is

24     repeatedly.

25  Q  Okay.  And I guess I was attempting to distinguish

```
 1        between the clinic and you personally.  Were you
 2        personally responsible for administering these
 3        tests?
 4   A    No.  No.  These tests are self-administered tests.
 5        The patient does it by themselves.
 6   Q    And the two tests you mentioned are known as the
 7        MMPI and the MCMI.  Am I correct on that?
 8   A    Yes.  They're all true/false questions.
 9   Q    Are those the only two psychometric tests that have
10        been administered at the clinic to dysphoric
11        patients?
12   A    Generally speaking, yes.
13   Q    And you say they're self-administered.  These are
14        tests where the patient is given a list of
15        questions and answers them?
16   A    Yes.
17   Q    And are you personally responsible for interpreting
18        or scoring the test results?
19   A    No.
20   Q    Who's responsible for that?
21   A    Well, No. 1, the computer generates an
22        interpretation, but we don't follow the computer.
23        We take that into consideration, but we have an
24        independent psychologist who is trained in the
25        interpretation of these tests, and we get usually a
```

1   one-page report that combines -- when we do both

2   tests, it combines the results of both of those

3   tests.

4   Q   And I assume that prior to the invention of

5       computers the tests went directly to the

6       independent psychologist to interpret?

7   A   Yes.

8   Q   So it sounds like you are not trained to interpret

9       the results of these tests, is that fair?

10  A   No.  Like most psychiatrists, we don't undergo

11      training for that.

12  Q   Training on this particular issue.  You're trained

13      in other matters, right?

14  A   Other matters, yes.

15  Q   I was joking.  Okay.  Doctor, you're familiar, I

16      assume, with the -- I'll just say the complete name

17      once -- but with the Standards of Care for the

18      Health of Transgender and Gender Diverse People

19      that is published by WPATH, correct?

20  A   Am I familiar with WPATH as an organization or --

21  Q   Are you familiar with the standards of care that

22      they publish?

23  A   Yes.

24  Q   And the current version is Version 8, which is

25      sometimes referred to as SOC8, is that correct?

1    A    Yes.

2    Q    And my understanding is that you were involved in

3         the drafting of Version 5 back when WPATH had its

4         predecessor name?

5    A    Yes.

6    Q    Okay.  And that was the version that came out in

7         1999?

8    A    Yes.

9    Q    And you were the -- do I have the title right?  You

10        were the writing chair for that version?

11   A    I was just the chair.  I didn't have the term

12        "writing chair," but I did the writing, right.

13   Q    Did you write the entire Version 5 or significant

14        portions of it?

15   A    I wrote significant portions of it.  And, for

16        example, George Brown wrote the part -- the section

17        on prisoners, but I integrated everyone's writings,

18        you know, into one writing style, and it was my

19        writing style.

20   Q    And I assume you approved every single word before

21        it was released?

22   A    Yes.

23   Q    Okay.  Is that the only version of the WPATH

24        standards of care that you were involved with?

25   A    Yes.

1  Q  And forgive me for being crass because I really

2     don't know what happened.  It's my understanding

3     that you had a falling out, for lack of a better

4     word, with the organization at some point after

5     Version 5 was released?

6  A  Can I fill you in on the details?

7  Q  I was going to say please feel free to use

8     different words than I used.

9  A  Yes.  I wouldn't use the words "falling out."

10 Q  Okay.

11 A  I presented -- we presented the fifth version, the

12    draft of the fifth version of standards of care to

13    the executive committee.  And the president of the

14    executive committee was the only one on the

15    committee who took umbrage at one thing in our

16    standards of care, and that is our requirement that

17    two independent mental health professionals should

18    recommend or see the patient before hormones were

19    given.  He was outraged at this, and he vowed in

20    front of the executive committee that while he

21    appreciated our work in general and he liked the

22    standards of care, he didn't like that, and he

23    found it so offensive that he was going to

24    immediately appoint a new committee.  And in 2001

25    or 2002, pretty much the 21 pages of our standards

1    of care were identical to the new standards of
2    care, the 6th version, but the 6th version had one
3    letter of recommendation required for hormones.
4    And in 2002, I believe I attended the
5    every-two-year meeting of Harry Benjamin Society,
6    and this time the audience was filled with
7    cross-dressed men, trans-identified men.  And
8    during the plenary sessions, if they heard
9    something they didn't like, they booed.  And this
10   was, in my view, a scientific organization.  We're
11   all trying to figure out from the '70s what in the
12   world was going on here and what should the medical
13   professional do about it.  And if we, in fact, gave
14   prisoners or patients what they wanted, what would
15   be the outcome?  And so these were the major
16   questions that we were trying to figure out as an
17   international group.
18       But when the patients were in the audience and
19   when they booed, I -- when Dr. Green, who was the
20   chair -- who was the head of Harry Benjamin Society
21   in 1999, when he alone objected to this and used
22   his power to redesign the 6th Standards of Care, I
23   realized that the organization that I thought was a
24   scientific organization had become an advocacy
25   organization.  And it was very hard to give a talk

1    knowing that if you said something that raised

2    questions about the motives and the wisdom of

3    surgery or hormones for certain people, the

4    audience would boo.

