# In the Matter Of:

*AUTUMN CORDELLIONE*

*-v-*

*COMMISSIONER, INDIANA DEPT. OF CORRECTION*

---

## Randi Ettner, PhD

*February 12, 2024*

---

StewartRichardson

Deposition Services

317.255.0872 · www.StewartRichardson.com

1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
2                    EVANSVILLE DIVISION

3

4

  AUTUMN CORDELLIONÉ, also    )
5  known as JONATHAN         )
  RICHARDSON,               )
6                       )
             Plaintiff,     )   CASE NO.
7                     )   3:23-cv-00135-RLY-CSW
    -v-                 )
8                     )
  COMMISSIONER, INDIANA      )
9  DEPARTMENT OF CORRECTION,  )
  in her official capacity,  )
10                     )
             Defendant.     )
11

12

13

14     The videotaped deposition upon oral examination

15  of RANDI ETTNER, PhD, a witness produced and sworn

16  before me, Marlana M. Haig, RPR, CRI, Notary Public in

17  and for the County of Marion, State of Indiana, taken

18  on behalf of the Defendant remotely via Zoom

19  videoconference on February 12, 2024, at 9:31 a.m.,

20  pursuant to the Federal Rules of Civil Procedure.

21

22

23

24        STEWART RICHARDSON & ASSOCIATES
        Registered Professional Reporters
25             (800) 869-0873

```
1              APPEARANCES VIA ZOOM VIDEOCONFERENCE:

2

   FOR THE PLAINTIFF:
3
     Kenneth J. Falk, Esq.
4     Gavin M. Rose, Esq.
      ACLU OF INDIANA
5     1031 East Washington Street
      Indianapolis, IN 46202-3952
6     kfalk@aclu-in.org
      grose@aclu-in.org
7

8  FOR THE DEFENDANTS:

9     Alexander R. Carlisle, Esq.
      Bradley Davis, Esq.
10    OFFICE OF THE ATTORNEY GENERAL
      IGCS - Fifth Floor
11    302 W. Washington Street
      Indianapolis, IN 46204
12    alexander.carlisle@atg.in.gov
      bradley.davis@atg.in.gov
13

14

15

16              INDEX OF EXAMINATION

17

18 EXAMINATION                              PAGE

19 DIRECT EXAMINATION

20 By Mr. Carlisle:                           5

21 CROSS-EXAMINATION

22 By Mr. Falk:                              96

23

24

25
```

```
 1                    INDEX OF DEFENDANT'S EXHIBITS

 2

 3     NUM.                   DESCRIPTION                    PAGE

 4
```

```
 5   Exhibit 37      Dhejne Study                           19

 6   Exhibit 38      Almazan Study                          38

 7   Exhibit 45      Report of Dr. Ettner                   16

 8   Exhibit 64      NCA Decision Memo                       7

 9   Exhibit 65      Bränström and Pachankis Study          28

10   Exhibit 67      Zamaryte Study                         41

11   Exhibit 68      English Study on Coronary              47

12                   Artery Disease
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        THE REPORTER:  My name is Marlana Haig, an
 2   associate of Stewart Richardson & Associates, One
 3   Indiana Square, Suite 2425, Indianapolis, Indiana.
 4   Today's date is February 12, 2024.  The time is 9:31
 5   a.m. EST.
 6        This is the case of Autumn Cordellioné also known
 7   as Jonathan Richardson v. Commissioner, Indiana
 8   Department of Correction, Cause No.
 9   3:23-cv-00135-RLY-CSW, held in the United States
10   District Court, Southern District of Indiana,
11   Evansville Division.
12        This deposition is being held remotely.  The
13   deponent is Randi Ettner, PhD.
14        Will counsel please identify themselves and any
15   persons present with you for the record.
16        MR. FALK:  Kenneth Falk from the ACLU of Indiana
17   for the plaintiff, along with my colleague, Gavin
18   Rose.
19        MR. CARLISLE:  Good morning.  Alex Carlisle, the
20   Indiana Attorney General's Office, for the
21   Commissioner.  Also here is Bradley Davis, deputy
22   attorney general.
23        THE REPORTER:  Can we have a stipulation that
24   this deposition will proceed according to the Federal
25   Rules of Trial Procedure and that we will waive any
```

1    objection to the fact that our notary court reporter

2    is in Indiana and our witness is in Illinois?

3         MR. FALK:  Plaintiff agrees and waives.

4         MR. CARLISLE:  So does Defendant.

5                   RANDI ETTNER, PhD,

6    called as a witness by the Defendant, having been

7    first duly sworn, was examined and testified as

8    follows:

9    DIRECT EXAMINATION

10   BY MR. CARLISLE:

11   Q Good morning, Dr. Ettner.  How are you?

12   A I'm well.  Thank you.

13   Q It's good to see you again.  The last time we spoke

14     was in the Kelly Stilwell case.  Do you recall?

15   A I do.

16   Q Since we know you've been deposed before, my question

17     is how many times have you been deposed before?

18   A Approximately two dozen.

19   Q Okay.  Since you are seasoned, I'm going to skip a lot

20     of the formalities.  I'll just remind you that you're

21     under oath.  Do you understand that?

22   A I do.

23   Q And if you answer a question, I will assume you

24     understood it; fair?

25   A Yes.

1    Q How did you prepare for this deposition today?

2    A I reviewed the report that I wrote, and I met with

3      Mr. Falk.

4    Q Did you read any other material?

5    A I don't believe I did.  I may have it, a recent survey

6      that was just released a few days ago.

7    Q What's the name of that survey?

8    A That was the 2022 transgender survey that was released

9      in a -- just a brief version.

10   Q Okay.  Do you know authors or who released it?

11   A I don't.  It's released -- it was previously released

12     in 2015.

13   Q Okay.  Any other documents or information you

14     reviewed?

15   A No.

16   Q Okay.  Did you read any deposition transcripts from

17     this case?

18   A I previously read Dr. Levine's deposition, and last

19     year I read the deposition of a woman who I believe is

20     the medical director of the prison.

21   Q Dr. Bedford?

22   A Possibly.  I don't recall her name.

23   Q Did you read Dr. Levine's report in this case?

24   A Yes.

25   Q Did you read the plaintiff's deposition transcript?

1  A No.

2  Q And what about Dr. Schechter's report or deposition?

3  A No.

4  Q Okay.  I'm going to jump right into it.  I'm going to

5     show you what's been marked as Exhibit 64.  Do you see

6     a document on your screen?

