1    say that for some individuals, the condition of gender

2    incongruence creates distress and creates problems in

3    living.

4  Q What is the difference, Doctor, between severe and

5    nonsevere gender dysphoria?

6  A Severe gender dysphoria -- like most of your

7    conditions, other medical conditions, gender dysphoria

8    exists on a continuum, just like, for example,

9    diabetes.  Some people can have no diabetes, they can

10   metabolic syndrome, they can have type 1 diabetes or

11   type 2 diabetes.  Diabetes that occurs early in life,

12   type 1, is far more severe than late-onset diabetes.

13        Similarly, with gender dysphoria, individuals who

14   have severe gender dysphoria, it typically appears

15   earlier in life, free -- before secondary sex

16   characteristics emerge, and it tends to be more severe

17   in the sense that it requires treatment, whereas

18   individuals who have less severe forms or aspects of

19   gender incongruence often don't require treatment.

20 Q And do you have any authority for establishing there

21   is a -- the spectrum of dysphoria from severe to less

22   severe?

23 A Well, Harry Benjamin first -- he was the first person

24   to identify the condition, did delineate that, those

25   levels of severity.

1    Q And so would WPATH have a discussion about severity

2       levels?

3    A Not -- they don't talk about severity levels per se.

4       They talk about options for treatment dependent on the

5       severity, which depend on the severity of the

6       dysphoria.

7    Q Do you have your report in front of you, ma'am?

8    A I do.

9    Q Okay.  If you could look at page 9 through 10.  Are

10      you there?

11   A I have 10.  I'm looking for 9.

12   Q Okay.

13   A Just one moment, please.  All my pages are mixed up

14      now, so this may take a minute.  I'm not trying to

15      create suspense.

16         MR. FALK:  Well, if it's any consolation, we're

17      not in suspense, so --

18         MR. CARLISLE:  Speak for yourself.

19         MR. FALK:  Okay.  Sorry.  You're right.  And

20      Gavin and Bradley's.

21   A So there's 10.  And you said 9 and 10, correct?

22   Q Yes.

23   A Okay.  I now have it.

24   Q All right.  Starting at the bottom of page 9, you

25      write, under the contemporary understanding of gender

1    identity, transition-related medical treatments

2    confirm, not change, an individual's sex by aligning

3    primary and secondary sex characteristics with the

4    person's gender identity.

5         What do you mean when you say contemporary

6    understanding?

7  A  What I mean is that a person cannot turn off or change

8    their gender identity because our contemporary

9    understanding is that this is an in-born, brain-based

10   condition, and so therefore one cannot alter it, and

11   henceforth conversion therapies are unethical.

12 Q  When you say contemporary, how long has this

13   contemporary understanding been around?

14 A  Well, in 2000, the first studies were done where

15   actual brains were visualized and the New York Times

16   reported on that, and it was -- it had always been

17   presumed as a possible hypothesis of the origin of

18   gender dysphoria since it had existed since time

19   immemorial and existed throughout the world that

20   perhaps -- and a child, different childrearing habits,

21   did not impact the development of it, no one had been

22   cured of severe gender dysphoria through

23   psychotherapy, so there were always researchers who

24   posited that it was a biological condition, and in

25   2000, some brains were examined postmortem.  Now, the

1    ability to examine brains postmortem obviously had

2    limitations because, No. 1, the people were dead, and

3    you couldn't collect a lot of brains, and also you

4    couldn't determine whether the differences that were

5    visible in those brain structures, predominantly in

6    the BSTc area of the brain, that's what they looked

7    at, was that a result of hormones that they took, or

8    was that there prior to hormones.

9        So even though researchers in 2000 saw

10   significant differences in areas of the brain,

11   questions remained; however, with advances in

12   technology, particularly functional magnetic resonance

13   imaging, it was possible to study brains of living

14   people prior to the initiation of hormones and thus

15   give information that settled that question.

16       Additionally, researchers from all over the

17   world, geneticists and people who studied alleles,

18   polymorphisms, people who study EEG irregularities,

19   there -- with the advent not only of advanced

20   technology but the computer, which allowed for these

21   people to do these -- gather a great number of studies

22   and combine, primarily in Europe where it's easier to

23   conduct research of this type than in the U.S., there

24   was a barrage of information demonstrating significant

25   and conclusive indications of biological nature of

1      gender dysphoria.

2   Q So when you use contemporary here on page 9, do you

3      mean new or in development?

4   A You mean our current?  It used to be a hypotheses.

5      It's now established that this is the etiology, and

6      even the DSM-5 talks about twin studies.  So, for

7      example, as I mention in my report, siblings are five

8      times more likely to have a sibling who also has

9      gender dysphoria, and there -- it runs in families.

10     Twins, even twins raised apart, have a high

11     concordance for gender dysphoria, and even in 2012

12     when the DSM-5 was published, they do note that in

13     there, and of course we've come a long way since 2012

14     in terms of the research in this area.

15  Q Okay.  Is there any debate in the medical community

16     about the biologic origins of gender identity?

17  A I think that there -- I don't think that there's much

18     debate about the biological origins.  I think that

19     there are people who are examining this from different

20     perspectives.  So there may not be one unifying

21     theory, but we know for instance that white matter,

22     gray matter, subcortical structures differ, and all of

23     that research is just well accepted.  It's -- there's,

24     you know -- there's no debate about that when you look

25     at the brains and when you look at that, that's --

1    that's conclusive, and that is methodologically sound.

2    And it's reported in journals where, you know, some

3    people wouldn't normally read, but I've documented

4    some of the most recent of those studies because I

5    collaborate with an individual in Spain who's done

6    quite a bit of work, if not most of the work, in the

7    area of brain and cerebral right hemisphere

8    differences in gender dysphoric individuals.

9  Q Is your opinion here or anywhere, is it your opinion

10   that transition-related medical treatments do not

11   change a person's sex?

12 A Would you repeat that?

13 Q Yeah.  Do transition-related medical treatments change

14   a person's sex?

15 A Medical treatments don't change a person's gender

16   identity.  It can confirm it.

17 Q So does that mean that -- is it possible to change

18   someone's gender identity then?

19 A Is it possible to change someone's gender identity?

20   No.  Gender identity is -- is an innate part of a

21   person's personality.  Some people experience

22   incongruity between the gender identity and their body

23   morphology or the sex they're assigned at birth, and

24   for some people that incongruity is so severe that

25   they do require some body modification in order to

1    bring into congruence their gender identity and their

2    body morphology.

