EXHIBIT
**103**

# EXPERT REBUTTAL REPORT OF DR. RANDI C. ETTNER, PH.D.

Randi Ettner, being duly sworn upon her oath, says that:

1.      As stated in my Expert Report dated December 8, 2023, that was previously submitted in this action, I am a clinical and forensic psychologist with expertise concerning the diagnosis and treatment of gender dysphoria. I have been asked by counsel for Plaintiff Autumn Cordellione' to provide the Court with my expert opinions addressing the expert report of Dr. Stephen Levine, submitted by defendants in Ms. Cordellioné's lawsuit seeking gender affirming surgery. While this expert rebuttal report does not address all of the deficiencies in the expert report of Dr. Levine, I have tried to highlight below the most serious errors.

2.      Dr. Levine was an author of the Harry Benjamin International Gender Dysphoria Association (the precursor to WPATH) Standards of Care 5th version, published in 1998 (SOC 5) (Attached).  Three years later, this iteration of the SOC was replaced by SOC 6, as knowledge of the condition advanced. Dr. Levine objected to the changes in transgender healthcare that occurred after 1998, and withdrew from the organization. He has been critical of WPATH and the standards the organization promulgates, and frequently provides testimony denying care to incarcerated gender dysphoric persons.

3.      As an expert in this field, I am familiar with Dr. Levine's opinions on the treatment of gender dysphoria, which differ in concerning ways from well-established standards of care, medical and scientific research, the position of virtually every professional medical

organization, and are based largely on his personal views. Dr. Levine asserts that clinicians and researchers working in the field of transgender healthcare, are guilty of "confirmation bias"—the tendency to regard information in a way that confirms or supports one's beliefs or opinions. Yet, Dr. Levine's own bias is evident and pervasive. In *Norsworthy v. Beard*, U.S. District Judge Tiger wrote: "The court gives very little weight to the opinions of Levine, whose report misrepresents the Standards of Care, overwhelming relies on generalizations about gender dysphoric prisoners, rather than the individualized assessment of Norsworthy; contains illogical inferences and admittedly contains references to a fabricated anecdote."

4.     Dr. Levine's assertion that the evidence for treatment of gender dysphoria is "low quality" belies his knowledge of research methodology. The gold standard in research is randomized clinical trials which represent the highest level of quality of evidence.  Dr. Levine's position implies that only treatments supported by randomized clinical trials are acceptable, a position I disagree with vehemently. Physicians and scientists routinely rely on lower level evidence, especially when high quality evidence is unavailable or cannot ethically or practically be obtained. Clinicians routinely benefit from and rely on clinical guidelines, case studies and case series, cohort studies, observational studies, and expert clinical and international consensus in regards to treatment of a particular clinical condition.

5.    Many psychiatric disorders, including PTSD, bipolar disorder, and even depression, are treated with drugs that don't rely on studies that demonstrate, via randomized controlled trials, the superiority of one drug versus another[1]. In fact, physicians often consider the individual patient when determining which medication to prescribe.

6.    Most surgical treatments are not amenable to randomized clinical trials. An individual obviously *knows* whether or not they have undergone surgery, making it impossible to conduct double blind studies. Further, it is considered unethical to deny an established medical or surgical treatment for the sole purpose of establishing a control group.  In 2013, the Royal College of Psychiatry addressed this, stating that it is impossible and unethical to conduct studies of gender affirming surgery using randomized controlled trials (p. 49).

7.    The Cochrane Database of Systematic Reviews identifies and appraises all evidence to answer a specific research question in healthcare. In a sample of 1,567 interventions studied within Cochrane reviews, the Journal of Clinical Epidemiology found 94% were not supported by high quality levels of evidence.[2] Despite a lack of

---

[1] An example is propranolol, a medication indicated for hypertension, is often prescribed for anxiety as it reduces the symptoms despite a lack of evidence.

[2] Howick, J., Koletski, D., Joannidis, J. et al. Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. *Journal of Clinical Epidemiology*, 148; 2022.

strong evidence, and based on national guidelines and clinical recommendation, surgeries such as rotator cuff repair (which 50,000 Americans undergo yearly), arthroscopic knee repair and many other surgical procedures have the same level of evidence as gender affirming surgery.

8.      Dr. Levine's opinion that high levels of evidence must undergird medical recommendations completely discounts clinical judgment and is in opposition to the National Commission on Correctional Healthcare (NCCHC) 2020 position statement on transgender healthcare advising reliance on "*clinical decision making* to initiate or advance hormone medication treatment or candidacy for surgical interventions" (emphasis added) and indicating that such decisions should be made on a case-by-case basis.[3] Providers have relied on their training and clinical judgment to provide case-by-case recommendations regarding medical and surgical treatments long before the GRADE assessment rating system was established and continue to do so.

9.      Dr. Levine ignores data regarding the etiology of gender dysphoria and the conclusion that it has a biological basis. In my report I cite evidence of scientific investigations that demonstrate that gender identity has biological underpinnings, such

---

[3]     National Commission on Correctional Health Care, Transgender and Gender Divers Health Care in Correctional Settings (2020), available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings 2020.pdf.

as studies involving endocrine disruption, prenatal hormonal influences, genetic contributions, and neurodevelopmental cortical studies.

10.     For example, studies show that prenatal sex hormones have a lasting impact, affecting sexual dimorphism both pre-and-postnatally (Galis, et al., 2010).  And follow-up studies have established that decreased prenatal androgen exposure is implicated in the development of gender incongruity in transgender women (Schneider, et al., 2006). In addition, multiple studies of twins demonstrate genetic heritability, and researchers have directly examined gene alleles that influence gender formation.  Indeed, several landmark studies have been undertaken to directly assess the role of specific genes on the androgen and estrogen receptors.  For example, Henningsson et al. (2005) found that transgender women differed from controls with respect to the mean length of the estrogen receptor beta (ERb) repeat polymorphism, suggesting lesser effective function of the ER receptor. And Bentz et al. (2008) found transgender men to differ from non-transgender controls in a specific allele distribution pattern, and to display an allele distribution akin to male controls. The identified gene, CYP17, is associated with gender incongruity, as is the loss of the female-specific genotype distribution. In addition, Hare et al. (2009) looked at polymorphisms in genes involved in sex steroid genesis. Specifically, they examined repeat length variants in the androgen receptor (AR), the estrogen receptor beta (ERb), and aromatase (CYP19) genes. They found a significant association between gender incongruity in birth-assigned males and the AR gene.

Furthermore, as I previously pointed out in my report, the advent of sophisticated brain imagery techniques enabled researchers to study large numbers of brains in vivo, overcoming the limitation of small sample size in post-mortem studies. Studies pre- and post-hormone treatment reveal that transgender women,  transgender men, non-transgender women, and non-transgender men present clear and distinct phenotypes, with respect to the gray and white matter of the brain (e.g., Mueller, et al., 2021). Transgender people differ from non-transgender people in the microstructure of the brain bundles that connect the regions of the brain.[4]

11.      Thus, while the specific biological genesis of gender incongruity is still a matter of study, scientific study and data point to the inescapable conclusion that gender identity and gender incongruity have biological underpinnings and are not a matter of choice.  As a recent review of scientific studies from 1948 to 2019 concluded: "gender identity is one of the most sex-specific human trait[s], and many studies show how brain sexually dimorphic structures are often in line with gender identity rather than with sex assigned at birth" (Risoti, et al., 2020).

12.      While Dr. Levine criticizes the methodology of a few studies designed to show the benefit of surgical intervention, he does not refute the findings of any of the

---

[4]  Transgender women show demasculinization of these bundles (Rametti, et al., 2011a), while transgender men show a masculinization in some bundles (Rametti, et al., 2011b).

aforementioned scientific studies. He simply ignores this entire body of international scientific research as it flies in the face of his belief that gender dysphoria is a condition that can be altered by volition or psychotherapy.

13.     Even if one disregards the preponderance of evidence that gender dysphoria is a medical condition that arises prenatally, the provision of healthcare doesn't require withholding treatment until complete and perfect knowledge about the origins of a condition is established.  There are many medical conditions for which we don't have complete understanding. We don't know the origins of many cancers nor can the unusual prevalence of colon cancer in young adults be explained. Medical knowledge regarding fibromyalgia, autoimmune disorders and many psychiatric disorders lack clear etiological pathways, but if treatment is available, reduces suffering and is the standard of care, it is provided.

14.     Given Dr. Levine's insistence on high quality evidence, it is ironic that he has no compunction making bold assertions without citing any data or research to support his claims. To cite but one example, he states that "male inmates are generally unable to trust their assigned mental health professionals: They resist discussing their developmental histories and prefer not to recognize their anger from their childhood and adolescent adversities. They are often manipulative, paranoid, and cannot be depended on to tell the full truth about their past or current life. They tend to externalize blame, and act out, rather than recognize and process what they feel. Inmates end up feeling that no one in

the DOC cares about them and their gender dysphoria." This gross generalization lacks even low quality evidence. Having evaluated gender dysphoric individuals in 20 states at 47 different institutions, this stereotype of gender dysphoric inmates does not comport with my experience.

15.     Dr. Levine's report is riddled with erroneous assertions. For example, he states without evidence, that the same people who wrote The Endocrine Society Guidelines also wrote the WPATH SOC. The Endocrine Society Guidelines were co-sponsored by, among others, the American Association of Clinical Endocrinologists, the American Society of Andrology, the European Society of Endocrinology and the Pediatric Endocrine Society.[5] WPATH has 3,300 members, and endocrinologists are a small subset of the membership.

16.     The 5th iteration of the Standards of Care, which Dr. Levine oversaw, outlines the criteria for surgery to be "undertaken for the treatment of the patient's gender identity disorder." It further advised providers to take a compassionate stance: "The resistance against performing surgery on the ethical basis of 'first do no harm' should be respected, discussed, and met with the opportunity to *learn about the psychological distress of having a gender identity disorder from the patient themselves."* (emphasis added). But Dr. Levine did

---

[5]   The Clinical Guidelines Subcommittee  of the Endocrine Society deemed the diagnosis and treatment of individuals with gender dysphoria/gender incongruence a priority area for revision and appointed a task force to formulate evidence-based recommendations. The task force followed the approach recommended by the Grading of Recommendations, Assesssment, Development and Evaluation Group, an international group with expertise in the development and implementation of evidence-based guidelines. The task force commissioned two systematic reviews to support the guidelines.

not heed this advice in regards to Autumn Cordellione'. He did not interview Ms. Cordellione' (who he often refers to as both "he" and "she" throughout his report), nor did he speak with her to understand her distress. Instead, he relied on a review of medical charts, a 12-minute viewing of a PREA recording and his belief that gender dysphoric prisoners are all irreparably damaged, unable to provide informed consent, and have ulterior motives in their quest for surgery.

17. Dr. Levine asserts, in what appears to be psychoanalytic prognostication regarding Ms. Cordellione': "Sex has always been a problem for this inmate. Getting rid of her genitals is just the most recent dramatic solution of her memories of abuse and perhaps other problems relating to his past impulses. Removing them cannot possibly extirpate his memories of them and how they were used by himself and others in harmful ways." p. 45.

18. Dr. Levine uses a kitchen sink approach, to not only deny surgery to Ms. Cordellione' but as de facto denial of gender affirming surgery for any prisoner. He asserts there is a lack of long-term studies demonstrating the efficacy of surgery, poor methodology of a few cherry-picked studies, deleterious surgical outcomes and, in the particular case of Ms. Cordellione', psychopathology and asthma, which he maintains renders her ineligible for surgical treatment.

19. My assessment of Ms. Cordellione' and a review of her medical records rule out the presence of any mental health or medical concerns that would contraindicate surgery

(SOC assessment criteria attached). Ms. Cordellione' is able to consent to treatment, she has no thought disorders, no brain injury, or cognitive impairment.

20.     A diagnosis of borderline personality disorder does not categorically prevent or contraindicate gender affirming surgery. Personality disorders are characterological and considered to be lifelong. Under the SOC, these conditions must be well-controlled. Ms. Cordellione's mental health has improved dramatically over time and with the benefit of hormonal treatment. She has not received  psychotropic medication since 2011. In May, 2023, a treating mental health provider described Ms. Cordellione' as "articulate, engaging, and forward looking...Likes to engage in psychotherapy to better herself." To deny treatment to a patient with controlled mental health issues would be medically unconscionable.

21.     There is a greater prevalence of asthma in transgender individuals, and asthma is not a contraindication for surgery.[6]  The American Thoracic Society publication  *Care of the transgender patient with a pulmonary complaint*" addresses this issue and endorses the WPATH SOC.

---

[6]  Morales-Estrella, et a. 2021, American Journal of Respiratory and Critical Care Medicine 2018;197:A1371 Transgender Status Is Associated with Higher Risk of Lifetime Asthma

22.    I strongly disagree with Dr. Levine's assertion that gender affirming surgery is not demonstrably therapeutic. As stated in my report (pp. 11-13), a plethora of investigations indicate the many benefits of surgery for patients with severe gender dysphoria.

23.    Dr. Levine's views are contrary to the views espoused by mainstream medicine: WPATH, the American Medical Association, the Endocrine Society, and the American Psychological Association all support surgery in accordance with the SOC as medically necessary.    *See*, *e.g.*, American Medical Association, *Resolution 122 (A-08)* (2008) (characterizing WPATH SOC as "established internationally accepted Standards of Care for providing medical treatment for people with GID, including mental health care, hormone therapy and sex reassignment surgery, which are designed to promote the health and welfare of persons with GID and are recognized within the medical community to be the standard of care for treating people with GID"); American Psychiatric Association, *Medical Treatment and Surgical Interventions* (Nov. 2017) (endorsing medical treatment recommendations from WPATH SOC); American Psychological Association, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People* (Dec. 2015) (referencing and endorsing WPATH *Identity and Gender Variance* (2009) (referencing WPATH SOC and noting that "[f]or individuals who experience such distress, hormonal and/or surgical sex assignment may be medically necessary to alleviate significant impairment in interpersonal and/or vocational functioning . . . [and] recommended in clinical practice, sex reassignment surgery is

almost always medically necessary, not elective or cosmetic"); American Academy of Child & Adolescent Psychiatry, *Clinical Guidelines & Training for Providers, Professionals, and Trainees* ("The Standards of Care" document is the international gold standard outlining the guidelines for the clinical treatment of gender dysphoria"); Rafferty, J., American Academy of Pediatrics Committee on Psychological Aspects of Child and Family Health, AAP Committee on Adolescence, & AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, Pediatrics, 142(4), 1-14 (2018) ("Most protocols for gender-affirming interventions incorporate [WPATH] and Endocrine Society recommendations"); World Professional Association for Transgender Health, *WPATH Policy Statements* (Dec. 16, 2016) (noting statements in support of WPATH Standards of Care by The American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American Academy of Family Physicians, the National Commission of Correctional Health Care, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, the American Society of Plastic Surgeons, and the World Health Organization); Hembree, W.C., et al., Endocrine Treatment for Gender Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, The Journal of Clinical Endocrinology & Metabolism, 102(11), 3869-3903 (2017) (setting out Endocrine Society standards of care and endorsing WPATH

SOC). I am not aware of any reputable medical organizations that do not recognize that gender-affirming surgical interventions may be medically necessary for certain transgender persons.

24.     Dr. Levine points to a few cherry-picked studies to support his assertion that surgery does not confer improved mental health. He cites the Branstrom and Pachankis study, where the authors were found to have erred in their methodology. Attempts to retrospectively repair the study error were not successful. Almazan et al. repeated the study with an improved methodology and found that gender affirming surgery confers significant mental health benefits.