5        And so the combination of my basic notion that

6    this was a -- my naive notion that this was a

7    scientific organization and it, in fact, had become

8    in the years I had been there a -- gone from that

9    kind of organization to an advocacy for sex

10   reassignment surgery -- that's how we called it in

11   those days -- that I wasn't sure that the science

12   or knowledge base enabled us to be an advocacy

13   organization.  And so I'm basically a fellow who is

14   always trying to figure out what is the nature of

15   this, and what is the nature of that.  And I

16   recognized that there's a difference between

17   scientific inquiry and advocation, and so I -- what

18   you called my falling out was a resignation in 2002

19   or 2003.  I just didn't pay my dues and so --

20   Q   So you terminated your membership in WPATH?

21   A   I just -- right.  I stopped going.

22   Q   Have you been a member of WPATH since that time?

23   A   No.

24   Q   I'm sorry?

25   A   No.

1    Q    Okay.   Okay.   Doctor, I'm looking for just the

2         two-sentence version here, but in general, what is

3         gender dysphoria?

4    A    Gender dysphoria is an interpretation of one's

5         psychic pain that's based on the fact that I have a

6         gender identity that doesn't match my body.

7    Q    You agree that it is a diagnoseable mental health

8         disorder?

9    A    Yes.

10   Q    Okay.   And it's listed as such in the current

11        version of the Diagnostic and Statistic Manual Of

12        Mental Disorders, the DSM-5, and its text

13        provision?

14   A    Yes.

15   Q    Okay.   And it's my understanding that both the

16        DSM-5 and the DSM-TR identifies several criteria

17        for the diagnosis of gender dysphoria, is that

18        correct?

19   A    Yes.

20   Q    And in your clinical practice, are these the

21        criteria that you apply in order to determine

22        whether to diagnose someone with gender dysphoria?

23   A    Well, that's a bit of a joke, actually.   The

24        patient comes in with a diagnosis.   You see, when

25        people come in with pain in their abdomen, the

1   doctor diagnoses the source.  The patient doesn't

2   come in and say, I have an infected gallbladder,

3   Doctor, or I have diverticulitis.  But in these

4   cases, a person comes in and says, I have gender

5   dysphoria.  And so we just ascertain, you know, has

6   it been there for six months?  Does it cause any

7   impairments in your social, educational, or

8   occupational functioning?  Do you want to have --

9   do you want to have the body parts of the opposite

10  gender?  Do you dislike your primary and secondary

11  sexual characteristics?  Do you feel like you have

12  the feeling your subjective world is much more

13  close to the opposite gender?

14  Q  Is it fair to say that they come in and say, hey, I

15     have this problem, and at that point, it's your job

16     to determine if they meet the clinical criteria for

17     formal diagnosis of gender dysphoria?

18  A  Yeah.  That's the apparent job, but what I'm saying

19     is a bit of a joke is the patient tells you the

20     diagnosis.  And based upon our experience in the

21     '70s and '80s and in the '90s, many people have

22     read about the criteria for gender dysphoria, and

23     they tell us -- they tell us that they meet the

24     criteria in their narrative.  You don't know, but

25     in the 1970s, the doctor wanted to distinguish the

1    true transsexual from what was called the secondary

2    transsexual, and then we discovered after about 10,

3    15 years --

4    Q   Doctor, I'm so sorry.  We have gone a little far

5        from where the question --

6    A   No, we haven't.  No, we haven't.

7    Q   Doctor, my question was when a patient comes in the

8        door and says, hey, I think I have this problem,

9        it's your job or the clinic's job to determine if

10       they meet the clinical criteria for formal

11       diagnosis of gender dysphoria, is that correct?

12   A   And it is whether they're telling the truth.

13   Q   Okay.  So, yes, it is your job to decide if they

14       meet the clinical criteria, is that correct?

15   A   And if they're telling us the truth.

16   Q   Okay.  I just -- and the only problem here is

17       because there's a court reporter writing this down,

18       Doctor, but the answer to my question is, yes,

19       that's the clinic's responsibility, and it's also

20       their responsibility to determine if the patient is

21       telling the truth, is that correct?

22   A   Yes.

23   Q   I'm sorry?

24   A   That's correct.

25   Q   Okay.  And in determining whether a person carries

1      a clinical diagnosis of gender dysphoria, I assume

2      you apply the criteria in the DSM-5 or its text

3      revision?

4    A  Yes.

5    Q  Okay.  And you agree that self-report can be

6      helpful in diagnosing many mental health

7      conditions, is that fair?

8    A  Yes, can be helpful.

9    Q  Okay.  Do you agree that if not properly treated,

10      gender dysphoria can cause a patient significant

11      distress?

12    A  The question is what is proper treatment?

13    Q  I understand that, but the question presupposes

14      that the patient is not being properly treated.  Do

15      you agree that if not properly treated, gender

16      dysphoria can cause a patient significant distress?

17    A  The question is meaningless because we have a

18      disagreement about what is the proper treatment.

19      So I can answer that question yes and you could

20      interpret it this way, and I interpret it quite the

21      opposite way.