7  A No.

8  Q Okay.  How about now?

9  A No.  Oh, yes.

10 Q Okay.  Okay.  Exhibit 64 on your screen is a National

11    Coverage Analysis decision memo titled NCA Gender

12    Dysphoria and Gender Reassignment Surgery, and this is

13    from -- this is for Medicare and Medicaid.  Do you see

14    that?

15 A Yes.  Yes.

16 Q Okay.  I'm going to go to page 2 of this document.

17 A I don't see page 2.

18 Q I apologize.  My -- I have a lag on my screen, so it's

19    thinking.  There we go.

20        Do you see page 2 now?

21 A I see a different page.  I don't know that it's page

22    2.  It starts with Roman numeral I, decision.  Is that

23    page 2?

24 Q Yes, ma'am.  I just wanted to show you the date this

25    was published was August 30th, 2016.  Do you see that?

1    A Yes.

2    Q And the decision section you pointed to in that first

3       paragraph, the highlighted text, if you could read

4       that.

5    A Yes, I read that to myself.

6    Q Okay.  So do you understand that the conclusion by CMS

7       here is that CMS declined to issue a national coverage

8       determination for gender reassignment surgery?

9    A Yes.

10   Q And CMS wrote that is because the clinical evidence is

11      inconclusive for the Medicare population?

12   A My understanding is that the Medicare population,

13      largely consisting of individuals over the age of 65,

14      did not previously have access to surgery, had not

15      been studied sufficiently and often had cooccurring

16      medical conditions.  So the May 30, 2014, Medicare

17      decision that sex reassignment surgery was not

18      experimental, safe, and effective was now going to

19      be -- rather than an NCD, individual decisions would

20      be made on a case-by-case basis.

21   Q Thank you for that summary.  And the highlighted text

22      here, you agree that CMS found that because the

23      clinical evidence was inconclusive; right?

24   A For that cohort, I agree, yes.

25   Q Okay.  Thank you.  Let's go to page 7 of this

1    document.  Do you see the section marked C, discussion

2    of evidence?

3  A Yes.

4  Q And the question this document was asking is

5    highlighted there, and that was this:  Is there

6    sufficient evidence to conclude that gender

7    reassignment surgery improves health outcomes for

8    Medicare beneficiaries with gender dysphoria?  You

9    agree that was the question this paper asked?

10 A I see that as highlighted.  I haven't read the whole

11   paper.

12 Q Okay.  Well, you at least agree then that's what the

13   highlighted portion says?

14 A Yes.

15 Q Okay.  Let me go to page 8.  Do you see the first

16   highlighted sentence on page 8 states as follows, CMS

17   identified numerous publications related to gender

18   reassignment surgery.  A large number of these were

19   case reports, case series, with or without descriptive

20   statistics or studies with population sizes too small

21   to conduct standard parametric statistical analyses.

22   Do you see that?

23 A Yes.

24 Q And then if you could jump down two paragraphs.  CMS

25   concluded a total of 33 studies were reviewed for this

1    paper.  Do you see that?

2  A I do, yes.

3  Q And do you understand that of all the studies CMS

4    looked at, only three -- 33 were identified as meeting

5    the inclusion criteria for this document?

6  A I'm sorry.  Would you repeat that?

7  Q Yes.  Do you agree that of all the studies CMS looked

8    at in researching, it identified 33 as appropriate for

9    the study because they met the inclusion criteria?

10 A I see that a total of 33 studies were reviewed from

11   1979 to 2015, and those use different assessment tools

12   on the same population, the Medicare population.

13 Q Okay.  I'm going to go to page 46 of this exhibit.

14   And this will be a better place to ask you this

15   question.

16       The second highlight on this page says, 33 papers

17   were eligible based on our inclusion/exclusion

18   criteria for the subsequent review.  Do you see that?

19 A Yes.

20 Q Okay.  And then CMS further wrote, all studies

21   reviewed had potential methodological flaws which we

22   describe below.  Do you see that?

23 A Yes.

24 Q And then in the next section titled quality of the

25   studies reviewed, do you see CMS writes, overall the

1      quality and strength of evidence were low due to

2      mostly observational study designs with no comparison

3      groups, subjective end points, potential confounding,

4      small sample sizes, lack of validated assessment tools

5      and considerable lost to follow-up.

6   A  I do see that.

7   Q  And then the next highlighted section here, do you see

8      CMS writes as follows:  Of the 33 studies reviewed,

9      published results were conflicting, some were

10     positive, others were negative.  Collectively the

11     evidence is inconclusive for the Medicare population.

12     Do you see that?

13  A  Yes.

14  Q  Now, do you know which studies are among the 33 CMS is

15     referencing here?

16  A  I do not.

17  Q  Okay.  Do you see the text continues, the majority of

18     studies were non-longitudinal, exploratory-type

19     studies, i.e., in a preliminary state of investigation

20     or hypothesis generating, or did not include

21     concurrent controls or testing prior to and after

22     surgery.  Do you see that?

23  A  Yes.

24  Q  Do you agree that those are limitations of studies?

25  A  I agree that those can lower the quality of evidence.

1    I don't agree that low-quality evidence in medical

2    research is useless.

3 Q Fair enough.  The low-quality evidence in medical

4    research, do you think that medical consensus can be

5    based solely on such low-quality evidence?

6 A Well, for example, 500,000 rotator cuff surgeries are

7    performed every year in the United States based only

8    on guidelines and clinical recommendations.  In fact,

9    a Cochrane review of --

10        (Technical interruption.)

11        (Reporter clarification.)

12 A A review of 1,567 surgical interventions demonstrated

13    that only 94 percent had high-quality evidence.  The

14    rest were based on guidelines, clinical consensus,

15    clinical experience.

16 Q CMS in the same paragraph we were just talking about

17    goes on to write, several reported positive results,

18    but the potential issues noted above reduced strength

19    and confidence.  Do you agree with that statement?

20 A I'm sorry.  Would you read that -- point out that

21    statement again?

22 Q Yeah.  It's the one, two -- the third sentence of that

23    second paragraph.  Several reported positive results

24    but the potential issues noted above reduced strength

25    and confidence.

1    A And what is the question, please?  Do I see -- I do

2      see that sentence, yes.

3    Q You agree that the limitations discussed in the

4      previous sentence would reduce strength and confidence

5      in a scientific study?

6    A I agree that in the Medicare cohort, which this

7      applies to, that there would be a lower quality of

8      evidence perhaps than in a different cohort, given

9      that most Medicare individuals are 65 or older.