3  Q So if I understand you, is gender identity a fixed

4    immutable category?

5  A For most people, it is.  There are people who say that

6    they are, for instance, nonbinary.  They may fall

7    somewhere on the continuum, they don't identify as

8    male or female, but their gender identity is

9    nonbinary.  There may be some people who say that they

10    can alter their gender identity, but those are not the

11    people that are typically seeking treatment.

12  Q Doctor, what if you had a transgender patient who in

13    the past identified as a man but now identifies as a

14    woman?  Given that gender identity is fixed, would

15    that indicate to you the person's identity is -- is

16    what?  What would that indicate to you about that

17    person's identity?

18  A It wouldn't indicate anything to me about that

19    person's identity.  I mean individuals who experience

20    some degree of gender incongruity can -- depending on

21    their age and the circumstances, the circumstances of

22    their life and how much distress it causes them or

23    nondistress.  So for example, in some cultures,

24    individuals who are born male are -- but prefer to

25    live as females and identify as females are accepted

1    into the society, and they don't experience any

2    distress.  So there's also a condition called

3    guevedoces where -- which is an intersex condition

4    which doesn't become apparent until puberty, so

5    children are raised as girls, and then at 12 or 13,

6    they develop testicles and are living -- and live as

7    boys, and that's very common in one particular area of

8    the Dominican Republic, and that's just part of the

9    culture.

10         So how a person experiences or doesn't experience

11   incongruity is a very individualized situation.

12  Q If gender identity is fixed, how can someone identify

13   as a man for some point of a life and then later

14   identify as a woman?  That seems like a contradiction.

15  A Well, what if that person doesn't know that there's

16   such a -- that they have the ability to live as a

17   woman?  I had a patient who was 87 years old who

18   married, he had children.  His wife left him because

19   she didn't think he was manly enough.  He raised three

20   daughters.  He was brilliant.  He spoke seven

21   languages.  One day he went to the doctor when he was

22   87 years old, and she told him he had an elevated PSA,

23   and she said one of the treatments for that is to give

24   you estrogen, but I'm sure you wouldn't want that

25   because that would turn you into a female, and all of

1    a sudden a light went off into his head.  He literally

2    danced down the street because for the first time in

3    his life, his life made sense to him.

4         Eighty-seven years ago, nobody knew that there

5    was a possibility of living in a gender other than the

6    one you were assigned at birth.  Christine Jorgensen

7    didn't appear until she -- that was the first time

8    Americans became aware of his phenomena.  So people

9    may have felt that they enjoyed female things or they

10   liked cooking or they were, you know -- felt more

11   feminine, they wanted to play with girls, but there

12   were no medical options available for them.  There was

13   no internet.  They didn't know that there was any

14   resources.

15   Q Sure.  But you're assuming the person doesn't know.

16     What if the person does know about transgenderism and

17     still identifies as different genders throughout his

18     or her life?  I mean --

19   A Some --

20   Q -- isn't that a contradiction with what you said, that

21     gender identity is fixed?

22   A No.  Some of those people furtively, furtively live as

23     women, they work as men, but they express their

24     femininity when they can.  Gender dysphoria

25     intensifies with age, so there are people who are able

1    to sort of squelch some of these feelings, and then as

2    they get older and DHA rises and there's some chemical

3    changes in the brain, they become destabilized, and

4    they do have to live in their authentic gender.

5           THE WITNESS:  Excuse me.  I would like to take a

6    short break and get some water.

7           MR. CARLISLE:  All right.  Let's go off the

8    record.

9           MR. FALK:  Thank you.

10          (A discussion was held off the record.)

11   BY MR. CARLISLE:

12   Q Okay.  We're back on the record.

13          Dr. Ettner, if I'm understanding you correctly,

14   in our example of a transgender patient who's had

15   knowledge of transgenderism and who has identified as

16   different genders at various portions of his or her

17   life, does it require a physiological biological

18   change every time that person changes genders?

19   A No.

20   Q But I thought gender identity was biologically

21   determined.

22   A Yes, but, for example, a person who has a degree of

23   gender incongruence, they consider themself gender

24   nonconforming or they may consider themself a

25   cross-dresser.  So at times they feel inclined to

1    appear as a female and to express that part of their

2    gender identity, that female gender identity, but they

3    don't --

4          (Technical interruption.)

5          (Reporter clarification.)

6  A  But they don't desire to modify their body.  They

7    don't have a severe form of the condition, they don't

8    have gender dysphoria.  They have a degree of gender

9    incongruence, but it is not severe, so they can live

10   in their assigned sex, but they do experience some

11   degree of gender incongruence.

12         Now, for other people, they may find that they

13   want to take hormones and a small dose of hormones may

14   make them feel comfortable, and they can live with

15   just in a way demasculinizing with taking an

16   antiandrogenic substance.  These are -- everything in

17   medicine is individually based, and people are

18   different.

19  Q  It seems like you added one more condition to our

20   hypothetical, which is if -- it might not be

21   biologically determined if you have a nonsevere form

22   of gender dysphoria, but what about someone with a

23   severe form of gender dysphoria, knowledge of

24   transgenderism, who has expressed different gender

25   identities at various points of his or her life?  How

1    can that be if gender identity is biologically

2    determined?

3  A I don't understand the question, and I think perhaps

4    I'm not explaining the answer well.

5        So gender incongruity is biologically based;

6    however, like all medical conditions, it appears on a

7    continuum.  Not everybody has a severe form.  So some

8    people can have hypothyroidism to such a small degree

9    that they don't require treatment.  Other people can

10   have Graves' disease and require massive treatment.

11   So you either have a condition or you don't, and then

12   you have it to a certain degree.

13       Now, there are people who socially transition.

14   So, for instance, I have had clients over the years

15   who have been gender dysphoric, they've taken

16   hormones, and they meet a woman, and they fall in

17   love, and they decide that they want to get married,

18   and so they go off hormones and they get married, and

19   if they have a severe form of gender dysphoria, they

20   act -- delusion does not work, and ultimately the

21   marriage fails, they return, they resume hormones, and

22   in some cases they have gender-affirming surgery.

23       So there are children -- and I realize this case

24   is not about children, but there are children who

25   transition and are simply ridiculed and, you know,

1  society is very difficult for them, so they -- they

2  revert to living in their -- in their assigned gender.