25.     Dr. Levine cites the Dhjene study (often referred to as the "Swedish study") several times throughout his report, as evidence that suicides frequently occur following gender affirming surgery. According to Dr. Dhjene, only the people who transitioned prior to 1989 had slightly higher rates of suicide attempts than the general public (but still far lower than pre-transition levels). Cecilia Dhjene, a colleague of mine, ultimately issued a statement to end the mischaracterization of her work and actually named Dr. Levine as an individual who has misused her research findings:

> Researchers are happy if their findings are recognized and have an impact. However, once published, the researcher loses control of how results are used. . . .Our findings have been used to argue that gender-affirming treatment should be stopped since it could be dangerous (Levine, 2016). But the results have also been used to show the vulnerability of the group and that better transgender health care is needed (Arcelus & Bouman, 2015; Zeluf et al., 2016). Despite the paper clearly stating that the study is not designed to evaluate whether or not gender-affirming is beneficial, it has

been interpreted as such. But we do not know what would have happened without gender-affirming treatment; the situation may have been even worse. As an analogy, similar studies have found increased somatic morbidity, suicide rates, and overall mortality for patients treated for depression and bipolar disorder (Ösby, Brandt, Correia, Ekbom, & Sparen, 2001). This is important information, but it does not follow that antidepressant or mood stabilizing treatment cause the mortality. Most of the articles that use the study to argue against gender-affirming health care are published in non-peer reviewed papers and the public media in general. I am grateful to friends, colleagues, journalists, etc. who have alerted me when the results of the study have been misinterpreted giving me a possibility to respond to the authors.

On Gender Dysphoria (Dept. of Clinical Neuroscience, Karolinska Institute, Stockholm, Sweden, 2017).

26.     Dr. Dhejne's stated: "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively or retrospectively, and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria." Dhejne, et al, Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden (2011).

27.     In 2023, data from the 2022 U.S. Transgender Survey conducted by the National Center for Transgender Equality, were released. There were 92,329 respondents, the largest survey ever conducted for the purpose of understanding the lives and experiences of transgender people in the U.S. (Attached). Of those individuals who underwent at least one gender affirming surgery, 97% reported improved life satisfaction.

28.     In addition to the numerous studies I cite in my report supporting the efficacy of surgery (pp. 11-13), there are additional sources that confirm the many benefits of surgical intervention. For example:

- Mayo Clinic reports **"**78% have significant improvement in psychological symptoms**"** post-surgery, Mayo Clinic Medical Professionals Endocrinology Mayo Clinic's Transgender and Intersex Specialty Care Clinic provides a home base for transgender patients and those with differences of sexual development, https://www.mayoclinic.org;

- Bauer et al. found a 62% reduction in risk of suicide ideation with the completion of medical transition, Bauer, G.,  Scheim, A., Pyne, J. et al. (2015), Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC Public Health*, 15:525;

- Ruppin U. & Pfafflin (2015); Long-term follow-up of adults with gender identity disorder, *Archives of Sexual Behavior*, 44(5):1321-9, found clinically significant improvements in all measures of symptoms on psychological tests;

- Wiepjes, et al., (2018):The Amsterdam cohort of gender dysphoria Study: *Journal of Sexual Medicine* 15(4): 582-590. Only 0.6% of transwomen and 0.3% of transmen who underwent gonadectomy were identified as experiencing regret;

- Salim and Poh (2018).  Gender-affirming penile inversion vaginoplasty, *Clinics in Plastic Surgery* 45(3):343-350, report "High patient satisfaction and reduction in dysphoria documented after vaginoplasty;

- De Cuypere (2017)  Mental health issues in Ettner, R. Monstrey, S., & Coleman, E. (Eds.) (2017). *Principles of Transgender Medicine and Surgery* (2nd ed.). New York: Routledge: 109.  "..giving the outcome data from some thousand clients…most people are very satisfied after gender confirming therapy; their gender dysphoria is alleviated, psychological functioning has improved, and their quality of life has increased. …psychiatric comorbidity has diminished";

- van de Grift, T., et al (2018) Surgical satisfaction, quality of life, and their association after gender-affirming surgery: A follow-up study. *Journal of Sex Marital Therapy*, 44(2): 138-48: Postoperative satisfaction was 94% to 100%;

- Horbach, S., Bouman, M., Smith, J. et al. (2015). Outcome of vaginoplasty in male-to-female transgenders: A systematic review of surgical techniques. *Journal of Sexual Medicine*, 12(6)1499-1512: Report that "trans women rate their quality of life after vaginoplasty higher than before surgery."

29.    A 2021 study published in *JAMA Surgery* involved 27,715 transgender individuals from across all 50 states. Almazan, A., & Keuroghlian, A. (2021). Association between gender-affirming surgery and mental health outcomes, *JAMA Surgery*, 156(7):611-618. Researchers compared those individuals who underwent gender-affirming surgeries during the prior two years with a reference group that desired surgery but had not yet undergone any. After controlling for sociodemographic factors, those who had undergone surgery had significantly less psychological distress, tobacco use, and suicidal ideation than those with no history of surgery. The authors conclude: "These findings support the provision of gender affirming surgeries for TGD (transgender and gender diverse) people who seek them."

30.    In addition, a systematic meta-analysis on publications performed by German researchers included 1,100 post-surgery participants. Seven different measures of quality of life were employed. The researchers concluded that gender-affirming surgery positively affects well-being, sexuality, and quality of life in general. Weinforth, et al., (2019). Quality of Life Following Male-to-Female Sex Reassignment Surgery, *Dtsch Arztebl Int*. 116(15):256-60. This is consistent with other research that has shown that transgender individuals who undergo gender-affirming surgery experience long-term mental health benefits. Park et al. (2022) did a 40-year follow up study concluding:

"Gender-affirming surgery is a durable treatment that improves overall patient well-being. High patient satisfaction, improved dysphoria, and reduced mental health comorbidities persists decades after GAS without any reported patient regret reduced mental health comorbidities persist decades after GAS without any reported patient regret." Long-term outcomes after gender-affirming surgery: 40-year follow-up study. *Annals of Plastic Surgery*, 89(4): 431-436.

31.     Under Version 8 of the WPATH SOC, published on September 15, 2022, the criteria for genital surgery (orchiectomy and vaginoplasty) in male-to-female transgender adult patients are as follow:

1.  Gender incongruence is marked and sustained;

2.  Meets diagnostic criteria for gender incongruence prior to gender-affirming surgical intervention in regions where a diagnosis is necessary to access health care;

3.  Demonstrates capacity to consent for the specific gender-affirming surgical intervention;

4.  Understands the effect of gender-affirming surgical intervention on reproduction and they have explored reproductive options;

5.  Other possible causes of apparent gender incongruity have been identified and excluded;

6.  Mental health and physical conditions that could negatively impact the outcome of gender-affirming surgical intervention have been assessed, with risks and benefits have been discussed;

7.  Stable on their gender affirming hormonal treatment regime (which may include at least 6 months of hormone treatment or a longer period if required to achieve the desired surgical result, unless hormone therapy is either not desired or is medically contraindicated).

WPATH SOC 8 at S256. Ms. Cordellione' meets these criteria.

32.     The SOC have delineated the role of the mental health professional since first published in 1979.  In order to assess readiness and eligibility for surgical treatment, a mental health professional must have experience with gender dysphoria, regardless of their credentials and/or competency in a related field. This includes, in addition to assessment, referring and preparing the patient for surgery, if applicable. Those new to the field should receive supervision with a provider with known expertise, pursue continuing education in this area, demonstrate an ability to distinguish coexisting comorbidities from gender dysphoria and have knowledge of the diversity of gender expression and gender identities. Self-study is not a substitute for experience and training in this subspecialty.

33.     Blanket policies restricting or denying a particular type of care—like the refusal to provide gender affirming surgery under any circumstances--are inconsistent with the SOC and the requirement to  provide medical treatment based on the medical needs of the individual.

34.     Dr. Levine regards the request for surgery as  merely a "desire." Dr. Levine is wrong. Surgical treatment of gender dysphoria is not elective or cosmetic. Nor is it considered or performed at the whim of the patient. For individuals, like Ms. Cordellione', who experience severe, ongoing gender dysphoria, it is a medical necessity.

35.     In my consulting work at Rush University Medical Center, Weiss Memorial Hospital; in my work previously at Lutheran General Hospital; in my clinical and forensic

work; and in supervision of mental health providers, I have evaluated hundreds of patients for gender affirming surgery over more than 20 years. I have extensive experience in treating and providing post-operative care for patients who have undergone this surgery (hundreds of patients over 20 years). In my work as described above, I have collaborated and continue to collaborate with surgeons and other medical professionals in determining the appropriate care, including surgical care, for transgender persons. This includes post-operative care. And, as noted in my curriculum vitae attached to my original expert report, I have published extensively on the subject of gender affirming surgery.

## Verification

I verify under the penalty of perjury that the foregoing is true and correct. Executed on this _____20_____ day of March, 2024.

Dr. Randi Ettner, Ph.D.

Version 5

Date of publication: June 15, 1998

**The Standards of Care for Gender Identity Disorders**
**Fifth Edition**

Harry Benjamin International Gender Dysphoria Association

Düsseldorf: Symposion Publishing, 1998

*Committee Members:*

Stephen B. Levine, MD (Chairperson), George R. Brown, MD, Eli Coleman Ph.D., Peggy T. Cohen-Kettenis., Judy Van Maasdam, MA, Friedemann Pfäfflin, MD, Leah C. Schaefer, Ed.D.

*Consultants:*

Dallas Denny MA, Domineco DiCeglie MD, Wolf Eicher MD, Jamison Green, Richard Green MD, Louis Gooren MD, Donald Laub MD, Anne Lawrence MD, Walter Meyer III MD, C. Christine Wheeler Ph.D.

Dieses Werk ist urheberrechtlich geschutzt. Die dadurch begründeten Rechte, insbesondere die der Übersetzung, des Nachdrucks, des Vortrags, der Entnahme von Abbildungen und Tabellen, der Funksendung, der Mikroverfilmung oder der Vervielfaltigung auf anderenWegen und der Speicherung in Datenverarbeitungsanlagen, bleiben, auch bei nur auszugsweiser Verwertung, vorbehalten.

Alle in diesem Buch enthaltenen Angaben, Ergebnisse usw. Wurden von den Autoren nach bestem Wissen erstellt. Sie erfolgen ohne jegliche Verpflichtung oder Garantie des Verlages. Er übernimmt deschal keinerlei Verantwortung und Haftung für etwa vorhandene inhaltliche Unrichtigkeiten.

1. Auglage 1998

1998 by Symposion Publishin, Dusseldorf

Einbandgestaltung: Doris Busch

Satz: Karen Flerning, Symposion Publishing Düsseldorf

Druck: Druckerei Zimmermann, Balve

Printed in Germany

ISBN 3-033814-00-6

This is the fifth version (June 15, 1998) of the Standards of Care since the original 1979 document. Previous revisions were in 1980, 1981, and 1990.

**Contents** **(Attachment 1)**

Committee Members and Consultants

***Introductory Concepts***

***Brief Reference Guide to the Standards of Care***

***The Full Text of the Standards of Care***

I.      Epidemiological Considerations

II.     Diagnostic Nomenclatures

III.    The Mental Health Professional

IV.     The Treatment of Children

V.      The Treatment of Adolescents

VI.     Psychotherapy with Adults

VII.    The Real Life Experience

VIII.   Requirements for Hormone Therapy for Adults

IX.     Hormone therapy for Adults

X.      Requirements for Genital Reconstructive and Breast Surgery

XI.     Surgery

**Committee Members**

*Stephen B. Levine,* MD (Chair)
Center for Marital and Sexual Health, Inc., Beachwood, Ohio, USA

*George R. Brown,* MD, Jonesborough, Tennessee, USA

*Eli Coleman* Ph.D., University of Minnesota, Minneapolis, Minnesota, USA

*Peggy T. Cohen-Kettenis.,* Ph.D., Akademisch Ziekenhuis, Utrecht, The Netherlands

*Judy Van Maasdam,* MA, Clarke Institute of Psychiatry, Toronto, Canada

*Friedemann Pf*äfflin, MD, Ulm University, Ulm, Germany

*Leah C. Schaefer,* Ed.D., New York, New York, USA


**Consultants**

Dallas Denny MA, Domineco DiCeglie MD, Wolf Eicher MD, Jamison Green, Richard Green MD, Louis Gooren MD, Donald Laub MD, Anne Lawrence MD, Walter Meyer III MD, C. Christine Wheeler Ph.D.

**Introductory Concepts**

**The Purpose of the Standards of Care**

The major purpose of the Standards of Care (SOC) is to articulate this international organization's professional consensus about the psychiatric, psychologic, medical, and surgical management of gender identity disorders. Professionals may use this document to understand the parameters within which they may offer assistance to those with these problems, Persons with gender identity disorders, their families, and social institutions may use the SOC as a means to understand the current thinking of professionals. All readers should be aware of the limitations of knowledge in this area and of the hope that some of the clinical uncertainties will be resolved in the future through scientific investigation.

**The Overarching Treatment**

The general goal of the specific psychotherapeutic, endocrine, or surgical therapies for people with gender identity disorders is lasting personal comfort with the gendered self in order to maximize overall psychological well-being and self-fulfillment.

**The Standards of Care Are Clinical Guidelines**

The SOC are intended to provide flexible directions for the treatment of gender identity disorders. When eligibility requirements are stated they are meant to be minimum requirements. Individual professionals and organized programs may raise them. Clinical departures from these guidelines may come about because of a patient's evolving method of handling a common situation, or a research protocol. These departures should be recognized as such, explained to the patient, documented both for legal protection and so that the short and long term results can be retrieved to help the field to evolve.

**The Clinical Threshold**

A clinical threshold is passed when concerns, uncertainties, and questions about gender identity persist in development, become so intense as to seem to be the most important aspect of a person's life, or prevent the establishment of a relatively unconflicted gender identity. The person's struggles are then variously informally referred to as a gender identity problem, gender dysphoria, a gender problem, a gender concern, gender distress, or transsexualism. Such struggles are known to be manifested from the preschool years to old age and have many alternate. Forms. These forms come about by various degrees of personal dissatisfaction with sexual anatomy, gender demarcating body characteristics, gender roles, gender identity and perceptions of others. When dissatisfied individuals meet specified criteria in one of two official nomenclatures – the International Classification of Diseases- 10 (ICD- 10) or the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV) – they are formally designated as suffering from a gender identity disorder (GID). Some persons with GID exceed another threshold – they persistently possess a wish for surgical transformation of their bodies.

**Two Primary Populations with GID Exist – Biological Males and Biological Females.**

The sex of a patient always is a significant factor in the management of GID. Clinicians need to separately consider the biological, social, psychological, and economic dilemmas of each sex. For example, when first requesting professional assistance, the typical biological female seems to be further along in consolidating a male gender identity than does the typical biological male in his quest for a comfortable female gender identity. This often enables the sequences of therapy to proceed more rapidly for male-identified persons. All patients, however, must follow the SOC.

**A Brief Reference Guide to the Standards of Care**

Caveat – It is recommended that no one use this guide without consulting the full text of the SOC (page 17ff) which provides an explication of these concepts.