22    Q  Doctor, I understand that we might have the

23      disagreement on what proper treatment is, but do

24      you agree in general matters that if a patient with

25      gender dysphoria is not receiving proper treatment,

1    however you define that term, the condition can

2    cause the patient significant distress?

3         MR. CARLISLE:  I'm going to object to the

4    argumentative nature of the questioning.  The

5    doctor is trying to answer.  Counsel cut him off.

6    Please let him finish the question.  He's trying to

7    answer.  These are complicated questions you're

8    asking.

9    Q  Do you understand the question, Doctor?

10   A  I understand the question has a built-in ambiguity

11   that would skew anyone's interpretation of the

12   answer to that question.  So the proper treatment

13   sometimes could be no treatment.  Sometimes it

14   could be psychotherapeutic treatment.  Sometimes it

15   could be the administration of psychiatric

16   medication, so what I'm saying is if you would ask

17   me the same question by delineating your concept of

18   proper treatment, I could answer the question, but

19   as it now stands, it's too ambiguous for me.

20   Q  Let me ask it this way.  Do you agree there are

21   circumstances in which gender dysphoria can cause a

22   patient significant distress?

23   A  Gender dysphoria for many people is a distressing

24   situation.  It is not a distressing -- well, again,

25   gender dysphoria we're now talking about as a

1      diagnosis.  And if we're talking about gender

2      dysphoria as a diagnosis, the answer to your

3      question is it is associated with distress.

4      Whether it's treated or not treated, it is

5      associated with distress.  But if we use the term

6      transgender, a transgender-identified person, that

7      may -- that person may or may not have distress.

8      And so the treatment of a transgender person who

9      gets no treatment other than recognition that

10     you're a transgender person, that doesn't cause

11     distress.  That's -- there are transgender people

12     who don't want treatment who don't feel they have a

13     problem and who are not distressed and then meet

14     criteria for gender dysphoria.

15  Q  For a transgender patient with a diagnosis of

16     gender dysphoria who is experiencing distress, do

17     you agree that there are treatments that can assist

18     in alleviating that distress?

19  A  Yes.

20  Q  Okay.

21         MR. ROSE:  I'm going to go off the record for

22     just a second, Gretchen.

23         (A discussion was held off the record.)

24  Q  Okay.  Doctor, I'm pulling up for you what I have

25     marked as Exhibit 32, and I will just ask you

1    generally first whether you recognize this

2    document.

3  A   I do.

4  Q   And I will tell you that I have removed your CV

5    from the report that Mr. Carlisle sent to us, but

6    other than that, you recognize this as the expert

7    report that you submitted in this case?

8  A   Yes.

9  Q   And did you draft this report yourself?

10  A   Yes.

11  Q   Okay.  Did anyone other than you draft any portion

12    of the report?

13  A   No.

14  Q   Other than the State's attorneys in this case, did

15    anyone comment or make suggestions on the report

16    before it was finalized?

17  A   No.

18  Q   I'm sorry.  I couldn't hear you.

19  A   No.

20  Q   Okay.  All right.  And you have a hard copy of this

21    report in front of you, correct?

22  A   Correct.

23  Q   And are you comfortable relying on the hard copy as

24    we go through some questions which will allow me to

25    bring other exhibits up on the screen?

1   A   Sure.

2   Q   Okay.  Will you flip to pages 14 and -- 14 to 15, I

3       suppose.

4   A   Okay.  Give me a second.

5   Q   You're fine.

6   A   I'm on page 14.

7   Q   Okay.  And I guess spanning pages 14 and 15, you

8       identify six parameters that you would use for

9       assessing the safety and efficacy of

10      gender-affirming surgery, is that correct?

11  A   Yes.

12  Q   I want to go through a couple of these one by one.

13      I don't know that my questions are going to cause

14      you to want to look at your report or not.  You

15      should certainly feel free to if you need to do so,

16      but the first parameter you identify is the impact

17      on genital dysphonia, correct?

18  A   Correct.

19  Q   And how were you defining genital dysphonia?

20  A   I don't like -- we're talking just about males now,

21      okay?

22  Q   Okay.

23  A   So I don't like the presence of my penis, my

24      scrotum, and the contents of my scrotum.  And I

25      don't like to look at them, or they disgust me, or

1    I would wish to be rid of them.  And sometimes

2    people express this by using terms like "down

3    there," right, than specifically designating the

4    word "penis," so --

5  Q  Is it fair to say that for a transgender woman,

6    genital dysphonia is the distress associated

7    specifically with having a penis, scrotum, or

8    testes?

9  A  Yes.

10 Q  Okay.  And do you agree that in the right person,

11   genital affirmation surgeries can cure genital

12   dysphonia?

13 A  I hope so.  I think that's one of the major reasons

14   or justifications for doing the surgery.

15 Q  Okay.  And I think you indicate in your report that

16   the literature indicates satisfaction rates are

17   generally from 72 percent to 92 percent, is that

18   correct?

19 A  Yes.  But, you see, that term, "satisfaction rate,"

20   doesn't ever get clarified too explicitly.  I'm

21   presuming, and based upon what the literature is

22   presuming, that when it comes to genital dysphonia,

23   I hope that the satisfaction rates means I'm happy

24   not to have these organs on me any longer.