10   Q If you look at the next sentence, ma'am, after careful

11     assessment, we identified six studies that could

12     provide useful information.  Of these, the four best

13     designed and conducted studies that assessed quality

14     of life before and after surgery using validated,

15     albeit nonspecific, psychometric studies did not

16     demonstrate clinically significant changes or

17     differences in psychometric test results after GRS.

18     Do you see that sentence?

19   A I do, yes.

20   Q And then it looks like the four studies CMS identified

21     were as follows:  Heylens, et al., 2014; Ruppin,

22     Pfafflin from 2015; Smith, et al., 2005; and Udeze, et

23     al, 2008.  Do you see that?

24   A Yes.

25   Q And I think you cited the Smith, et al. 2005 article

1      in your report at page 10; right?

2   A  I would have to refer to my report.

3   Q  Okay.  The page isn't too important right now, but do

4      you recall citing that article in your report?

5   A  Again, I would have to refer to my report.

6   Q  Okay.  We'll bring that up in just one second, Doctor.

7          Let me ask you this right now.  Do you agree with

8      CMS that these four studies did not demonstrate

9      clinically significant changes or differences in

10      psychometric test results?

11   A  I would accept that, and I would add that for that

12      reason, the decision to provide surgery on a

13      case-by-case basis rather than an NCD was a reasonable

14      conclusion.

15   Q  I'm going to go to page 32 of 64.  On this page

16      there's a synopsis of the 2005 Smith study that we

17      just mentioned.  Do you see that?

18   A  Yes.

19   Q  And I'm going to go down to the bottom of the page.

20      The last sentence of the last full paragraph states as

21      follows:  Regarding vaginoplasty, 20 of 67 or 29.8

22      percent male-to-female respondents, not including 10

23      nonrespondents, reported incomplete satisfaction with

24      their vaginoplasty.  Do you see that?

25   A  I see the sentence.  I'm not certain what study that

1    that conclusion refers to.  Is that the Smith study?

2  Q Yes.  Let me go up on the page a little bit, and I've

3    highlighted the Smith study title at the top.

4  A Yes.

5  Q And you're free to read those subsequent paragraphs to

6    the next highlighted section.

7  A Thank you.  I'll take a minute to do that.

8        Could you scroll up, please?

9  Q Yes.

10 A Thank you.  Yes.  I've finished reading it.

11 Q Okay.  Do you agree the second highlight there states

12   as follows, regarding vaginoplasty, 20 of 69 -- I'm

13   sorry, 20 of 67 or 29.8 percent, male-to-female

14   respondents, not including 10 nonrespondents, reported

15   incomplete satisfaction with their vaginoplasty?

16 A That's what the -- that's what's reported there, yes.

17 Q Okay.  Do you have a copy of your report in front of

18   you, ma'am?

19 A I do.

20 Q That would help.  I'm going to go on the screen to

21   page 90 of 64, and if you could look in your report at

22   page 10.  Let me know when you're there.

23 A I'm there.

24 Q Okay.  It looks like in the paragraph starting,

25   decades of careful and methodologically sound

1     scientific research.  Do you see that paragraph?

2  A Yes.

3  Q At the end of that paragraph you cite Smith, et al.

4     2005; correct?

5  A Yes.

6  Q And Jarolím, et al. 2009?

7  A Yes.

8  Q All right.  And on your screen in Exhibit 64 at page

9     90 this is part of the bibliography section of Exhibit

10    64, and it looks like the Jarolím study you cite is

11    highlighted there.  Do you see that?

12 A Yes.  I don't have my bibliography with me, however,

13    just the report.

14 Q Okay.  I just want to confirm this is the same 2009

15    study you were referencing?

16 A Is this my bibliography on the screen right now?

17 Q No.  This is the CMS document, Exhibit 64.

18 A So I'm not certain that that's the article that I'm

19    referencing, as I don't have my bibliography with me.

20 Q Okay.  It looks like it's -- I'm on Exhibit 45, which

21    is your report at page 47 of the PDF file in appendix

22    B.  Do you see that?

23 A I'm sorry.  I'm not following.

24 Q Okay.  Let me make this easier for you.  I'm going to

25    stop sharing my screen.  One second.

1          I'm going to share Exhibit 45 with you, Doctor.

2      Do you see Exhibit 45 on your screen?

3   A Yes.

4   Q And this is a copy of your expert report in this case;

5      correct?

6   A Yes.

7   Q And I understand you have a copy of this report in

8      front of you but not the bibliography?

9   A Correct.

10  Q Okay.  So on Exhibit 45 then, I'm going to go down to

11     page 47 of the PDF, and you can see the Jarolím cite

12     there right in the middle?

13  A Yes.

14  Q Okay.

15  A Yes.  And this is my bibliography that's on the screen

16     now?

17  Q Yes.  Exhibit 45 is your bibliography, correct.

18          Now I'm going to put the CMS exhibit back up.

19     Exhibit 64 is back up on your screen at page 90.  That

20     highlighted citation, it looks like it's the same one;

21     right?

22  A Yes.

23  Q Would it surprise you to learn that CMS cited the

24     study in its bibliography but did not include it among

25     the studies that it found were sufficient to meet its

1    conclusion criteria?

2    A Could you rephrase the question?  I'm sorry.  I don't

3       understand it.

4    Q Yes.  Would you be surprised that CMS did not include

5       this study as among the 33 it found met the inclusion

6       criteria?

7    A I don't have an opinion of surprise or not surprise.

8       I would want to review this article and then again

9       review the inclusion criteria that the CMS report was

10      referencing.

11   Q All right.  Looking at the highlighted citation on

12      your screen, the title includes that this was a

13      retrospective three-month follow-up study with

14      anatomical remarks.  Do you see that?

15   A Yes.

16   Q And do you know what the follow-up period for the CMS

17      inclusion criteria was?

18   A I don't recall, no.

19   Q Okay.  I'm going to go to page 47 of Exhibit 64.

20          At the top of page 47, there's a reference to a

21      2011 article by an author named -- perhaps it's

22      Dhejne, D-h-e-j-n-e.

23   A Excuse me.  It's Cecilia Dhejne.  She's a colleague of

24      mine.

25   Q Dhejne.  We referred to her as Cecilia in another

1    deposition because we couldn't pronounce the last

2    name.

3         Are you familiar with this 2011 study?

4  A Yes.

5  Q And this study has been marked as Exhibit 37 in this

6    case.  CMS writes here at page 47, the study

7    identified increased mortality and psychiatric

8    hospitalization compared to the matched controls.  The

9    mortality was primarily due to completed suicides,

10   19.1-fold greater than in control Swedes, but death

11   due to neoplasm and cardiovascular disease was

12   increased two to 2.5 times as well.