3  So there are many reasons why people might not always

4  express their gender identity, and if it is severe,

5  however, they will have to express it. Severe gender

6  identity is -- it is a serious medical condition, and

7  people will go to the ends of the earth. Literally

8  people used to go to Morocco to Casablanca before

9  there were surgeons in the United States performing

10  the surgery.

11 Q Okay. Thank you.

12      WPATH provides for a number of various treatment

13  options for dysphoria; right?

14 A For gender incongruity, yes. Yes, correct.

15 Q And WPATH allows for the exercise of independent

16  medical judgment?

17 A I don't understand that. Could you rephrase that?

18 Q Yes. Does WPATH encourage mental health professionals

19  to exercise independent medical judgment when treating

20  gender dysphoria?

21 A WPATH has guidelines and outlines what the tasks of

22  the mental health professional are and what the

23  requirements are for individuals who initiate hormones

24  or who initiate surgery, so there are some necessary

25  but not necessarily sufficient conditions for the

```
 1    treatment options, and WPATH outlines -- it's shared
 2    decision-making.  We work in multidisciplinary teams,
 3    and we consider that shared decision-making.  Patient
 4    alone doesn't make the decision; patient makes it with
 5    providers.
 6  Q So does WPATH allow for the exercise of independent
 7    medical judgment when treating gender dysphoria?
 8  A I'm still -- I'm still not understanding the question.
 9    Whose independent medical judgment?
10  Q Treating medical professionals, mental health
11    professionals.
12  A Well, mental health professionals can evaluate an
13    individual and do evaluate individuals prior to
14    surgery if you're talking about surgery.  If you're
15    talking about hormones, physicians who feel
16    comfortable and who have experience prescribing
17    hormones can initiate hormones without mental health
18    input.
19  Q Can two medical professionals determine two different
20    courses of treatment for gender dysphoria while both
21    relying on WPATH?
22  A In regards to the same patient?
23  Q Yeah.
24  A Would you repeat that question?  Sorry.
25  Q Can two different medical professionals prescribe two
```

1     different courses of treatment when treating the same

2     individual in accordance with WPATH?

3  A Are those medical professionals from the same

4     discipline or different disciplines?  For example --

5  Q Same.

6  A Same?  That would be unlikely if they are specialists

7     in this highly specialized area.  So, for example --

8  Q But possible?

9  A I think anything is possible, but, for example, a

10    surgeon may determine that a patient is too obese for

11    him to consider surgery, even though the patient

12    medically requires it, and another surgeon may say,

13    I'm comfortable doing surgery; even though the patient

14    is obese, I still believe that I can accomplish the

15    surgery, and I'm willing to provide it.  So surgeons

16    have different comfort levels with -- in terms of

17    those kinds of parameters, so they would agree that

18    the surgery is necessary, but they may disagree on

19    their willingness to perform it.

20  Q Let's narrow it down a little bit more.  Under WPATH,

21    can two reasonable medical professionals come to

22    different conclusions about whether surgery should be

23    a treatment option from the same patient?

24  A It's -- if they are from different disciplines, that's

25    not uncommon, and that's why we work in

```
 1    multidisciplinary teams.  So, for example --
 2  Q And from the same discipline?
 3  A I think from the same discipline, it's possible.  Two
 4    endocrinologists may feel that the patient's hormones
 5    are not consistent enough or have not been -- are not
 6    in an appropriate level to initiate surgery, and they
 7    may want to alter the endocrinological protocol.  Two
 8    psychologists, one who's been following the patient
 9    for years and one who is a specialist, may differ on
10    whether the patient is a candidate or whether they are
11    eligible.
12  Q Okay.  Doctor, if you could look at page 10 of your
13    report, Exhibit 45.
14  A Yes, I'm there.
15  Q Okay.  Do you see the paragraph starting genital
16    reconstruction surgery?
17  A Yes.
18  Q You write, genital reconstruction surgery for
19    transgender women has two therapeutic purposes.
20    First, removal of the testicles eliminates the major
21    source of testosterone in the body.  Second, the
22    patient attains body congruence, resulting from the
23    urogenital structures appearing and functioning as is
24    typical for non-transgendered women.
25         Doctor, focusing on the first purpose you
```

1    identify, if I could rephrase that, and tell me if I

2    have a correct understanding.  Are you saying that

3    eliminating the testes, which are the organs that

4    produce the testosterone in the body, will result in a

5    hormonal level that's like a natal woman?  Is that why

6    that surgery is a purpose under that first prong?

7  A You're partially correct and partially incorrect.

8  Q Okay.  Can you explain?

9  A Yes.  So the testicles are the target organ that

10    produce androgens, which kindle the gender dysphoria.

11    Now, when you give antiandrogen hormones to people,

12    you lower the testosterone levels; however, that is a

13    completely different path of physiology than actually

14    removing that target organ.  So the removal of the

15    target organ is a very significant reduction in gender

16    dysphoria, far more -- far more efficacious than a

17    chemical, trying to chemically suppress testosterone.

18    You're just removing the target organ entirely.

19    That's why we see, consistently in the prisons,

20    individuals attempting to remove the testicles because

21    by doing so, they would have -- they would alleviate

22    the testosterone that is really, in a sense, poisoning

23    them.

24  Q Now, at page 22 of your report, you note that the

25    plaintiff has been hormonally reassigned; right?

1    A Correct.   Correct.

2    Q So I'm just trying to understand that.  If she has the

3       same circulating sex hormones as a female, then

4       removing the testicles has the same effect as the

5       hormone treatment?

6    A No, it doesn't, though.

7    Q Why not?

8    A So the levels will be similar, but the -- but the

9       phenomenology, the psycholo- -- the feeling will be

10      different.  So, in other words, when you chemically

11      suppress hormones, you are -- hormones vary.

12      They're -- you know, they're not always exactly

13      steady, they vary.  So when you chemically suppress

14      them, you try to find a level that keeps a person in a

15      certain range, but when you remove the testicles all

16      together, people have a completely different response

17      than with a chemical suppression.

18           So I'm trying to think of an analogy, and I don't

19      think I can really think of a good one, but it's --

20      you're -- you are altering -- hormones work primarily

21      on the brain due to a feedback system.  They affect

22      every organ system in the body.  When you remove that

23      target organ, you completely alter the individual's

24      feelings, so they experience less gender dysphoria

25      because they're not -- it's like pushing against a

1    mountain when you try to suppress testosterone, but

2    when you eliminate the target organ, people just

3    immediately feel better.