I.  **Professional involvement with patients with gender identity disorders involves any of the following:**
    A.  Diagnostic assessment
    B.  Psychotherapy
    C.  Real life experience
    D.  Hormonal therapy
    E.  Surgical therapy

II. **The Roles of Mental Health Professional with the Gender Patient**
    Mental health professionals (MHP) who work wth individuals with gender identity disorders may be regularly called upon to carry out many of these responsibilities:
    A.  To accurately diagnose the individual's gender disorder according to either the DSM-IV or ICD-10 nomenclature
    B.  To accurately diagnose any co-morbid psychiatric conditions and see to their appropriate treatment
    C.  To engage in psychotherapy
    D.  To ascertain eligibility and readiness for hormone and surgical therapy
    E.  To make formal recommendations to medical and surgical colleagues
    F.  To document their patient's relevant history in a letter of recommendation
    G.  To be a colleague on a team of professionals with interest in the gender identity disorders
    H.  To educate family members, employers, and institutions about gender identity disorders
    I.  To be available for follow-up of previously seen gender patients.

III. **The Training of Mental Health Professionals**
    A.  The Adult-Specialist
        1. Basic clinical competence in diagnosis and treatment of mental or emotional disorders
        2. The basic clinical training may occur within any formally credentialing discipline – for example, psychology, psychiatry, social work, counseling, or nursing.

          3. Recommended minimal credentials for special competence with the gender identity disorders:
1. Master's degree or its equivalent in a clinical behavioral science field granted by an institution accredited by a recognized national or regional accrediting board
2. Specialized training and competence in the assessment of the DSM-IV/ICD-10 Sexual Disorders (not simply gender identity disorders)
3. Documented supervised training and competence in psychotherapy
4. Continuing education in the treatment of gender identity disorders

  B. The Child-Specialist
      1. Training in childhood and adolescent developmental psychopathology.
      2. Competence in diagnosing and treating the ordinary problems of children and adolescents

## IV. The Differences between Eligibility and Readiness Criteria for Hormones or Surgery
  A. **Eligibility –** the specified criteria that must be documented before moving to a next step in a triadic therapeutic sequence (real life experience, hormones, and surgery)
  B. **Readiness –** the specified criteria that rest upon the clinician's judgment prior to taking the next step in a triadic therapeutic sequence

## V. The Mental Health Professional's Documentation Letters for Hormones or Surgery Should Succinctly Specify:
  A. The patient's general identifying characteristics
  B. The initial and evolving gender, sexual, and other psychiatric diagnoses
  C. The duration of their professional relationship including the type of psychotherapy or evaluation that the patient underwent
  D. The eligibility criteria that have been met and the MHP's rationale for hormones or surgery
  E. The patient's ability to follow the Standards of Care to date and the likelihood of future compliance
  F. Whether the author of the report is part of a gender team or is working without benefit of an organized team approach
  G. The offer of receiving a phone call to verify that the documentation letter is authentic

## VI. One letter is required for Instituting Hormone Treatment; Two Letters are Usually Required for Surgery
  A. Two separate letters of recommendation from mental health professionals who work alone without colleagues experienced with gender identity disorders are required for surgery and
      1. If the first letter is from a person with a master's degree, the second letter should be from a psychiatrist or a clinical psychologist – those who can be expected to adequately evaluate co-morbid psychiatric conditions.
      2. If the first letter is from the patient's psychotherapist, the second letter should be from a person who has only played an evaluative role for the patient. Each letter writer, however, is expected to cover the same seven elements

B. One letter with two signatures is acceptable if the mental health professionals conduct their tasks and periodically report on these processes to a team of other mental health professionals and nonpsychiatric physicians.

## VII. Children with Gender Identity Disorders
A. The initial task of the child-specialist mental health professional is to provide careful diagnostic assessments of gender-disturbed children.
1. The child's gender identity and gender role behaviors, family dynamics, past traumatic experiences, and general psychological health are separately assessed. Gender-disturbed children differ significantly along these parameters.
2. Hormonal and surgical therapies should never be undertaken with this age group.
3. Treatment over time may involve family therapy, marital therapy, parent guidance, individual therapy of the child, or various combinations.
4. Treatment should be extended to all forms of psychopathology, not simply the gender disturbance.

## VIII. Treatment of Adolescents
A. In typical cases the treatment is conservative because gender identity development can rapidly and unexpectedly evolve. Teenagers should be followed, provided psychotherapeutic support, educated about gender options, and encouraged to pay attention to their aspects of their social, intellectual, vocational, and interpersonal development.
B. They may be eligible for beginning triadic therapy as early as age 18, preferable with parental consent.
1. Parental consent resumes a good working relationship between the mental health professional and the parents, s that they, too, fully understand the nature of the GID.
2. In many European countries sixteen to eighteen-year-olds are legal adults for medical decision making, and do no require parental consent. In the United States, age 18 is legal adulthood.
C. Hormonal Therapy for Adolescents. Hormonal treatment should be conducted in two phases only after puberty is well established.
1. In the initial phase biological males should be administered an antiandrogen (which neutralize testosterone effects only) or an LHRH agonist (which stops the production of testosterone only)
2. Biological females should be administered sufficient androgens, progestins, or LHRH agonists (which stops the productions of estradiol, strone, and progesterone) to stop menstruation.
3. Second phase treatments – after these changes have occurred and the adolescent's mental health remains stable
   1. Biologic males may be given estrogenic agents
   2. Biologic females may be given higher masculinizing doses of androgens
   3. Second phase medications produce irreversible changes
D. Prior to Age 18. In selected cases, the real life experience can begin at age 16, adolescents younger than age 18 should rarely be done.

1. First phase therapies to delay the somatic changes of puberty are best carried out in specialized treatment centers under supervision of , or in consultation with, an endocrinologist, and preferable, a pediatric endocrinologist, who is part of an interdisciplinary team.
2. Two goals justify this intervention
    1. To gain time to further explore the gender and other developmental issues in psychotherapy
    2. To make passing easier if the adolescent continues to pursue gender change.
3. In order to provide puberty delaying hormones to a person less than age 18, the following criteria must be met
    1. Throughout childhood they have demonstrate an intense pattern of cross-gender identity and aversion to expected gender role behaviors
    2. Gender discomfort has significantly increased with the onset of puberty
    3. Social, intellectual, psychological, and interpersonal development are limited as a consequence of their GID
    4. Serious psychopathology, except as a consequence of the GID, is absent
    5. The family consents and participates in the triadic therapy
E. Prior to Age 16. Second phase hormones, those which induce opposite sex characteristics should not be given prior to age 16 years.
F. Mental Health Professional Involvement is an Eligibility Requirement for Triadic Therapy During Adolescence.
    1. To be eligible for the implementation of the real life experience or hormone therapy, the mental health professional should be involved with the patient and family for a minimum of six months.
    2. To be eligible for the recommendation of genital reconstructive surgery or mastectomy, the mental health professional should be integrally involved with the adolescent and the family for at least eighteen months.
    3. School-aged adolescents with gender identity disorders often are so uncomfortable due to negative peer interactions and a felt incapacity to participate in the roles of their biologic sex that they refuse to attend school.
        1. Mental health professionals should be prepared to work collaboratively with school personnel to find ways to continue the educational and social development of their patients.

IX. **Psychotherapy with Adults**
A. Many adults with gender identity disorder find comfortable, effective ways of identifying themselves without the triadic treatment sequence, with or without psychotherapy.
B. Psychotherapy is not an absolute requirement for triadic therapy.
    1. Individual programs vary to the extent that they perceive the need for psychotherapy.
    2. When the mental health professional's initial assessment leads to a recommendation for psychotherapy, the clinician should specify the goals of treatment, estimate its frequency and duration.
    3. The SOC committee is wary of insistence on some minimum number of psychotherapy sessions prior to the real life experience, hormones, or surgery but expects individual programs to set these

4. If psychotherapy is not done by members of a gender team, the psychotherapist should be informed that a letter describing the patient's therapy may be requested so the patient can move on to the next phase of rehabilitation.

C. Psychotherapy often provides education about a range of options not previously seriously considered by the patient. Its goals are:
   1. To be realistic about work and relationships
   2. To define and alleviate the patient's conflicts that may have undermined a stable lifestyle and to attempt to create a long term stable life style
   3. To find a comfortable way to live within a gender role and body

D. Even when the initial goals are attained, mental health professionals should discuss the likelihood that no educational, psychotherapeutic, medical or surgical therapy can permanently eradicate all psychological vestiges of the person's original sex assignment

**X.  The Real-Life Experience**

A. Since changing one's gender role has immediate profound personal and social consequences, the decision to do so should be preceded by an awareness of what these familial, vocational, interpersonal, educational, economic, and legal consequences are likely to be.

B. When clinicians assess the quality of a person's real-life experience in the new gender role, the following abilities are reviewed
   1. To maintain full or part-time employment
   2. To function as a student
   3. To function in community-based volunteer activity
   4. To undertake some combination of items 1-3
   5. To acquire a new (legal) first of last name
   6. To provide documentation that persons other than the therapist know that the patient functions in the new gender role.

**XI.  Eligibility and Readiness Criteria for Hormone Therapy for Adults**

1. Three eligibility criteria exist:
   1. Age 18 years
   2. Demonstrable knowledge of what hormones medically can and cannot do and their social benefits and risks
   3. Either a documented real life experience should be undertaken for at least three months prior to the administration of hormones

   OR

   4. A period of psychotherapy of a duration specified by the mental health professional after the initial evaluation (usually a minimum of three months) should be undertaken
   5. Under no circumstances should a person be provided hormones who has neither fulfilled criteria #3 or #4.

2. Three readiness criteria exist:
   1. The patient has had further consolidation of gender identity during the real-life experience or psychotherapy
   2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health
   3. Hormones are likely to be taken in a responsible manner

3. Hormones can be given for those who do no initially want surgery or a real life experience. They must be appropriately diagnosed, however, and meet the criteria stated above for hormone administration.

## XII. Requirements for Genital Reconstructive and Breast Surgery

1. Six eligibility criteria for various surgeries exist and equally apply to biological males and biological females
   1. Legal age of majority in the patient's nation
   2. 12 months of continuous hormonal therapy for those without a medical contraindication
   3. 12 months of successful continuous full time real-life experience. Periods of returning to the original gender may indicate ambivalence about proceeding and should not be used to fulfill this criterion
   4. while psychotherapy is not an absolute requirement for surgery for adults, regular sessions may be required by the mental health professional throughout the real life experience at a minimum frequency determined by the mental health professional.
   5. Knowledge of the cost, required lengths of hospitalizations, likely complications, and post surgical rehabilitation requirements of various surgical approaches.
   6. Awareness of different competent surgeons
2. Two readiness criteria exist
   1. Demonstrable progress in consolidating the new gender identity
   2. Demonstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better or at least a stable state of mental health.

## XIII. Surgery

1. Genital, Breast, and Other Surgery for the Male to Female Patient
   1. Surgical procedures may include orchiectomy, penectomy, vaginoplasty, augmentation mammaplasty, and vocal cord surgery.
   2. Vaginoplasty requires both skilled surgery and postoperative treatment. Three techniques are: penile skin inversion, pedicled rectosigmoid transplant, or free skin graft to line the neovagina
   3. Augmentation mammaplasty may be performed prior to vaginoplasty if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormonal treatment for two years is not sufficient for comfort in the social gender role. Ohther surgeries that may be performed to assist feminization include: reduction thyroid chondroplasty, liposuction of the waist, rhinoplasty, facial bone reduction, face-lift, and blephoroplasty.
2. Genital and Breast Surgery for the Female to Male Patient
   1. Surgical procedures may include mastectomy, hysterectomy, salpingo-oophorectomy, vaginectomy metoidioplasty, scrotoplasty, urethroplasty, and phalloplasty.
   2. Current operative techniques for phalloplasty are varied. The choice of tecniques may be restricted by anatomical or surgical considerations. If

the objectives of phalloplasty are a neophallus of good appearance, standing micturition, and/or coital ability, the patent should be clearly informed that there are both several separate stages of surgery and frequent technical difficulties which require additional operations.

3. Reduction mammaplasty may be necessary as an early procedure for some large breasted individuals to make the real life experience feasible.
4. Liposuction may be necessary for final body contouring

3. Postsurgical Follow-up by Professionals
   1. Long term postoperative follow-up is one of the factors associated with a good psychosocial outcome.
4. Follow-up is essential to the patient's subsequent anatomic and medical health and to the surgeon's knowledge about the benefits and limitations of surgery
   1. Postoperative patients may incorrectly exclude themselves from follow-up with the physician prescribing hormones as well as their surgeon and mental health professional.
   2. These clinicians are best able to prevent, diagnose and treat possible long term medical conditions that are unique to the hormonally and surgically treated.
   3. Surgeons who are operating on patients who are coming from long distances should include personal follow-up in their care plan.
   4. Continuing long term follow-up has to be affordable and available in the patient's geographic region.
   5. Postoperative patients also have general health concerns and should undergo regular medical screening according to recommended guidelines
5. The need for follow-up extends beyond the endocrinologist and surgeon, however, to the mental health professional, who having spent a longer period of time with the patient than any other professional, is in an excellent position to assist in any post-operative adjustment difficulties.

**The full text of the Standards of Care**

*Introduction*

This section provides an in depth understanding of the Standards of Care. It supplies comprehensive information about the matters either not contained in The Brief Reference Guide or listed there online in an abbreviated fashion. This explication of the SOC is intended for all readers – professionals, patients, family members, and institutional personnel who have to make decisions about those with gender identity disorders.

**I.        Epidemiological Considerations**

**Prevalence**

When the gender identity disorders first came to professional attention, clinical perspectives were largely focused on how to identify candidates for sex reassignment surgery. As the field matured, professionals recognized that some persons with bona fide gender identity disorders neither desired nor were candidates for sex reassignment surgery. The earliest estimates of prevalence for adults were stated as 1 in 37,000 males and 1 in 107,000 females. The most recent information of the transsexual end of the gender identity disorder spectrum from Holland is 1 in 11,900 males and 1 in 30,400 females. Four observations, not yet firmly supported by systematic study, increase the likelihood of a higher prevalence: 1) unrecognized gender problems are occasionally diagnosed when patients are seen with anxiety, depression, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, other sexual disorders and intersexed conditions; 2) some nonpatient male transvestites, female impersonators, and male and female homosexuals may have a form of gender identity disorder; 3) the intensity of some persons' gender identity disorders fluctuates below and above a clinical threshold; 4) gender variant behavior among female-bodied individuals tends to relatively invisible to the culture, particularly to mental health professionals and scientists.

**Natural History of Gender Identity Disorders**

In the past, so much attention had been paid to the therapeutic sequence of cross-gender living, administration of cross-sex hormones, and genital (and other) surgeries that some made the erroneous assumption that a diagnosis of GID inevitably should lead to this sequence. A diagnosis of GID actually only creates a serious consideration of an array of complex options, only one of which is medical support for this triadic therapeutic sequence. Ideally, prospective data about the natural history of gender identity struggles would inform all treatment decisions. These are lacking except for the demonstration that most boys with gender identity disorder outgrow their with to become a girl without therapy. Five less firmly scientifically established factors prevent clinicians from prescribing the triadic therapeutic sequence based on diagnosis alone: 1) some carefully diagnosed persons spontaneously change their aspirations; 2) others make more comfortable accommodations to their gender identities without medical interventions; 3) others give up their wish to follow the triadic sequence during psychotherapy;

4) some gender identity clinics have an unexplained high drop out rate; and 5) the percentage of persons who are not benefitted from the triadic sequence varies significantly from study to study

**Cultural Differences in Gender Identity Disorders Throughout the World.**

Even if epidemiologic studies established that a similar base rate of gender identity disorders existed all over the world, it is likely that cultural differences from one country to another would alter the behavioral expressions of the disorder. Moreover, access to treatment, cost of treatment, the therapies offered and the social attitudes towards the afflicted and the professionals who deliver care differ broadly from place to place. While in most countries, crossing gender boundaries more reliably generates moral outrage rather than compassion, there are striking examples in certain cultures how the cross-gendered behaviors of spiritual leaders are not stigmatized.