25 Q  But the initial dissatisfaction generally reflects

1          surgical complications?

2     A    Well, yes, in the immediate, you know, one, two,

3          three weeks after a surgery, I would imagine that

4          first not having the genitals, the male genitalia,

5          is a source of satisfaction, and then having

6          female-appearing genitals, even though you can't

7          see them because of bandages, that's a source of

8          satisfaction.  Then the dissatisfaction comes from

9          the experience of pain, but most importantly when

10         they actually see their genitals, that if there's a

11         problem with that, then they get dissatisfied that

12         they don't have adequate-looking female genitalia.

13    Q    And is it fair, Doctor, to say that the surgical

14         complications, in your understanding, can range

15         from extremely mild to more severe?

16    A    Yes.

17    Q    And minor complications can oftentimes be treated

18         easily with over-the-counter medication or

19         something like that to reduce symptoms such as

20         nausea or headaches or something like that?

21    A    No.  I wasn't thinking about that, no.  I was

22         thinking about anatomical matters.  Postoperative

23         care with antibiotics or nausea medicine or pain

24         medicine, that goes without saying, is just part of

25         postoperative care.  Those aren't complications.

1    Nausea from an anesthetic, for example, is not --

2    that's not what I consider to be a complication or

3    what surgeons consider to be a complication.  It's,

4    you know, the turning black of a new tissue.

5    That's a surgical complication, you know, the --

6    for -- I just want to distinguish between ordinary

7    postoperative distress, pain, discomfort, and

8    nausea, sometimes the horror at the amount of blood

9    that's being in the bandages, these are not

10    complications.

11  Q  My understanding is that there's an established

12    system for rating surgical complications and their

13    severity.  Are you familiar with that?

14  A  Not very, no.

15  Q  Okay.

16  A  There's what the surgeons call minor versus major

17    complications.

18  Q  Have you ever heard of the Clavien-Dindo scale?

19  A  No.

20  Q  For the court reporter, that's two words,

21    C-l-a-v-i-e-n, and the second word is D-i-n-d-o.

22    Doctor, just for the record -- and I'm sorry.  I'm

23    trying to cross things off here.  You're not a

24    physician, is that correct?

25  A  I'm not a physician?  That's not correct.  I am a

1    physician.

2  Q  I'm sorry.  You're not a surgeon, is that correct?

3  A  I'm not a surgeon.

4  Q  In paragraph 36 of your report, you cite a study

5     with a complication rate, I think, of 28.9 percent.

6     You agree that rate includes what you will call

7     minor complications?

8  A  I'm sorry.  I'm trying to find the sentence.  It's

9     on page 16?

10 Q  I'm sorry.  It's on the very bottom of page 15 in

11    the 2018 study of 330 patients.

12 A  Oh, yes.

13 Q  You agree that the complication rates reported

14    there reflect minor complications, correct?

15 A  Right now I don't know if the satisfaction -- I

16    don't know if that's total complication rate or the

17    minor complication rate without looking at the

18    article.

19 Q  Okay.

20 A  I presume it's the total complication rate.

21 Q  Some of the articles that you cited rate

22    complications as a grade Roman numeral I, grade

23    Roman numeral II, Roman numeral III.  Are you

24    familiar with that rating system?

25 A  No.  Actually, the term that you used that you

1     spelled out for the court reporter, I have never

2     encountered that in the articles that I have read.

3     That's why I said I never heard of it. So if it is

4     a standard, it's certainly not a standard in the

5     articles that I read.

6  Q  Okay. And are you familiar in general matters with

7     complications being assigned a grade level followed

8     by a Roman numeral?

9  A  No, but that would make sense to me.

10  Q  Do you believe that the articles that you cited

11     used that grade system?

12  A  I don't think so, but I cited a lot of articles,

13     you know, read them a long time ago so...

14  Q  Okay. Will you flip to paragraph 40 of your

15     report? Let me know when you're there.

16  A  I'm there.

17  Q  In this paragraph, you provide what you call an

18     edited abstract from -- a quotation from an edited

19     abstract from an article published by Dunford and

20     others, is that correct?

21  A  Yes.

22  Q  And by edited, I assume that you edited certain

23     portions of the quotations that you used?

24  A  Yes, just to make it more succinct.

25  Q  Okay. I'm going to try to share my screen once

1    again.  I'm going to pull up what I have marked as

2    Exhibit 33.  Do you see that in front of you?

3  A  Yes.  Could you raise the font?

4  Q  I have absolutely no idea -- I can try to zoom.

5  A  I'm sorry.  It's just -- I'll read it the way it

6    is.

7  Q  Okay.  I found a way to zoom in.  I'm sorry.

8    There.  Is that better?

9  A  Yes.  Thank you.

10 Q  Okay.  My first question is do you recognize this

11   Exhibit 33 as the Dunford article that you cite?

12 A  Correct.

13 Q  Let me know if you need me to scroll down.

14 A  Okay.

15 Q  Do you recognize this as the Dunford article that

16   you cite?