13        Do you agree with those -- with that finding?

14  A I agree that that's what is written here.

15        I would point out that Dr. Dhejne has spoken and

16   written that her work has been mischaracterized, and

17   in 2017, she specifically named Stephan Levine as

18   someone who has mischaracterized her research.  She's

19   published subsequently research stating that

20   gender-affirming care when conducted in accordance

21   with the WPATH standards of care is ineffective and

22   that this study, she has explicitly said, should not

23   be used to indicate that suicide was more common as a

24   result of sex reassignment surgery.

25  Q Do you see the next sentence here from CMS states, we

1    note mortality from this patient population did not

2    became apparent until after 10 years.  Do you agree

3    with that statement?

4  A Yes.

5  Q CMS then writes, the risk for psychiatric

6    hospitalization was 2.8 times greater than in control

7    events after adjustment for prior psychiatric disease,

8    in parentheses, 18 percent.  Do you agree with that?

9  A Yes.

10  Q The risk for attempted suicide was greater in

11    male-to-female patients regardless of the gender of

12    the control.  Do you agree with that?

13  A Yes.

14       MR. FALK:  And I'm just going to -- excuse me.

15    I'm going to object.  When you ask do you agree with

16    that, are you asking the witness if she agrees with

17    the conclusion or if she agrees that you're reading

18    the report correctly?  So I'd ask you to clarify the

19    question.

20       MR. CARLISLE:  I can ask a more specific

21    question.

22  Q CMS then writes, further we cannot exclude therapeutic

23    interventions as a cause of the observed excess

24    morbidity and mortality.  Do you agree that's what the

25    document states?

1  A I agree that that's what I'm reading on the screen.  I

2     don't agree with that conclusion based on subsequent

3     studies and Dr. Dhejne's own writings about how this

4     has been mischaracterized and how these surgeries were

5     performed in the '70s and '80s, and there were other

6     objections that she cites.

7  Q Do you agree that her study found that we cannot

8     exclude therapeutic interventions as a cause of the

9     observed excess morbidity and mortality?

10 A I don't.

11 Q All right.  Let me go to page 48.  Doctor, do you see

12    the section C, summary?

13 A No.  It's not on my screen.

14       Yes.  Now I see it.

15 Q Okay.  CMS writes, based on an extensive assessment of

16    the clinical evidence as described above, there is not

17    enough high-quality evidence to determine whether

18    gender reassignment surgery improves health outcomes

19    for Medicare beneficiaries with gender dysphoria and

20    whether patients most likely to benefit from these

21    types of surgical intervention can be identified

22    prospectively.  Do you agree with that?

23       MR. FALK:  Again, I'm going to ask that the

24    question be clarified as to whether she agrees with

25    what you just read or whether she -- whether she

```
 1      agrees that you read it correctly or whether she
 2      agrees with the content of what you just read.
 3   Q Okay.  Do you agree that I read it correctly?
 4   A Yes.
 5   Q And as to the content of what I read, do you agree
 6      with that?
 7   A No, because high-quality evidence refers to level 1
 8      and level 2 levels of evidence, which are not possible
 9      or ethical in this population, so there would -- it
10      would be unlikely that there would be high-quality
11      evidence.
12            As I stated before, 1 in 10 orthopedic surgeries
13      done in this country do not have high-quality
14      evidence.  Vitamin D doesn't have high-quality
15      evidence, nor does aspirin.  So the absence of
16      high-quality evidence I do not agree discounts the
17      utility and the benefits of gender reassignment
18      surgery.
19   Q In the next paragraph, Doctor, CMS writes, the
20      knowledge on gender reassignment surgery for
21      individuals with gender dysphoria is evolving.  Do you
22      agree that the knowledge on gender reassignment
23      surgery is evolving?
24   A This document was written in 2016.  It certainly has
25      evolved since then.
```

1    Q Do you agree that it is still evolving, even today?

2    A I agree that there's a barrage of research on every

3       aspect of gender incongruence, much more so than in

4       previous years.

5    Q I'm sorry.  You said you agree that there's a

6       something -- I didn't catch that.

7    A Research -- research is continuously being published

8       on every aspect of the gender incongruity.

9    Q Do you agree with CMS here on page 48 that additional

10      research of contemporary practice is needed regarding

11      surgery?

12   A I agree that additional research on every medical

13      intervention is useful.

14   Q But you disagree that any additional research of

15      gender conformation surgeries is needed at this time?

16   A No.  I wouldn't characterize my answer that way.

17   Q Okay.  Can you please clarify then?

18   A I think that research is continuously being published

19      as more individuals undergo gender-affirming

20      surgeries, and as that number increases, more studies

21      are being done using larger sample sizes.

22   Q Do you agree with CMS's statement on page 48 that to

23      assess long-term quality of life and other

24      psychometric outcomes, it will be necessary to develop

25      and validate standardized psychometric tools in

1        patients with gender dysphoria?

2    A  I think that there has already been some standardized

3        psychometric tools that have been -- already have been

4        validated since this was published.

5    Q  And do you think -- does that cause you to disagree

6        with the statement I just read?

7    A  I agree that standardized psychometric tools will

8        create uniform comparisons between studies; however, I

9        don't think that additional studies are necessary to

10       demonstrate the efficacy of gender-confirmation

11       surgery.

12   Q  You mentioned some psychometric tools have been

13       validated.  Which specific tools are you referring to?

14   A  There -- there's a few that have been validated.  I

15       think the Utrecht gender dysphoria one is -- one is

16       out of Utrecht in the Netherlands, and there have been

17       some others.  I'm not certain what the name of them

18       are, but there are people that have constructed

19       measurements that are -- that have been statistically

20       validated, and to indicate quality of life, for

21       example.

22   Q  Did you use any of these tools when you examined the

23       plaintiff in this case?

24   A  Not -- not specifically, no, although some of the

25       questions on those instruments are questions that

1    evaluators would typically ask.

2  Q  I'm going to go to page 54 of Exhibit 64.

3        Doctor, I want to ask you about methodology.  Do

4    you agree that methodologists have developed criteria

5    to determine the strengths and weaknesses of clinical

6    research?

7  A  Yes.

8  Q  And do you agree with CMS's statement that generally

9    the strength of evidence refers to, first, the

10    scientific validity underlying the study findings

11    regarding causal relationships between healthcare

12    interventions and health outcomes?