4  Q So if I'm following you, the difference between

5    surgical removal of the testes and a hormone regimen

6    that will provide the same hormone profiles in a natal

7    female, is that surgery helps with the feeling of it,

8    whereas hormones does not affect the feelings?

9  A No.  Hormones do affect the feelings, but not to the

10   same extent.  So you could still have erections with

11   the -- with a chemical suppression.  You still have --

12   you know, you can still have some androgen production

13   despite taking the antiandrogens.  So you will reduce

14   the testosterone, you'll change the ratio of the

15   estrogen to testosterone, but it won't be as dramatic

16   or as impactful or as efficacious as removing the

17   organ.  So there's a difference in giving a woman --

18   in doing a hysterectomy, removing those organs, and

19   taking birth control pills, for example.

20  Q So surgical removal of the testes is more efficacious

21   than hormones because -- because the feeling of

22   incongruence is addressed better when the organ is

23   removed?

24  A Yeah, I think that's fair to say.  I would say that,

25   yes; and additionally, people who have gender

1    dysphoria will tuck their testicles so that they don't

2    have to view them.  They'll try to often insert them

3    back into the body cavity.  After a while, people will

4    experience testicular pain from tucking, and so that's

5    another reason why people are pleased when they no

6    longer have testicles, but basically it is a different

7    pathophysiology of the removal of the organ and a

8    chemical suppression, and one is more effective in

9    attenuating gender dysphoria.

10  Q Okay.  So that assumes that someone is tucking

11    testicles back into the body cavity; right?

12  A Or tucking them in some other way and wearing a tight

13    garment, which is often the case.

14  Q All right.  Let me ask you about your second

15    identified therapeutic purpose of surgery, which is

16    the patient attains body congruence resulting from the

17    urogenital structures appearing and functioning as is

18    typical for non-transgendered women.  Now, isn't that

19    the feelings prong you're talking about?  In other

20    words --

21  A If you're a woman -- if you're a woman, you don't want

22    to have a penis and testicles.  You want to have your

23    primary sex characteristics and your secondary sex

24    characteristics consistent with your gender identity.

25    That is by definition the diagnosis of gender

1    dysphoria, the desire to be rid of the primary and/or

2    secondary sex characteristics.  A person who has been

3    hormonally reassigned, and remember hormones act

4    primarily on the brain, so a person who is living as a

5    female and has male genitalia is going to be vastly

6    distressed, and they are going -- if they have severe

7    gender dysphoria, they are going to experience

8    distress that is going to intensify with time and age,

9    and they have no means of -- they have no way to

10   resolve that themself.  They can't -- they can't rid

11   themselves of those organs.  They need surgical help

12   or else they just, what, amputate their organs

13   themselves, which unfortunately some people have done.

14  Q So the second purpose you've identified, is it that

15   whether one has attained bodily congruence, the

16   feeling of congruence, is that based on the appearance

17   or the presence of the genitals?

18  A A gender dysphoric person detests their genitalia.

19   They have severe anatomical dysphoria around their

20   genitals.  They don't want to touch their penis.  They

21   don't want to look at it typically.  They don't --

22   they despise it.  It feels inappropriate.  It doesn't

23   belong there.  It's not part of them.  It's what

24   psychologists refer to as egodystonic, so they feel

25   female, they have some breast tissue, they -- if

1    they're lucky they can appear as female.  Even in a

2    prison situation they have some social accoutrements,

3    they can change their name, but they cannot rid

4    themselves of their primary sex characteristics, and

5    that is the torment of gender dysphoria.

6  Q In your report, I believe you suggest that the

7    plaintiff's medical professionals did not have

8    sufficient experience to treat gender dysphoria; is

9    that accurate?

10 A Yes.

11 Q Is that -- does that appear to be a system-wide issue

12   with the Indiana Department of Correction?  Is it a

13   training issue?  Like why do you make that conclusion?

14 A Well, I can only speak for the medical records that I

15   read, and the depositions that I read, and my

16   understanding that these individuals are not members

17   of WPATH or haven't received training in this highly

18   specialized area of medicine.

19 Q But you agree with the decision to administer hormones

20   to the plaintiff; right?

21 A Yes.

22 Q Would you have the same opinion if you knew that

23   another prisoner at the Indiana Department of

24   Corrections was approved for surgery?

25        MR. FALK:  Sorry, what opinion?  Is your question

1  about an opinion?  I apologize.

2      MR. CARLISLE:  Yes.

3 Q Is your -- would your opinion that plaintiff's mental

4  health professionals do not have sufficient experience

5  to treat gender dysphoria, would that opinion change

6  if you knew that another prisoner at DOC was approved

7  for surgery?

8 A No, that would not change my opinion.

9 Q How long did -- no.  When did you meet with the

10  plaintiff?

11 A October 23rd, 2023.

12 Q For how long did you meet with the plaintiff?

13 A I think two hours or so.

14 Q Was anyone else there during that meeting?

15 A No.  It was a videotaped -- it was held over

16  videoconferencing.

17 Q During your meeting with the plaintiff, do you think

18  the plaintiff told you the truth about everything she

19  represented to you?

20 A I think that the plaintiff expressed her feelings to

21  me in a frank and forthright manner.  Whether or not

22  every single specific -- there may have been some

23  omissions in what she told me, but in general, she

24  was -- she was straightforward, she was honest, and

25  additionally one of the psychometric tests that I

1    administered has a validity component built into it,

2    which detects malingering, fabrication, dishonesty, et

3    cetera.

4  Q You stated there may have been omissions made during

5    your meeting with the plaintiff.  What particularly

6    are you thinking of?

7  A Well, I'm not thinking of anything in particular, but

8    I think that there are certain things that people in

9    prison are loathe to admit because there may be

10   consequences if that's revealed, if I were to put that

11   in a report, or they may neglect to tell me something

12   about their history that they think might alter my

13   opinion, but I didn't have any of those suspicions

14   with Ms. Cordellioné.  I mean she was forthright about

15   her self-harm and her history, and of course I

16   reviewed all of her medical records and took a very

17   thorough history, as I've been trained to do.

18 Q So to your knowledge, based on your review of the

19   medical records, the plaintiff did not affirmatively

20   misrepresent anything during your meeting with her?

21 A I can't say that for sure.  And I certainly don't

22   recall as I sit here now every single aspect of our

23   conversation.

24 Q Are you aware that the plaintiff has admitted to

25   manipulating medical professionals to get things like

1    drugs?

2  A I am aware that the plaintiff can be manipulative,

3    yes.