II.     **Diagnostic Nomenclatures**

**The Five Elements of Clinical Work**

Professional involvement with patients with gender identity disorders involves any of the following: diagnostic assessment, psychotherapy, real life experience, hormonal therapy, and surgical therapy. This section provides a background on the first stage – diagnostic assessment.

**The Development of a Nomenclature**

The term 'transsexual' emerged into professional and public usage in the 1950s as a means of designating a person who aspired to or actually lived in the anatomically contrary gender role, whether or not hormones had been administered or surgery had been performed. During the 1960s and 1970s, clinicians used the term >>true transsexual.<< The true transsexual was thought to be a person with a characteristic path of atypical gender identity development that predicted an improved life from a treatment sequence that culminated in genital surgery. They were thought to have: 1) cross-gender identifications that were consistently expressed behaviorally in childhood, adolescence, and adulthood; 2) minimal or no sexual arousal to cross-dressing; and no heterosexual interest (relative to their anatomic sex). True transsexuals could be of either sex. <<True transsexual << males were distinguished from males who arrived at the desire to changer their gender via a reasonably masculine behavioral developmental pathway. Belief in the true transsexual concept for males dissipated when it was realized that: 1) such patients were rarely encounters; 2) those who requested genital reconstructive surgery more commonly had adolescent histories of fetishistic cross-dressing or autogynephilic fantasies without cross-dressing; 3) some of the original true transsexuals had falsified their histories to make their stories match the earliest theories about the disorder. The concept for >>true transsexual<< females never created diagnostic uncertainties, largely because patient histories were relatively consistent and gender variant behaviors, such as, female cross-dressing, remained unseen by clinicians. The term 'gender

dysphoria syndrome' was then adopted to designate the presence of a gender problem in either sex until psychiatry developed an official nomenclature.

The diagnosis of Transsexualism was introduced in the DSM-III in 1980 for gender dysphoric individuals who demonstrated at least two years of continuous interest in removing their sexual anatomy and transforming their bodies and social roles. Others with gender dysphoria could be either diagnosed as Gender Identity Disorder of Adolescence or Adulthood Nontranssexual Type or Gender Identity Disorder Not Otherwise Specified (GIDNOS). These diagnostic terms were ignored by the media who used the term transsexual for any person who wanted to change or had changed sex.

**The DSM-IV**

In 1994, the DSM-IV committee replaced the diagnosis of Transsexualism with Gender Identity Disorder. Depending on their age, those with a strong and persistent cross-gender identification and a persistent discomfort with his or her sex or a sense of inappropriateness in the gender role of that sex were to be diagnosed as Gender Identity Disorder of Childhood (302.6), Adolescence, or Adulthood (302.85). For persons who did not meet the criteria, Gender Identity Disorder Not Otherwise Specified (GIDNOS)(302.6) was to be used. This category included a variety of individuals – those who desire only castration or penectomy without a concomitant desire to develop breasts; those with a congenital intersex condition; those with transient stress-related cross-dressing; those with considerable ambivalence about giving up their gender roles. Patients with GID and GIDNOS were to be subclassified according to the sex of attraction: attracted to males; attracted to females; attracted to both; attracted to neither. This subclassification on the basis of orientation was intended to assist in determining over time whether individuals of one orientation or another fared better in particular approaches; it was not intended to guide treatment decisions.

Between the publication of DSM-III and DSM-IV, the term >>transgendered<< began to be used in various ways. Some employ it to refer to those with unusual gender identities in a value free manner – that is, without a connotation of psychopathology. Some professionals informally use the term to refer to any person with any type of gender problem. Transgendered is not a diagnosis, but professionals find it easier to informally use than GIDNOS, which is.

**ICD-10**
The ICD-10 now provides five diagnoses for the gender identity disorders (F64):

***Transsexualism (F64.0) has three criteria:***
1. The desire to live and be accepted as a member of the opposite sex, usually accompanied by the wish to make his or her body as congruent as possible with the preferred sex through surgery and hormone treatment
2. The transsexual identity has been present persistently for at least two years
3. The disorder is not a symptom of another mental disorder or a chromosomal abnormality

***Dual-role Transvestism (F64.1) has three criteria:***

1. The individual wears clothes of the opposite sex in order to experience temporary membership in the opposite sex
2. There is no sexual motivation for the cross-dressing
3. The individual has no desire for a permanent change to the opposite sex

***Gender Identity Disorder of Childhood (64.2) has separate criteria for girls and for boys.***

***For Girls:***

1. The individual shows persistent and intense distress about being a girl, and has a stated desire to be a boy (not merely a desire for any perceived cultural advantages to being a boy) or insists that she is a boy.
2. Either of the following must be present:
   a. Persistent marked aversion to normative feminine clothing and insistence on wearing stereotypical masculine clothing
   b. Persistent repudiation of female anatomical structures, as evidenced by at least one of the following:
      1) An assertion that she has, or will grow, a penis
      2) Rejection of urination in a sitting position
      3) Assertion that she does not want to grow breasts or menstruate
   c. The girls has not yet reached puberty
   d. The disorder must have been present for at least 6 months

***For Boys:***

1. The individual shows a persistent and intense distress about being a boy, and has a desire to be a girl, or, more rarely, insists that he is a girl
2. Either of the following must be present:
   a. Preoccupation with stereotypic female activities, as shown by a preference for either cross-dressing or simulating female attire, or by an intense desire to participate in the games and pastimes of girls and rejection of stereotypical male toys, games and activities
   b. Persistent repudiation of male anatomical structures, as evidenced by at least one of the following repeated assertions
      1) That he will grow up to become a woman (not merely in the role)
      2) That his penis or testes are disgusting or will disappear
      3) That it would be better not to have a penis or testes
3. The boy has not yet reached puberty
4. The disorder must have been present for at least 6 months

Other Gender Identity Disorders (F64.8) has no specific criteria.

Gender Identity Disorder, Unspecified has no specific criteria.

Either of the previous two diagnoses could be used for those with an intersexed condition.

The purpose of the DSM-IV and ICD10 is to organize and guide treatment and research. These nomenclatures were created at different times and driven by different professional groups through a consensus process. There is an expectation that the differences between the systems will be eliminated

by the year 2000. At this point, the specific diagnoses are based to a larger extent on clinical reasoning than on scientific investigation. It has not been sufficiently studied, for instance, whether sexual attraction patterns predict whether or not a patient will be a mentally healthier person in five years with or without the triadic sequence.

**The Gender Identity Disorders are Mental Disorders**

To qualify as a mental disorder, any behavioral pattern must result in a significant adaptive disadvantage to the person and cause personal mental suffering. The DSM-IV and ICD-10 have defined hundreds of mental illnesses which vary in onset, duration, pathogenesis, functional disability, and treatability. The designation of Gender Identity Disorders as mental disorders is not a license for stigmatization or for the deprivation of gender patients' civil rights. The use of a formal diagnosis is an important step in offering relief, providing health insurance coverage, and generating research to provide more effective future treatment.

**III.    The Mental Health Professional**

**The Ten Tasks of the Mental Health Professional**

Mental health professionals (MHP) who work with individuals with gender identity disorders may be regularly called upon to carry out many of these responsibilities:

1. to accurately diagnose the individual's gender disorder;
2. to accurately diagnose any co-morbid psychiatric conditions and see to their appropriate treatment;
3. to counsel the individual about the range of treatment options and their implications;
4. to engage in psychotherapy
5. to ascertain eligibility and readiness for hormone and surgical therapy;
6. to make formal recommendations to medical and surgical colleagues
7. to document their patient's relevant history in a leter of recommendation;
8. to be a colleague on a team of professionals with interest in the gender identity disorders;
9. to educate family members, employers, and institutions about gender identity disorders;
10. to be available for follow-up of previously seen gender patients.

**The training of Mental Health Professionals**

*The Adult-Specialist*

The education of the mental health professional who specializes in adult gender identity disorders rests upon basic general clinical competence in diagnosis and treatment of mental or emotional disorders. The basic clinical training may occur within any formally credentialing discipline – for example, psychology, psychiatry, social work, counseling, or nursing. The following are the recommended minimal credentials for special competence with the gender identity disorder:

1. A master's degree or its equivalent in a clinical behavioral science field. This or a more advanced degree should be granted by an institution accredited by a recognized national or regional accrediting board. The mental health professional should have written credentials from a proper training facility and a licensing board.
2. Specialized training and competence in the assessment of the DSM-IV/ICD-10 Sexual Disorders (not simply gender identity disorders).
3. Documented supervised training and competence in psychotherapy.
4. Continuing education in the treatment of gender identity disorders which may include attendance at professional meetings, workshops, or seminars or participating in research related to gender identity issues.

*The Child-Specialist*

The professional who evaluates and offers therapy for a child or early adolescent with GID should have been trained in childhood and adolescent developmental psychopathology. The professional should be competent in diagnosing and treating the ordinary problems of children and adolescents.

**The Differences between Eligibility and Readiness**

The SOC provides eligibility requirements for hormones and surgery. Without first meeting eligibility requirements, the patient and the therapist should not request hormones or surgery. An example of an eligibility is: a person must live full time in the preferred gender for twelve months prior to genital reconstructive surgery. To meet this criterion, the professional needs to document that the real life experience has occurred for this duration. Meeting readiness criteria – further consolidation of the evolving gender identity or improving mental health in the new or confirmed gender role – is more complicated because it rests upon the clinician's judgment. The clinician might think that the person is not yet ready because his behavior frequently contradicts his stated needs and goals.

**The Mental Health Professional's Relationship to the Endocrinologist and Surgeon**

Mental health professionals who recommend hormonal and surgical therapy share the legal and ethical responsibility for that decision with the physician who undertakes the treatment. Hormonal treatment can often alleviate anxiety and depression in people without the use of additional psychotropic medications. Some individuals, however, need psychotropic medication prior to, or concurrent with, taking hormones or having surgery. The mental health professional is expected to make these decisions and see to it that the appropriate psychotropic medications are offered to the patient. The presence of psychiatric co-morbidities does not necessarily preclude hormonal or surgical treatment, but some diagnoses pose difficult treatment dilemmas and may delay or preclude the use of either treatment.

***The Mental Health Professional's Documentation Letters for Hormones or Surgery Should Succinctly Specify:***
1. The patient's general identifying characteristics
2. The initial and evolving gender, sexual, and other psychiatric diagnoses
3. The duration of their professional relationship including the type of psychotherapy or evaluation that the patient underwent
4. The eligibility criteria that have been met and the MHP's rationale for hormones or surgery
5. The patient's ability to follow the Standards of Care to date and the likelihood of future compliance
6. Whether the author of the report is part of a gender team or is working without benefit of an organized team approach
7. That the sender welcomes a phone call to verify the fact that the mental health professional actually wrote the letter as described in this document.

The organization and completeness of these letters provide the hormone-prescribing physician and the surgeon an important degree of assurance that mental health professional is knowledgeable about gender issues and is competent in conducting the roles of the mental health professional.

**One Letter is Required for Instituting Hormone Therapy**

One letter from a mental health professional, including the previous seven points, written to the medical professional who will be responsible for the patient's endocrine treatment is sufficient.

**Two Letters are Generally Required for Surgery**

It is ideal if mental health professionals conduct their tasks and periodically report on these processes to a team of other mental health professionals and nonpsychiatric physicians. Letters of recommendation to physicians or surgeons written after discussion with a gender team then reflect the influence of the entire team. One letter to the physician performing surgery will generally suffice as long as it is signed by two mental health professionals.

More commonly, however, letters of recommendation are from mental health professionals who work alone without colleagues experienced with gender identity disorders. Because professionals working independently may not have the benefit of ongoing professional consultation on gender cases two letters of recommendation are required prior to initiating hormonal therapy or surgery. If the first letter is from a person with a master's degree, the second letter should be from a psychiatrist or a clinical psychologist – those with doctoral degrees who can be expected to adequately evaluate co-morbid psychiatric conditions. If the first letter is from the patient's psychotherapist, the second letter should be from a person who has only played an evaluative role for the patient. Each letter writer, however, is expected to cover the same topics. At least one of the letters should be an extensive report. The second letter writer, having read the first letter, may choose to offer a briefer summary and an agreement with the recommendation.

## IV.     The Treatment of Children

The initial task of the child-specialist mental health professional is to provide careful diagnostic assessments of gender-disturbed children. This means tat the individual child's gender identity and gender role behaviors, family dynamics, past traumatic experiences, and general psychological health are separately assessed. Gender-disturbed children differ significantly along these parameters. Since many gender-disturbed children do not meet formal criteria for GID of Childhood and many that do will not continue to do so later in childhood, hormonal and surgical therapies should never be undertaken with this age group. Treatment for these children, however, should be offered based on the clinician's assessment. Over time, this may involve family therapy, marital therapy, parent guidance, individual therapy of the child, or various combinations. Treatment should be extended to all forms of psychopathology, not simply the gender disturbance. Effort should be made, even with mild forms of gender identity struggles, to follow the family. This allows the child and the family to benefit from continuing services as the gender identity problem evolves and allows the clinician to rethink the validity of the initial assessment.

## V.     The Treatment of Adolescents

Adolescents should be dealt with conservatively because gender identity development can rapidly and unexpectedly evolve. They should be followed, provided psychotherapeutic support, educated about gender options, and encouraged to pay attention to other aspects of their social, intellectual, vocational, and interpersonal development. Because an adolescent shift toward gender conformity can occur

primarily to please the family, it may not persist or reflect a permanent change in gender identity. Clinical follow-up is encouraged.

Adolescents may be eligible for beginning triadic therapy as early as age 18, preferable with parental consent. Parental consent presumes a good working relationship between the mental health professional and the parents, so that they, to, fully understand the nature of the GID. In many European countries 16 to 18-year-olds are legal adults for medical decision making, and do not require parental consent.

The age at which adolescents who consistently maintain an unwavering desire to live permanently in the opposite gender role should be permitted to begin the real life experience or hormonal therapy is 18 years.

**Hormonal Therapy for Adolescents**

Hormonal treatment should be conducted in two phases only after puberty is well established. In the initial phase biological males should be provided an antiandrogen (which neutralize testosterone effects only) or an LHRH agonist (which stops the production of testosterone effects only), and biological females should be administered sufficient androgens, progestins, or LHRH agonists (which stops the production of estradiol, estrone, and progesterone) to stop menstruation. After these changes have occurred and the adolescent's mental health remains stable, biologic males may be given estrogenic agents and biologic females may be given higher masculinizing does of androgens. Medications used in the second phase, estrogenic agents for biologic males and high dose androgens for biologic females, produce irreversible changes.

**Prior to Age 18**

In selected cases, the real life experience can begin at age 16, with or without first phase hormones.

The administration of hormones to adolescents younger than age 18 should rarely be done. These first phase therapies to delay the somatic changes of puberty are best carried out in specialized treatment centers under supervision of, or in consultation with, an endocrinologist, and preferable, a pediatric endocrinologist, who is part of an interdisciplinary team. Two goals justify this intervention: a) to gain time to further explore the gender and other developmental issues in psychotherapy; b) make passing easier if the adolescent continues to pursue gender change. In order to provide puberty delaying hormones to a person less than age 18, the following criteria must be met:

1. Throughout childhood they have demonstrated an intense pattern of cross-gender identity and aversion to expected gender role behaviors;
2. Gender discomfort has significantly increased with the onset of puberty;
3. Their social intellectual, psychological, and interpersonal development are limited as a consequence of their GID;
4. Serious psychopathology, except as a consequence of the GID, is absent;

5. The family consents and participates in the triadic therapy

**Prior to Age 16**

Second phase hormones – those which induce opposite sex body should not be given prior to age 16 years.