17 A  Yes.

18 Q  And on the first page of this article, I have

19   highlighted a portion of the abstract that happens

20   under -- the sub-header is emphasis and

21   conclusions.  Did you have an opportunity to read

22   the highlighted portion?

23 A  You're not talking about the abstract now, right?

24 Q  We're still in the abstract, yes.

25 A  Oh, under -- I'm sorry.  The conclusions, yes.

1    Okay.

2  Q  I'm sorry.  Yeah.  The sub-header under the

3    abstract.

4  A  I misunderstood your question.  All right.  "The

5    evidence for gender reassignment surgery

6    complications and functional outcomes is of the low

7    level."

8  Q  Doctor, let me just -- I'm sorry.  Let me take you

9    where I was going with that.  My question to you is

10    you agree that the highlighted portion of the first

11    page here is the portion from which you provided an

12    edited quotation in paragraph 40 of your report?

13  A  Yes.

14  Q  Okay.  And the portion you just read said the

15    evidence for GRS complications and functional

16    outcomes is of low level, correct?

17  A  Yes.

18  Q  And it's my understanding that the phrase "low

19    level" has an established meaning in scientific

20    research.  Is that a fair statement?

21  A  That's correct.

22  Q  The highest level evidence is evidence from

23    randomized clinical trials, double-blind studies,

24    stuff of that nature, is that fair?

25  A  Systematic reviews of large numbers of articles,

1    yeah.

2  Q  And you agree that something like a randomized

3     controlled study cannot ethically be performed to

4     determine to meet the efficacy of gender-affirming

5     surgeries, is that fair?

6  A  Well, this is a highly debatable question, and it

7     involves intricate methodologic consideration.  And

8     given, you know, your time constraints and you're

9     not willing to have me sort of give a discourse on

10    things, I don't think I can answer your question

11    affirmatively that it's fair.  It's complicated.

12    There could be random assignments to surgery, to

13    not surgery.  And for a one-year followup, a

14    two-year followup, and the people who didn't get

15    surgery after the designated period of time, if

16    they still wanted to, could have surgery.  So I

17    think it's -- what we're up against is that many

18    people feel based upon the fashion of doing surgery

19    that it's medically necessary, and it's helpful,

20    and therefore they say it's not ethical to withhold

21    effective treatment.

22        But as you can tell from the rest of my expert

23    opinion report, the question about whether the

24    benefit on the mental health of a person which is

25    the whole reason for doing these operations, that

84

1    the answer to that question is certainly not clear
2    after 60 years of doing surgery.  So I do believe
3    it's possible, but there is no will to do ethical
4    things, but the reason it's not done is not because
5    it's unethical.  It's not done because there's no
6    will to do it.  Surgeons want to do surgery, and
7    patients want to have surgery.  And so the answer
8    becomes we can't answer the question in a
9    scientific way.
10   Q  So you think it would be ethical to withhold
11      surgery from persons that a surgeon might think
12      would benefit from the surgery?
13   A  If the field after 50 years in a high level way
14      cannot determine the benefits, the fact that a
15      surgeon thinks that a patient would benefit is not
16      as compelling as the fact that science hasn't
17      demonstrated there's a consistent benefit from
18      doing this.
19   Q  My understanding is that evidence called low level
20      technically refers to evidence from descriptive or
21      qualitative studies or retrospective studies
22      perhaps with a very small sample size, is that
23      fair?
24   A  What that really means is you can't be sure.  If
25      the evidence is of low level, low grade level, then

1    we can't be sure that the harms don't outweigh the

2    benefits or that we can -- the benefits cannot be

3    guaranteed.  That's what low level means.  If it

4    says very low level, what that means is that the

5    harms may distinctly outweigh the benefits.  If

6    it's a low level, we can't be sure that the

7    benefits that are aspired to be achieved will be

8    achieved.  That's what low level means in a

9    specific sense.

10   Q   And you agree that scientists and practitioners

11       rely on the level of evidence from time to time,

12       correct?

13   A   Ideally.

14   Q   And it's my assumption that if one low level study

15       is performed and then another low level study

16       reaches the same conclusion, that a number of low

17       level studies can add up to something that has

18       greater significance to practitioners than any

19       single study, is that fair?

20   A   Yes.  But, again, the evaluation of a group of

21       studies cannot be done by simply -- if it's a

22       surgical study, for example, it can't simply be

23       done by surgeons.  It has to be done by people who

24       are much more sophisticated about scientific

25       methodology.  You see, I want my surgeon to be an

1       expert as to how to do the surgery.  That doesn't

2       necessarily -- that expertise which I assume they

3       have is not the same as the expertise in the

4       scientific review of, say, 35 studies on the

5       subject.  Those are two different skill sets, and

6       most surgical training programs do not train

7       surgeons on methodologic evaluation of data.

8   Q  Okay.  And flipping back to paragraph 40 of your

9       report, are you still there?

10  A  Still there.

11  Q  The first underlined sentence that you have there

12      says, "The evidence for complications and

13      functional outcomes is low and weak."  Do you see

14      that?

15  A  Yes.

16  Q  So it's my understanding that in editing this

17      abstract, you changed the words "of low level" to

18      be simply "low and weak", is that correct?