13  A  I'm not -- I'm not certain as I sit here now.  I would

14    have to think about that in terms of research

15    methodology and levels of evidence.

16  Q  Okay.  What about the second point, reduction of bias?

17  A  Reduction of bias is an attribute of high-quality

18    methodological research.

19  Q  All right.  And if you look at the bullet point

20    listing on page 54 to 55, CMS identifies certain

21    attributes that lend themselves to stronger scientific

22    evidence.  If you could read through that bullet point

23    list, and then I'll have a question for you.

24  A  I've read the list.

25  Q  Doctor, do you agree that these are all attributes

1    that indicate stronger scientific evidence?

2    A Yes.

3    Q And further down on page 55, there's another bullet

4      point list, and CMS suggests these various types of

5      biasses can undermine internal validity.  Can you

6      please read that bullet point list?

7    A I'm not sure where that is.  Could you point that to

8      me?

9    Q Yes.  There is -- do you see the paragraph starting

10     regardless of whether the design?

11   A Yes.

12   Q That paragraph sets up the list.

13   A Yes.

14   Q Do you agree that those four biasses in that bullet

15     point list can undermine the internal validity of a

16     study?

17   A Generally speaking, they can.  However, according to

18     the Royal College of Psychiatry on page 49 of their

19     bulletin, they say that some of these are literally

20     impossible when it comes to studies involving

21     vaginoplasty.  You cannot have randomized controlled

22     trials.  It's impossible.  You can't have

23     double-blinded trials.  That would involve having

24     people not know whether or not they've had surgery or

25     not.  And so while these are high-minded and they are

```
 1      in fact, some of the hallmarks of excellent research

 2      methodology, they're not possible in not just gender

 3      surgery but in many other types of surgery, including

 4      rotator cuff, late versus early appendectomy, and nine

 5      out of 10 orthopedic surgeries that are performed.

 6   Q So it's your testimony that it's impossible to have

 7      non-biased studies in the context of gender

 8      reassignment surgery?

 9   A My testimony is it's impossible to have randomized

10      controlled trials in gender-affirming vaginoplasty

11      surgery.

12   Q Can studies on sex reassignment surgery avoid bias?

13   A That depends on the study of the methodology of the

14      study and how it is conducted, like all studies.

15   Q You agree that the goal of these studies is to avoid

16      bias; right?

17   A That's one of the goals.

18   Q Further down on page 55, CMS writes, the following is

19      a representative list of study designs ranked from

20      most to least methodologically rigorous in their

21      potential ability to minimize systematic bias.  Do you

22      see that, Doctor?

23   A Yes.

24   Q And at the top of the list is randomized controlled

25      trials, followed by nonrandomized controlled trials,
```

1      and prospective cohort studies, then retrospective

2      case control studies, then cross-sectional studies,

3      then surveillance studies, for example using

4      registries or surveys, then consecutive case series,

5      then single case reports.

6          Do you agree with the hierarchy CMS writes here?

7  A In general, I do.  I am not an expert in research

8      design, but I do agree that randomized controlled

9      trials are the gold standard for research methodology

10     and that single case reports or series are considered

11     lower level; however, they are often used in

12     guidelines along with expert consensus and some

13     retrospective studies and studies that have a smaller

14     sample size.

15  Q I'm going to stop sharing my screen.

16        Doctor, I'm going to show you what's been marked

17     as Exhibit 65, the Bränström and Pachankis study.  Do

18     you see Exhibit 65 on your screen?

19  A Yes.

20  Q And this is the Bränström and Pachankis article.  Are

21     you familiar with this study?

22  A Yes.

23  Q And you're aware that the American Journal of

24     Psychiatry issued a correction to this study after it

25     was found to be methodologically unsound?

1    A Yes.

2    Q All right.  And page 8 of 65, do you see the

3      correction there?

4    A Yes.

5    Q Are you aware that the correction indicates that upon

6      reanalysis of the survey data, the results

7      demonstrated no advantage of surgery in relation to

8      subsequent mood or anxiety disorder-related healthcare

9      visits or prescriptions or hospitalizations following

10     suicide attempts?

11   A I'm aware that the original study had methodological

12     flaws and that the findings were not at -- did not

13     match the strength that the authors had attributed to

14     them, and that the authors then attempted to

15     retrospectively create a control group, which was not

16     a matched group either.

17   Q And do you agree with the finding in the correction

18     that the results demonstrated no advantage of surgery

19     in relation to subsequent mood or anxiety

20     disorder-related healthcare visits or prescriptions or

21     hospitalizations following suicide attempts in that

22     comparison?

23   A I would have to read the whole article, but I do agree

24     that the article was methodologically flawed, and

25     the -- and a secondary study by a different group,

```
 1      Almazan, repeated a study and did find significant
 2      relationship with gender-affirming surgery and mental
 3      health outcomes, and that was the Almazan study using
 4      the same subject group and with a better, obviously,
 5      methodology.
 6   Q So it sounds like you'd have to reread Exhibit 65 to
 7      answer that question?
 8   A Which question are you referring to?
 9   Q Whether you agree that the results of the
10      reexamination demonstrated no advantage of surgery in
11      relation to subsequent mood or anxiety
12      disorder-related healthcare visits or prescriptions or
13      hospitalizations following suicide attempts?
14   A I basically agree that this -- that the Bränström
15      article was flawed and did not show what the authors
16      initially said they found.
17   Q Got you.  But as you sit here today, you can't opine
18      on whether the reexamination supports the finding and
19      the conclusion?
20           MR. FALK:  I'm sorry.  What reexamination are we
21      speaking about because she indicated there was a
22      second study based on the same -- the same set.  So
23      are you talking about that second study or this study?
24           MR. CARLISLE:  No, the reexamination for Exhibit
25      65.
```

1        MR. FALK:  Thank you.

2   A So my understanding, without reviewing the study,

3     Bränström's attempt to construct a control group to

4     rectify a deficiency that was pointed out in these

5     corrections of 1,661 subjects who had not undergone

6     surgery was not a matched control group, and so their

7     attempt to correct the article did not in fact verify

8     their findings.  And so I haven't seen on the screen

9     the -- their study, but I would agree that they did

10    not find what they stated they found in the first

11    study, and that this correction is in fact accurate

12    that there were methodological flaws in the study

13    that -- that repudiated their findings.

14  Q Okay.  I'm going to stop sharing my screen.

15        MR. FALK:  Alex, excuse me.  It's been about an

16    hour.  I don't know if Dr. Ettner needs a break or

17    not, but I just wanted to point that out.  It's been

18    an hour.