4  Q And what role did that knowledge play in your

5    evaluation of the veracity of her self-reports during

6    your meeting?

7  A It didn't at all impact on my determination that

8    surgery is indicated for her.

9  Q And why is that?

10 A Because she has severe gender dysphoria, and whether

11   or not she was -- did you use the term veracity?  Was

12   I --

13 Q Yes.

14 A No.  I mean unless -- there was nothing in there in

15   our interview, in the medical records, in my

16   experience that would stop me or preclude my

17   determination, my concern of what was vital for that

18   particular patient.

19 Q And what is the mental health professional's role in

20   evaluating a patient like you did in determining

21   veracity of patient reports?

22 A Well, mental health providers are not fact-finders, so

23   it's not our job to verify every single statement that

24   an individual tells us.  Basically the mental health

25   provider is having a therapeutic interview with a

1  client, and when a psychologist is trained to

2  determine whether -- whether or not a person is being

3  reasonably forthright or if they have a motivation to

4  dissemble; is there a secondary gain, what would they

5  gain from lying to me, what would a person living in a

6  male prison gain from taking hormones and appearing as

7  female, what would be their -- what would be the --

8  how would that be them manipulating me?

9        So my training is really not just to listen to

10 what a patient says but also to understand affect and

11 to understand all of the other subtle elements of

12 interview.  So in a way, it's like when you listen to

13 a song on the radio, you hear the words, but you also

14 hear the music.  So I'm not trying to verify every

15 single thing that a patient tells me.  I'm trying to

16 understand the phenomenology of the individual, what

17 condition they have, what treatments they receive, how

18 they've responded to those treatments, what their

19 current status is, and what is medically indicated for

20 them currently.

21 Q Do you agree with the plaintiff that two hours is an

22   insufficient amount of time for a mental health

23   professional to really get to know a patient?

24        MR. FALK:  I'm going to object to representation

25 made by -- made by the plaintiff.  You can certainly

```
 1    ask the doctor if she thinks that's a sufficient
 2    amount of time, but I don't think appropriate to
 3    characterize what the plaintiff said when the
 4    plaintiff is not here.
 5  Q You can answer.
 6  A Would you repeat the question?
 7  Q Do you agree with the plaintiff that two hours is an
 8    insufficient amount of time for a mental health
 9    professional to really get to know a patient?
10  A To really get to know a patient?
11  Q Yes.
12  A I think two hours is probably insufficient time to
13    really get to know anybody; however, I don't think
14    it's an insufficient amount of time for a specialist
15    like myself, who has a singular task, which I've been
16    trained to do and have done for decades, to evaluate
17    whether or not an individual needs medically
18    necessarily treatment.
19  Q Doctor, apart from the plaintiff's self-reports, is
20    there any evidence that this plaintiff has severe
21    gender dysphoria?
22  A Sure.  Yes.
23  Q And what is that?
24  A She's been diagnosed with gender dysphoria.
25  Q Based on her self-reports.
```

1   A I'm sorry?

2   Q Based on self-reporting; right?

3   A No.  She received a diagnosis from -- from the

4     Department.  She met the criteria and received a

5     diagnosis, and based on that diagnosis, someone deemed

6     her a candidate for cross-sex hormones.

7   Q Are you referring to the mental health professionals

8     whom you said lack experience in treating gender

9     dysphoria?

10  A Yes.  Someone in the Department diagnosed her with

11    gender dysphoria and initiated hormone treatment, and

12    she meets the criteria according to the DSM-5.

13         Was there a further question there?

14  Q Yes.  I guess anything else?

15  A Anything else regarding?

16  Q So my original question was apart from self-reports,

17    what evidence is there that this plaintiff has severe

18    gender dysphoria.  You indicated her diagnosis.  Is

19    there anything else apart from self-reports and her

20    diagnosis?

21  A Her behavior.

22  Q What do you mean by that?

23  A I mean her ideation and attempts to remove her own

24    genitalia, her social transition, her -- the

25    development of secondary sex characteristics,

1  consolidation of a female identity while living in a
2  male prison, a continued distress, very significant
3  distress, she displays around her genitals, her -- she
4  takes a shower and doesn't undress completely because
5  she doesn't want to look at her genitals.  There's a
6  severe amount of anatomical distress around her
7  primary sex characteristics, and she has the typical
8  tell-tale signs of an individual, who despite being
9  steady on cross-sex hormones, still experiences a
10  significant degree of gender dysphoria.
11 Q Doctor, what -- you mentioned the plaintiff's distress
12  over the appearance, the presence of her genitals.
13  What evidence do you have that that distress has
14  resulted in significant -- clinically significant
15  impairment in social functioning or ability to work?
16 A Well, I don't consider those criteria in terms of
17  people who are living in a prison situation who don't
18  have to maintain a normal occupation or live within a
19  family or, you know, otherwise socialize.  So in the
20  prison context, there are other implications of
21  clinically significant distress.
22 Q So in the prison context, the social or occupational
23  functioning of the patient is not a relevant
24  consideration or criteria of the diagnosis?
25 A It can be or it cannot be, depending on the

1    individual.  The criteria for the diagnosis is

2    clinically significant distress.

3  Q Or impairment in social, occupational or other

4    important areas of functioning.  Are you aware that

5    the plaintiff has a job?

6  A The operative word there being or.

7  Q Are you aware that the plaintiff has a job?

8  A I don't know at this point in time if she has a job or

9    not currently.

10 Q Are you aware that the plaintiff socializes in prison?

11 A Plaintiff did discuss some social situations in

12   prison.

13 Q Do you have any evidence that those two areas,

14   occupational or social, are impaired in her

15   functioning?

16 A I don't have that evidence, no.

17 Q Doctor, you said that in the prison context, this DSM

18   element of clinically significant distress or

19   impairment in social, occupational or other important

20   areas of functioning does not apply equally as in the

21   community; is that accurate?

22 A It may not apply.  It may not apply in the same way

23   that it would in the community.

24 Q Doctor, I thought WPATH instructed that the guidelines

25   have to apply similarly -- no, identically in prison

1    as they do outside of prison.  Is that a misguided

2    understanding?

3  A Yes, it is.  The treatment.

4  Q But not the diagnosis?

5  A Oh, well, the diagnosis is established:  Marked and

6    sustained gender dysphoria is the diagnosis and the

7    first criteria for surgery, marked and sustained

8    gender dysphoria, a gender dysphoria diagnosis in

9    regions where that's important, information about

10   implications on reproduction, no other possible

11   condition would explain the gender dysphoria,

12   stability on hormones for at least six months, and the

13   ability to provide informed consent.