**Mental Health Professional Involvement is an Eligibility Requirement for Triadic Therapy During Adolescence**

To be eligible for the implementation of the real life experience or hormone therapy, the mental health professional should be involved with the patient and family for a minimum of six months. To be eligible for the recommendation of genital reconstructive surgery or mastectomy, the mental health professional should be integrally involved with the adolescent and the family for at least eighteen months. While the number of sessions during these six and eighteen month periods rests upon the clinician's judgment, the intent is that hormones and surgery be thoughtfully and recurrently considered over time.

School-aged persons with gender identity disorders often are so uncomfortable due to negative peer interactions and a felt incapacity to participate in the roles of their biologic sex that they refuse to attend school. Mental health professionals should be prepared to wok collaboratively with school personnel to find ways to continue the educational and social development of their patients.

**VI.    Psychotherapy with Adults**

**A Basic Observation**

Many adults with gender identity disorder find comfortable, effective ways of identifying themselves that do not involve all the components of the triadic treatment sequence. While some individuals manage to do this on their own, psychotherapy can be very helpful in bringing about the discovery and maturational processes that enable self-comfort.

**Psychotherapy is Not an Absolute Requirement for Triadic Therapy**

Every adult gender patient does not require psychotherapy in order to precede with the real life experience, hormones, or surgery. Individual programs vary to the extent that they perceive the need for psychotherapy. When the mental health professional's initial assessment leads to a recommendation for psychotherapy, the clinician should specify the goals of treatment, estimate its frequency and duration. The SOC committee is wary of insistence on some minimum number of psychotherapy sessions prior to the real life experience, hormones, or surgery for three reasons: 1. Patients differ widely in their abilities to attain similar goals in a specified time; 2. Minimum number of sessions tend to be construed as a hurdle which tends to be devoid of the genuine opportunity for personal growth; 3.

The committee would like to encourage the use of the mental health professional as an important support to the patient throughout all phases of gender transition. Individual programs may set eligibility criteria to some minimum number of sessions or months of psychotherapy.

The mental health professional who conducts the initial evaluation need to be the psychotherapist. If psychotherapy is not done by members of a gender team, the psychotherapist should be informed that a letter describing the patient's therapy may be requested so that the patient can proceed with the next phase of rehabilitation.

**Goals of Psychotherapy**

Psychotherapy often provides education about a range of options not previously seriously considered by the patient. It emphasizes the need to set realistic life goals for work and relationships. And it seeks to define and alleviate the patient's conflicts that may have undermined a stable lifestyle.

**The Therapeutic Relationship**

The establishment of a reliable trusting relationship with the patient is the first step toward successful work as a mental health professional. This I usually accomplished by competent nonjudgmental exploration of the gender issue with the patient during the initial diagnostic evaluation. Other issues may be better dealt with later, after the person feels that the clinician is interested in and understands the gender problem. Ideally, the clinician's work is with the whole of the person's complexity, not merely a narrow definition of gender. The goal of therapy, to help the person to live more comfortable with in a gender role and body, also means to deal effectively with nongender issues. The clinician often attempts to facilitate the capacity to work and to establish or maintain supportive relationships. The clinician understands a broader definition of gender – an aspect of identity that is inextricably related to all aspects of living. Even when these initial goals are attained, mental health professionals should discuss the likelihood that no educational, psychotherapeutic, medical, or surgical therapy can permanently eradicate all vestiges of the person's original sex assignment.

**Processes of Psychotherapy**

Psychotherapy is a series of highly refined interactive communications between a person who is knowledgeable about ho people emotionally suffer and how this may be alleviated and one who is experiencing gender distress. The psychotherapy sessions initiate a developmental process. They enable the person's: history to be appreciated, current dilemmas to be understood, and unrealistic idea and maladaptive behaviors to be identified. Psychotherapy is not a specific technology, informed by a specific ideology, delivered to the patient to cure the gender identity disorder. Its usual goal is a long term stable life style with realistic chances for success in relationships, education, work, and gender identity and role. Gender distress often intensifies relationship, work and educational dilemmas. Typically, psychotherapy consists regularly held 50-minute sessions.

The therapist should make clear that it is the patient's right to choose among many options. The patient can experiment over time with alternative approaches. Since most patients have tried unsuccessfully to suppress their cross-gender aspirations prior to seeing the psychotherapist, this recommendation is not realistic.

Ideally, psychotherapy is a collaborative effort. The therapist must be certain that the patient understands the concepts of eligibility and readiness because they must cooperate in defining the patient's problems and in assessing progress in dealing with them. Collaboration prevents stalemates between a therapist who seems needlessly withholding of a recommendation and a patient who seems to profoundly distrusting to freely share thoughts, feelings, events, and relationships.

Benefit from psychotherapy may be attained at every stage of gender evolution. This includes the post-surgical period when the anatomic obstacles to gender comfort have been remove and the person continues to feel a lack of genuine comfort and skill in living in the new gender role.

**Options for Gender Adaptation**

The activities and processes that are listed below have, in various combinations, helped people to find more personal ease. These adaptations may evolve spontaneously and during psychotherapy. Finding a new adequate gender adaptation does not mean that the person may not in the future elect to pursue the real life experience, hormones, and genital reconstruction. These activities and processes are focused on matters other than real life experience, hormones, and surgery.

*Activities:*

### *Biological Males*
1. Cross-dressing: unobstrusively with undergarments; unisexually; or in a feminine fashion
2. Changing the body through: hair removal through electrolysis or body waxing; minor plastic cosmetic surgical procedures
3. Increasing grooming, wardrobe, and vocal expression skills

### *Biological Females*
1. Cross-dressing: unobstrusively with undergarments; unisexually; or in a masculine fashion
2. Changing the body through breast binding, weight lifting, applying theatrical facial hair
3. Padding underpants or wearing a penile prosthesis

### *Both Genders*
1. Learning about transgender phenomena from: support groups and gender networks; communication with peers via the Internet; studying these Standards of Care; relevant lay and professional literatures about legal rights pertaining to work, relationships, and public cross-dressing
2. Involvement in recreational activities of the desired gender
3. Episodic cross-gender living

*Processes*

1. Acceptance of personal homosexual or bisexual fantasies and behaviors (orientation) as distinct from gender role aspirations
2. Acceptance of the need to maintain a job, provide for the emotional needs of children, honor a spousal commitment, or not to distress a family member as currently having a higher priority than the personal wish for constant cross-gender expression
3. Integration of male and female gender awareness into daily living
4. Identification of the triggers for increased cross-gender yearnings and effectively attend to them; for instance, develop better self-protective, self- assertive, and vocational skills to advance at work and resolve interpersonal struggles to strengthen key relationships
5. Seeking spiritual comfort

**VII.  The Real-Life Experience**

The act of fully adopting a new or evolving gender role for the events and processes of everyday life is known as the real-life experience. The real-life experience is essential to the transition process to the gender role that confirms with personal gender identity. Since changing one's gender role has immediate profound personal and social consequences, the decision to do so should be preceded by an awareness of what the familial, vocational, interpersonal, educational, economic, and legal consequences are likely to be. Professionals have a responsibility to discuss these predictable consequences. These represent external reality issues hat must be confronted for success in the new gender role. This may be quite different from the personal happiness in the new gender role that was imagined prior to the real life experience.

**Parameters of the Real Life Experience**

When clinicians assess the quality of a person's real-life experience in the new gender role, the following abilities are reviewed:

1. To maintain full or part-time employment
2. To function as a student;
3. To function in community-based volunteer activity;
4. To undertake some combination of items 1-3
5. To acquire a new (legal) first or last name
6. To provide documentation that persons other than the therapist know that the patient functions in the new gender role.

**Real-Life Experience versus Real Life Test**

Although professionals may recommend living in the desired gender as a step toward surgical assistance, the decision as to when and how to begin the real-life experience remains the person's responsibility. Some begin the real-life experience and decide that this often imagined life direction is not in their best interest. Professionals sometimes construe the real-life experience as the real life test of the ultimate diagnosis. If patients prospered in the aspired-to gender, they were confirmed as <<transsexual>>, if they decided against continuing, they <<must not have been>>. This reasoning is a

confusion of the forces that enable successful adaptation with the presence of a gender identity disorder. The real-life experience tests the person's resolve, capacity to function in the aspired to gender, and the alignment of social, economic, and psychological supports. It assists both the patient and the mental health professional in their judgments how to proceed. Diagnosis, although always open for reconsideration, precedes a recommendation for patients to embark on the real life experience. When the patient is successful in the real life experience, both the MHP and the patient gain confidence in the original decision to embark on the path to the irreversible further steps.

**Beard Removal for the Male to Female Patient**

Beard density is a genetically determined secondary sex characteristic whose growth is not significantly slowed by cross-sex hormone administration. Facial hair removal via electrolysis is a generally safe, time-consuming process that often facilitates the real life experience for biologic males. Side effects are often discomfort during and immediately after the procedure, and, less frequently, hypo-or hyper pigmentation, scarring, and folliculitis. Formal medical approval for hair removal is not necessary; electrolysis may be begun whenever the patient deems it prudent. It is usually recommended prior to commencing the real life experience because the beard must be grown out to visible lengths so that it can be most easily removed. Many patients will require two years of regular treatments to effectively eradicate their facial hair. Hair removal by laser is a new alternative approach, but experience with it is limited.

**VIII.     Requirements for Hormone Therapy for Adults**

**Eligibility Criteria**

The administration of hormones is not to be lightly undertaken because of their medical and social dangers. Three criteria exist.
1. Age 18 years
2. Demonstrable knowledge of what hormones medically can and cannot do and their social benefits and risks;
3. Either a documented real life experience should be undertaken for at least three months prior to the administration of hormones Or
4. A period o psychotherapy of a duration specified by the mental health professional after the initial evaluation (usually a minimum of three months) should be undertaken
5. Under no circumstances should a person be provided hormones who has neither fulfilled criteria #3 or #4

**Readiness Criteria**

Three criteria exist:
1. The patient has had further consolidation of gender identity during the real-life experience or psychotherapy;

2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies an absence of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance);
3. Hormones are likely to be taken in a responsible manner

**Can Hormones Be Given For Those Who Do Not Initially Want Surgery or a Real Life Experience?**

Yes, but after diagnosis and psychotherapy with a qualified mental health professional following minimal standards listed above. These cases often are deeply controversial and require particular caution.

IX.     **Hormone Therapy for Adults**

**Reasons for Hormone Therapy**

Cross-sex hormonal treatments play an important role in the anatomical and psychological gender transition process for properly selected adults with gender identity disorders. These hormones are medically necessary for rehabilitation in the new gender. They improve the quality of life and limit psychiatric co-morbidity which often accompanies lack of treatment. When physicians administer androgens to biologic females and estrogens, progesterone, and/or testosterone-blocking agents to biologic males, patients feel and appear more like members of their aspired-to sex.

**The Desired Effects of Hormones**

Biologic males treated with cross-sex hormones can realistically expect treatment to result in: breast growth, some redistribution of body fat to approximate a female body habitus, decreased upper body strength, softening of skin, decrease in body hair, slowing or stopping the loss of scalp hair, decreased fertility and testicular size, and less frequent, less firm erections. Most of these changes are reversible, although breast enlargement will not completely reverse after discontinuation of treatment.

Biologic females treated with cross-sex hormones can expect: a permanent deepening of the voice, permanent clitoral enlargement, mild breast atrophy, increased upper body strength, weight gain, facial and body hair growth, male-pattern baldness, increased social and sexual interest and arousability, and decreased hip fat.

The degree of desired effects actually attained varies from patient to patient. The maximum physical effects of hormones may not be evident until two years of continuous treatment. Heredity limits the tissue response to hormones and cannot be overcome by increasing dosage.

**Medical Side Effects**

Side effects in biologic males treated with estrogens may include increased propensity to blood clotting (venous thrombosis with a risk of fatal pulmonary embolism), development of benign pituitary

prolactinomas, infertility, weight gain, emotional lability and liver disease. Side effects in biologic females treated with testosterone may include infertility, acne, emotional lability (including the potential for maor depression), increases in sexual desire, shift of lipid profiles to male patterns which increase the risk of cardiovascular disease, andn the potential to develop benign and malignant liver tumors and hepatic dysfunction. Patients with medical problems or are otherwise at risk for cardiovascular disease may be more likely to experience serious or fatal consequences of cross-sex hormonal treatments. For example, cigarette smoking, obesity, advanced age, heart disease, hypertension, clotting abnormalities, malignancy, and some endocrine abnormalities are relative contraindications for the use of hormonal treatment. Therefore, some patients may not be able to tolerate cross-sex hormones. However, risk-benefit ratios should be considered collaboratively between the patient and prescribing physician.

**Social Side Effects**

There are often important social effects from taking hormones which the patient must consider. These include relationship changes with family members, friends, and employers. Hormone use may be an important factor in job discrimination, loss of employment, divorce and marriage decisions, and the restriction or loss of visitation rights for children. The social effects of hormones, however, can be positive as well.

**The Prescribing Physician's Responsibilities**

Hormones are to be prescribed by a physician. Hormones are not to be administered simply because patients demand them. Adequate psychological and medical assessments are required before and during treatment. Patients who do not understand the eligibility and readiness requirements and who are unaware of the SOC should be informed of them. This may be a good indication for a referral to a mental health professional experienced with gender identity disorders.

The physician providing hormonal treatment and medical monitoring need not be a specialist in endocrinology, but should become well-versed in the relevant medical and psychological aspects of treating person with gender identity disorders.

After a thorough medical history, physical examination, and laboratory examination, the physician should again review the likely effects and side effects of this treatment, including the potential for serious, life-threatening consequences. The patient must have the cognitive capacity to appreciate the risks and benefits of treatment, have his/her questions answered, and agree to medical monitoring of treatment. The medical record must contain a written informed consent document reflecting a discussion of the risks and benefits of hormone therapy.

Physicians have a wide latitude in what hormone preparations they may prescribe and what routes of administration they may select for individual patients. As therapeutic options rapidly evolve, it is the responsibility of the prescribing physician to make these decisions. Viable options include oral,

injectable, and transdermal delivery systems. Typically applied hormonal creams have not been shown to produce adequate cross-sex effects. The use of transdermal estrogen patches should be considered for males over 40 years of age or those with clotting abnormalities or a history of venous thrombosis.

In the absence of any other medical, surgical, or psychiatric conditions, basic medical monitoring should include: serial physical examinations relevant to treatment effects and side effects, vital sign measurements before and during treatment, weight measurements before and during treatment, weight measurements, and laboratory assessment. For those receiving estrogens, the minimum laboratory assessment should consist of a pretreatment free testosterone level, fasting glucose, liver function tests, and complete blood count with reassessment at 6 and 12 months and annually thereafter. A pretreatment prolactin level should be obtained and repeated at 1, 2, and 3 year. If hyperprolactemia does not occur during this time, no further measurements are necessary.

For those receiving androgens, the minimum laboratory assessment should consist of pretreatment liver function tests and complete blood count with reassessment at 6 months, 12 months, and yearly thereafter. Yearly palpation of the liver should be considered. Patients should be screened for glucose intolerance and gall bladder disease.

Biological males undergoing estrogen treatment should be monitored for breast cancer and encourage in engage in routine self-examination. As they age, they should be monitored for prostatic cancer. Females who have undergone mastectomies who have a family history of breast cancer should be monitored for the disease. Gender patients, whether on hormones or not, should be screened or pelvic malignancies as are other persons.