19  A  Is of low level.  You mean I added in "weak"?

20  Q  You added in "weak" without noting that you changed

21      the verbiage in the article, yes.

22  A  Well, but I guess I did.  I didn't realize I did.

23      But, of course, that's what low level means.

24  Q  Okay.  Doctor, I would just tell you that because I

25      don't want to waste your time going through the

1     article at any length, you are absolutely correct

2     that this Dunford article characterizes most of the

3     research, most of the studies on this subject, as

4     being of low level.  It does, however, characterize

5     one study of being of moderate level.  Do you have

6     an understanding as to what it means for a study to

7     be of moderate level?

8   A  I don't think moderate is the term that is used.

9     Maybe -- wait a second.  It probably means of

10     likely benefit.

11  Q  Okay.

12  A  But moderate means without certainty, I think.

13  Q  Okay.  And I will just tell you that this study

14     describes as being moderate level a study performed

15     by Buncamper and others that was published in 2016,

16     which I have brought up as Exhibit 34 on your

17     screen.

18  A  Uh-huh.

19  Q  Do you see that in front of you?

20  A  Very -- yeah.

21  Q  I can scroll down here.  Do you see that now?

22  A  Yes.

23  Q  Are you familiar with this study?

24  A  Not right off the bat, no.

25  Q  Okay.  Are you aware that the study was cited

1    multiple times in the SOC8?

2  A  No.

3  Q  This study describes itself as a retrospective

4     study.  What is a retrospective study?

5  A  It means looking backwards.  It means the -- it's

6     the opposite of a prospective study.  A prospective

7     study we evaluate the patient by certain

8     psychometric or certain objective terms and

9     subjective terms, and then we do periodic future

10    reevaluations using the same patterns, using the

11    same instruments.  And then we, at a predesignated

12    time, say, two years or five years, we look at the

13    comparison between the pre- and the postoperative

14    state and make conclusions.

15        So a retrospective study doesn't have any of

16    the pre -- it's just after the surgery is done, we

17    then take a look at how the patients are faring

18    hopefully both objectively and subjectively that is

19    how they report they're doing.

20 Q  Okay.  In the conclusions in the study, the authors

21    write, and I'm quoting here, that -- the portion I

22    have highlighted on your screen spanning pages

23    1,006 to 1,007 they write, "After reviewing 475

24    penile and vaginoplasty procedures performed over

25    the past 14 years, we conclude that successful

1      vaginal construction is achieved in the majority of

2      patients without the need for a secondary

3      functional reoperation.  Intraoperative

4      complications are scarce.  The prevalence of

5      postoperative complications is high but most are

6      minor and can be easily treated."

7         Did I read that correctly, Doctor?

8  A  Yes.  You're an excellent reader, Mr. Rose.

9  Q  And my assumption is that intra, i-n-t-r-a,

10     operative complications are those that arise during

11     the surgery itself?

12  A  Or -- yeah, that would be like bleeding.

13  Q  Sure.  And that's distinguished from postoperative

14     complications which arise after the surgery?

15  A  Yes, and divided into first 30 days with up to 6

16     months, 1 month to 6 months and then 12-month

17     complications.

18  Q  Do you agree that 475 patients over the span of 14

19     years is a decent sample size?

20  A  Oh, yes.  You see -- yes, certainly.

21  Q  And before today were you aware of this article?

22  A  I don't know.

23  Q  Is there a reason that you did not mention it in

24     your expert report?

25  A  Probably because if it's not in my report, it's --

1      I'm not aware.  As I think I said to you, if you

2      put in PubMed "vaginoplasty," you get 11,000

3      articles and --

4  Q  Well --

5  A  It's one of the many thousands of articles I

6      haven't read.

7  Q  And that's certainly understandable.  I will

8      readily admit I have not read every legal decision

9      out there, but Exhibit 33, the Dunford article, you

10     did cite in your report characterizes exactly one

11     study as being of moderate level rather than being

12     low level, and I was wondering why you did not take

13     it upon yourself to find a moderate level evidence.

14  A  Maybe I was lazy, and maybe I was rushing.  I don't

15     know.  You need to understand that retrospective

16     studies done by surgeons -- I don't know whether --

17     you see, I don't know how many people died, how

18     many people suicided.  This is talking about the

19     surgical complication rates.  It's not talking

20     about anything else.  It's not even talking about

21     whether -- about genital dysphonia or gender

22     dysphoria or mental health.  It's just saying that

23     from a retrospect of 475 operations done by most

24     likely a series of surgeons over a 14-year period,

25     generally speaking, the -- and we have this term

1  "scarce," which is a very unusual term for a

2  surgeon to use.  We usually use "the surgical

3  complication rates were low."  I don't know, you

4  know, what -- or they say it's 5 percent or less.

5  I have tried to quote surgical articles and give an

6  actual percentage rate.  And so if 9 percent -- if

7  9 percent of people have to have a second major

8  operation, you know, a rescue operation, you can

9  decide whether 9 percent it means -- is scarce.