19        MR. CARLISLE:  Do you want to take a break?

20        THE WITNESS:  I'd love a short break.

21        MR. CARLISLE:  All right.  Let's go off the

22    record.

23        MR. FALK:  Thank you.

24        (A discussion was held off the record.)

25  BY MR. CARLISLE:

1  Q Okay.  We're back on the record.

2        Doctor, do you think there's any debate regarding

3    the efficacy or safety of gender-confirmation surgery

4    among the medical community?

5        THE REPORTER:  You're on mute, Doctor.

6        THE WITNESS:  Can you hear me now?

7        MR. FALK:  Yeah.

8        THE WITNESS:  Okay.

9  A No, I do not.  Every major medical organization

10    endorses surgery in accordance with the WPATH

11    standards.

12 Q Do you think the current medical literature regarding

13    gender-confirmation surgery is methodologically sound

14    enough to place the question of surgery beyond debate?

15 A I think the guidelines, which are based on the best

16    available evidence and clinical consensus are

17    significant and are more than adequate to demonstrate

18    the benefit of surgery for those individuals who

19    require it.

20 Q Do you think the current medical literature on

21    gender-confirmation surgery is methodologically sound

22    enough to place this question of surgery beyond

23    debate?

24 A I don't think that decisions about surgery are based

25    solely on literature and methodology.  They're based

```
1      on decades of experience, patient-reported outcomes,

2      guidelines, clinical consensus, and in my decades of

3      experience, yes, I think there is more than sufficient

4      information to provide surgery.

5  Q And it's your testimony that there's no debate in the

6      medical community on that question of surgery?

7  A My testimony is that the major medical associations,

8      the AMA, the American Psychiatric Association, the

9      American Psychological Association, College of

10     Obstetrics and Gynecology, National Association of

11     Social Workers, the Endocrine Society, and every other

12     medical society, including the National Commission on

13     Correctional Healthcare, all endorse surgery, and the

14     WPATH standards of care are considered the guidelines.

15 Q Doctor, I'm going to share Exhibit 45 on your screen,

16     which is your report in this case.

17         Starting at the bottom of page 9, you have a

18     section about gender-affirming surgery; right?

19 A Uh-huh.

20         MR. FALK:  Yes?

21 A Yes.

22 Q And my question is, how did you decide which articles

23     to cite in this section of your report?

24 A I'm sorry.  In which section of my report?

25 Q The section titled gender-affirming surgery starting
```

1    on page 9.

2  A Can we scroll down a bit?

3  Q Yes.

4  A Or I can refer to my own.

5  Q Yeah, feel free to look at page 9 through page 13,

6    which is the section of your own report.

7  A Thank you.

8        Many of these studies were studies that the

9    center for Medicare reviewed in their 2014

10   determination that surgery was non-experimental, safe

11   and effective, so these are many of those studies.

12   Additionally, there are some other studies which are

13   metaanalyses such as the Cornell study, which I

14   believe looked at 96 studies -- and let me just turn

15   to that.  That is on page --

16  Q 13, I believe.

17  A 13?  Thank you.  Right.  They conducted a systematic

18   review of the literature on the outcome of

19   gender-confirming surgeries, reviewing 56 studies

20   verifying the efficacy of surgery.  93 percent

21   reported beneficial effects.  So I included that.

22        There are other studies which I didn't include,

23   but I could have, Park, which I mistakenly referred to

24   as Parker in my report, it's a typo, interviewed

25   patients who had undergone surgery 40 years prior and

1  found no regrets and extreme satisfaction with

2  surgery, and I think I mentioned earlier in response

3  to your question of what I had viewed prior to my

4  deposition, the most recent transgender survey, which

5  I think included 97,000 individuals, 96 percent or 97

6  percent reported satisfaction with surgery.

7      So I believe that there is an additional

8  accumulation of studies that are listed in the

9  standards of care 8 in the surgery section, some of

10  which are prospective studies, which give further

11  information that buttressed the standards of care.

12      MR. FALK:  Alex, I'm sorry.  Part of your outline

13  is on the screen, which you probably don't want us to

14  see that.

15      MR. CARLISLE:  No.  Is it on there now?

16      MR. FALK:  Yes.  Now even better.  Yes, it is.

17  Now it's not.

18      MR. CARLISLE:  Do you see Exhibit 45 on your

19  screen, Doctor?

20      THE WITNESS:  No.  I see my report on the screen.

21      MR. FALK:  Yeah, the exhibit stayed up, but your

22  outline was sort of superimposed on top of it.  I just

23  wanted to tell you.  But it wasn't --

24      MR. CARLISLE:  Thank you.

25      MR. FALK:  I didn't think you wanted us to read

1    along, so --

2           MR. CARLISLE:  I don't.  Thank you, Ken.

3    BY MR. CARLISLE:

4    Q Okay.  We were talking about, Doctor, how you decided

5      to cite which articles, pages 10 to 13 of your report.

6      You first talked about many of the articles relied on

7      by CMS in a 2014 decision?

8    A I'm sorry.  Is that a question?

9    Q Yes.

10   A Yes.

11   Q Is that the decision from the appeals board about

12     surgery, whether it should be a -- and I think it was

13     an NCD?

14   A It reversed the 1981 decision based on reasonableness,

15     reviewed all of the literature and concluded that what

16     they referred to at the time as sexual reassignment

17     surgery was not experimental, was safe and was

18     effective.

19   Q Yes.  Let me -- I'm just trying to verify which

20     document you're talking about.  I'll show you on the

21     screen what was previously marked as Exhibit 29.

22           Is this the decision you're referring to?

23   A Yes.

24   Q That's all I wanted to know.  I'll stop sharing my

25     screen.

1          Doctor, as a supplement to our discovery requests

2     to you, could you provide a copy of all articles you

3     cite at pages 10 to 13?

4   A I'm sorry.  Would you repeat that question?

5   Q Yes.  As a supplement to our discovery requests that

6     you previously answered through counsel, could you

7     provide a copy of all articles you cite at pages 10

8     through 13?

9   A Did I?  Is that the question?  Did I?

10  Q No.  The question is will you?

11  A Oh, will I?  Will --

12  Q Yes.

13  A -- I provide those?

14  Q Yes.

15  A If I have them, I will.

16        MR. FALK:  Yeah, and we -- we're happy to -- if

17    that's the request, to see which of those are publicly

18    available and which of those Dr. Ettner has.