14        Finally, no mental health or physical ailment

15   contradicts the indication for surgery.  That's the

16   associated guidelines which are the necessary but not

17   sufficient indications for genital reconstruction.

18        MR. CARLISLE:  Do you want to take a break?

19        THE WITNESS:  Yes, please.

20        MR. FALK:  How much longer do you have, do you

21   think?

22        MR. CARLISLE:  I think -- let's go off the

23   record.

24        MR. FALK:  Oh, I'm sorry.  Yes.

25        MR. CARLISLE:  That's okay.

1          (A discussion was held off the record.)

2     BY MR. CARLISLE:

3     Q We're back on the record.

4          Dr. Ettner, how many transgendered prisoners have

5       you evaluated?

6     A Well over a hundred in 20 different states.

7     Q Of those prisoners, how many have you been asked to

8       consider whether a surgery is appropriate as a

9       treatment option?

10    A Maybe 20 percent, 25 percent.

11    Q And of that 20 to 25 percent, how many have you

12      recommended receive surgery?

13    A How many have received it or how many have I

14      recommended receive it?

15    Q How many have you recommended should receive surgery

16      in your opinion?

17    A Of those that I was asked to opine on whether surgery

18      was necessary?

19    Q Correct.

20    A Probably 90 percent of that group.

21    Q Of the 10 percent that you did not recommend for

22      surgery, what, if you could generalize, was the reason

23      or what were the reasons for not recommending surgery?

24    A Primarily two reasons:  One was severe mental illness

25      psychosis and a detachment from reality, even though

1    they did have gender dysphoria, and in the other
2    cases, they had not met the criteria for readiness.
3  Q Okay.  How many expert witness reports have you
4    submitted on behalf of transgendered prisoners who
5    have filed lawsuits?
6  A How many expert witness reports -- would you repeat
7    that?
8  Q How many expert witness reports have you submitted on
9    behalf of transgendered prisoners who have filed
10    lawsuits?
11 A Well, I've worked on some class-action suits that
12    involve numerous prisoners, named plaintiffs and
13    unnamed plaintiffs.  I honestly don't know the answer
14    to that question.
15 Q Those reports would be in your CV; right?
16 A No.  They're not in my CV.
17 Q Okay.  So --
18 A So I have written reports on cases where I've been
19    retained for prisoners, not all of those have been
20    regarding surgery.
21 Q Have they all been related to the treatment the
22    prisoner has received for his or her gender dysphoria?
23 A No.
24 Q Well, can you estimate that figure?  How many expert
25    reports have you submitted on behalf of transgendered

1    prisoners relating to their treatment in prison for

2    their gender dysphoria?

3  A  I would have to count.  I would have to go back and

4    actually look in my files, otherwise I'm just

5    guessing.

6  Q  More or less than 50?

7  A  Reports for people regarding treatment for gender

8    dysphoria in prisons?

9  Q  Yes.

10  A  I would say less than 50.

11  Q  Closer to 10 or 20?  Just an estimate.  I'm not going

12    to hold you to these numbers, just want an idea.

13  A  Closer to 20 definitely.

14  Q  Okay.  So more than 20, less than 50?

15  A  Well, encompassing all aspects of treatment,

16    including, you know, psychotropic medications,

17    accommodations, transfer to a different prison, things

18    like that.

19  Q  My question is of those reports, do you -- do you

20    always include a section about the risk of suicide or

21    self-harm if the treatment is -- the course of

22    treatment is not changed in some manner?

23  A  No.

24  Q  When do you not include a section like that?

25  A  When it's not appropriate to the -- to the matter that

1      I'm addressing.

2    Q Okay.  How many -- how many times have you indicated

3      in a report that there's a possibility of suicide or

4      self-harm risk for a transgendered prisoner?

5    A As many times as I've felt that the person was at risk

6      for suicide or self-harm.

7    Q Do you do that for any time surgery is the subject of

8      the report?

9    A No, not necessarily.

10   Q When would you not include that for a surgery report?

11   A It would depend on the individual that I'm assessing,

12     their level of resilience, how long they've been in

13     custody and other factors, are they in jail, are they

14     on hormones, how long have they been on hormones, etc.

15     I mean every person is an individual, so it would

16     depend, but there is a risk of three trajectories for

17     individuals who have severe gender dysphoria and are

18     in imminent need of treatment, and I will discuss

19     those if I think it's applicable.

20   Q If you could look at your report, Exhibit 45, page 25,

21     please.

22   A Sorry.  This is going to take a minute.

23   Q Take your time.

24   A It doesn't help that I can't see very well either, so

25     hang on.  Did you say 25?

1  Q Yes.

2  A Got it.

3       MR. FALK:  Excuse me.

4  Q All right.  In the top paragraph, second sentence, you

5     indicate that the plaintiff's care providers have

6     noted no suicidal ideation.  Do you see that?

7  A Yes.

8  Q And I understand that is based on the initiation of

9     hormones since 2020; correct?

10 A I think so, yes.

11 Q Let me ask you, Doctor, is there any evidence you've

12    seen to suggest that this plaintiff is at risk for

13    suicide attempt?

14 A The plaintiff has, I believe, six prior suicide

15    attempts, and prior suicide attempts are the

16    single-most influential factor in predicting completed

17    suicides.  So when someone has prior suicides, they're

18    always at a higher risk than individuals without a

19    history of suicide attempt.

20 Q You understand those prior suicide attempts were

21    before the plaintiff received a diagnosis of gender

22    dysphoria; right?

23 A Yes.

24 Q And how does that affect the analysis of suicide risk?

25 A It makes it less likely.

1   Q Is it accurate to say that the plaintiff's course of

2      hormone treatments has lessened her suicidal ideation?

3   A Yes.

4   Q If you could go to page 22 and 23 of your report,

5      please.

6   A Okay.

7   Q All right.  22, the bottom, the last sentence you

8      write, for transgender women residing in carceral

9      settings, ideation about surgical self-treatment,

10     auto-castration or auto-penectomy or actual attempts

11     are a tell-tale sign that treatment is inadequate and

12     surgical intervention is medically necessary.

13          Do you see that?

14  A Yes.

15  Q And then you go on to write, Ms. Cordellioné did once

16     attempt penile ligation, and that footnote 4 --

17  A Yes.

18  Q -- attempts at surgical self-treatment should not be

19     viewed as evidence of uncontrolled mental illness.  On

20     the contrary, such behavior represents a rational

21     intention to eliminate the testosterone by removal of

22     the androgen-producing target organ.