Physicians should provide their patients with a brief written statement indicating that this person is under medical supervision which includes cross-sex hormone therapy. During the early phases of hormone treatment, the patient should be encouraged to carry this statement at all times to help prevent difficulties with the police.

**Reductions in Hormone Doses After Gonadectomy**

Estrogen doses in post-orchiectomy patients can often be reduced by 1/3 to ½ and still maintain feminization. Reductions in testosterone doses post-oophorectomy should be considered, taking into account the risks of osteoporosis. Lifelong maintenance treatment is usually required in both sexes.

**The Misuse of Hormones**

Some individuals obtain hormones from nonmedical sources, such as friends, family members, and pharmacies in other countries. These treatments are often excessive in dose, produce more side effects, are medically unmonitored, and expose the person o greater medical risk. Persons taking medically monitored hormones have been known to take additional doses of illicitly obtained hormones without their physician's knowledge. Mental health professionals and prescribing physicians should inquire

whether their patients have increased their doses and make a reasonable effort to enhance compliance in order o limit medical and psychiatric morbidity from treatment. It is ethical for physicians to discontinue taking medical and legal responsibility for patients who place themselves at higher risk by noncompliance with the prescribed hormonal regimen. Patient pressure is not a sufficient reason to deliver substandard medical care.

**Other Potential Benefits of Hormones**

Hormonal treatment, when medically tolerated, should precede any genital surgical interventions. Satisfaction with the hormone's effects consolidates the person's identity as a member of the aspired-to gender and further adds to the conviction to preoceed. Dissatisfaction with hormonal effects may signal ambivalence about proceeding to surgical interventions. Hormones alone often generate adequate breast development, precluding the need for augmentation mammaplasty. Some patients who receive hormonal treatment will not desire surgical interventions.

**The Use of Antiandrogens and Sequential Therapy**

Antiandrogens can be used as adjunctive treatments in biologic males receiving estrogens, even though they are not always necessary to achieve feminization. In some patients, antiandrogens may offer assistance by more profoundly suppressing the production of testosterone and enabling a lower dose of estrogen to be used when adverse estrogen side effects are anticipated.

Feminization does not require sequential therapy. Attempts to mimic the menstrual cycle by prescribing interrupted estrogen therapy or substituting progesterone for estrogen during part of the month are not necessary to achieve feminization.

**Informed Consent**

Hormonal treatments should be provided only to those who are legally able to provide informed consent. This includes persons who have been declared by a court to be emancipated minors and incarcerated persons who are considered competent to participate in their medical decisions. For adolescents, informed consent needs to include the minor patient's assent and the written informed consent of a parent or legal guardian. Informed consent implies that the patient understands that hormone administration limits fertility and the removal of sexual organs prevents the capacity to reproduce.

**Hormonal Treatment of Prisoners**

Patients who are receiving hormonal treatments as part of a medically monitored program of gender transition should continue to receive such treatment while incarcerated to prevent emotional liability, reversibility of physical effects, and the sense of desperation that my include depression and suicidality.

## X.  Requirements for Genital Reconstructive and Breast Surgery

**Eligibility Criteria**

These minimum eligibility criteria for various surgeries equally apply to biological males seeking genital reconstruction and biological females seeking mastectomy and phalloplasty. They are:

1. Legal age of majority in the patient's nation
2. 12 months of continuous hormonal therapy for those without a medical contraindication
3. 12 months of successful continuous full time real-life experience. Periods of returning to the original gender may indicate ambivalence about proceeding and should not be used to fulfill this criterion
4. if required by the mental health professional, regular responsible participation in a psychotherapy throughout the real life experience at a frequency determine by the mental health professional. Psychotherapy, per se, is not an absolute eligibility criterion for surgery.
5. Demonstrable knowledge of the cost, required lengths of hospitalizations, likely complications, and post surgical rehabilitation requirements of various surgical approaches.
6. Awareness of different competent surgeons

**Readiness Criteria**

The readiness criteria include:

1. Demonstrable progress in consolidating the evolving gender identity
2. Deomstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better state of mental health (this implies an absence of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance).

**Can Surgery Be Provided Without Hormones and the Real Life Experience?**

Individuals who >>just<< want mastectomy, penectomy, or genital reconstructive therapy without meeting the eligibility criteria can not be provided bodily alterations because they are >>special cases<. Organ removal or remodeling is a surgical treatment for a gender disorder. The surgery occurs after many careful steps. Such surgery is not a patient right that once demanded has to be granted. The SOC contains provisions for an individual approach for every patient, but this does not mean that the general guidelines for the sequence of psychiatric evaluation, possible psychotherapy, hormones, and real life experience can be ignored because a person desires just one surgical procedure.

If a person has lived convincingly as a member of the opposite sex for a long period of time and is assessed to be a psychologically healthy person after a requisite period of psychotherapy, there is no inherent reason that he or she must take hormones prior to having a desired breast or genital surgery.

## XI.  Surgery

**Conditions under which Surgery May Occur**

Surgical treatment for a person with a gender identity disorder is not merely another elective procedure. Typical elective procedures only involve a private mutually consenting contract between a suffering person and a technically competent surgeon. Surgeries for GID are to be undertaken only after a comprehensive evaluation by a qualified mental health professional. Surgery may be performed once written documentation testifies that a comprehensive evaluation has occurred and that the person has met the eligibility and readiness criteria. By following this procedure, the mental health professional, the physician prescribing hormones, the surgeon and the patient share in the responsibility of the decision to make irreversible changes o the body. The patient who has decided to undergo genital or breast operations, however, tends to view the surgery as the most important and effective treatment to correct the underlying problem.

**Requirements for the Surgeon Performing Genital Reconstruction**

The surgeon should be a urologist, gynecologist, plastic surgeon or general surgeon, and Board-Certified as such by a nationally known and reputable association. The surgeon should have specialized competence in genital reconstructive techniques as indicted by documented supervised training with a more experienced surgeon. Even experience surgeons in this field must be willing to have their therapeutic skills reviewed by their peers. Willingness and cooperation with peer review are essential. This includes attendance at professional meetings where new ideas about techniques are presented.

Ideally, the surgeon should be knowledgeable about more than one of the surgical techniques for genital reconstruction so that the surgeon will be able to choose the ideal technique for the individual patient's anatomy and medical history. When surgeons are skilled in a single technique, they should so inform their patients and refer those who do not want or are unsuitable for this procedure to another surgeon.

Prior to performing any surgical procedures, the surgeon should have all medical conditions appropriately monitored and the effects of the hormonal treatment upn the liver and other organ systems investigated. This can be done alone or in conjunction with medical colleagues. Since pre-existing conditions may complicate genital reconstructive surgeries, surgeons must also be competent in urological diagnosis. The medical record should contain written informed consent for the particular surgery to be performed.

**How to Deal with the Ethical Question Concerning Sex Reassignment (Gender Confirming) Surgeries**

Many persons, including medical professionals, object on ethical grounds to surgery for GID. In ordinary surgical practice, pathological tissues are removed in order to restore disturbed functions or corrections are made to disfiguring body features to improve the patient's self image. These specific conditions are not present when surgery is performed for gender identity disorders. In order to understand how surgery is able to alleviate the psychological discomfort of the patient with a gender identity disorder, professionals who are inexperienced with severe gender identity disorders need to listen to these

patients discuss their symptoms, dilemmas, and life histories. It is important that the professionals dealing with gender patients feel comfortable about altering anatomically normal structures.

The resistance against performing surgery on the ethical bases of >>above all do no harm<< should be respected, discussed, and met with the opportunity to learn about the psychological distress of having a gender identity disorder from the patients themselves.

**Genital, Breast, and Other Surgery for the Male to Female Patient**

Surgical procedures may include orchiectomy, penectomy, vaginoplasty and augmentation mammaplasty. Vaginoplasty requires both skilled surgery and postoperative treatment. The three techniques are: penile skin inversion, pedicled rectosigmoid transplant, or free skin graft to line the neovagina. Augmentation mammaplasty may be performed prior to vaginoplasty if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormonal treatment for two years is not sufficient for comfort in the social gender role. Other surgeries that may be performed to assist feminization include: reduction thyroid chondroplasty, suction-assisted lipoplasty of the waist, rhinoplasty, facial bone reduction, face-lift, and blephoroplasty. These do not require letters of recommendation from mental health professionals as does genital reconstruction therapy. The committee is concerned about the safety and effectiveness of voice modification surgery and urges more follow-up research prior to widespread use of this procedure. Patients who elect this procedure should do so after all other surgeries requiring general anesthesia with intubation are completed to protect their vocal cords.

**Breast and Genital Surgery for the Female to Male Patient**

Surgical procedure may include mastectomy (chest reconstruction), hysterectomy, salpingo-oophorectomy, vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, and phalloplasy. Current operative techniques for phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical consideration. If he objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, the patient should be clearly informed that there are both several separate stages of surgery and frequent technical difficulties which require additional operations. Even the metoidioplasty technique, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one surgery. The plethora of techniques for penis construction indicate that further technical development is necessary. Patients may undergo hysterectomy and salpingo-oophorectomy prior to phalloplasty.

The mastectomy procedure is usually the first surgery performed for ease in passing in the preferred gender role, but for some patients this is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient is informed.

Genital surgeries often combine more than one of the above operations but typically genital surgery requires several separate operative procedures.

76

**The Surgeon's Relationship with the Physician Prescribing Hormones and Mental Health Professional**

The surgeon is not merely an interchangeable technician hired to perform a procedure. The surgeon is part of the team of clinician participating in a long rehabilitation process. The patient often feels an immense positive regard for (transference) and trusting bond to the surgeon, which ideally will enable long term follow-up care. Because of the significance of the surgeon to the patient, these physicians are responsible for awareness of the diagnosis that has let to the recommendation for genital reconstruction. Surgeons should have a chance to speak at length with their patients to satisfy themselves that the patient is likely to benefit from the procedures apart from the letters recommending surgery. Ideally, the surgeon should have a close working relationship with the other professionals who have been actively involved in the patient's psychological and endocrinological care. This is usually best accomplished by belonging to an interdisciplinary team of professionals who specialize in gender identity disorders. Such gender teams do not exist everywhere, however. At the very least, the surgeon needs to be reassured that the mental health professional and physician prescribing hormones are reputable professionals with specialized experience with the gender identity disorders. This is often reflected in the quality of the documentation letters. Since factitious and falsified letters have occasionally been presented, surgeons should personally communicate with at least one of the mental health professionals to verify the authenticity of their letters.

**Surgery for Persons with Psychotic Conditions and Other Serious Mental Ilnesses**

Surgical therapies are undertaken only for the treatment of the patient's gender identity disorder. When severe psychiatric disorders with impaired reality testing – such as, schizophrenia, dissociative identity disorder, borderline personality disorder, are present as well, a significant effort must be made to improve these conditions with stat-of-the-art psychiatric treatments before hormones and surery are contemplated. A reevaluation by a Ph.D clinical psychologist or psychiatrist should be conducted within two weeks of surgery describing the patient's mental status and readiness for surgery. It is preferable if the clinician has previously evaluated the patient. No surgery should be performed while the patient is actively psychotic.

**Postsurgical Follow-up by Professionals**

In general, long-term postoperative follow-up is encouraging in that it is one of the factors associated with a good psychosocial outcome. Follow-up is also essential to the patient's subsequent anatomic and medical health and to the surgeon's knowledge about the benefits and limitations of surgery.

Long-term follow-up with the surgeon is recommended in al patients to ensure an optimal surgical outcome. Surgeons who are operating on patients who are coming from long distances should include personal follow-up in their care plan and then ensure affordable, local, long-term aftercare in the patient's geographic region. Post-operative patients may also incorrectly exclude themselves from follow-up with the physician prescribing hormones, not recognizing that these physicians are best able to prevent, diagnose and treat possible long term medical conditions that are unique to the hormonally

and surgically treated. Postoperative patients also have general health concerns and should undergo regular medical screening according to recommended guidelines.

The need for follow-up extends beyond the endocrinologist and surgeon, however, to the mental health professional, who having spent a longer period of time with the patient than any other professional, is in an excellent position to assist in any post-operative adjustment difficulties.

**5.1-** We recommend health care professionals assessing transgender and gender diverse adults for physical treatments:

**5.1.a-** are licensed by their statutory body and hold, at a minimum, a master's degree or equivalent training in a clinical field relevant to this role and granted by a nationally accredited statutory institution.

**5.1.b-** for countries requiring a diagnosis for access to care, the health care professional should be competent using the latest edition of the World Health organization's International Classification of diseases (ICd) for diagnosis. In countries that have not implemented the latest ICd, other taxonomies may be used; efforts should be undertaken to utilize the latest ICd as soon as practicable.

**5.1.c-** are able to identify co-existing mental health or other psychosocial concerns and distinguish these from gender dysphoria, incongruence, and diversity.

**5.1.d-** are able to assess capacity to consent for treatment.

**5.1.e-** Have experience or be qualified to assess clinical aspects of gender dysphoria, incongruence, and diversity.

**5.1.f-** undergo continuing education in health care relating to gender dysphoria, incongruence, and diversity.

**5.2-** We suggest health care professionals assessing transgender and gender diverse adults seeking gender-affirming treatment liaise with professionals from different disciplines within the field of transgender health for consultation and referral, if required. *The following recommendations are made regarding the requirements for gender-affirming medical and surgical treatment (all should be met):*

**5.3-** We recommend health care professionals assessing transgender and gender diverse adults for gender-affirming medical and surgical treatment:

**5.3.a-** only recommend gender-affirming medical treatment requested by a tgd person when the experience of gender incongruence is marked and sustained.

**5.3.b-** ensure fulfillment of diagnostic criteria prior to initiating gender-affirming treatments in regions where a diagnosis is necessary to access health care.

**5.3.c-** Identify and exclude other possible causes of apparent gender incongruence prior to the initiation of gender-affirming treatments.

**5.3.d-** ensure that any mental health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed, before a decision is made regarding treatment.

**5.3.e-** ensure any physical health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed, before a decision is made regarding treatment.

**5.3.f-** assess the capacity to consent for the specific physical treatment prior to the initiation of this treatment.

**5.3.g-** assess the capacity of the gender diverse and transgender adult to understand the effect of gender-affirming treatment on reproduction and explore reproductive options with the individual prior to the initiation of gender-affirming treatment. **5.4-** We suggest, as part of the assessment for gender-affirming hormonal or surgical treatment, professionals who have competencies in the assessment of transgender and gender diverse people wishing gender-related medical treatment consider the role of social transition together with the individual.

**5.4-** We suggest, as part of the assessment for gender-affirming hormonal or surgical treatment, professionals who have competencies in the assessment of transgender and gender diverse people wishing gender-related medical treatment consider the role of social transition together with the individual.

**5.5-** We recommend transgender and gender diverse adults who fulfill the criteria for gender-affirming medical and surgical treatment require a single opinion for the initiation of this treatment from a professional who has competencies in the assessment of transgender and gender diverse people wishing gender-related medical and surgical treatment.

**5.6-** We suggest health care professionals assessing transgender and gender diverse people seeking gonadectomy consider a minimum of 6 months of hormone therapy as appropriate to the tgd person's gender goals before the tgd person undergoes irreversible surgical intervention (unless hormones are not clinically indicated for the individual).

**5.7-** We recommend health care professionals assessing adults who wish to detransition and seek gender-related hormone intervention, surgical intervention, or both, utilize a comprehensive multidisciplinary assessment that will include additional viewpoints from experienced health care professional in transgender health and that considers, together with the individual, the role of social transition as part of the assessment process.