10  It's not about this article.

11      The other thing is if the vast majority of

12  articles show inconvincing evidence and if one

13  shows convincing evidence, what do we make of that?

14  You see, in science, one study is not enough to

15  prove anything.  One study is enough to generate a

16  hypothesis that needs to be tested.

17  Q  Okay.  Doctor, the second parameter that you cite

18  beginning on paragraph 41 of your report, is the

19  impact of gender dysphoria.  Do you see that?

20  A  Oh, yes.

21  Q  And when you use the phrase "gender dysphoria,"

22  here are you using it consistent with how it is

23  defined in the DSM?

24  A  Yes, about the sense of living in one's body in a

25  way that causes distress.

1   Q   And are you referring to it here as a clinical

2       diagnosis, gender dysphoria, I guess was my

3       question?

4   A   I'm sorry.  Would you repeat that, Mr. Rose?

5   Q   Are you referring to it here as the clinical

6       diagnosis, gender dysphoria?

7   A   No.  I'm suggesting that gender dysphoria has two

8       different meanings.  One is -- it's a psychiatric

9       diagnosis, yes or no, and the other thing is it is

10      the subjective discomfort with the self because I

11      want to be a woman, for example, and I don't feel

12      completely feminine.  So it's the continued

13      dissatisfaction with the gendered and anatomic

14      self.  And I know this is confusing, but the

15      treatment is not of the diagnosis.  The treatment

16      is justified on the basis of the diagnosis, but the

17      goal of treatment is to remove or significantly

18      ameliorate the subjective gender dysphoria of

19      living in a body that doesn't match my gender

20      identity and ambition to be much more -- appearing

21      more much more a woman so I can feel more

22      comfortable with my sense of self and my living in

23      my body, and that's just the confusion between the

24      terms.

25  Q   Is it fair to say here that you're using the term

1      "gender dysphoria" to refer to a symptom rather

2      than that clinical diagnosis?

3  A  Yes.

4  Q  Okay.  And you agree that gender-affirming

5      surgery -- excuse me -- that genital affirmation

6      surgery can ameliorate a patient's gender dysphoria

7      to the extent the gender dysphoria is focused on

8      the genitals, is that correct?

9  A  That's why I say the high satisfaction rates may

10     very well be about the absence of male genitalia.

11  Q  And I'm sorry.  I might have just missed the first

12     word to your answer, but did you say yes?

13  A  Yes.  I was clarifying my answer.

14  Q  That's perfectly fine.  I just didn't hear you.

15     I'm sorry.  And you agree other types of

16     affirmation surgery can ameliorate a patient's

17     gender dysphoria to the extent their gender

18     dysphoria is focused on those other body parts, Is

19     that fair?

20  A  Yes.  Ameliorate means improvement.  Do we agree on

21     that meaning?  It can lessen the -- it can lessen.

22  Q  Yeah, of course.  In paragraph 43 of your report,

23     you identified five types of observations that

24     suggest that gender dysphoria persists after gender

25     confirmation surgery for an unknown number of

1     patients.  Do you see that?

2  A  Yes.

3  Q  I have a question about a couple of these, but the

4     first is that some seekers obtain additional

5     surgery.  Do you see that?

6  A  Uh-huh.

7  Q  Is that yes?

8  A  Yes.  I'm sorry.

9  Q  That's for the court reporter, not me.  And this

10    might be because the persons who have one type of

11    gender confirmation surgery such as genital surgery

12    might continue to experience dysphoria related to

13    other body parts, is that correct?

14  A  Yes.

15  Q  Okay.  It's possible that the person always planned

16    to have surgeries in sequence such as they always

17    planned on the second surgery?

18  A  That's -- I guess it's possible, but that's not my

19    usual experience.  The usual experience, especially

20    with prisoners, is that they say, this is the only

21    thing I want.

22  Q  Okay.  The second observation you note is that some

23    persons detransition after a vaginoplasty.  A small

24    number will ask the surgeon to re-create the

25    appearance of male genitalia.  Do you see that?

1    A   Yes.

2    Q   And the study you cite there is a 2016 study by

3         Djordjevic and and others, is that correct?

4    A   Yes.

5    Q   For the court reporter, that's D-j-o-r-d-j-e-v-i-c.

6    A   That's J.

7            (Exhibit 35 was marked for identification.)

8    Q   Oh, did I say G?  I'm sorry.  D-j-o-r-d.  Thank

9         you.  Okay.  I am bringing up what I have marked as

10       Exhibit 35.  Do you see that on the screen?

11   A   Yes.

12   Q   Do you recognize this as the Djordjevic study that

13       you cite?

14   A   Yes.

15   Q   And on the first page, I have highlighted a portion

16       of it.  Under aims, the author describes that the

17       aim is to analyze retrospectively seven patients

18       who underwent reversal surgery after regretting

19       their decision to undergo male-to-female sex

20       reassignment surgery elsewhere.  Do you see that?

21   A   Yes.

22   Q   All right.  Okay.  Is it fair to say that this

23       study did not attempt to determine anything about

24       the rate of regret?

25   A   No, they couldn't.

1   Q   And that's because they were only analyzing persons

2       who had already decided that they wanted reversal

3       surgery, correct?