19    Obviously if they're publically available and

20    Dr. Ettner doesn't have them, or whether -- if she

21    doesn't have them, she doesn't have them.  So if

22    you're asking us a supplement to do that, we're

23    welcome to look at this point.

24        MR. CARLISLE:  Very good.

25  Q All right.  Dr. Ettner, I'm going to show you what's

1    been marked as Exhibit 38 previously.  Do you recall

2    referring to the -- I think it's Almazan study?

3  A Yes.

4  Q One minute.  My screen is buffering.

5       Is this the study you were referring to earlier?

6  A Yes.

7  Q Okay.  From 2021.  Do you see at the top there the box

8    starting importance?

9  A I do.

10  Q The author's note, requests for gender-affirming

11    surgeries are rapidly increasing among transgender and

12    gender-diverse people; however, there is limited

13    evidence regarding the mental health benefits of these

14    surgeries.  Do you agree there is limited evidence

15    regarding the mental health benefits of these

16    surgeries?

17  A I don't know if there's limited evidence.  I think

18    that there is evidence, and that the evidence would

19    benefit from amplification.

20  Q I'm going to stop sharing my screen.  I'm going to

21    show you on your screen the Cornell website we just

22    discussed at page 13 of your report.

23       Doctor, is this the website you cited in your

24    report at page 13?

25  A I didn't cite a website, I don't believe.  Oh, perhaps

1    I did, but this is the study that I referred to, yes,

2    the metaanalysis.

3  Q Okay.  And the title of this web page is What Does the

4    Scholarly Research Say About the Effect of Gender

5    Transition on Gender Well-Being; right?

6  A Yes.

7  Q I'm going to scroll down on this page, and it looks

8    like as you noted, there are 51 studies that they cite

9    in support of the claim that gender transition

10    improves well-being of transgender people; right?

11  A You broke up.  I'm sorry.  I didn't hear your

12    question.

13  Q On this website we're looking at on your screen, the

14    author's note, they found 51 studies that support

15    their claim that gender transition improves the

16    well-being of transgender people; correct?

17  A Yes.

18  Q And then there's about four they say are mixed

19    findings or null findings; right?

20  A Yes.

21  Q Okay.  And then my question to you is have you read

22    all these articles that are linked on this website?

23  A I have read the majority of these articles, and I know

24    personally many of the authors of these articles.

25  Q Do you know how many of these articles are case

1     studies?

2   A Are what?  I'm sorry.  I didn't hear you.

3   Q Case studies.

4   A I don't offhand, no.

5   Q Okay.  I'm going to click on the Megeri, M-e-g-e-r-i,

6     and Khoosal, K-h-o-o-s-a-l, from 2007.

7        Dr. Ettner, do you see that in this excerpt that

8     comes up when you click on that box, there was --

9     there by results, there was no significant change in

10    anxiety and depression scores in people with gender

11    dysphoria, male-to-female pre- and postoperatively.

12    Do you see that?

13   A I'm going to need a minute to read this.

14   Q Okay.

15   A Yes.  I see that.

16   Q Do you agree with that finding?

17   A I agree that that's what the authors found in this

18    study.

19   Q Do you think that article supports Cornell's

20    hypothesis?

21   A I would have to see the entirety of the article.

22    There may be other indications of positive effects of

23    gender-affirming surgery.  Anxiety and depression are

24    only two outcomes that they're mentioned -- that are

25    mentioned in this paragraph that's displayed.  I would

```
 1      like to see the entire article and then to know if
 2      this was included as one of the articles they cited
 3      indicating that there was a benefit to the surgery.
 4    Q Fair enough.  I will represent to you that this is one
 5      of the articles they cited.
 6           Are you aware that some of these articles are not
 7      strictly about surgery?
 8    A Yes.
 9    Q Do you think an article that is not about surgery
10      supports any conclusions about gender-confirmation
11      surgery?
12    A I can't say that in a general sense.  It would depend
13      on the article.
14    Q Do you have any concern that Cornell's public policy
15      research portal is biased?
16    A It's not a concern I've ever entertained.
17    Q Okay.  I'm going to stop sharing my screen, Doctor.
18           I'm going to show you Exhibit 67.  One minute.
19      Sorry about the delay on my screen.
20           Is it working?
21    A Yes.
22    Q Okay.  Dr. Ettner, I'm showing you what's been marked
23      as Exhibit 67, and this is an article from Continuing
24      Medical Education entitled Pharmacovigilance and
25      Principle of Nonmaleficence in Sex Reassignment.  The
```

```
 1    head author is Kristina Zamaryte.  Do you see that?
 2   A Yes.
 3   Q Are you familiar with this article?
 4   A No.
 5   Q Okay.  In that case I'm going to go down to page 4.
 6     Dr. Ettner, do you see a highlighted sentence on page
 7     4?
 8   A No.  I see a highlighted sentence now.
 9   Q Okay.  The authors write, articles addressing the
10     outcomes of such surgical intervention have provided
11     conflicting evidence and have, in fact, shown a more
12     negative effect in the long-term.  Do you see that?
13   A Yes.
14   Q And they cite notes 65 to 68; correct?
15   A Yes.
16   Q If we go down to note 65, do you see that it's an
17     article from M. Landén in 2001 called Done is Done and
18     Gone is Gone, Sex Reassignment is Presently the Best
19     Cure For Transsexuals?  Do you see that, ma'am?
20   A Yes.
21   Q And are you familiar with the Landén article?
22   A I've read the Landén article in years past, not
23     recently.
24   Q Do you agree that the Landén article supports the
25     author's conclusion on page 4 that some articles
```

```
 1      addressing the outcome of such surgical interventions
 2      have provided conflicting evidence?
 3   A I'm sorry.  I don't understand the question or what
 4      article you're referring to.
 5   Q Okay.  Do you have your report in front of you?
 6   A I do.
 7   Q All right.  I'm buffering over here, so I'm not trying
 8      to create suspense, just technical difficulties.
 9          Okay.  All right.  Dr. Ettner, if you could go to
10      page 12 of your report.  Are you there?
11   A Yes.
12   Q Okay.  Very good.  The first full paragraph, it looks
13      like you cite the Landén 2001 study.  Do you agree?
14   A First paragraph, did you say?  Yes, I see it.
15   Q All right.  So based on the fact that you cited that
16      study, do you agree with the author's finding in
17      Exhibit 7 -- 67 about that study?
18   A I'm not, again, certain what author you're referring
19      to.  Would you rephrase your question?
20   Q Yeah.  Let me go back to page 4 of Exhibit 67 on your
21      screen.  And at the last paragraph, there's a
22      highlighted sentence, and that sentence cites the same
23      study you cite at page 12 of your report.  Do you see
24      that?
25   A No, and I'm still confused.  Articles addressing the
```

1    outcome of such surgical intervention.  Without

2    reading this whole paper, I'm not certain what

3    surgical intervention they're referring to because,

4    just briefly glancing upward, I see hysterectomized,

5    non-hysterectomized, surgical menopause, so there's

6    several -- castration.  There's several different

7    surgeries they're talking about.