23          Did I read that right?

24  A Yes.

25  Q When you say rational in footnote 4, is that a typo?

1    A No.

2    Q Are you concerned that by characterizing self-ligation

3       attempts as rational, it will encourage more prisoners

4       with gender dysphoria to attempt self-harm?

5    A No.

6    Q Did you tell this plaintiff that a ligation attempt is

7       rational?

8    A I don't recall telling her that.

9    Q Tell me about the -- the note in your report that we

10      just read about the plaintiff did once attempt penile

11      ligation.

12   A What would you like to know about that?

13   Q What did the plaintiff tell you about that incident?

14   A That they used some device to attempt to strangulate

15      the penis or the -- was it penal ligation?  Yes.  And

16      the pain was very -- it was very painful, so on that

17      occasion, they stopped.

18   Q So ligation, that's an attempt to cut off the blood

19      flow?

20   A To strangulate the testes or penile.  Prisoners use

21      any number of devices.  Dental floss, string, rubber

22      band are common.

23   Q And this plaintiff told you she attempted to do this

24      to her penis, and do you know when she attempted to do

25      this?

1    A I don't recall as we sit here now precisely when.

2    Q Do you know any of the circumstances about where she

3       was or what she did after?  I mean do you have any

4       more details about that?

5    A Not that I recall, only that ideation and attempts at

6       ligation strangulation or cutting are incredibly

7       frequent, and Brown & Brown and McDuffie have

8       documented that extensively in the literature, and in

9       my own experience of meeting with countless

10      individuals and reading tens of thousands of medical

11      records, people frequently will attempt ligation of

12      the penis, the testicles or, if they have the

13      opportunity to actually cut, they will cut the

14      testicles.

15   Q This is not a -- I don't mean to be flippant when I

16      ask this, but are ligation attempts painful?

17   A Sure.

18   Q Do prisoners who attempt ligation usually seek medical

19      treatment after?

20   A Not typically.  Typically what happens with these

21      attempts is if cutting is involved, prisoners are

22      frequently almost always unaware of the amount of

23      blood when they cut the testicles, and the amount of

24      blood is either -- becomes conspicuous, at which point

25      they are found out and either -- and taken away,

1  treated.  There's consequences.  Sometimes the

2  spermatic cords can actually retract, which is also a

3  difficulty, and that causes severe pain, so many of

4  these attempts are discovered.

5       Ligation can be hidden, so people will tie a

6  rubber band around their penis, sometimes for a week

7  at a time or as long as they can stand it, and we've

8  actually had cases where people have flushed a penis

9  or testicles down the toilet.

10 Q So would you be surprised if a prisoner claimed to

11   have cut the scrotum but there's no indication that

12   the prisoner received medical treatment after the

13   cutting incident?

14 A No.

15 Q Even though cutting the scrotum results in a large

16   amount of blood loss?

17 A It depends on how deep they cut and where they make

18   the incision.  Sometimes they are -- sometimes they're

19   MedEvaced out to an emergency room depending on the

20   amount of blood loss.  Other times they're just -- you

21   know, it's minor.

22 Q Would you be surprised to know that the plaintiff

23   mentioned three testicular ligation attempts?

24 A No.

25 Q But the plaintiff did not tell you about those

```
 1    attempts during your meeting?

 2  A No.

 3  Q Would you be surprised if the plaintiff didn't mention

 4    a penile ligation attempt?

 5  A No.

 6  Q On page 25 of your report --

 7  A Okay.

 8  Q Okay.  There's a section on page 25, the heading,

 9    other possible causes of apparent gender incongruity

10    have been identified and excluded.  Do you see that?

11  A Yes.

12  Q And you point to a note in the medical records from

13    Dr. Gale where he states he couldn't find any

14    undiagnosed psychopathology to better explain the

15    transgender identity of this plaintiff.

16  A I see that.

17  Q All right.  And apart from relying on that note from

18    Dr. Gale, is your conclusion in this section based on

19    any other evidence?

20  A Yes.

21  Q And what is that other evidence?

22  A It was my evaluation of Ms. Cordellioné and my

23    conclusion that she was suffering from gender

24    dysphoria.

25  Q Okay.  And how in your evaluation did you exclude any
```

```
 1    other possible causes of her expressed symptoms?
 2  A Well, I can't think of any other cause other than a
 3    psychotic delusion, you know, a person thinks that
 4    they're the Virgin Mary, something like that that
 5    might explain a desire to appear as a female.  There
 6    was no other possible explanation other than gender
 7    dysphoria.
 8  Q Did you -- what effect did the plaintiff's borderline
 9    personality disorder diagnosis have on your
10    evaluation?
11  A It was something that I noted, and it was something
12    that is -- was historically documented in her medical
13    records.
14  Q And what effect did that have on your evaluation?
15  A It had no effect on her -- on my determination that
16    surgery is medically necessary for Ms. Cordellioné.
17  Q What about any other current or historical mental
18    health quote comorbidities that the plaintiff has or
19    has had?
20  A If they render her so detached from reality, such as a
21    labeled psychosis, dementia, some organic brain
22    dysfunction, some bipolar psychotic episode that would
23    prevent her from being capable of participating in a
24    medical decision, providing informed consent.  If she
25    was detached from reality or had, you know, some
```

1     serious cognitive impairment, that would make her an

2     unsuitable candidate for gender-affirming genital

3     reconstruction.

4 Q Did you discuss the risks and complications of

5     orchiectomy or vaginoplasty with the plaintiff?

6 A No, not in any detail.

7 Q What psychosocial difficulties do trans prisoners

8     face, if you could generalize?

9 A What psychosocial difficulties --

10 Q Yes.

11 A -- do transgender prisoners?

12 Q Yes.

13 A The question?

14 Q Yes.

15 A What is the end of the question?  Do they face?

16 Q Yes.  What psychosocial difficulties do trans

17     prisoners face?

18 A Well, I would be generalizing depending on the

19     carceral institution, but in general appearing as a

20     female in a male prison can be hazardous.  It can

21     leave an individual open to sexual exploitation.  I

22     had a case recently where a transgender woman would be

23     sexually assaulted while she was sleeping, and so it

24     can be a dangerous situation for an individual, and of

25     course it can be -- they can be subject to social

1    difficulties.  They may not have access to the

2    healthcare or the female commissary items that would

3    make them more comfortable.  I, again, had a patient

4    who didn't leave her cell for nine months, didn't

5    shower for nine months because she was so fearful as a

6    woman living in a male prison.