Attachment 2

**2022**

# U.S. TRANS SURVEY

## EARLY INSIGHTS

**Attachment 3**

# Early Insights:
# A Report of the 2022
# U.S. Transgender Survey

by:

Sandy E. James, Jody L. Herman, Laura E. Durso,
and Rodrigo Heng-Lehtinen

February 2024









# ACKNOWLEDGEMENTS

**T**HE 2022 U.S. Transgender Survey (USTS) team extends our gratitude to all the members of the transgender community who participated in the 2022 USTS and the hundreds of individuals and organizations who assisted with recruitment. We thank the Black Trans Advocacy Coalition, National Queer Asian Pacific Islander Alliance, and TransLatin@ Coalition for partnering with the National Center for Transgender Equality (NCTE) to present the survey. We thank the members of the 2022 USTS Scientific Advisory Council and Outreach Council for their substantial guidance and contributions and without whom the survey would not have been successful. We thank the many experts who assisted with questionnaire development and countless other USTS volunteers who made contributions at every stage of the project. We also thank Chivita Espacial and Aldo Resendiz for providing translations, and we thank Burness, Pickaxe, Qualtrics, Teal Media, and the Williams Institute for their contributions to the project.

Special thanks to Josie Caballero, Alex del Rosario, Sybastian Smith, Leroy Thomas, Tekla Taylor, Illyana Bocanegra and the following NCTE staff and contractors for their significant contributions to the project (in alphabetical order): Will Cole, Andrew Flores, Brendon Holloway, Olivia Hunt, Leesh Menard, Nikki Mia, Lisa Mottet, Devon Ojeda, Kathryn O'Neill, Dakota Strode, Luke Wegener, and Jami Westerhold.

This project would not have been possible without the generous support of the Robert Wood Johnson Foundation and the TAWANI Foundation.

## Recommended Citation

James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). *Early Insights: A Report of the 2022 U.S. Transgender Survey*. National Center for Transgender Equality, Washington, DC.

© 2024 The National Center for Transgender Equality. We grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the authors and the National Center for Transgender Equality. Further written permission is not required.

# INTRODUCTION

**T**HIS report provides a first look at the results of the 2022 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE) in partnership with the Black Trans Advocacy Coalition, National Queer Asian Pacific Islander Alliance, and TransLatin@ Coalition. The 2022 USTS is the follow up to the 2015 USTS, which has been an essential source of data on the experiences of transgender people for advocates, educators, researchers, policymakers, and the general public since the publication of its report in 2016.[1] Building upon the success of the prior study, the 2022 USTS is now the largest survey ever conducted to examine the experiences of binary and nonbinary transgender people in the United States, with an unprecedented 92,329 respondents. The 2022 USTS provides updated information to help the public better understand the lives and experiences of transgender people in the United States and the challenges that many transgender people face. As such, it is an invaluable resource for identifying and addressing issues that are of vital importance to binary and nonbinary transgender people in the United States.

In the years since the 2015 USTS was conducted, the United States has experienced substantial social, political, legal, and other changes that have impacted the lives of binary and nonbinary transgender people. The 2022 USTS was designed to offer updated and expanded perspectives on the experiences of transgender people, including in the areas of education, employment, family life, health care, housing, life satisfaction, and public accommodations. By expanding the scope of the survey and filling the significant gaps in understanding about the lives and challenges faced by transgender people, the USTS will continue to serve as a crucial tool for research, education, advocacy, and policymaking.

This report presents preliminary findings that provide an overview of the experiences of binary and nonbinary transgender people. The findings and information presented are high-level statistics and should be interpreted and contextualized accordingly. For example, although the survey was open to transgender people aged 16 and older, findings in this report are limited to respondents aged 18 and over unless otherwise noted. This report presents select findings from a range of survey topics, but it does not include findings from every issue area covered in the survey. This report also does not present differences in outcomes based on demographic and other characteristics or provide comparisons to the U.S. general population or the 2015 USTS. This report does, however, provide important information and updated perspectives

---

[1] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality.

on some of the most substantial issues and experiences impacting transgender people in the United States. With these early insights from the 2022 USTS, readers can better understand some of the challenges that binary and nonbinary transgender adults face in the United States. The forthcoming full report of the 2022 U.S. Transgender Survey will present comprehensive findings of the survey and paint a more complete picture of the diversity, resilience, and strength of the transgender community.

# METHODOLOGY

## Overview

The U.S. Transgender Survey (USTS) was administered online in English and Spanish and open to binary and nonbinary transgender people aged 16 and older residing in the United States, a U.S. territory, or on a U.S. military base overseas. The survey instrument included questions covering a wide range of experiences and issues, such as those related to health care, employment, education, housing, and public accommodations. The survey was hosted by Qualtrics and could be accessed exclusively through the USTS website (USTransSurvey.org). Data were collected over a 48-day period, from October 19 through December 5, 2022. The sample included 92,329 respondents, including 84,170 adults (18 and older), from all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas. The following sections provide an overview of the survey methodology. While these sections provide general information about the USTS's methodology, they do not include a detailed discussion of all aspects of the methodology. A detailed description of the methodology will be included in the full report of the 2022 U.S. Transgender Survey.

## History of the U.S. Transgender Survey

The 2022 USTS is the successor to the 2015 USTS, which was conducted by the National Center for Transgender Equality (NCTE) and was previously the largest and most comprehensive survey about the experiences of transgender people in the United States, with 27,715 respondents. The 2015 USTS was developed as the follow-up to the National Transgender Discrimination Survey (NTDS), which was conducted by NCTE and the National LGBTQ Task Force from late 2008 to early 2009. The NTDS was conducted to address the significant lack of data about transgender people in the United States, particularly from federal surveys. The NTDS became the first large, national survey to broadly examine the experiences of transgender people in the United States and the NTDS report, published in 2011, provided groundbreaking findings.[2]

Throughout the long history of developing, conducting, and reporting on the largest, most comprehensive surveys about the experiences and life outcomes of transgender people in the U.S., USTS and NTDS researchers and authors acknowledged the need to evolve and collect data to identify and address both current and emerging needs of transgender people. This included improving upon on survey question design and expanding substantive content to fill remaining knowledge gaps, examine new and underexplored issues, investigate potential changes in experiences and outcomes over time, and improve comparisons between the experiences of transgender people and the U.S. general population. The 2022 USTS was developed with those considerations, and feedback received from researchers, practitioners, and advocates was continuously assessed while constructing and finalizing the questionnaire.

[2] Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

# USTS Respondents

The USTS documents the experiences of transgender people, which the project defines as anyone who identifies with a different gender than they were assigned at birth. As such, the study was inclusive of those with binary and nonbinary transgender identities and other identities on the transgender identity spectrum, regardless of the terminology used by the respondent. The term "transgender" or "trans" was defined broadly for the purposes of this study to include a wide range of identities, but some individuals for whom the study was intended may have assumed that the term did not include them. Accordingly, promotional materials worked to affirm that the survey was inclusive of a range of gender-expansive identities and was open to transgender people at any stage of their lives, journey, or transition.

The study included individuals aged 16 and older at the time of survey completion. This differed from the 2015 USTS sample, which was limited to respondents 18 and older. As with all survey research, it is important to consider the context in which the study is being conducted, and the research team evaluated the context of being transgender in the U.S. at the time of the study when deciding to expand the sample to 16- and 17-year-olds. Since the USTS was last conducted, there have been numerous social, political, and legal developments that impact the experiences of transgender people of all ages in the United States, including those that have had a profound impact on transgender youth. There have also been advancements in research that have improved our understanding of the experiences of transgender youth. These cultural and research-related changes underscored the importance of collecting data about the experiences of transgender youth. Therefore, in consultation with the USTS Scientific Advisory Committee, the research team determined that it was appropriate to include 16- and 17-year-olds in the USTS sample and developed the survey instrument accordingly. As previously noted, however, findings presented in this preliminary report only include respondents aged 18 and over unless otherwise noted.

The study population was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, to capture the experiences of transgender people who were subject to laws, policies, and social and cultural environments in the U.S. at the time they completed the survey.

## Developing the Survey Instrument

The 2022 USTS research team worked for more than a year to develop the survey instrument under the advisement of a Scientific Advisory Committee and in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject matter expertise. Using the 2015 USTS survey instrument as the foundation, it was important to focus on the general goals of collecting updated data on a wide range of topics and to address data collection gaps. It was also critical to develop a survey instrument that expanded the range of topics presented, responded to changing social, environmental, and political landscapes, and responded to feedback about the 2015 iteration. For example, given the unparalleled impact of the COVID-19 pandemic, the research team had to consider how the pandemic might affect respondents'

experiences with respect to USTS-specific measures. Accordingly, the research focused on collecting data that would be comparable to the 2015 USTS while expanding or adding topics and questions for context (e.g., COVID-19), to respond to issues in law and policy (e.g., health care, sports), and to yield new or improved information (e.g., physical health, transition-related health care, education, life satisfaction).

To further refine the survey, nearly 100 people participated in a pilot study to evaluate the questionnaire and were offered a $25 gift card for their participation. Pilot study participants included individuals who were eligible for the survey and who represented a wide range of characteristics and experiences that reflected the diversity of the intended study sample. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared, and its purpose was to evaluate the substantive content and technical aspects of the survey. Pilot study participants were asked to provide general feedback on individual questions and the entire questionnaire and to address specific questions from the research team as part of their evaluation. Pilot study feedback was compiled, discussed, and used to inform final revisions to the survey instrument.

The final survey questionnaire contained a total of 605 possible questions presented in thirty-eight sections addressing topics across a range of life experiences. This was a significant expansion over the 324 possible questions in the 2015 USTS and reflects efforts to substantially increase knowledge in many issue areas. The additional questions often sought a more nuanced understanding of an issue that only affected some respondents rather than resulting in more questions for all respondents. No respondent received all possible questions, and the online survey platform allowed respondents to move efficiently through the questionnaire using skip logic to ensure that respondents only received questions that were appropriate based on their previous answers. As a result, despite having nearly twice the number of possible questions as in the 2015 USTS, the 2022 USTS maintained an average completion time of 60 minutes, as verified by the pilot study. As with both the 2015 USTS and the NTDS, evaluations of the USTS questionnaire confirmed that the length was appropriate for such a comprehensive survey, and the need for data about the experiences of transgender people outweighed concerns about the survey length.

## Outreach

The primary outreach objective was to raise awareness of the survey and provide opportunities to complete the survey for as many transgender people as possible across the U.S. and its territories. Outreach efforts also focused on connecting with people who are often underrepresented in survey research and those with limited access and opportunity to complete an online survey. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals.

The outreach team substantially improved on the 2015 USTS outreach model by expanding efforts on multiple fronts and applying lessons learned, such as the benefits of a longer outreach period and diverse approaches to community engagement. The outreach period began approximately one year before the survey launch, and the outreach team used various strategies to connect with transgender people through multiple

points of access, such as through transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities. The outreach team expanded on the eleven-person 2015 USTS Advisory Committee to assemble a USTS Outreach Council comprised of twenty-two organizations and individuals who advised on and participated in outreach to transgender people in communities across the U.S. and in U.S. territories throughout the outreach period. Working with the Outreach Council significantly increased outreach engagement and served as the bedrock for outreach efforts. The outreach team also contacted nearly 1,900 organizations and individuals to request their support by sharing information about the survey with their members and contacts. The team directly corresponded with more than 250 organizations during the outreach period and while the survey was in the field, and countless other organizations promoted the survey to their communities. The team worked to connect with potential respondents through a variety of methods, including making thousands of phone calls and sending tens of thousands of text messages.

Throughout the outreach period, the team conducted a survey pledge campaign, which was among the most important methods for engaging and communicating with potential respondents. The campaign invited potential participants and allies to pledge to take the survey and/or spread the word about the survey. The survey pledge was designed to raise awareness about the survey and engage potential respondents for a sustained period leading up to the survey launch. Individuals who completed pledge information received email and text communications throughout the outreach period. The pledge was an important component of the outreach and communications strategy in the 2015 USTS, and the large number of pledgers in 2015 (~14,000) was thought to correspond to the eventual large number of respondents (27,715). The 2022 USTS outreach team improved upon the survey pledge campaign to substantially increase connections and engagement, resulting in 34,576 people who pledged to take the survey before it launched, 12,015 of whom also pledged to share the survey with other transgender people in their life.

As an incentive to complete the survey, participants were offered the opportunity to enter into a random drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes. After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site to a web page on the NCTE-hosted USTS website to sign up for the random drawing.

The outreach team worked with organizations to reduce barriers to accessing the survey and increase opportunities to take the survey for people who may otherwise not have had access. One such method was by working with organizations to organize "survey-taking events." These were events during which organizations provided a location and resources for attendees to take the survey, such as computers or tablets. These events were intended to provide access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. The team also ran a tablet-loan program to provide another avenue through which organizations could offer survey access.

# Communications

The communications strategy was implemented in coordination with outreach efforts with a goal of reaching a wide range of transgender people, including those in populations that are traditionally underrepresented in surveys. The communications team employed a range of methods to share information about the survey, including email, social media, and print media, and created engaging materials to spread the word about the survey. The USTS website was redesigned to improve functionality and better share information with potential respondents and organizations and individuals interested in promoting the survey. The website included a description of the survey, information about the team working on the survey, frequently asked questions, and an interactive map with information about organizations that supported the survey.

The communications team created promotional materials and messaging to share through email, social media, and other methods. They maintained communication with thousands of individuals and organizations, including people who pledged to take or spread the word about the survey, organizations that committed to support the survey through outreach efforts, and people who had signed up to be in communication with NCTE about the organization's work and projects more generally.  They also developed a "partner toolkit" with materials for organizations to download and use, including key messaging, promotional graphics, video scripts, social media posts, event materials, and language for emails. The team provided information through many channels, resulting in the survey being promoted by influencers, organizations, and content creators through social media platforms, such as Instagram, Twitter, Facebook, TikTok, and Tumblr. The team also commissioned videos from key influencers to promote the survey prior to the survey launch and during the data-collection period, including "progress videos" that were embedded in the survey to thank respondents and encourage them to continue completing the survey. In addition to providing materials about the survey, the USTS team held dozens of events to raise awareness about the survey, such as Instagram and Facebook Live events to discuss the survey with influencers and organizations.

# Institutional Review Board and Confidentiality

The USTS was approved by an Institutional Review Board (IRB), which is an entity intended to protect the rights and welfare and ensure confidentiality of individuals participating in a research study. The study underwent an extensive full-board review by the University of California, Los Angeles, North General IRB, which included review and approval of the study design, questionnaire, and all recruitment materials leading up to the launch of the survey and throughout the fielding period in English and Spanish. As required by the IRB, the survey began with a study information sheet describing aspects of the study and participants' rights in the study. Participants were required to consent to taking the survey at the end of the information sheet and before beginning the questionnaire.

The survey was anonymous, and maintaining privacy and confidentiality in the collection and maintenance of survey data was an important component of preserving participants' anonymity. The IRB required the research team

to ensure that confidentiality protections were in place for the study and demonstrate sufficiency of data security protocols. The research team also obtained a Certificate of Confidentiality from the National Institutes of Health, which could be used to legally refuse to disclose information that may identify respondents in any federal, state, or local civil, criminal, administrative, legislative, or other proceedings, such as if there is a court subpoena.

## Survey Hosting, Data Collection, and Cleaning

The survey was programmed and hosted by Qualtrics, and data collection was managed by Qualtrics throughout the 48-day fielding period. Following the end of the survey data-collection period, the database was securely transferred to the USTS research team for cleaning and analysis. The data then underwent cleaning using standard practices and additional cleaning for eligibility to remove responses that did not belong in the sample (e.g., duplicate responses, incomplete responses, illogical responses) and improve the quality of the final sample. The data were then recoded as needed, including recoding of write-in responses for questions with a "not listed above" answer choice. Write-in responses were recoded into existing answer choices when possible, and in some cases, new answer categories were created for frequently repeated write-in responses.