4   A   Right.  This study is significant only in the fact

5       that there are people who regret having sex

6       reassignment surgery who go so far as to find

7       another person to restore their male genitalia.

8       That's the only significance of the study.

9   Q   So you only cited this to note that some persons

10      have in fact requested reversal surgery, is that

11      fair?

12  A   (Inaudible.)

13  Q   I'm sorry, Doctor.  I might just be having

14      difficulty hearing.  Did you yes?

15  A   I said that's all, yes.

16          MR. CARLISLE:  Gavin, I'm sorry to interrupt.

17      Could you zoom in on the next exhibit just for me?

18      I'm have a little trouble seeing the screen.

19          MR. ROSE:  On this exhibit?

20          MR. CARLISLE:  No, on the next one.

21          MR. ROSE:  Of course.  And I don't think we're

22      quite there yet, and all of these are published in

23      the tiniest font possible, and that's not my fault.

24  Q   Okay.  Doctor, I'm looking at paragraph 44 of your

25      report.  Do you see that?

1   A   Uh-huh.

2   Q   Yes?

3   A   Yes.

4   Q   I'm sorry.  And the third sentence in that

5       paragraph you write, "One illuminating criticism,

6       for example, is that to qualify as regret a person

7       has had to tell the surgeon this at a follow up

8       visit even though it is known that at least

9       75 percent of detransitioned patients do not return

10      to the surgeon and that suicides are not considered

11      to be regret."

12          Did I read that correctly?

13   A   Yes.

14   Q   And the article you cite for that is an article

15      published in 2021 by Littman and -- or I guess just

16      by Littman, is that correct?

17   A   Yes.

18   Q   And I have pulled up Exhibit 36 on your screen.

19      Can you see that okay?

20   A   Yeah, I can see it.

21   Q   Sorry.  I'm trying to remember where the zoom

22      button is.

23   A   Okay.

24   Q   This is the Littman article that you cite, is that

25      correct?

1   A   Yes.

2   Q   Are you're familiar with Dr. Littman?

3   A   Yes.

4   Q   And you're aware that she was responsible for

5       coining the term quote, unquote, rapid onset gender

6       dysphoria to refer to gender dysphoria diagnosed

7       for a first time during a patient's adolescence?

8   A   I think the simple answer to your question is yes.

9   Q   And you agree that that term, rapid onset gender

10      dysphoria, has been sharply criticized by a large

11      number of professional organizations including the

12      American Psychological Association and the American

13      Psychiatric Association?

14  A   And I'm aware the outcome of those things too that

15      the study was reanalyzed, and it was reaffirmed

16      only when advocates of -- well, see, in 2018 --

17  Q   I'm sorry.  Doctor, I don't mind that you're

18      explaining, but I didn't actually get an answer to

19      my question.  The question was simply you

20      understand that a large number of professional

21      organizations sharply criticized Dr. Littman's use

22      of that term, correct?

23  A   And the answer is yes, and I'm aware that as a

24      result of -- I don't know if it's a large number --

25      but there were organizations that criticized the

1    study, and it caused the data to be reanalyzed, and

2    the conclusions were exactly the same.

3  Q  And by this reanalysis, do you mean that

4    Dr. Littman published a correction to her original

5    article?

6  A  I think so, yeah.

7  Q  During this correction, a portion of her correction

8    was designed to make it clear that some of the data

9    she obtained from publishing a poll or survey on

10   websites that some persons thought might be biased?

11 A  Yes.  But bias goes both ways, and it is amazing in

12   this field there is such animus and such attack

13   that has not seen in any other medical field.  And

14   Dr. Littman has been the object of enormous attacks

15   over the years, as have many other people who don't

16   seem to buy the fashion-based medicine party line,

17   and so this is --

18 Q  Doctor, in paragraph 44, you cite this Littman

19   article, Exhibit 36, for two propositions, first,

20   that at least 75 percent of detransitioned patients

21   do not return to the surgeon who performed the

22   confirmation surgery, and, second, that suicides

23   are not considered to be regret.  Is that a fair

24   summary of these statements for which you are

25   relying on this article?

1   A   Yeah.   But the second idea is not the same as the

2       first.   They are two different concepts.

3   Q   But you, as you sit here today, cite this Littman

4       article, Exhibit 36, for both of those concepts,

5       correct?

6   A   No.   The suicide rates are not considered regret.

7       I guess I should have -- I should have put the

8       Littman citation after the word "surgeon."

9   Q   Okay.   So you cite this for the proposition that it

10      is known that at least 75 percent of detransitioned

11      patients do not return to the surgeon?

12  A   Based on the Littman review of those 100 cases.

13  Q   Okay.   And it's my understanding that Dr. Littman

14      in this article reviewed survey answers from 100

15      respondents who described themselves having quote,

16      unquote, detransitioned?

17  A   Yes.

18  Q   So it again was not attempting to determine regret

19      rate, is that fair?

20  A   No.   It can't determine rate on the basis of the

21      method she used.

22  Q   Okay.

23  A   It's the same kind of concept that we talked about

24      for the surgical, previous exhibit.

25  Q   Do you believe that the article was attempting to