8    Q Okay.  Fair enough.  Go ahead.

9    A Thromboembolic events, which could be caused by

10   inappropriate use of estrogen, and here they talk

11   about that, supraphysiological levels.  So I would

12   have to review this article carefully to understand

13   the -- what -- what's going on here basically.

14   Q Fair enough.  Let me ask you this.  Do you at least

15   agree that the articles of Exhibit -- excuse me, the

16   authors of Exhibit 7 [sic] cited the same study that

17   you cited?

18   A Is this -- is this Exhibit 7 that I'm looking at now?

19   Q 67.

20   A 67.  So you're asking me if the -- I believe you're

21   asking me if the 2001 Landén study is mentioned in the

22   bibliography of the article that's on the screen?  Is

23   that the question?

24   Q Yes.  Not only that, but that they cite footnote 65 in

25   that sentence that's highlighted.

```
 1   A I don't -- I don't know.

 2   Q Do you see 65 through 68 as a --

 3   A I do.

 4   Q -- citation for that sentence?

 5   A I do.

 6   Q And if we go down to footnote 65, it's the Landén

 7     study.

 8   A I'll assume that, although I don't see that on the

 9     screen any longer.

10   Q But do you see footnote 65 on your screen?

11   A Yes.

12   Q And it's the Landén study?

13   A Yes.

14   Q Okay.  My question is do you think the fact that you

15     and the authors of 67 drew different conclusions from

16     the same study indicates that there is a reasonable

17     debate on the question of surgery among the medical

18     community?

19   A I would have no way of answering that question without

20     reading this article, reading -- and then rereading

21     the Landén article, and then I think you had a

22     compound question in there.  The second half of that

23     question, was it -- did I -- would I then opine that

24     there is controversy, or what was the second part of

25     that question?
```

1   Q Does that indicate there's reasonable debate on the

2       issue of surgery within the medical community?

3   A Not necessarily, no.

4   Q Why not?

5   A Well, it may be that this -- would you turn again to

6       the title, to the beginning of this article?

7   Q Here's page 1.

8   A So I'm not certain because the word pharmacovigilance

9       indicates cross-sex hormone, and so I'm not certain

10      how much of the article has to do with pharmacological

11      issues in treatment of gender dysphoria.  And from a

12      few brief glances at what you showed me previously, it

13      did talk about supraphysiological hormones, and it

14      talked about other conditions relating to the

15      endocrine administration of contrary hormones.  The

16      objective of this article provides specific

17      pharmacological vigilance search details, so I'm not

18      certain that that is an indication that not only that

19      there's contradiction in the Landén article but that

20      that answers the -- addresses the other question you

21      were asking about whether this singular article

22      indicates that there is controversy about the efficacy

23      of gender-affirming surgery in select individuals.  I

24      don't see any correlation there.

25          MR. FALK:  And I'm just going to interpose an

1    objection.

2  Q Fair enough.

3       MR. FALK:  I'm just going to interpose an

4    objection, if I could.  I think the question

5    presupposed accepting what that footnote says, the

6    Landén article said.  The doctor quotes the abstract

7    from the Landén article in her report, and I don't

8    think she can attempt to go behind the exhibit and

9    figure out what they mean by their footnote.  So I

10    would just object that it's not a question that the

11    doctor can answer, although she did answer.

12  Q All right.  Let's move on, Doctor.  I'm going to show

13    you what's been marked as Exhibit 68.  Let me know

14    when it's on your screen.

15  A It's on my screen, although it -- it needs to be a

16    little smaller in order to encompass the entire page.

17       Yeah, it's good now.

18  Q Okay.  Doctor, are you familiar with this article,

19    which is called, Men With Coronary Artery Disease Have

20    Lower Level of Androgens Than Men With Normal Coronary

21    Angiograms by English, et al.?

22  A No.

23  Q Okay.  Do you have any knowledge of a correlation

24    between androgen levels in men and coronary artery

25    disease?

1    A Do I personally have any knowledge?

2    Q Yes.

3    A I've never published in that area.  I've published on

4      hypertension and its relationship to cardiac

5      reactivity, but that's the limit of my knowledge about

6      this topic.

7    Q Okay.  Given that knowledge that you expressed, are

8      you able to agree or disagree with the conclusion on

9      page 1 of Exhibit 68 that men with coronary artery

10     disease have significantly lower levels of androgens

11     than normal controls, challenging the preconception

12     that physiologically high levels of androgens in men

13     account for their increased relative risk for coronary

14     artery disease?

15   A That would beyond -- be beyond the scope of my area of

16     expertise.

17   Q Okay.  I'm going to stop sharing the screen.

18          Doctor, I want to get more into your evaluation

19     of the plaintiff and what's in your report.  Let me

20     start -- it's kind of a broad question.  Is gender

21     identity biologically determined?

22   A Gender identity is, I would say, yes.  Biologically?

23     I would use a different term, maybe

24     neuroendocrinologically, but, yes, it is a -- it is an

25     in-born characteristic.  It not a lifestyle choice,

1    for example.

2    Q Okay.  And it's -- is gender identity a -- does it

3    have any mental health component?

4    A What do you mean by mental health component?

5    Everybody has gender identity.  Everybody --

6    Q Let me ask it --

7    A Everybody has a gender identity.  It's intrinsic.

8    It's a sense of belonging to a certain category such

9    as male or female.

10    Q Yeah, let me ask a better question.  Is gender

11    dysphoria a mental health issue?

12    A Gender dysphoria is a serious but fortunately

13    treatable medical condition that has attendant mental

14    health sequelae.

15    Q When you say attendant, what do you mean by attendant?

16    A I mean that there are social issues that accompany

17    individuals who are gender dysphoric that can create

18    distress and problems in living.

19    Q Okay.  So if I'm understanding you correctly, gender

20    dysphoria, is it primarily a biologically or

21    neuroendocrinologically based issue?

22    A The etiology of it is biological.

23    Q Okay.  And then the social or mental health sequelae

24    are kind of secondary features?

25    A I don't know that I'd say secondary features.  I would