7         So depending on the prison, depending on the

8    individual, depending on the cultural climate,

9    depending on the staff, there's a great deal of

10    variation, but it's never an easy -- it's not an easy

11    objective.  It's always challenging for a prisoner to

12    come out and attempt to transition in a male carceral

13    institution.

14   Q And is it fair to say that those generalized

15    psychosocial difficulties you described prisoners

16    facing are different than what trans people in the

17    community face?

18   A Again, I think it depends on the situation.  Depends

19    on a person's socioeconomic status, it depends on

20    their geographical location, their age.  I mean there

21    are so many factors.  I mean Caitlyn Jenner probably

22    had an easier time than someone living in rural

23    Florida.

24   Q But you would agree that the prison context presents

25    particular context that is not the same as a community

```
 1      context?
 2    A I agree that prisons are different than communities
 3      where people have access to care and people have
 4      agency that prisoners don't have.
 5    Q Is this plaintiff receiving adequate treatment for her
 6      gender dysphoria?
 7    A I'm sorry.  I didn't hear you.  You broke up.
 8    Q Is this plaintiff receiving adequate treatment for her
 9      gender dysphoria?
10    A No.  She requires additional treatment.
11    Q And -- and how do you know that?
12    A Because I evaluated her.
13    Q And so the only -- is the only reason that you say she
14      requires additional treatment based on her
15      self-reports during your evaluation?
16    A No.
17          MR. FALK:  And I'm going to object just because
18      it's been asked and answered, but you can keep
19      answering.  Sorry.
20    Q Apart from her self-reports, what other evidence do
21      you have that her current course of treatment for
22      gender dysphoria is inadequate?
23    A The treatment she's received so far has not eliminated
24      her gender dysphoria.  She experiences extreme
25      distress, and she is attempting surgical
```

1    self-treatment, which is a tell-tale sign that

2    treatment is insufficient and that hormones alone have

3    not adequately attenuated the gender dysphoria.

4    Q Anything else?

5    A My experience in evaluating patients.

6    Q Of course.  But I mean anything else particular to

7    this plaintiff?

8    A Yes.  I mean all of the -- all of the stigmata of

9    severe gender dysphoria:  Ligation, ideation, repeated

10    attempts at -- of auto-castration or auto-penectomy.

11    Her, she spends hours removing hair trying to remove

12    the stigmata, the secondary sex characteristics.

13    Her -- the inability to tolerate or even to talk about

14    her male genitalia, her extreme distress about the

15    incongruity of her primary sex characteristics.

16    Q And you know all that based on her self-reports;

17    correct?

18    A No.

19    Q All right.

20         MR. CARLISLE:  Let's go off the record.

21         (A discussion was held off the record.)

22         MR. CARLISLE:  All right.  We're back on the

23    record.  And, Doctor, at this time I have no further

24    questions.  I thank you for your time.

25         THE WITNESS:  Thank you.

```
1    CROSS-EXAMINATION

2    BY MR. FALK:

3    Q Doctor, at the very beginning of this deposition you

4      were asked who was present when you were prepared by

5      your attorneys, and you mentioned I was present.  Were

6      other -- were Gavin Rose and Stevie Pactor there as

7      well?

8    A Yes.

9    Q Just wanted to make that clear.

10          And -- and I apologize.  This is probably because

11     it involves numbers, and I'm not good with numbers.

12     You had mentioned that there's a certain percentage of

13     orthopedic surgeries of a certain type that are not

14     based on randomized control trials and, in fact, based

15     on low-level evidence.  Do you remember those

16     questions?

17   A I do, yes.

18   Q Could you -- could you tell me -- and maybe everyone

19     else understood, but could you tell me what the

20     percentages were we were talking about?

21   A Only one out of every 10 orthopedic surgeries are

22     supported by rigorous scientific evidence.

23   Q Thank you.  And you were asked a series of questions

24     by Mr. Carlisle concerning whether there's debate

25     about the efficacy of gender-affirming surgery or
```

```
 1    perhaps also gender-affirming care in general.  Do you
 2    remember those series of questions?
 3  A Yes.
 4  Q And are there individual practitioners who disagree
 5    with WPATH?
 6  A Yes.  I'm aware that there are individuals who
 7    disagree with WPATH, and who even disagree that there
 8    is such a thing as gender dysphoria or a need for
 9    surgery, but those individuals are -- fall outside of
10    the mainstream of medical and scientific consensus.
11  Q Okay.  And, Doctor, I think in response to my question
12    about the -- where you gave the answer of 10 percent,
13    that -- that 90 percent, what is -- what is that
14    supported by, if anything?
15  A Well, the Cochrane reviews, which look at the evidence
16    and the level of evidence for procedures, has
17    determined that 94 percent of the procedures that they
18    reviewed, which was 1,567, 94 percent of those
19    procedures did not have significant high levels of
20    evidence, that most of those procedures were based on
21    guidelines and clinical consensus.
22  Q And by high-level evidence, do you mean things like
23    randomized controls?
24  A Randomized controlled trials, double-blinded studies,
25    you know, placeb- -- you know, the use of placeboes in
```

1    studies, rigorous scientific methodology.

2  Q Was only present for 10 percent of the surgeries or

3    less than 10 percent?

4  A Correct.

5         MR. FALK:  I have no further questions.

6         MR. CARLISLE:  Nothing on those.

7         THE REPORTER:  This concludes the deposition of

8    Randi Ettner, PhD.  Would counsel please state if they

9    wish a copy of the transcript, any stipulations or

10   other matters to be included in the record.

11        MR. FALK:  Plaintiffs would like a copy.  I can

12   talk to the client off record, if that's okay, about

13   signature.

14        MR. CARLISLE:  Defendant would like a copy.

15   E-tran is fine.

16        MR. FALK:  An E-tran is fine for Plaintiff.

17        THE REPORTER:  Do you both want exhibits

18   attached?

19        MR. CARLISLE:  Yes, please.

20        MR. FALK:  Yes, please.  Thank you.

21        (A discussion was held off the record.)

22        MR. FALK:  We will take signature.  Thank you.

23   And the court reporter will e-mail that to me, and

24   I'll e-mail it to you, and we'll review it as well

25   because we want to relive the experience as well.

 1   (The deposition concluded at 1:40 p.m.)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25