Several survey weights were developed for use in our analyses to reduce sampling biases and be more representative of the U.S. transgender population with regard to age, race/ethnicity, education, and geographical region. Findings in this report for these demographic characteristics reflect the weighted percentages. Separate weights were developed for the full sample (ages 16+) and for the adult sample (ages 18+). The weights were based on the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance System (BRFSS), which is one of the few sources of representative data for the U.S. trans population.

As previously noted, the forthcoming full report of the 2022 U.S. Transgender Survey will contain a detailed description of survey methodology, including more information about the cleaning and weighting processes.

## Presentation of Findings

Findings in this early insights report of the 2022 USTS represent the overall findings for each topic examined, presented as weighted percentages of the entire adult sample or of specified subgroups. Results are only reported for respondents aged 18 and older, except as noted for findings that also include 16- and 17-year-olds. This report does not include additional analyses to examine differences in outcomes based on demographic and other characteristics. Comprehensive results, including those for 16- and 17-year-olds and broken down by a variety of characteristics, will be reported in the full report of the 2022 U.S. Transgender Survey.

Percentages are rounded to whole numbers, and results were rounded according to the following convention: findings with 0.50 and above were rounded up, and findings with 0.49 and below were rounded down (e.g., 1.50 rounded to 2% and 1.49 rounded to 1%). Findings of 0.49% or less were labeled "less than 1%" or "<1%." Findings presented in figures and tables may not always add up to 100% due to rounding.

Throughout the survey, respondents answered questions about experiences that occurred within a certain time period prior taking the survey, such as "in the last 12 months" or "in the last 30 days." When time periods are noted in this report, they relate to when the respondent took the survey. For example, "in the last 12 months" in this report means that the respondent had the experience in the 12 months prior to taking the survey.

When interpreting the preliminary findings presented in this report, it is important to note that although the team sought to recruit a sample that was as representative as possible of transgender people in the U.S. and analytic weights reduce sample biases, study respondents were not drawn from a random sample. Therefore, while this sample is a large one, the findings may not be representative of all transgender people.

# RESULTS

## Characteristics of USTS Respondents

- **Gender:** Thirty-eight percent (38%) of respondents identified as nonbinary, 35% identified as a transgender woman, 25% identified as a transgender man, and 2% identified as a crossdresser.

- When considering sex assigned at birth, 35% of respondents identified as a transgender woman, 30% identified as nonbinary (assigned female at birth), 25% identified as a transgender man, 8% identified as nonbinary (assigned male at birth), and 2% identified as a crossdresser.





- **Intersex Status.** Five percent (5%) of respondents reported they were born with a variation in physical sex characteristics or had an intersex variation or Difference of Sex Development, 72% reported they were not, and 23% reported that they did not know.



- **Race:** One percent (1%) of respondents identified as American Indian or Alaska Native ("AIAN"), 7% identified as Asian/Asian American or Native Hawaiian/Pacific Islander ("Asian/NHPI"), 8% identified as Black/African American ("Black"), 14% identified as Latino(a)(x)(e)/Hispanic ("Latino(a)(x)(e)"), less than 1% identified as Middle Eastern/North African ("MENA"), 56% identified as White/European American ("White"), and 13% identified as two or more races ("Biracial/Multiracial"). Additionally, less than 1% identified as "a racial or ethnic identity not listed above."



- **Age:** Forty-three percent (43%) of respondents were age 18 to 24, 36% were age 25 to 44, 9% were age 45 to 54, 6% were age 55 to 64, and 7% were over the age of 65.

- **Parental Status:** Seventeen percent (17%) of respondents reported that they were parents and 3% were parents of a transgender or nonbinary child (including adult children).

- **Geographic location:** USTS respondents were living in all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas. Based on Census regions, 41% were living in the South, 23% lived in the West, 19% lived in the Northeast, and 17% lived in the Midwest. Census regional categories do not include U.S. territories or U.S. military bases overseas.



**Location by Region**

Midwest 17%

South 41%

Northeast 19%

West 23%

**South:** AL, AR, DE, DC, FL, GA, KY, LA, MD, MS, NC, OK, SC, TN, TX, VA, WV
**West:** AK, AZ, CA, CO, HI, ID, MT, NM, NV, OR, UT, WA, WY
**Northeast:** CT, ME, MA, NH, NJ, NY, PA, RI, VT
**Midwest:** IA, IN, IL, KS, MI, MN, MO, NE, ND, OH, SD, WI

- **Citizenship Status:** Nearly all respondents were U.S. citizens either by birth (95%) or through naturalization (3%), and 1% were Permanent Residents. One percent (1%) of respondents held another immigration status, such as visa holder (including T, U, HB-1, or other visa), undocumented, Deferred Action for Childhood Arrivals (DACA) recipient, refugee, or asylee.

- **Educational Attainment:** Thirty-five (35%) percent of respondents had completed high school or obtained a GED, 26% had completed some college, 13% had not completed high school, 11% had a bachelor's degree, 7% had an associate's degree, and 7% had a master's degree or higher.



**Educational Attainment**

| 13% | 35% | 26% | 7% | 11% | 7% |
|---|---|---|---|---|---|
| Have Not Completed High School | High School Diploma Or GED | Some College (No Degree) | Associate's Degree | Bachelor's Degree | Graduate Or Professional Degree |

# HEALTH AND HEALTH CARE

## Impact of the COVID-19 Pandemic

Respondents were asked questions about their experiences with the COVID-19 pandemic to determine how it impacted the ways in which they move through the world and interact with others.

- Most respondents reported that, in the last 12 months, they went out in public places (such as a grocery store, restaurant, or shopping mall) less than they did before the COVID-19 pandemic, including 27% who went out "somewhat less" than before, 33% who went out "a lot less" than before, and 1% that did not go out at all. Twenty-seven percent (27%) of respondents went out "about the same amount" as before the pandemic, 7% went out "somewhat more" than before, and 5% went out "a lot more" than before.

- Most respondents wore a mask at least some of the time when out in public in the last 12 months, including 28% who wore a mask "all of the time," 33% who wore one "most of the time," and 24% who wore one "some of the time." Twelve percent (12%) wore a mask "a little of the time," and 4% wore a mask "none of the time."

## General Health and Experiences with Health Care Providers

- Approximately two-thirds of respondents reported that their health status was "good" (36%), "very good" (24%), or "excellent" (6%). One-quarter (25%) rated their health status as "fair," and 9% said it was "poor."

- More than one-quarter of respondents (28%) did not see a doctor when they needed to in the last 12 months due to cost.

- Nearly one-quarter of respondents (24%) did not see a doctor when they needed to in the last 12 months due to fear of mistreatment.

- Forty-four percent (44%) of respondents experienced serious psychological distress in the last 30 days (based on the Kessler 6 Psychological Distress Scale).

- Seventy-nine percent (79%) of respondents saw a doctor or health care provider within the last 12 months, and 9% saw a provider between 1 and 2 years ago.

- Of those who saw a health care provider within the last 12 months, nearly one-half (48%) reported having at least one negative experience because they were transgender, such as being refused health care, being misgendered, having a provider use harsh or abusive language when treating them, or having a provider be physically rough or abusive when treating them.

## Health Insurance

- Eighty-seven (87%) percent of respondents had health insurance coverage.

- Approximately 1 in 4 respondents (26%) had at least one issue with their insurance company in the last 12 months, such as being denied coverage for hormone therapy, surgery, or another type of health care related to their gender identity/transition; gender-specific health care because they were transgender; or routine health care because they were transgender.

## Gender Identity and Transition

- Nearly all respondents (94%) who lived at least some of the time in a different gender than the one they were assigned at birth ("gender transition") reported that they were either "a lot more satisfied" (79%) or "a little more satisfied" (15%) with their life. Three percent (3%) reported that transitioning gender made them "neither more nor less satisfied" with their life, 1% were "a little less satisfied," and 2% were "a lot less satisfied" with their life.

| Life Satisfaction Since Transitioning Gender | |
| --- | --- |
| A Lot More Satisfied | 79% |
| A Little More Satisfied | 15% |
| Neither More Nor Less Satisfied | 3% |
| A Little Less Satisfied | 1% |
| A Lot Less Satisfied | 2% |

- Nearly all respondents (98%) who were currently receiving hormone treatment reported that receiving hormones for their gender identity/transition made them either "a lot more satisfied" (84%) or "a little more satisfied" (14%) with their life. One percent (1%) reported that hormones made them "neither more nor less satisfied" with their life, and less than 1% said that they were "a little less satisfied" or "a lot less satisfied" with their lives after receiving hormones.



**Life Satisfaction With Receiving Hormone Treatment**

| | |
|---|---|
| A Lot More Satisfied | 84% |
| A Little More Satisfied | 14% |
| Neither More Nor Less Satisfied | 1% |
| A Little Or A Lot Less Satisfied | <1% |

- Nearly all respondents (97%) who had at least one form of surgery for their gender identity/ transition reported that they were either "a lot more satisfied" (88%) or "a little more satisfied" (9%) with their life. One percent (1%) reported that surgery made them "neither more nor less satisfied" with their life, less than 1% were "a little less satisfied," and 1% were "a lot less satisfied" with their life.

**Life Satisfaction After Gender-Affirming Surgery**

| | |
|---|---|
| A Lot More Satisfied | 88% |
| A Little More Satisfied | 9% |
| Neither More Nor Less Satisfied | 1% |
| A Little Less Satisfied | <1% |
| A Lot Less Satisfied | 1% |

# FAMILY LIFE

*This section includes some data for 16- and 17-year-old respondents.*

- Thirty-six percent (36%) of adult respondents who said that some or all of their immediate family knew that they were transgender said their family members were "supportive" of them being transgender, and 31% said they were "very supportive." Eight percent (8%) said their immediate family was "unsupportive" of them being transgender, 4% had "very unsupportive" immediate families, and 22% reported that they were "neither supportive nor unsupportive."

- Among 16- and 17-year-old respondents who said that some or all of their immediate family knew that they were transgender, 27% said their family members were "supportive" of them being transgender, and 17% said they were "very supportive." Fifteen percent (15%) said their immediate family was "unsupportive" of them being transgender, 14% had "very unsupportive" immediate families, and 28% reported that they were "neither supportive nor unsupportive."



**Immediate Family Support by Age**

| | Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive |
|---|---|---|---|---|---|
| **16 - 17** | 17% | 27% | 28% | 15% | 14% |
| **18 - 24** | 24% | 42% | 20% | 9% | 4% |
| **25 - 44** | 31% | 37% | 22% | 7% | 3% |
| **45 - 64** | 39% | 26% | 24% | 7% | 3% |
| **65+** | 39% | 24% | 29% | 4% | 4% |
| **Adults (18+)** | 31% | 36% | 22% | 8% | 4% |

- Thirty-five percent (35%) of adult respondents who said that some or all of their extended family members (such as grandparents, aunts, uncles, and cousins) knew that they were transgender said their family members were "supportive" of them being transgender, and 23% said they were "very supportive." Seven percent (7%) said their extended family was "unsupportive" of them being transgender, 3% had "very unsupportive" extended families, and 32% reported that they were "neither supportive nor unsupportive."

- Among 16- and 17-year-old respondents who said that some or all of their extended family members (such as grandparents, aunts, uncles, and cousins) knew that they were transgender, 35% said their family members were "supportive" of them being transgender, and 13% said they were "very supportive." Seventeen percent (17%) said their extended family was "unsupportive" of them being transgender, 6% had "very unsupportive" extended families, and 29% reported that they were "neither supportive nor unsupportive."



**Extended Family Support by Age**

- More than one in ten (11%) adult respondents who grew up in the same household with family, guardians, or foster parents said that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

- Five percent (5%) of 16- and 17-year-old respondents who grew up in the same household with family, guardians, or foster parents said that a family member was violent towards them because they were transgender, and 1% were kicked out of the house because they were transgender.

## Income, Employment, Workplace Experiences, and Housing Stability

- More than one-third (34%) of respondents were experiencing poverty.

- The unemployment rate among USTS respondents was 18%.

- More than one in ten (11%) respondents who had ever held a job said they had been fired, forced to resign, lost the job, or been laid off because of their gender identity or expression.

- Nearly one-third (30%) of respondents had experienced homelessness in their lifetime.

## Experiences In Restrooms

- Four percent (4%) of respondents were denied access to a restroom in a public place, at work, or at school in the last 12 months.

- In the last 12 months, 6% of respondents had been verbally harassed, physically attacked, or experienced unwanted sexual contact when accessing or using a restroom.

## Harassment and Violence

- Nearly one in ten (9%) respondents reported that they were denied equal treatment or service in the last 12 months because of their gender identity or expression.

- Nearly one-third (30%) of respondents reported that they were verbally harassed in the last 12 months because of their gender identity or expression.

- More than one-third (39%) of respondents reported that they were harassed online in the last 12 months because of their gender identity or expression.

- Three percent (3%) of respondents reported that they were physically attacked in the last 12 months because of their gender identity or expression.

## Comfort with Law Enforcement

- Nearly half (47%) of respondents reported that they would feel "very uncomfortable" asking the police for help if they needed it, and 26% reported feeling "somewhat uncomfortable." Ten percent (10%) of respondents reported feeling "somewhat comfortable," 8% felt "very comfortable," and 10% felt "neutral" about asking the police for help when they needed it.

- Sixty-two percent (62%) of respondents reported that they were "very uncomfortable" or "somewhat uncomfortable" asking for help from the police when needed because of their gender identity or expression.

## Identity Documents

- Nearly half (48%) of respondents who had at least one form of identity document (such a birth certificate, passport, or driver's license) said that none of their IDs listed the name they wanted. Twenty percent (20%) had the name they wanted on some of their IDs, and 33% had the name they wanted on all their IDs.

- Fifty-nine percent (59%) of respondents who had at least one ID said that none of their IDs listed the gender they wanted, 23% said some of their IDs listed the gender they wanted, and 19% said that all their IDs listed the gender they wanted.

- Twenty-two percent (22%) of all respondents reported being verbally harassed, assaulted, asked to leave a location, or denied services when they have shown someone an ID with a name or gender that did not match their presentation.

## Experiences at School

*This section includes some data for 16- and 17-year-old respondents.*

- More than three-quarters of adult respondents (80%) and nearly two-thirds of 16- and 17-year-old respondents (60%) who were out or perceived as transgender in K-12 experienced one or more form of mistreatment or negative experience, including verbal harassment, physical attacks, online bullying, being denied the ability to dress according to their gender identity/expression, teachers or staff refusing to use chosen name or pronouns, or being denied the use of restrooms or locker rooms matching their gender identity.

## Impact of Unequal Treatment

- Forty percent (40%) of respondents had thought about moving to another area because they experienced discrimination or unequal treatment where they were living, and 10% of respondents had actually moved to another area because of discrimination.

- Nearly half (47%) of respondents had thought about moving to another state because their state government considered or passed laws that target transgender people for unequal treatment (such as banning access to bathrooms, health care, or sports), and 5% of respondents had actually moved out of state because of such state action.

- The top 10 states from which respondents moved because of state laws targeting transgender people for unequal treatment were (in alphabetical order): Alabama, Arizona, Florida, Georgia, Missouri, North Carolina, Ohio, Tennessee, Texas, and Virginia.



**Top 10 States USTS Respondents Reported Leaving**

*(Presented in alphabetical order)*

Alabama

Arizona

Florida

Georgia

Missouri

North Carolina

Ohio

Tennessee

Texas

Virginia