1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF INDIANA
 2                          EVANSVILLE DIVISION

 3
      AUTUMN CORDELLIONÉ, also     )
 4    known as JONATHAN            )
      RICHARDSON,                  )
 5                                 ) Cause No.
                   Plaintiff,      ) 3:23-cv-00135-RLY-CSW
 6      v.                         ) Evansville, Indiana
                                   ) March 26, 2024
 7    COMMISSIONER, INDIANA        )
      DEPARTMENT OF CORRECTION,    ) 10:40 a.m.
 8    in her official capacity,    )
                                   )
 9                 Defendant.      )

10

11

12                 BEFORE THE HONORABLE RICHARD L. YOUNG

13                     TRANSCRIPT OF PROCEEDINGS
                    PRELIMINARY INJUNCTION HEARING

14
      APPEARANCES:
15
      For the Plaintiff:          Kenneth J. Falk
16                                Gavin Minor Rose
                                  Stevie J. Pactor
17                                ACLU OF INDIANA
                                  1031 E. Washington Street
18                                Indianapolis, IN  46202

19
      For the Defendant:          Alexander R. Carlisle
20                                Katherine A. Meltzer
                                  Bradley Davis
21                                Rebekah Durham
                                  OFFICE OF THE ATTORNEY GENERAL
22                                Indiana Government Center South
                                  5th Floor
23                                302 W. Washington Street
                                  Indianapolis, IN  46204

24

25
```

1    court Reporter:            Elizabeth Taylor Culiver, RPR
                                United States District Court
2                               101 N.W. MLK, Jr. Blvd.
                                Evansville, IN  47708
3                               (812) 499-8782

4

5

6            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2                                                              **PAGE**

3

4    **AUTUMN CORDELLIONE**

5    Direct Examination By Ms. Meltzer.....................   18
     Cross Examination By Mr. Falk........................   50
6    Redirect Examination By Ms. Meltzer..................   59

7    **DANNY T. MITCHELL**

8    Direct Examination By Mr. Carlisle...................   60
     Cross Examination By Mr. Falk........................   69

9

     **MICHAEL DAVID FARJELLAH, Psy.D.**

10

     Direct Examination By Mr. Davis......................   71
11   Cross Examination By Ms. Pactor......................   91
     Redirect Examination By Mr. Davis....................   95

12

     **ADRIENNE BEDFORD, M.D.**

13

     Direct Examination By Ms. Durham.....................   97
14   Cross Examination By Dr. Falk........................  111
     Redirect Examination By Ms. Durham...................  120

15

     **STEPHEN LEVINE, M.D.**

16

     Direct Examination By Mr. Carlisle...................  124
17   Cross Examination By Mr. Rose........................  170
     Redirect Examination By Mr. Carlisle.................  181

18

     **RANDI ETTNER, Ph.D.**

19

     Direct Examination By Mr. Falk.......................  183
20   Cross Examination By Mr. Carlisle....................  190

21

22

23

24

25

1

# I N D E X   O F   E X H I B I T S

2

3

4

**JOINT EXHIBITS:**                                                    **PAGE**

5

| Exhibit | Page |
|---------|------|
| 1 | 7 |
| 2 | 7 |
| 3 | 7 |
| 4 | 7 |
| 5 | 7 |
| 6 | 7 |
| 7 | 7 |
| 12 | 7 |
| 13 | 7 |
| 15 | 7 |
| 16 | 7 |
| 18 | 7 |
| 19 | 7 |
| 20 | 7 |
| 21 | 7 |
| 22 | 7 |
| 23 | 7 |
| 24 | 7 |
| 25 | 7 |
| 26 | 7 |
| 27 | 7 |
| 28 | 7 |
| 29 | 7 |
| 30 | 7 |
| 31 | 7 |
| 33 | 7 |
| 34 | 7 |
| 35 | 7 |
| 36 | 7 |
| 37 | 7 |
| 38 | 7 |
| 39 | 7 |
| 40 | 7 |
| 41 | 7 |
| 42 | 7 |
| 43 | 7 |
| 46 | 7 |
| 48 | 7 |
| 51 | 7 |
| 52 | 7 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53....................................................... 7
54....................................................... 7
55....................................................... 7
56....................................................... 7
61....................................................... 7
62....................................................... 7
63....................................................... 7
64....................................................... 7
65....................................................... 7
67....................................................... 12
68....................................................... 12
69....................................................... 7
70....................................................... 12
71....................................................... 7
72....................................................... 7
75....................................................... 7
76....................................................... 7
77....................................................... 7
78....................................................... 7
79....................................................... 7
82....................................................... 7
83....................................................... 7
84....................................................... 12
85....................................................... 7
86....................................................... 7
87....................................................... 7
88....................................................... 7
89....................................................... 7
90....................................................... 7
91....................................................... 7
92....................................................... 7
93....................................................... 7
94....................................................... 7
95....................................................... 7
96....................................................... 7
97....................................................... 7
98....................................................... 10
99....................................................... 10
100...................................................... 7
101...................................................... 7
102...................................................... 12
103...................................................... 10
104...................................................... 10
106...................................................... 13
107...................................................... 14
108...................................................... 12

1          *(In open court.)*

2               THE CLERK:  All rise.  United States District Court

3    for the Southern District of Indiana is now in session

4    pursuant to adjournment.  The Honorable Richard L. Young

5    presiding.  Court is in session.  Please be seated.

6               THE COURT:  Morning, everyone.

7               MR. FALK:  Morning, Judge.

8               MR. CARLISLE:  Morning.

9               THE COURT:  We're here today in the matter of *Autumn*

10   *Cordellioné, also known as Jonathan Richardson v.*

11   *Commissioner, Indiana Department of Correction, in her*

12   *official capacity*.  Cause Number 3:23-cv-135.  We're here

13   today on the complaint for declaratory and injunctive relief.

14               Representing Autumn Cordellione is attorney Ken Falk,

15   attorney Gavin Rose, and attorney Stevie Pactor.  Representing

16   the Commissioner is attorney Alex Carlisle, Bradley Davis,

17   Kate Meltzer, and Rebekah Durham.

18               All right.  Do we wish to have an opening comment or

19   how do you want to proceed here today?

20               MR. FALK:  Your Honor, in light of the extensive

21   briefing, we'll waive opening.  We would just move to separate

22   witnesses at this time.  And we do have exhibits to move into

23   evidence.  Plaintiff does not intend to call any witnesses in

24   our case-in-chief; although, we reserve the right to call both

25   Ms. Cordellione and Dr. Randi Ettner in rebuttal.  But I would

 1    like to turn this over to Mr. Rose since he and Mr. Carlisle

 2    worked on the presentation of the evidence.

 3            THE COURT:  Mr. Carlisle, any opening comment you

 4    wish to make or do you wish to waive as well?

 5            MR. CARLISLE:  We're going to waive opening, Your

 6    Honor.

 7            THE COURT:  Mr. Rose?

 8            MR. ROSE:  Good morning, Judge.  I'm more than

 9    cognizant that the Court does not necessarily want to spend a

10    lot of time on the documents.

11            My intention is to move the exhibits in two waves.

12    First, I'm going to move all exhibits to which neither party

13    objects to make sure they are in the record and then we will

14    move the exhibits -- move our exhibits to which the defendant

15    has voiced an objection so that both parties can create their

16    record that way.

17            So we will first move the admission of Exhibits 1

18    through 7, 12 through 13, 15 through 16, 18 through 31, 33

19    through 43, 46, 48, 51 through 56, 61 through 65, 69, 71

20    through 72, 75 through 79, 82 through 83, 85 through 97, 100

21    through 101, and 105.  Do I have that right, Alex?

22            MR. CARLISLE:  Yes.  That's right.

23            THE COURT:  All right.  We'll show those exhibits

24    admitted without objection.

25        *(Joint Exhibits received in evidence.)*

1    MR. ROSE:  Then we will also move the admission of

2  Exhibit 98, the expert report of Dr. Ettner, Exhibit 99, the

3  expert report of Dr. Schechter, Exhibit 103, the rebuttal

4  report of Dr. Ettner, and 104, the rebuttal report of

5  Dr. Schechter.

6    MR. CARLISLE:  Your Honor, the -- there's a partial

7  objection to these exhibits, and it depends on how the Court

8  is going to handle the motion to partially disqualify

9  Dr. Levine's testimony.  It's our position that if the Court

10  finds Dr. Levine not qualified to testify about surgery, then,

11  likewise, it should find Dr. Ettner not qualified for the same

12  purpose.

13    On the flip side, though, plaintiff's surgical

14  expert, Dr. Schechter, would not be qualified to testify about

15  surgery's effects on any mental health issue including gender

16  dysphoria.  So we are reserving a partial objection on those

17  grounds.

18    THE COURT:  Mr. Rose?

19    MR. ROSE:  Judge, I have three responses to that

20  objection real quick.  The first is that -- and we recognize

21  this applies to Dr. Levine's testimony as well, but obviously,

22  the -- when the gatekeeper and fact finder are the same, the

23  Court can admit the evidence subject to later exclusion.

24    The second objection -- excuse me, the second

25  response is at least with respect to Dr. Ettner, I'm not

1    entirely sure what the objection is.  Our objection to

2    Dr. Levine is not him testifying about surgery as such.  It's

3    him specifically going into detail about the nature, rate, and

4    severity of surgical complications as a result of

5    gender-affirming surgery.  That is not something that

6    Dr. Ettner attempts to do, so I'm not entirely clear how he --

7    how the state thinks that she stepped out of her lane.

8         And my third response, Judge, is that I think there's

9    something of a false equivalency here.  Dr. Ettner and

10   Dr. Schechter have both treated, thousands in the case of

11   Dr. Schechter, hundreds in the case of Dr. Ettner, patients

12   who have received gender-affirming surgery.  They have both

13   published extensively on the issue.  The CVs speak for

14   themselves.  They participate as a team not only in the

15   evaluation, the recommendation on the surgery for

16   Dr. Schechter but also the postoperative care.

17        Dr. Schechter is certainly qualified to testify as to

18   the necessity of the procedure that he has performed over

19   1,500 times and devotes 90 to 95 percent of his practice on.

20   By contrast, Dr. Levine, other than a couple of essays, does

21   not appear to have published any original research concerning

22   gender-affirming surgery.

23        The record reflects that in the last 30 years, he has

24   -- he has recommended a handful of persons to receive

25   gender-affirming hormones and even fewer to receive surgery

1    and certainly did not reflect that he plays any roles in

2    postoperative care.

3           As I say, we understand that the Court may wish to

4    admit everything subject to later exclusion, but I do want to

5    make sure our position about the relative experience of our

6    experts is made part of the record.

7           THE COURT:  Thank you, Mr. Rose.  We'll show those

8    objections overruled at this time.  As is obvious, this is a

9    court trial.  We don't have any issues regarding a jury

10   hearing any type of testimony or seeing any type of exhibits

11   that they shouldn't see or are not supported by sufficient

12   expertise or foundation.  So we'll go from there.

13       *(Joint Exhibits received in evidence.)*

14          MR. ROSE:  Thank you, Judge.  With that, as Mr. Falk

15   said, we do not plan on putting on any live evidence while we

16   reserve our right to call rebuttal witnesses.  The plaintiff

17   rests.

18          THE COURT:  Thank you.  Mr. Carlisle, any record you

19   want to make before you call your first witness?

20          MR. CARLISLE:  Yes, Your Honor.  We will move to

21   admit the remaining exhibits that the plaintiff objects to.

22   Those are Exhibits 32, 67, 68, 70, 73, 80, 81, 84, 102, and

23   then exhibits 106 through 108.

24          THE COURT:  And plaintiff has objection to those?

25          MR. ROSE:  We do.  But beforehand, I'm sorry, Alex,

1    are there Exhibits 57 and 58?  I have those as omitted

2    entries.

3              MR. CARLISLE:  67 and 68.

4              MR. ROSE:  Oh, I'm sorry.

5              THE COURT:  I had 67 and 68.

6              MR. ROSE:  I'm sorry.  I misheard him.

7              We do have objections, Judge.  I want to make as

8    efficient use of the Court's time as possible, so with the

9    Court's permission, I will group the objections in a way that

10   makes the most sense to me.

11             Exhibits 67, 68, 70, 84, and 102, and I get I think

12   Exhibit 108, which is the affidavit of counsel authenticating

13   those is intricately related, these are all publications that

14   the DOC has submitted in this case.  None of them have been

15   cited by any of the expert reports.  None of them were

16   authenticated through any of the expert depositions.  We made

17   reference in our reply brief to them being unauthenticated,

18   hearsay.  I understand that -- that the state has submitted

19   the affidavit of Mr. Carlisle to try to cure that.  I

20   apologize if I use the wrong verbiage.  The real objection is

21   that we have no reason to believe these publications were not

22   made in the journals that they appear to be, but without an

23   expert saying I relied on this publication, this is how I

24   relied on the publication, and this is the type of publication

25   that persons in my field routinely rely on, the exhibits have

1   no more evidentiary value than a printout from Wikipedia or a

2   post from Facebook is our objection to those.

3          THE COURT:  My preliminary ruling on those objections

4   will be those objections are overruled.  When the time comes

5   for those exhibits to be presented, you can examine further.

6       *(Joint Exhibits received in evidence.)*

7          MR. ROSE:  Sure.  Exhibit 80 is a declaration from

8   Linda Thomas, the mother of the victim of Ms. Cordellione's

9   crime 20 odd some years ago.  We have a relevance objection to

10  it.  We're always hesitant to make a relevance objection when

11  the Court is the factfinder, but we do want that on the

12  record.

13         THE COURT:  Okay.  Sure.

14         MR. ROSE:  Exhibit 81 is a demonstrative exhibit that

15  has been prepared by the DOC's attorneys.  Obviously, we

16  recognize that the rules of evidence give the DOC the

17  opportunity to create a summary of voluminous records.  It's

18  our position they've gone beyond this.  The exhibit contains

19  not just a summary of stuff in evidence but also the DOC's

20  attorneys editorializing on the proper study methodology and

21  whatnot, which we think is far outside the -- might be fodder

22  for legal argument or briefing but is not proper use of a

23  demonstrative exhibit.

24         Exhibit 106 and 107 were exhibits that the DOC just

25  filed yesterday.  I apologize.  Exhibit 106 is a literature

1  review published by Myriad and others that were cited in

2  paragraph 48(a) of Dr. Levine's report.  Given that it was

3  cited, we will remove our objection to that exhibit.

4          THE COURT:  Okay.

5          MR. ROSE:  Though, we obviously lacked an ability to

6  comment on it in our briefing, we would note that it's our

7  position that it, like much of the other evidence,

8  overwhelmingly supports the necessity of gender-affirming

9  care; although, it does possibly concern --

10         THE COURT:  So no objection to 106?

11         MR. ROSE:  No objection to 106.

12         THE COURT:  Show it admitted.

13     *(Joint Exhibit received in evidence.)*

14         MR. ROSE:  Exhibit 107, we're concerned about the

15  timeliness.  It is a motion for sentencing modification that

16  the plaintiff filed pro se I think on January 4th of this

17  year.  I don't know what it has to do with anything.  I

18  suppose we're okay with it coming in.  We would ask the Court

19  to state judicial notice of the fact that it was denied by the

20  state court on January 19th.  That's available through MyCase

21  and obviously the Court can take judicial notice of public

22  court records like that.

23         THE COURT:  What's the relevance of 107?

24         MR. CARLISLE:  Your Honor, I'm going to have Kate

25  Meltzer answer that, if possible -- if allowed.

1          THE COURT:  All right.  Ms. Meltzer?

2          MS. MELTZER:  Your Honor, there's representations

3    made within the motion related to the belief that the

4    circumstances that resulted in the crime are no longer

5    present.  This ties into the reason and basis for her crime as

6    tied to her transgender identity and her gender dysphoria.  It

7    also is the timeline of showing that she was seeking release

8    to home detention or work release on January 4th, 2024, well

9    after this lawsuit was filed.

10         MR. ROSE:  As I say, Judge, we don't see the

11   relevance, but the Court can make its own determination on

12   that.  We would just ask that the Court take judicial notice

13   of the fact that it was denied.

14         THE COURT:  All right.  The Court will take judicial

15   notice that the sentence modification referred to in 107 was

16   denied by the Indiana state court and further admission will

17   be taken under advisement.

18      *(Joint Exhibit received in evidence.)*

19         MR. ROSE:  I think that leaves us only with

20   Exhibit 32, the expert report of Dr. Levine, Exhibit 73, which

21   is an email from Dr. Levine to the DOC's attorney, as well as

22   Exhibit 74 the deposition of Dr. Levine.  We have obviously

23   filed a *Daubert* motion with respect to portions of

24   Dr. Levine's testimony.  The state filed their objection

25   yesterday.  Unless the Court has a different way that it would

1    like us to handle, we'll go ahead and file a reply within the

2    time period contemplated by the local rules.

3         For the record, we do have that *Daubert* objection to

4    the deposition of Dr. Levine as well as his expert report.

5         We have another objection to both the expert report

6    Exhibit 32 and the email, Exhibit 73, that is that neither of

7    them are verified.  They are unsworn statements.  In a court

8    of law, there's obviously -- obviously, that is not worth much

9    in a court of law, but we have that objection.

10        So far as the email is concerned, we have an

11   additional objection.  It appears to be an attempt to

12   supplement Dr. Levine's expert report long after the due date

13   for expert disclosures to be made.  Kit came and passed.  We

14   recognize that it is a -- that it appears to have been

15   occasioned by his review of the video deposition of the

16   plaintiff.

17        That said, there was a longstanding deadline for

18   expert disclosures to be made.  The defendant's disclosures

19   were due on January 22nd, and it is up to them to make sure

20   that their expert has everything they want the expert to have

21   before that date.  This was not provided to us until the eve

22   of their response brief on March 7th when it was publicly

23   filed.

24        There's obviously a great array of case law saying

25   that an expert cannot testify to matters not disclosed in

1    their expert report.  I'm happy to cite case law, but I assume

2    the Court is aware of it.  So we have that objection to

3    Exhibit 73 as well.

4            I think I have covered all of the exhibits.

5            THE COURT:  All right.  Thank you.

6            MR. ROSE:  Thank you, Judge.

7            THE COURT:  Mr. Carlisle, any response?

8            MR. CARLISLE:  Thank you, Your Honor.  So I think

9    starting with Exhibit 80, declaration of Linda Thomas, we have

10   noted why that's relevant in our brief.  Ms. Thomas testified

11   about the fear she has if the plaintiff is released with a

12   different identity, and so that's the relevance of that.  It

13   goes to the state interests.  I'll point the Court to our

14   brief on that area.

15           Exhibit 81, Your Honor, the demonstrative exhibit,

16   that's a factual summary of what those cases say.  I mean,

17   Dr. Levine will testify about that exhibit today, so you'll

18   hear that.  The information included there is accurate and

19   it's just based on what's in the reports.  In fact, most of it

20   is quoting from the reports, and so it is just a helpful tool

21   for the Court to understand a large volume of evidence.  So it

22   is admissible as a demonstrative exhibit.

23           As to Dr. Levine's testimony, we have filed a

24   response in opposition to their motion to exclude.  Dr. Levine

25   will be testifying further about his qualifications today.  We

1   think that the preliminary injunction stage, of course,

2   evidence is relaxed.  The procedures are relaxed.  The Court

3   knows how to weigh evidence.  So we do think the Court should

4   consider all the evidence before it and that's the better

5   course and just weigh it accordingly.

6           The email from -- Exhibit 73 from Dr. Levine to

7   counsel came after the report deadline.  So just because he

8   looked at more evidence after, we did timely disclose that in

9   supplement.  He could not have included his impressions of a

10  deposition in his expert report because it had not occurred

11  yet.  And there's nothing inconsistent in that email from his

12  report.  So I think it's a harmless addition to the record at

13  any rate.

14          And then so the -- my statement about -- or our

15  position to the *Daubert* motion would apply to Exhibits 32 and

16  74 equally.  So we think both of those are admissible in their

17  entirety.

18          THE COURT:  All right.  The motions -- the objections

19  regarding the exhibits, the *Daubert* motion as well, all that's

20  taken under advisement.  We'll see how the evidence comes in.

21  As I mentioned to you a little earlier, I'm going to let you

22  make your record today, and since we don't have a jury here,

23  the Court certainly can evaluate the evidence and place

24  whatever weight the Court believes it deserves if it, in fact,

25  is admitted later on.

1              Okay.  Mr. Carlisle, call your first witness.

2              MR. FALK:  Excuse me, Your Honor.  You did grant the

3    motion to separate witnesses?

4              THE COURT:  Yes, that's automatic if there's any

5    witnesses in here.

6              MR. CARLISLE:  Your Honor, the plaintiff and the

7    warden will be in person.  The warden is not in the courtroom

8    at this time.  And so we would call the plaintiff.

9              THE COURT:  All right.  Very good.

10             MR. FALK:  And, Judge, Mr. Carlisle indicated that

11   there are going to be some exhibits for Ms. Cordellione to

12   look at, so I asked Ms. Pactor if she could sit in the corner

13   there to help turn the pages because she has to remain cuffed.

14             THE COURT:  Sure.  Absolutely.

15         **AUTUMN CORDELLIONE, DEFENDANT'S WITNESS, SWORN**

16                     **DIRECT EXAMINATION**

17   BY MS. MELTZER:

18   Q.    Good morning, ma'am.

19   A.    Morning.

20   Q.    Can you please restate your name for the record?

21   A.    Autumn Cordellioné, also known as Jonathan Richardson.

22   Q.    And that is your legal name Jonathan Richardson,

23   correct?

24   A.    Yes, it is.

25   Q.    Thank you, ma'am.  You were first committed to Indiana

 1    Department of Correction in 2002, correct?

 2    A.    Yes, I believe that's the correct date.

 3    Q.    And your earliest possible release date currently is

 4    about end of December 2027, correct?

 5    A.    Yes.

 6    Q.    Can you please flip to Exhibit 97 for me?

 7    A.    I believe we're there.

 8    Q.    And you testified at your deposition that this was your

 9    handwritten list you had made a few months ago, correct?

10    A.    That is correct.

11    Q.    And this document is entitled Surgeries to Reach My

12    Ideal Self under which you first list vagina, correct?

13    A.    Yes.

14    Q.    You then list one cup size bigger than my current size

15    and breast implant in parenthesis, correct?

16    A.    Yes.

17    Q.    It then lists brow lift, reduction, uterus transplant,

18    gluteus implant.  Did I get that correct?

19    A.    Gluteus.

20    Q.    Gluteus implant.  BBL, can you briefly provide the Court

21    what that is?

22    A.    A Brazilian booty lift.

23    Q.    Thank you.  It then lists tummy tuck, hair removal for

24    the body and face and wigs, so many, correct?

25    A.    Yes.  You're correct.

1   Q.    And you also testified at your deposition that if the

2   surgeries on this list helped you relieve your suffering, then

3   ultimately you believe they are medically necessary, correct?

4   A.    Yes.

5   Q.    And the two surgeries you are seeking in this lawsuit

6   are an orchiectomy and vaginoplasty, correct?

7   A.    I believe that is correct.

8   Q.    And on this list you first list vagina.  And do you

9   understand a vaginoplasty as giving you a vagina?

10  A.    Yes.

11  Q.    At your deposition, you testified that the vaginoplasty

12  was your number one priority, correct?

13  A.    Yes.

14  Q.    You also testified getting a vagina won't solve my

15  problems, correct?

16  A.    Yes.

17  Q.    Then isn't it true that you do not believe vaginoplasty

18  will cure your gender dysphoria?

19  A.    Could you repeat that?

20  Q.    Then isn't it true that you do not believe vaginoplasty

21  will cure your gender dysphoria?

22  A.    I believe that it will ameliorate a significant part of

23  the pain and suffering that I go through every day, but I

24  don't think that it's a magic wand that will remove every

25  problem that I have, but it will make my life much easier to

 1   live and take away a lot of my suffering and pain.

 2   Q.    Please flip to Exhibit 69 and then state 593.

 3   A.    (Witness complied with the request.)

 4         MS. PACTOR:  We're having a binder malfunction.  I'm

 5   sorry.

 6         MS. MELTZER:  That's okay.  Understood.

 7         THE COURT:  You know, we have all this electronic

 8   equipment in here.  I don't know why you don't just put it up

 9   on the screen.  I mean, this is 20 years ago where we fidgeted

10   through notebooks.

11         MS. MELTZER:  Is it okay if I consult with my

12   co-counsel?

13         MS. PACTOR:  I'm sorry, Kate.  Can you repeat the

14   Bates number?

15         MS. MELTZER:  Oh, yeah.  It's 593 of Exhibit 69.

16         THE COURT:  Well, I'm not going to sit here all day

17   and watch people flip through notebooks.  Let's take 10 or

18   15 minutes.  Tina can show you how to present this evidence on

19   the screen.

20         THE CLERK:  All rise.  Court is in recess.

21     (Recess taken 11:07 a.m. to 11:09 a.m.)

22         THE CLERK:  All rise.  Court is in session.  Please

23   be seated.

24         THE COURT:  Ms. Meltzer, are we ready to go?

25         MS. MELTZER:  I apologize, Your Honor.  Yes.

1          THE COURT:  All right.  You may continue.

2          MS. MELTZER:  Thank you.

3    BY MS. MELTZER:

4    Q.    And we're at Exhibit 69, state 593.

5          THE COURT:  That's a little better, isn't it?

6          THE WITNESS:  Yes.  Thank you so much.

7          THE COURT:  Me, too.

8          MS. MELTZER:  Same.

9    BY MS. MELTZER:

10   Q.    And this is your 2019 medical record, and this is where

11   you request, I would like to request estrogen treatment for my

12   transgender needs.  Do you recall making this statement?

13   A.    Yes.

14   Q.    And you testified at your deposition that this was your

15   dis- -- the first time you disclosed your transgender identity

16   to a medical professional at Indiana Department of Correction,

17   correct?

18   A.    Yes.

19   Q.    And for the record, I may refer to Department of

20   Correction as IDOC.  Okay?

21   A.    Thank you.

22   Q.    At the time of your disclosure, you had served about

23   17 years of your sentence confined in DOC, correct?

24   A.    I believe that's correct.

25   Q.    You testified at your deposition that you knew to ask

1   Dr. Gale for estrogen treatments because of another

2   transgender offender you met named Pearl, correct?

3   A.     Correct.

4   Q.     I want to learn more about Pearl.  When did you meet

5   Pearl?

6   A.     Sometime around 2019.

7   Q.     And you were housed at Correctional Industrial Facility

8   then, correct?

9   A.     Yes.

10  Q.     Did Pearl appear feminine to you?

11  A.     Absolutely.  She had breasts and a very feminine look

12  and manner.

13  Q.     You testified at your deposition that Pearl provided you

14  with legal pamphlets, correct?

15  A.     Not -- they weren't so much legal pamphlets.  They were

16  more like just LGBTQ info letters, newsletters.

17  Q.     Did you testify on page 51, lines 22 through 25 in your

18  deposition that they contained information about legal

19  recourse?

20  A.     Yes, but not exactly how to do it.  Just that you might

21  be able to seek these remedies.

22  Q.     And the legal pamphlets mentioned possible legal

23  recourse.  Did that also include if hormone treatment therapy

24  was denied within the prison context?

25  A.     Yes.

1    Q.    Did you read them prior to requesting estrogen

2    treatments from Dr. Gale in 2019?

3    A.    Actually, I focused mainly on the parts about the

4    estrogen.  I didn't really focus on any of that part about

5    being denied.  In fact, I only read it offhandedly at the very

6    end of 2020.

7    Q.    Did Pearl influence your decision to disclose your

8    transgender identity on July 22nd, 2019?

9    A.    She showed me that it's possible to live as transgender

10   in prison, and I didn't even know that was possible, much less

11   that transgenders were a thing.

12   Q.    Did Pearl influence your decision to request estrogen

13   treatments on July 22nd, 2019?

14   A.    No.

15   Q.    But you did testify at your deposition on page 52, lines

16   1 through 3, because that is what Pearl was on --

17   A.    Yes.

18   Q.    -- when you stated why you requested the estrogen,

19   correct?  But you don't believe Pearl influenced your

20   decision?

21   A.    No.  I make my own decisions.  I may take information

22   around me and experiences, but ultimately, she didn't say,

23   hey, go do this.  I looked at her and said, I love the fact

24   that you're actually becoming a woman, and I want to be that,

25   too.

1    Q.    But you did request them, quote, because that is what

2    Pearl was on, correct?

3    A.    Yes.

4    Q.    After you made your disclosure and request to Dr. Gale

5    in July 2019, you were evaluated for a gender dysphoria

6    diagnosis, correct?

7    A.    Yes.

8    Q.    And what was that evaluation process like?

9    A.    I was asked specific questions by, I believe,

10   Dr. Dionisio, and she asked me a series of questions, asked me

11   how I felt, why I was seeking hormones, how long I knew I was

12   a transgender, did I know what the full term of transgender

13   was, and did I have any issues concerning my belief that I was

14   transgender.

15   Q.    Did you also continue to meet with Dr. Gale throughout

16   the evaluation time period?

17   A.    I believe so.

18         MS. MELTZER:  And I'm going to have Alex pull up

19   state 531, also in Exhibit 69.  And if you could scroll a

20   little bit more to the top, please.  Thank you.

21   BY MS. MELTZER:

22   Q.    And these are your records from your session with

23   Dr. Gale and you see at the top it says October 21st, 2019,

24   correct?

25   A.    Yes.

1           MS. MELTZER:  And then please go to 532.

2    BY MS. MELTZER:

3    Q.   And then here is references -- the sentence starts with

4    "Discussed history of diagnosis".

5    A.   Can I have a second to read it?  I am not usually able

6    to see any of this, so I'm not sure if that is what it

7    discussed.

8    Q.   So under -- do you see where it says

9    Interventions/Methods Provided?

10   A.   Yes.

11   Q.   It's the third paragraph down.  And then I believe it is

12   the last sentence in that first paragraph.  It starts with

13   "Discussed history of"?

14   A.   I see it.  Let me read it real quick, please.  Yes.

15   Q.   And then just for the record, it states, "Discussed

16   history of diagnosis and offender's belief that it was her

17   manipulation of psychologists for the purpose of getting

18   medication referrals that led to most of those diagnoses."

19           And was she referring to your past diagnoses prior to

20   gender dysphoria?

21   A.   Yes.

22   Q.   So you do recall discussing that with Dr. Gale then,

23   correct?

24   A.   The fact that I had manipulated in the past to obtain

25   medications for attempts at suicide, yes.

CORDELLONE - DIRECT/MELTZER

27

1   Q.    And at your deposition, you were asked on page 69,

2   quote, do you manipulate doctors to get things, correct?

3   A.    Yes.

4   Q.    And in response you stated, quote, yes, whenever I would

5   attempt suicide, I obtained a medication in large quantities,

6   and so I had to convince them that I needed it in order to

7   kill myself, right?

8   A.    Yes.  That's correct.

9   Q.    You were also asked at your deposition on page 64, Do

10  you always tell the truth when you talk to mental health

11  professionals or PREA coordinators, correct?

12  A.    Yes.

13  Q.    And then you responded no, correct?

14  A.    Yes, that's what I stated.

15  Q.    And when asked when do you lie, you responded next,

16  whenever it is in my best interest of my personal and mental

17  safety, correct?

18  A.    Yes.  That's correct.

19  Q.    Then isn't it true that you lie to doctors when you

20  believe it is both in your best interest and to self-harm?

21  A.    Yes.

22  Q.    Have you manipulated any doctors or lied to any doctors

23  related to your gender dysphoria diagnosis?

24  A.    No.

25  Q.    Why should we believe you today?

1    A.    Are you --

2             THE WITNESS:  Can I ask for a clarification?

3             THE COURT:  Ask her to repeat the question, sure.

4    BY MS. MELTZER:

5    Q.    I can restate it.

6    A.    That's fine.  But I -- I wanted to know whether or not

7    -- with the question you asked, you wanted to know exactly --

8    yes, just please repeat it.  Thank you.  Sorry.

9    Q.    If you've admitted to lying in the past to doctors both

10   when you believe it's in your personal interest, your best

11   mental and health safety as well as in order to self-harm

12   through, say, an overdose and obtain prescription medication,

13   why should we believe that you have not manipulated or lied to

14   doctors related to your gender dysphoria diagnosis today?

15            MR. FALK:  Your Honor, I'm going to object just to

16   the question because she was diagnosed with gender dysphoria

17   after the DOC filed its own procedures in 2020, and there's no

18   question that she's carried the diagnosis of gender dysphoria.

19   The question seems to presume that somehow she manipulated

20   doctors to diagnose her with gender dysphoria, and she's been

21   diagnosed for years with gender dysphoria.  And, of course,

22   we're not here today about her diagnosis with gender

23   dysphoria.  We're here today because her diagnosis of gender

24   dysphoria requires her to have surgery.  Thank you.

25            MS. MELTZER:  Your Honor, it's the genuineness of the

1    dysphoria.  We're here arguing whether she's entitled to

2    surgical intervention and whether that is medically required

3    under the constitution, but it could also be construed as

4    another means to self-harm.

5            THE COURT:  Objection overruled.  Take care of that

6    on cross exam.

7    A.    You should believe me because I told the individuals who

8    I sought help from my gender dysphoria that I manipulate, and

9    I've been known to manipulate to get medication.  I let them

10   know that, even Dr. Dionisio who was giving me the evaluation.

11   So if I was trying to lie, I never would have told her

12   anything like that, but I did so that way she could go into it

13   with a clear mind and make her determination based off of

14   rational decisions, not off of simply believing what I said.

15   BY MS. MELTZER:

16   Q.    And then right above where it says Current Assessment in

17   bold, do you see that where it says, Stable.  Accepting of

18   information shared?

19   A.    Hold on.  Current Assessment?

20   Q.    Yes, the line directly above that, ma'am.

21   A.    Oh, my bad.

22   Q.    That's okay.

23   A.    Yes.  I see that.

24   Q.    Do you agree that you were stable at the time of your

25   session with Dr. Gale in October 2019?

1   A.    No.

2   Q.    Why?

3   A.    I was -- because I was suffering greatly from depression

4   and anxiety and a lot of that was stemming from my gender --

5   undiagnosed at the time, gender dysphoria.

6   Q.    But you do admit that Dr. Gale on October -- in

7   October 2019 noted that you were stable and accepting of the

8   information shared, correct?

9   A.    I do notice that, yes.

10  Q.    Thank you.

11        MS. MELTZER:  Exhibit 55, state 1748, please.

12  BY MS. MELTZER:

13  Q.    And do you see in bold about midway down where it says

14  Prescriber's Evaluation?

15  A.    Yes, I do.

16  Q.    And this looks to be your gender dysphoria evaluation,

17  and then at the top it is dated April 2nd, 2020, correct?

18  A.    Yes.

19  Q.    And it shows this was conducted by, I believe,

20  Dr. Dionisio.

21        MS. MELTZER:  On 1752, Alex.

22  A.    Yes.

23  BY MS. MELTZER:

24  Q.    And you testified at your deposition that you recalled

25  meeting Dr. Dionisio -- I apologize if I'm mispronouncing that

1   -- but you recalled meeting with her for this evaluation,

2   correct?

3   A.    Yes.

4   Q.    You also testified that you told her the truth when you

5   met with her, correct?

6   A.    Yes.

7         MS. MELTZER:  Please go to state 1759.

8   BY MS. MELTZER:

9   Q.    And I believe it's the third paragraph down under

10  Expectations.  The third to last paragraph.

11  A.    I see it.

12  Q.    Where it states, "She hopes this is a foundation".  Do

13  you see where it starts with that?

14  A.    Yes, I do.

15  Q.    "She hopes this a foundation she can start so she has a

16  foundation to really transition when she lives prison."  I

17  assume she meant leaves prison.  Do you recall discussing that

18  with Dr. Dionisio?

19  A.    Yes.

20  Q.    Was it then your intent to receive gender-confirmation

21  surgery once you were released from prison?

22  A.    At the time I didn't know that surgery was even a

23  possibility in prison.  There was no policies I was aware of.

24  So yes, at the time, that was correct.

25        MS. MELTZER:  Exhibit 55 and state 1750.

1   BY MS. MELTZER:

2   Q.    And under Transition to Date, the second to last

3   paragraph.

4   A.    I see it.

5   Q.    The very last two lines in that section, it says, legal

6   name change, desires; legal gender marker change, denies.  Did

7   you deny that you wanted a legal gender marker change at the

8   time?

9   A.    Sorry.  I'm just -- could you repeat that?

10  Q.    The last two lines says legal name change, desires, and

11  then legal gender marker change, denies.  Did you not want a

12  legal gender marker change at that time?

13  A.    I think I simply misunderstood what a gender marker

14  change was.  She never explained, so I believe I just blindly

15  denied it without knowing what it was.

16  Q.    What do you believe a gender marker change to be?

17  A.    It changes them on my legal documents, my sex

18  designation to represent my gender identity.

19  Q.    As female?

20  A.    As female, yes.  Now I understand that, and now I'm

21  seeking it.

22  Q.    And can you please flip back to Exhibit 97?

23  A.    I'm there.

24  Q.    Thank you.  And when you had discussed with Dr. Dionisio

25  your intent to establish a foundation through hormone for a

CORDELLONE - DIRECT/MELTZER

1    full transition, does this list represent a full transition to

2    you?

3    A.    I'd say yes.

4    Q.    So I would like to represent to you the parties

5    stipulated that you were first diagnosed with gender dysphoria

6    in 2020 and that you started receiving hormone treatment

7    therapy by way of estrogen supplement and a testosterone

8    suppressor.  In addition, the parties stipulated to the fact

9    that between announcing your transgender identity to mental

10   health staff on July 2019 and December 2022, you have been

11   seen by mental health staff on nearly 50 occasions and five

12   times since January 1st, 2023.  And based on those

13   stipulations, you have been seen by mental health staff over

14   50 times since July 2019, correct?

15   A.    Yes, under my request.

16   Q.    And I now want to discuss some of these mental health

17   visits after your gender dysphoria diagnosis and start of

18   hormone treatment.

19         MS. MELTZER:  Exhibit 54 at state 1309.

20   BY MS. MELTZER:

21   Q.    This shows at the top there that it was an on site

22   consult you had on January 24th, 2022.

23         MS. MELTZER:  And then if you could go to state 1311,

24   please.

25   BY MS. MELTZER:

1    Q.    And it shows that this was authored by Leticia Martinez

2    Mateos.  Do you know her?

3    A.    Yes, I do.

4    Q.    Who is she?

5    A.    She was a therapist I was seeing at CIF.

6    Q.    Okay.  Then you recall meeting her I presume, correct?

7    A.    Yes, I do.

8    Q.    Were you honest with Ms. Martinez Mateos?

9    A.    Yes.

10           MS. MELTZER:  State 1310, please.

11   BY MS. MELTZER:

12   Q.    And then under Subjective Information in bold there, do

13   you see that?  It's at the top.

14   A.    Yes.

15   Q.    And then within that section in the second paragraph it

16   states, "She stated that she looks forward to being released

17   from prison so that she may continue her physical transition

18   into womanhood."  Did you tell Dr. Martinez Mateos that?

19   A.    Yes.  And, again, I would state at the time I wasn't

20   aware that there was any such thing as other surgeries I'd be

21   allowed to pursue in prison.

22           MS. MELTZER:  Can you please go to state 1263?

23   BY MS. MELTZER:

24   Q.    And this shows at the top it was an on site consult that

25   took place on July 6th, 2022.

1          MS. MELTZER:  And then if you could please go to

2     state 1265.

3     BY MS. MELTZER:

4     Q.     And, again, this was with Dr. Martinez Mateos.

5          MS. MELTZER:  And then if you'd go to state 1264,

6     please.

7     BY MS. MELTZER:

8     Q.     And then, again, up at the top under Subjective

9     Information, we are going -- at the second paragraph in the

10    third sentence that starts with "She stated she also"...  Do

11    you see that?

12    A.     Yes.

13    Q.     "She stated that she also wishes to advocate for gender

14    reassignment surgery as she would like to undergo this

15    transition before she gets older."

16          Did you file this lawsuit to advocate for

17    gender-confirmation surgery?

18    A.     Could you define advocate?

19    Q.     To speak on behalf of, to promote.

20    A.     Only on my own behalf.

21          MS. MELTZER:  And can you please go to Exhibit 54 at

22    state 1211, please?

23    BY MS. MELTZER:

24    Q.     And then up at the top it shows that this is a chronic

25    care visit that took place on October 25th, 2022.

1          MS. MELTZER:  And then if you could, a couple pages

2     down, please, to 1214.

3     BY MS. MELTZER:

4     Q.    And it shows it was authored by Victoria Crawford.  Who

5     is Victoria Crawford?

6     A.    No idea.

7     Q.    It looks like she is an FNP.  Is it possible she was a

8     nurse you saw?

9     A.    Maybe.

10    Q.    Do you recall meeting with any nurses on October 25th,

11    2022?

12    A.    It was quite a few years ago.  I can't really place it.

13    Q.    Okay.  Well, I will stipulate to you that this is one of

14    the dates included in the parties' stipulation where you were

15    seen by mental health staff.

16    A.    Okay.

17    Q.    Do you have any reason to doubt that you were not honest

18    with the nurses you saw on this date?

19          MR. FALK:  Objection.  She just testified that she

20    doesn't remember meeting with a nurse, so I don't think she

21    can testify as to the specifics as to the date.  And, Your

22    Honor, prisoners are not given access to their medical

23    records, so showing a prisoner medical records and asking to

24    somehow verify what's in there -- she's never seen it before.

25          MS. MELTZER:  Your Honor, the parties have stipulated

1    that this mental health visit occurred.  I did not ask her to

2    confirm whether she was honest with her.  I said do you have

3    any reason to doubt that you may have not been honest with her

4    on this date.

5            THE COURT:  Objection overruled.

6    BY MS. MELTZER:

7    Q.    Do you have any reason to doubt that?

8    A.    Not that I'm aware of.

9            MS. MELTZER:  Can you please go to state 1213?

10   BY MS. MELTZER:

11   Q.    And then under Assessment/Plan under number three where

12   it says assessment, gender identity disorder in adults.  Do

13   you see that?

14   A.    Yes, I do.

15   Q.    And then it starts with "He is requesting".  And I

16   apologize, ma'am.  Do you see that?

17   A.    Yes, I do.

18   Q.    And it states, quote, He is requesting an increase in

19   his dosages because he wants to get his hormones to a level

20   appropriate for surgery when he is released in two years,

21   correct?

22   A.    That sounds about right.

23           MS. MELTZER:  Alex, can you please go to 1070, also

24   in Exhibit 54?  And then at the top, please.

25   BY MS. MELTZER:

1   Q.   It shows this was a provider visit on July 13th, 2023.

2            MS. MELTZER:  And then if could flip to state 1072.

3   BY MS. MELTZER:

4   Q.   This was authored by Christina Nudi, I believe, and it

5   looks like she was also a nurse.  Do you recall this

6   individual?

7   A.   No, not specifically.

8   Q.   And, again, do you have any reason to doubt that you may

9   not have been honest with her on July 13th, 2023?

10  A.   Not that I'm aware of.

11           MS. MELTZER:  Alex, can you please go to 1070 under

12  History of Present Illness?

13  BY MS. MELTZER:

14  Q.   And do you see where it says up there about midway?

15  A.   Yes.

16  Q.   And it shows you discussed two topics, the first being

17  asthma flare-up and the second being hormone meds.  Do you see

18  that?

19  A.   Yes.

20  Q.   And under number two related to hormone meds it states

21  is wanting his meds increased.  Do you recall requesting an

22  increase in your hormone medications?

23  A.   Yeah, that sounds about right.

24  Q.   It then states is watching his numbers so that when he

25  gets out, he can get surgery.  Do you recall stating that?

1    A.    That sounds about right.

2          MS. MELTZER:  Alex, can you please go to state 1040

3    also in Exhibit 54?

4    BY MS. MELTZER:

5    Q.    Shows this is a chronic care visit that occurred on

6    September 19th, 2023.

7          MS. MELTZER:  And if you can go to state 1043.

8    BY MS. MELTZER:

9    Q.    Shows it was authored by Sara Gatwood, NP, who I presume

10   is also a nurse.  Do you recall meeting --

11   A.    Actually, Sara Gatwood is the doctor at the time.

12   Q.    Okay.  So she was a physician?

13   A.    Yes, but I do know her.

14   Q.    Okay.  Do you recall meeting with Sara Gatwood on this

15   date?

16   A.    Yes, I believe I remember that visit.

17   Q.    I'll represent to you that pursuant to the federal

18   docket, you filed this lawsuit on August 28, 2023.  So this

19   visit occurred after you filed your complaint in this case,

20   correct?

21   A.    I believe so, yes.

22   Q.    Were you honest with Sara Gatwood?

23   A.    Not in the sense of wanting my surgeries after I had

24   gotten out of prison.  I didn't feel like having discussions

25   with the doctors about my lawsuit.

*CORDELLIONE – DIRECT/MELTZER*

1    MS. MELTZER:  Alex, can you go back to 1040 under

2    history of mental health?

3    BY MS. MELTZER:

4    Q.    So after your lawsuit was filed and you met with

5    Dr. Gatwood, it states in the medical records, quote, States

6    that changes have leveled off and she is hoping to have

7    surgery when she leaves prison.  You then lied to Sara Gatwood

8    on that date?

9    A.    I admitted the fact that I was seeking surgeries at the

10   time.  I simply told her what she was asking, why I needed

11   them.

12   Q.    And she is hoping to have surgery when she leaves

13   prison.  Was that why you needed them?

14   A.    I needed them for surgery, yes, but not for when I leave

15   prison.  I wanted to make sure my levels were correct in case

16   the lawsuit went through and I was able to receive my

17   surgeries.  I would have the correct levels.

18   Q.    Then did you lie to Dr. Gatwood to receive an increased

19   level of hormones on that date by telling her that you were

20   hoping to have the surgery when you left prison?

21   A.    By technicality, yes.

22        MS. MELTZER:  Okay.  And, Your Honor, pursuant to

23   Federal Rule 201, defendant respectfully requests this Court

24   take judicial notice of Exhibit 107, which is the motion for

25   alternative placement, which was filed by the plaintiff in

1    this case in Vanderburgh Superior Court on January 4th, 2024,

2    in state court.

3              THE COURT:  Any objection?

4              MR. FALK:  Just relevance, Your Honor.

5              MS. MELTZER:  And the relevance is the content

6    contained within the motion as it relates to her gender

7    dysphoria, her intentions or lack thereof in receiving

8    surgery, as well as the circumstances as it relates to any

9    current stress she may face and her crime that resulted in her

10   incarceration.

11             THE COURT:  I'll take judicial notice of 107.

12             MS. MELTZER:  Thank you, Your Honor.

13   BY MS. MELTZER:

14   Q.   Do you recall filing this motion just this past

15   January in your convicting court in Vanderburgh?

16   A.   Yes.

17   Q.   And on page 2 under paragraph 4, it shows that you were

18   mainly requesting the Court to modify your placement to work

19   release or home detention, correct?

20   A.   Yes.

21   Q.   So then you were seeking an alternative to confinement

22   in a state prison just as early as this past January, correct?

23   A.   Yes.

24   Q.   And that's months after this lawsuit was filed, correct?

25   A.   Yes.

1          MS. MELTZER:  And then if you could go to paragraph 6

2     at -- I believe it says number one, which was likely a Word

3     document auto trick it played on you there.

4     BY MS. MELTZER:

5     Q.    And you list the reasons in support of your request for

6     this motion, correct?

7     A.    Yes.

8          MS. MELTZER:  If you can go to subsection C.

9     BY MS. MELTZER:

10    Q.    You state the crime was the result of circumstances

11    unlikely to reoccur, correct?

12    A.    Yes.

13    Q.    And the crime in that statement refers to the murder of

14    your minor stepdaughter, correct?

15    A.    Yes.

16    Q.    What were the circumstances that you reference there?

17    A.    The murder of someone.  Any form of murder.

18    Q.    And you state the crime of murder was the result of

19    circumstances unlikely to reoccur.  What were those

20    circumstances you reference that resulted in the crime?

21    A.    No.  That's a misinterpretation.  I'm saying that

22    committing the crime of murder will never happen again.  Those

23    circumstances will never arise again.  Not that there were any

24    specific circumstances, just that I would never commit murder

25    again --

*CORDELLONE – DIRECT/MELTZER*

43

1    Q.    But you do --

2    A.    -- if that's -- sorry.  Go ahead.

3    Q.    But you do admit it says the crime, quote, was the

4    result of circumstances unlikely to reoccur, correct?

5            MR. FALK:  Your Honor, I'm going to object.  The

6    witness has answered.  Counsel did not get the answer she

7    wanted to get, but the witness has answered --

8            MS. MELTZER:  I can move on, Your Honor.

9            MR. FALK:  -- and given a rationale explanation.

10           THE COURT:  Sustained.  Let's move on.

11           MS. MELTZER:  And then if you can go to subsection G

12   on the following page, please.

13   BY MS. MELTZER:

14   Q.    And it says, "The petitioner has worked on her mental

15   health for many years and has not required medication since

16   2011," correct?

17   A.    Yes.

18   Q.    Do you then agree that your mental health has stabilized

19   since 2011?

20   A.    Not entirely.

21   Q.    Why?

22   A.    My gender dysphoria has been greatly decompensating as

23   the years have gone by since 2011.

24   Q.    When do you want surgery?

25   A.    As soon as possible.

CORDELLIONE - DIRECT/MELTZER

1   Q.    Have any medical professionals within Indiana Department

2   of Correction recommended you for gender-confirmation surgery?

3   A.    I was never evaluated.

4   Q.    You were never evaluated by any physicians where you

5   discussed surgery such as --

6         MS. MELTZER:  Well, there'll be testimony later

7   today, Your Honor, from Dr. Farjellah.

8   BY MS. MELTZER:

9   Q.    Do you remember meeting Dr. Farjellah?

10  A.    Yes.  And he specifically told me that there would be no

11  evaluations and no surgeries.  So how could he have given me

12  an evaluation?

13  Q.    What's your understanding of evaluation?

14  A.    Being told that you're having an evaluation and agreeing

15  to being evaluated.

16  Q.    And how does that differ with any of the times you met

17  with Dr. Gale, Dr. Martinez Mateos, Dr. Gatwood, any of your

18  other physicians?

19  A.    None of them have evaluated me for anything.

20  Q.    So of over 50 visits since July 2019, you don't believe

21  you've ever been evaluated by these mental health

22  professionals, correct?

23  A.    Not to my knowledge.

24        MS. MELTZER:  Alex, can you please go to state 1040

25  within Exhibit 54, I believe.

1  BY MS. MELTZER:

2  Q.    Then under problem list, the last one, it shows you have

3  been diagnosed with borderline personality disorder since

4  2010, correct?

5  A.    Yes, that's what it says.

6  Q.    But you disagree with that diagnosis, correct?

7  A.    Yes.

8  Q.    And you testified today that you manipulated doctors to

9  receive that diagnosis so you could obtain medication to try

10 and overdose?

11 A.    Yes.  I actually overdosed on a medication they had and

12 was in a coma for 20 days.

13 Q.    So if your mental health doctors erroneously diagnosed

14 you with borderline personality disorder, isn't it possible

15 they incorrectly diagnosed you with gender dysphoria?

16 A.    I don't believe so.  My gender dysphoria went through an

17 entire committee.  Multiple months, actually not years, of

18 evaluation.  I've been given tests and reviewed by a

19 specialist.  And everybody agrees that I have gender dysphoria

20 and an extreme severe distress from my gender dysphoria.  That

21 diagnosis and all my other diagnoses were given to me by

22 therapists with no tests or any psychometrics.  Just a

23 30-minute visit.  And I switched doctors so numerously, they

24 gave it to me without ever really seeing me more than one or

25 two times.

1   Q.    Thank you, ma'am.  And then based on your testimony just

2   now, you admit you then did get evaluated for gender

3   dysphoria.  You've been evaluated, correct?

4   A.    Not for surgery.

5   Q.    Okay.  And you are not a mental health professional

6   correct?

7   A.    Not in the slightest.

8   Q.    Since you stopped taking medications in 2011, have you

9   attempted suicide?

10  A.    Yes.

11  Q.    When?

12  A.    Within the last couple of weeks.

13  Q.    Have you told anybody that within the prison?

14  A.    No.

15  Q.    Have you told any medical providers that?

16  A.    No.

17  Q.    So nobody within the Department of Correction or any of

18  their contracted medical health professionals has any

19  knowledge of your attempted suicide that occurred only a few

20  weeks ago?

21  A.    No.

22  Q.    How did you attempt suicide?

23  A.    I saved up some of my medications.  I have Melatonin

24  pills that you can get off commissary, and I took a large

25  dosage of those out of my property, and I sat there and put --

 1   tried to ligate my peni -- penis.  Sorry.  I just don't like

 2   saying the word.  By putting magic shave all over it and tying

 3   it up on three different occasions since 2025 [sic] while I've

 4   been on RHU.

 5   Q.   Did the prison commissary always have Melatonin for

 6   purchase?

 7   A.   No.

 8   Q.   When did that happen?

 9   A.   As far as I'm aware, maybe in the last year or two.

10   Q.   Did you tell any other inmates about your suicide

11   attempt?

12   A.   I was in RHU in a cell by myself, no.

13   Q.   And that was for your protection, correct?

14   A.   I was told it was for my safety and security since I had

15   been stabbed in prison and threats on my life, yes.

16   Q.   When did that happen?

17   A.   I was stabbed in 2009 -- sorry.  2-9-2023.  Wait.  2024.

18   My bad.  This year.

19   Q.   So that happened just after your deposition on

20   February 8th, 2024?

21   A.   Yes.

22   Q.   The day after, correct?

23   A.   Yes.

24   Q.   How did that start?

25   A.   An offender by the name of Curry -- sorry.  His name is

1    Christian Delusinay, nickname's Curry, stabbed me because I

2    refused to have sex with him.

3    Q.    Was there any altercation that took place within the

4    general population among other offenders that saw?

5    A.    Yes.  It happened in the bathroom.  Numerous people saw

6    it.  It was all on camera and recorded by INI, Internal

7    Investigations.

8    Q.    Did the altercation begin in the bathroom?

9    A.    He made a -- he -- no.  It would have started whenever

10   he was at my bed asking me if I would have sex with him.

11   Q.    Did you call him into the bathroom?

12   A.    Yes.

13   Q.    Why?

14   A.    Because I thought it was going to be a physical

15   altercation of punching.  I'm used to that in prison, but

16   instead, it turned into something more violent.

17   Q.    Are there surveillance videos within the bathroom?

18   A.    Only to see the first few sinks.

19   Q.    Then isn't it correct you called him into the bathroom

20   where there were no surveillance cameras because you believed

21   you were going to be in a physical altercation?

22   A.    Yes.  I didn't believe I was going to be stabbed.

23   Q.    Were you then offered protective custody by the prison?

24   A.    No.  My people had to report to the facility that I had

25   even been stabbed over 24 hours later when I told my people.

1  Q.    Who are your people?

2  A.    Janelle Flessas.

3  Q.    Who is that to you?

4  A.    My girlfriend.

5  Q.    Did you tell anybody at the prison prior to that?

6  A.    No.

7  Q.    Did you suffer any injury that required any stitches or

8  surgical intervention in any manner?

9  A.    It required me to see medical and have iodine put on it,

10 triple antibiotic ointment, and have bandages placed on them.

11 Q.    Do you believe this incident is related to your

12 transgender identity?

13 A.    Yes.

14 Q.    Did you waive protective custody when they provided it

15 to you upon being aware?

16 A.    Yes.

17 Q.    Then how did you end up in the RHU, which I assume is

18 the restricted housing unit?

19 A.    There begun to have threats on my life by organizations

20 because I was LGBTQ and Janelle yet again called and let the

21 facility know.  I and another offender were placed in the RHU

22 and now we're placed on department-wide protective custody

23 status, meaning that I can go nowhere in any of the Department

24 of Correction without being placed on a PC unit, protective

25 custody unit, for my own safety.

1    Q.    And you were offered that by the prison for your own

2    safety but you accepted it this time, correct?

3    A.    Actually, I requested it that time.

4          MS. MELTZER:  No further questions at this time, Your

5    Honor.

6          THE COURT:  Thank you.  Mr. Falk?

7          MR. FALK:  Thank you, Your Honor.

8                          **CROSS-EXAMINATION**

9    BY MR. FALK:

10   Q.    You testified that you recently tried to commit suicide

11   and to strangle your penis; is that correct?

12   A.    Yes.

13   Q.    And where were you housed?

14   A.    Restrictive housing unit.

15   Q.    Now, did being placed in restrictive housing increase

16   your dysphoria and your discomfort?

17   A.    Yes.  Most of my accommodations were taken away.

18   Q.    What do you mean?

19   A.    The fact that I spent every day showering for about an

20   hour or two removing all my body hair, my facial hair, has

21   been restricted down to three showers a week for ten minutes

22   each time, and I'm not allowed to have a razor outside of

23   those times.

24   Q.    And how did that increase your discomfort or dysphoria?

25   A.    It caused me to have to feel the hair on my body and see

1    it on my body and not be able to see myself as the woman

2    inside.  I had to be forced to look like a man.  And also I

3    was forced to wear clothing that was too big for me as well as

4    I'm not allowed to have my female garments.  I was eventually

5    allowed to have my panties but that was after having to wear

6    the boxers for a week.

7    Q.    Now, you were asked some questions about when you wanted

8    surgery.  Do you remember those questions?

9    A.    Yes.  Yes, I do.

10   Q.    And there was a time I think you testified that you

11   didn't know that surgery was even a possibility?

12   A.    Yes, I didn't know that it was even a possibility.  When

13   I actually requested it, none of the -- Dr. Gale,

14   Ms. Martinez, none of them were even aware it was a

15   possibility.  They told me they didn't know there was a policy

16   for it.

17   Q.    And when you found out that it was a possibility, did

18   you formally request surgery?

19   A.    Yes.

20   Q.    How did you do that?

21   A.    I put in a health care requesting that surgery.  I also

22   made my mental health providers aware of it.

23          MR. FALK:  And, Your Honor, I think Ms. Cordellioné's

24   declaration at 101 discusses the various health care requests

25   that she made in June, November -- June and November of 2022,

CORDELLIONÉ - CROSS/FALK

1  January of '23, February of '23, and April of '23 for surgery.

2  BY MR. FALK:

3  Q.    Now, was there time -- how did you make these requests?

4  A.    You get a health care request.  It can be labeled for

5  mental health, other prescription refills, sick call.  I

6  labeled it mental health, and I fill it out, putting my bed

7  location, my DOC number, my name, and the date that I filled

8  it out, and then I put it into the health care box, and nurses

9  pick it up, review it, and then forward it to where it needs

10 to go.

11 Q.    Now, referring you to the request you filed in late

12 February of 2023 and the response you received, do you

13 remember that one?

14 A.    Yes.

15 Q.    What was the response that you received?

16 A.    That I was on a waiting list.

17 Q.    For?

18 A.    For evaluation for my gender dysphoria.  Sorry.  On

19 evaluation for my gender reassignment surgery.

20 Q.    And then that was -- I believe that response was on

21 March 1st of 2023 and then you filed another request

22 subsequent to that?

23 A.    Yes.

24 Q.    Why did you file another request when you had been told

25 that you were on the list to be evaluated?

CORDELLIONÉ - CROSS/FALK

1  A.    Because I waited a while and I didn't hear anything.  I

2  asked my mental health doctors, and they said they didn't

3  know.  So I filed an official request to get more information

4  about where I was at on the list.  How much further -- how

5  much longer I'd have to wait.

6  Q.    And did you ever hear anything back?

7  A.    No.

8  Q.    And is that when you filed the formal grievance?

9  A.    Yes.

10  Q.    Why did you wait to file the formal grievance?

11  A.    Because to have filed it beforehand is pointless in

12  prison.  They'll immediately just shoot it down saying that

13  you were told you're on a waiting list.  You're being moved

14  forward towards getting your surgery.  They're not denying you

15  your surgery.  But once I never heard a complete response and

16  after I was told that surgery would no longer be an option

17  whatsoever, nor even the evaluations for it, I filed my

18  grievance because it was denying me the right of dealing with

19  my gender dysphoria and getting my surgeries.

20  Q.    Now, counsel brought up some medical records from later

21  in 2023 when there was a discussion as to surgery.  At that

22  point the law had been passed; is that correct?

23  A.    Yes.

24  Q.    And what was your understanding about your ability at

25  that point to get surgery?

 1   A.     That it was nonexistent.

 2   Q.     Now, you were asked some questions about the exhibit,

 3   Exhibit 97, I believe.  We don't need to see it.  About your

 4   wish list -- your surgical wish list?

 5   A.     Yes.

 6   Q.     You list a number of things.  I learned in this case

 7   what a BBL is.  What do you want?

 8   A.     What I want is to get my bottom surgery.  That's the

 9   thing that I believe will ameliorate, make my gender dysphoria

10   more copable, more dealable, able to be able to live my life

11   without constant thoughts of killing myself, without constant

12   attempts of harming myself.  That's the surgery I want and

13   need.

14   Q.     Is that what you're asking for?

15   A.     Yes.  I'm not asking for the other things.

16   Q.     Now, there was some questions about your mental health

17   diagnosis, your borderline personality.  Do you remember those

18   questions?  Do you remember the questions you were asked

19   today?

20   A.     Yes.

21   Q.     Prisoners in the department are given mental health

22   codes; is that correct?

23   A.     Yes, they are.

24   Q.     And have you been able to see -- I think you -- on your

25   tablet or any way -- other way what those codes are?

*CORDELLIONÉ - CROSS/FALK*

1    A.    I'm able to see what my own code is.  Anytime I get a

2    classification review, it's up in my code listing, and I'm

3    also able to see what the code represents on the tablet.  They

4    post it on the tablet, what the designations mean.

5    Q.    And the codes are A through F; is that correct?

6    A.    Yes, for mental health.

7    Q.    Okay.  And A is top?

8    A.    Yeah.  That means you have no mental health issues, no

9    diagnoses, no history of mental health issues.

10   Q.    What's B?

11   A.    B means that you may have mental health issues but

12   they're stable.  They're no longer causing any significant

13   problems and you're not on any real medication, and it's not

14   causing you any social problems.

15   Q.    And what's C?

16   A.    C means that you may have some moderate leading up to

17   severe issues causing social interaction problems, vocational

18   problems.  You're likely on medication, and you're likely seen

19   at least every 90 days.

20   Q.    And then it goes down from there?

21   A.    Yes.

22   Q.    Gets progressively worse.  What is your code currently?

23   A.    B.

24   Q.    Has it been changed recently?

25   A.    Yes, it has.

1  Q.    What was it before?

2  A.    It was a C.

3  Q.    Okay.  So you've gone up?

4  A.    Yes, I have.

5  Q.    Now, you were asked some questions about telling the

6  truth to mental health personnel about suicide or anything

7  else.  Do you remember those questions?

8  A.    Yes, I do.

9  Q.    Why would you not tell a mental health professional the

10  truth about something?

11  A.    Because if I told the truth, the consequences of telling

12  the truth were more harsh than the suffering I was having to

13  deal with at the time.

14  Q.    And what are those consequences?

15  A.    Being placed on a strip cell suicide watch, a padded

16  cell, even having medications pushed on me against my will,

17  psychotropics.  They don't let you think.  They just bog you

18  down.

19  Q.    And you have a long history of taking psychotropics up

20  to 2010; is that correct?

21  A.    Yes.  I had told mental health at the time that I was --

22  wanted to be off all of them because I couldn't think.  I was

23  sleeping all the time, and it really wasn't ultimately doing

24  me any good.

25  Q.    And you've been placed in seclusion in the rubber room

1    or whatever it's called; is that correct?

2    A.    Yes.  I actually did time in a rubber cell for two weeks

3    in New Castle's mental health.  I was placed in there

4    completely naked in a cell that is cold with no mat, no

5    blanket, no clothes with a hole in the floor with a grate that

6    you have to use the restroom through.  You're not allowed to

7    see anybody.  The window that they can see in, they can see in

8    and you can't see out.  If you want to flush that -- that hole

9    in the floor, you have to yell at the door.  They pass you

10   your food through the slot.  It's a sack, and you're not

11   allowed to even wash your hands.  So you've been using the

12   restroom.  You're not given toilet paper.  You're allowed to

13   take a shower once a week.  It's -- it was -- it was horrible.

14   Q.    Okay.  And your concern is that if you tell persons

15   about suicidal thoughts whatsoever, that might happen again?

16   A.    Yes.

17   Q.    Now, you were asked some questions about being evaluated

18   for surgery.  Are you okay?  Do you need a Kleenex?  I'm

19   sorry.  I was too busy looking at my notes.

20         MR. FALK:  Can I approach the witness?  I'm sorry,

21   Your Honor.

22         THE COURT:  You may.

23         MR. FALK:  Could we have two minutes, Your Honor?

24         THE COURT:  Sure.  Let's take a brief recess.  Just a

25   couple minutes.

CORDELLIONÉ - CROSS/FALK

```
 1            THE CLERK:  All rise.  Court is in recess.
 2       (Recess taken 11:58 a.m. to 12:01 p.m.)
 3            THE CLERK:  All rise.  Court is in session.  Please
 4  be seated.
 5            THE COURT:  Mr. Falk.
 6            MR. FALK:  Thank you, Your Honor.  Thank you for the
 7  break.
 8  BY MR. FALK:
 9  Q.    Ms. Cordellioné, we had to take a break because you got
10  so upset.  Could you tell me why you got so upset?
11  A.    Yes.  My time spent in a rubber room and strip cells and
12  suicide watch have been very painful to me.
13  Q.    Okay.  We don't need to go any further.  But you had
14  other examples of that besides the ones you told the Court,
15  correct?
16  A.    Yes.
17  Q.    And just finally, you spoke with Dr. Ettner, our expert;
18  is that correct?
19  A.    Yes, I did.
20  Q.    And for how long, do you remember?
21  A.    About two hours, maybe a little longer.
22  Q.    And she did a full evaluation on you for surgery; is
23  that correct?
24  A.    Yes, she did.  She gave me my full evaluation for
25  surgery.
```

1    Q.    What did she do besides talk to you?

2    A.    She gave me four psychometric tests.  One of them

3    supposedly has a validity aspect to it, which helps tell

4    whether you're lying or fibbing when you're taking your tests.

5    Q.    Did you tell her the truth?

6    A.    I told her the truth, yes.

7          MR. FALK:  I have nothing further.  Thank you.  Thank

8    you, Your Honor.

9          THE COURT:  Ms. Meltzer?

10         MS. MELTZER:  Briefly, Your Honor.

11                     **REDIRECT EXAMINATION**

12   BY MS. MELTZER:

13   Q.    Ma'am, you testified that there was an altercation in

14   the bathroom that occurred one day after your deposition on

15   February 9th, 2024, and you also testified that just mere

16   weeks ago, you attempted suicide while in RHU, correct?

17   A.    Yes.

18   Q.    Is this litigation causing you distress?

19   A.    Not the litigation.  The fact that I'm having to

20   continue to go along with this stuff between my legs and no

21   ability to get rid of it on my own.

22   Q.    But it had nothing to do with the hearing or the

23   deposition where defense counsel, Alex Carlisle, deposed you

24   for a few hours the day before your altercation?

25   A.    No.

1          MS. MELTZER:  No further questions for this witness,

2     Your Honor.

3          MR. FALK:  Nothing, Your Honor.  Thank you.

4          THE COURT:  You may step down.

5          THE WITNESS:  Thank you.

6     *(Witness excused.)*

7          THE COURT:  Next witness, please.

8          MR. CARLISLE:  Defendant calls Warden Dan Mitchell.

9          **DANNY T. MITCHELL, DEFENDANT'S WITNESS, SWORN**

10                    **DIRECT EXAMINATION**

11    BY MS. MELTZER:

12    Q.    Good afternoon.  Can you please state your full name for

13    the record?

14    A.    My name?  Danny T. Mitchell.

15    Q.    Is it all right if I call you Warden today?

16    A.    Sure.

17    Q.    And when were you first employed by Department of

18    Correction, Warden?

19    A.    1988.

20    Q.    What facility was that?

21    A.    Branchville Correctional Facility.

22    Q.    Have you consistently been employed with Department of

23    Correction since then?

24    A.    I had a short leave for about 11 months years ago, but

25    35 years at Branchville Correctional Facility.

MITCHELL – DIRECT/MELTZER

1  Q.    All at Branchville?

2  A.    Yeah.

3  Q.    And at some point throughout your employment, you became

4  the deputy warden, correct?

5  A.    That is correct.

6  Q.    When did that occur?

7  A.    2013.

8  Q.    And what were some of your duties and responsibilities

9  as deputy warden?

10 A.    At that time, initially, I was over programming, like

11 re-entry staff, case management staff.

12 Q.    And at some point I believe in April 2022 in your

13 declaration you testified that you were appointed as warden,

14 correct?

15 A.    That is correct.

16 Q.    Can you please give a brief overview of your

17 responsibilities as warden?

18 A.    Well, the big thing is just safety and security of not

19 only incarcerated individuals but staff and anyone that

20 volunteers there.  Just safety and security over all of the

21 facility.

22 Q.    Would prison administration accurately describe that?

23 A.    Sure.

24 Q.    How many employees report to you directly as their

25 supervisor?

1    A.    Eight direct reports.

2    Q.    And who are they?

3    A.    I have physical point at director.  His name is Rob

4    Howerton.  Diane Pfeiffer is an administrative assistant.

5    Both deputy wardens, Deputy Warden Hoffman, Deputy Warden

6    Sampson.  Clerical staff reports directly to me.  Her name is

7    Ms. Bolin.  Also safety hazard manager, Frank Woods, reports

8    to me.

9    Q.    Okay.  And what is your highest level of education?

10   A.    I have a bachelor's degree.

11   Q.    And what is that in?

12   A.    Education.

13   Q.    Do you know the plaintiff, Jonathan Richardson, who

14   identifies as female Autumn Cordellioné?

15   A.    I do.  Yeah, I'm aware.

16   Q.    Then I assume it is correct that Branchville has a

17   transgender population, correct?

18   A.    We do.

19   Q.    About how large is Branchville's transgender population?

20   A.    I think currently around -- I think currently seven, but

21   that's kind of fluctuated over the last couple years.  Seven

22   to nine, you know, in the last few years.

23   Q.    What type of general accommodations does Branchville

24   provide for their transgender population?

25   A.    They provide -- we offer scheduled shower times just for

*MITCHELL – DIRECT/MELTZER*

63

1   that population where they can have privacy, and they also are

2   able to purchase certain items off of gender neutral

3   commissary.

4   Q.    Are employees also instructed to use preferred pronouns

5   when permitted?

6   A.    Yeah.  If an individual requests to be addressed a

7   certain way, the staff is encouraged to do that, yes.

8   Q.    Are there circumstances where a transgender offender

9   would not be permitted those accommodations?

10  A.    Not that I'm aware of unless -- you know, it might be

11  interrupted like if a person went on like a suicide watch or a

12  security issue could cause maybe an interruption for a period

13  of time, but in general, no.

14          MS. MELTZER:  Alex, can you please pull up

15  Exhibit 15?

16  BY MS. MELTZER:

17  Q.    And I show this is Indiana Department of Correction

18  policy 02-01-118 and is entitled Inclusive Gender Practices

19  For Incarcerated Individuals, and it became effective March 1,

20  2023.  Are you familiar with this policy?

21  A.    I am.

22          MS. MELTZER:  Can you please go to page 3 and scroll

23  to section J?

24  BY MS. MELTZER:

25  Q.    And this section is titled Transgender Review Committee

1   and it is defined as "A treatment team comprised of facility

2   staff from different on-site disciplines that contribute a

3   broad range of perspective and treatment modalities in the

4   management of affected incarcerated individuals' needs."  Do

5   you see that?

6   A.    I do.

7   Q.    It then provides that at a minimum, the committee

8   members must include the classification supervisor, the PREA

9   compliance manager, the health services personnel, behavioral

10  health personnel, unit team staff, custody staff, and the

11  deputy warden, correct?

12  A.    That is correct.

13  Q.    And then it's correct that based off of this, I assume

14  Branchville has a Transgender Review Committee?

15  A.    We do.  We actually meet monthly.  It's during our PREA

16  meeting.  We have a monthly PREA meeting and this is also part

17  of that.

18  Q.    Thank you.  And then does Branchville offer mental

19  health services to offenders?

20  A.    They do.

21  Q.    How does an offender receive mental health services?

22  A.    Well, it's a variety of ways.  They can request it on

23  their own.  A staff member could, you know, refer them.  So,

24  yeah, it's offered.

25  Q.    What about in an emergency circumstance?  Would that

MITCHELL – DIRECT/MELTZER

```
 1   result in any immediate mental health services?

 2   A.    It depends on what's -- you know, what kind of

 3   circumstance you're talking about.  If it's a security issue,

 4   the main thing is, you know, the safety of the individual.  So

 5   we would probably, you know, move that individual to a

 6   restricted housing unit where they would be segregated away

 7   from the population and mental health would be contacted if it

 8   was after hours or on the weekend.  You know, it just depends

 9   on the circumstances, yeah.

10   Q.    And would a known risk or discovery of an actual threat

11   of self-harm by an offender be considered an emergency?

12   A.    Sure.

13   Q.    What other measures does Branchville have in place to

14   protect offenders from self-harm?

15   A.    Well, if -- you know if it's reported to staff, we take

16   measures quickly.  We get that person segregated away from the

17   population in a holding cell environment where staff could

18   just focus on that individual.

19   Q.    And does Branchville offer suicide companions?

20   A.    Currently we don't.  Staff does that, but we're working

21   on getting that program up and going.

22   Q.    So then would a correctional officer serve that purpose?

23   A.    Exactly.

24   Q.    And how long would that correctional officer observe

25   somebody on suicide watch?
```

MITCHELL - DIRECT/MELTZER

1  A.    Well, as long as -- you know, as long as that person is

2  on watch, you know, we would have an individual there watching

3  them.  And that's, you know, day-to-day.  And mental health is

4  the only one that can -- can, you know, modify that watch.

5  Q.    So then that would be 24/7 --

6  A.    Sure.

7  Q.    -- for as long as it's needed?

8  A.    Yeah.

9  Q.    And as warden, do you expect your staff and on-site

10  medical professionals to keep you routinely informed of any

11  actually known risks of self-harm by an offender?

12  A.    Absolutely.

13  Q.    Have you been made aware of any instances where a

14  Branchville offender engaged in self-harm with intent to

15  conform to a transgender identity?

16  A.    Not that I'm aware of.

17  Q.    Are you aware of any instances involving a known threat

18  of offender self-harm to conform to a transgender identity?

19  A.    I mean, we may have had some -- some individuals make,

20  you know, idle threats, but to my knowledge, you know, nothing

21  serious.

22  Q.    And I'll represent to you that plaintiff testified today

23  regarding a recent incident she was involved in at Branchville

24  Correctional Facility.  Are you aware of a recent incident

25  that took place around February 2024 involving the plaintiff?

1    A.    I am.

2    Q.    Have you reviewed any records related to the incident?

3    A.    I have.

4    Q.    And where did the incident occur?

5    A.    It was in our E unit, E dormitory.  It's just a general

6    population housing unit.

7    Q.    Do you know if the incident was captured on surveillance

8    video?

9    A.    Part of the incident was.

10   Q.    What part of the incident?

11   A.    The part where the plaintiff was beckoning an individual

12   into the bathroom area for what I take as a fight or a

13   confrontation.

14   Q.    Have you personally watched the surveillance footage?

15   A.    I have.

16   Q.    Then it shows Autumn was beckoning the individual

17   starting it by pulling him into the bathroom?

18   A.    Yeah.  Just like beckoning him into the bathroom.

19   Q.    And was Autumn offered protective custody after the

20   incident?

21   A.    She was.

22   Q.    Did she accept it?

23   A.    When our officials spoke with her, felt like it was an

24   isolated incident.  That was the message they were getting

25   from Autumn and waived protective custody at that time.

1   Q.    Why was she transferred to a restrictive housing unit?

2   A.    We received a phone call from -- a staff received it at

3   our control room.  I think it was Janelle that called, a

4   person named Janelle, and they assumed it was a family member

5   and said that Autumn was in danger, that there was -- I think

6   the word hit was put out on her.

7   Q.    So then after she had waived protective custody, the

8   prison received information that she may still be in danger

9   and was that offered to her again?

10  A.    It was.

11  Q.    And this time she accepted, correct?

12  A.    She did.

13  Q.    Based on your personal review of the records related to

14  this incident as well as any surveillance video footage that

15  you just testified about, was the incident related to her

16  transgender identity?

17  A.    No.

18          MR. FALK:  Your Honor, I'm going to object.  Number

19  one, the tapes are not in evidence.  They're the best

20  evidence.  Number two, he cannot draw a conclusion as to what

21  something was based on reviewing tapes.

22          THE COURT:  Sustained.  Rephrase your question.

23  BY MS. MELTZER:

24  Q.    Based on your review of the records, did it provide why

25  the incident occurred?

*MITCHELL - CROSS/FALK*

 1    A.    The incident was looked into and investigated and felt

 2    like there was no PREA, no --

 3            MR. FALK:  Your Honor, I'm going to continue my

 4    objection.

 5            MS. MELTZER:  Your Honor this is rebuttal testimony

 6    to what plaintiff testified to.

 7            MR. FALK:  I understand that, but it still has to be

 8    admissible, Your Honor.

 9            THE COURT:  Sustained.

10            MS. MELTZER:  No further questions at this time, Your

11    Honor.

12            THE COURT:  Mr. Falk?

13            MR. FALK:  Thank you.

14                    **CROSS-EXAMINATION**

15    Q.    Warden, Ms. Cordellioné is currently in restrictive

16    housing pending a transfer to another facility's protective

17    custody unit; is that correct?

18    A.    That's correct.

19    Q.    And it's my understanding that while she was in her

20    prior placement, it was an open dorm; is that correct?

21    A.    Open housing, yeah, general population.

22    Q.    And she had the ability to shower more frequently than

23    she can now; is that correct?

24    A.    Yes.

25    Q.    And she had the ability to shave to keep her razor

*MITCHELL - CROSS/FALK*

1   because she likes to shave.  You understand that, correct?

2   A.    Yes.

3   Q.    And she doesn't have that ability now, to shave whenever

4   she wants, if you know?

5   A.    Yeah.  I mean, they're offered, you know, safety razors

6   to shave with in our restrictive housing.

7   Q.    Periodically.  Not on demand, correct?

8   A.    Yeah.

9   Q.    Yes?  I'm sorry?

10  A.    Yes.

11  Q.    And I know just from when we were down there from a

12  deposition, she was able to wear pants that she had been able

13  to alter a little bit to make tighter fitting.  Is she allowed

14  to wear that clothing in protective custody?

15  A.    Normally, you know, we -- we offer like a jumpsuit.

16  Q.    Okay.  Is she allowed to wear her bras?

17  A.    To my knowledge, yes.  I --

18  Q.    You don't know?

19  A.    Yeah, I don't -- I can't say for sure.

20  Q.    Okay.  Have there been suicides at Branchville while

21  you've been there?

22  A.    No successful suicides.

23  Q.    There's been attempts?

24  A.    A couple.

25  Q.    And I assume that things happen in the facility that you

Case 3:23-cv-00135-RLY-CSW    Document 83    Filed 04/05/24    Page 71 of 192 PageID
#: 3393
*WITNESS LAST NAME - DIRECT/ATTYLAST*

71

1   and the other administrative staff never find out about; is

2   that correct?

3   A.    Well, that's possible.  That's possible, yes.

4          MR. FALK:  I have nothing further.  Thank you.

5          THE WITNESS:  You're welcome.

6          THE COURT:  Ms. Meltzer, anything else?

7          MS. MELTZER:  No questions, Your Honor.

8          THE COURT:  Sir, thank you for your testimony.  You

9   may step down.

10         THE WITNESS:  Thank you, Judge.

11      *(Witness excused.)*

12         THE COURT:  Next witness.

13         MR. CARLISLE:  Defendant calls Dr. Farjellah.  He's

14   on Zoom.

15         MR. DAVIS:  Good afternoon, Doctor.  Could you please

16   state your name for the record?

17         THE WITNESS:  Good morning, sir.  It's Michael David

18   Farjellah.

19         MR. FALK:  Your Honor, I don't think the witness has

20   been sworn.

21         MR. DAVIS:  Oh, I apologize, Your Honor.

22         THE COURT:  Plus we need some volume as well.

23    **MICHAEL DAVID FARJELLAH, Psy.D, DEFENDANT'S WITNESS, SWORN**

24                      **DIRECT EXAMINATION**

25   BY MR. DAVIS:

1    Q.    Let's start again, Doctor.  Could you please state your

2    name for the record?

3    A.    Yes, sir.  It's Michael David Farjellah.

4    Q.    And what is your current occupation, sir?

5    A.    I am a clinical psychologist.

6    Q.    And when and where did you receive your training as a

7    clinical psychologist?

8    A.    I received my clinical training at Fielding Graduate

9    University and most of my internships and residencies and

10   fellowship were through the United States Army.

11   Q.    And are you licensed in Indiana?

12   A.    Yes, sir.

13   Q.    Prior to your work with the Department of Corrections,

14   you worked with the U.S. Army, correct?

15   A.    Yes.  That's correct.

16   Q.    Okay.  And how long was that for?

17   A.    I'm retired from the Army, 23 years.  I was a

18   psychologist -- a clinical psychologist in the Army about half

19   that time, roughly ten years.

20   Q.    And can you briefly describe some of your

21   responsibilities as a clinical psychologist for the U.S. Army?

22   A.    I -- I mostly work as a brigade psychologist, Fort Hood.

23   Otherwise, currently known as Fort Cavazos.  A couple of -- a

24   couple of combat deployments to Afghanistan and Poland, but

25   essentially, I would work as the -- the clinical psychologist

1   representative to the brigade commander and typically had, you

2   know, anywhere from 4 to 6,000 troops in that brigade in which

3   I worked -- I worked with them.

4   Q.    Could you describe some of the mental health needs of

5   the patients you saw?

6   A.    The -- it's -- the usual -- kind of the usual suspect,

7   so to speak, of the field are, you know, anxiety, depression,

8   anger.  Specific I think and unique to the military is just a

9   lot of suicidality.  And so that would be kind of a day in the

10  life as an Army psychologist.

11  Q.    How are you able to identify the patients who were -- or

12  I should say the soldiers who were experiencing suicidal

13  ideations?

14  A.    Well, it's -- bottom line, I think it takes time to --

15  to get to the root causes of the conflict and the stress

16  within, but I would say as a general -- as a general rule, I

17  try to pay attention to the -- the messages sent -- emotional

18  messages, the level of distress, the -- that would be kind of

19  a key factor.

20        I'm certainly going to be looking for what we call

21  protected factors, reasons to live, as opposed to just to die.

22  If I were to look for some of the strongest factors for I

23  think a higher risk for suicidality, I would be looking for a

24  sense of worthlessness, what we would consider to be

25  burdensomeness, the feeling that they're a burden to people

1    and that they would -- the world would be a better place

2    without them.  That's -- you know, that sense of grit, I

3    think.  I'm looking for grit and resiliency.  The

4    circumstances that they're in, of course, paint a huge

5    pictures as to whether or not they're at high risk, but I

6    think that I'm just looking for underlying factors of how well

7    can they survive this current distressful situation or episode

8    that they're in.  I could go on, sir.  Is that -- would that

9    be -- is that sufficient?

10   Q.    Let me ask another question.  Is what you were looking

11   for in their emotional presentation, is that based off of

12   things that they say to you or is that based off of nonverbal

13   factors as well?

14   A.    Absolutely nonverbal factors are a critical element.

15   It's probably as relevant as the verbal factors, the history,

16   the information that I get about them prior to receiving them

17   or interviewing them.  Their presentation with me, their past

18   history of suicidality, and self-harm are huge indicators of

19   the present risk.  One person I think in this case -- it made

20   a lot of sense to me -- said that suicide is homicide turned

21   inward.  So I'm very much looking for past aggressive acts

22   toward others, toward themselves, self destruct behavior,

23   cutting, addiction, anything that would indicate kind of

24   higher elements of hatred toward self, which I think obviously

25   -- I think that would heighten the sort of degree of risk.

  1          MS. PACTOR:  Before this goes any further, I just

  2    want to object on the grounds that Dr. Farjellah has not been

  3    designated or qualified as an expert.  He saw Ms. Cordellioné

  4    twice, and he is a fact witness about those -- those two

  5    visits.  I don't think anyone disputes that he indicated that

  6    he thought Ms. Cordellioné was not suicidal during those

  7    visits.

  8          MR. DAVIS:  Your Honor, he -- even though he's not an

  9    expert witness, he can testify to his clinical experience,

 10    which is relevant in this case.

 11          THE COURT:  He can testify to his experience, sure,

 12    and then we need to go into his contact -- his professional

 13    contact with the plaintiff.

 14          MR. DAVIS:  I can move on to his experience with the

 15    DOC.

 16    BY MR. DAVIS:

 17    Q.    Doctor, when did you begin working with the Department

 18    of Correction?

 19    A.    I began in April 2020.

 20    Q.    And have you since left the Department of Correction?

 21    A.    Yes, sir.  I left about six months ago in

 22    September 2023.

 23    Q.    Okay.  And what was your position at DOC?

 24    A.    I was a staff psychologist.  I was a staff psychologist.

 25    I worked across the roughly three and a half years at seven

1   different prisons in the DOC.

2   Q.    Okay.  And Branchville was one of those prisons?

3   A.    Yes.

4   Q.    Can you briefly describe some of the mental health

5   issues that you have treated in DOC?

6   A.    Yes.  Yes, sir.  I think -- I think the difference

7   between the DOC and my Army experience is there's just a

8   higher degree of those on the schizophrenic spectrum.  There's

9   a much larger percentage of inmates that meet criteria for

10  personality disorder.  And just -- just -- it's a very

11  aggressive group.  So there was a great bit of antisocial

12  behavior, narcicisstic behavior, borderline personality

13  disorder.  I think that was -- that was the basic difference.

14  Serious mental illness, a lot more of that, and then, of

15  course, personality disorder I think are the big differences

16  between the prison experience and the Army experience.

17  Q.    Yes.  And do you know the plaintiff, Jonathan

18  Richardson, also known as Autumn Cordellioné?

19  A.    Yes.

20  Q.    And how do you know her?

21  A.    I met with Autumn twice about a year ago in the month of

22  May and then again in the month of June.

23  Q.    And what was the purpose of those meetings?

24  A.    The first meeting, there was -- there is a requirement

25  in the Indiana Department of Correction that once a person who

1    has identified as transgender transfers into the prison, the

2    clinical psychologist is required to interview them, and

3    that's how I met Autumn.

4    Q.    Okay.  And did you provide psychotherapy to the

5    plaintiff?

6    A.    To an extent, particularly in the second session, yes.

7    I mean, the first session was essentially an interview, an

8    evaluation, and then she came back in June, and we provided

9    psychotherapy.

10   Q.    Quickly, how important is therapy in treating the

11   transgender population within DOC?

12   A.    I think it -- it depends on their -- their, I guess you

13   might say, maturity.  But I think it's a critical component if

14   the essential, you might say, conflict within is there -- I

15   think the wrestling match, the struggle that they go through

16   in terms of their gender identity.  And I think therapy is a

17   critical component in terms of helping anyone to navigate

18   through that struggle.

19   Q.    And how many -- how many transgender individuals within

20   DOC have you treated?

21   A.    Roughly 20.  I believe that there's approximately 70 to

22   75 across the Indiana Department of Correction, and I worked

23   with 20, somewhere in that neighborhood.  There were eight at

24   Branchville at the time that Autumn arrived, which is roughly

25   10 percent of the population.

*FARUSH – DIRECT/DAVIS*

1   Q.    Yes.  And typically how long do you provide treatment to

2   these individuals?

3   A.    It depends.  It depends on, I think, their presentation,

4   their need.  If they're stable, most likely -- because I --

5   you know, Branchville was one of five prisons that I was

6   working at.  So kind of had to -- you know, had to be careful

7   how much time I spent at any particular prison.  But if there

8   was a great clinical need, I'd spend as much time as

9   necessary.  If they were relatively stable, then most likely

10  they would work with one of the two social workers that were

11  at Branchville.

12  Q.    Let's return to your sessions with the plaintiff.  Did

13  you take notes or keep records of these sessions?

14  A.    Yes, sir.  Yes.

15  Q.    And when was your first session?

16  A.    The first session was May 8th, 2023.

17        MR. DAVIS:  Alex, could I have Exhibit 78, please

18  beginning page 7?

19  BY MR. DAVIS:

20  Q.    Doctor, when you first saw the plaintiff, what mental

21  conditions did she present with?

22  A.    The first -- my first interaction with Autumn went

23  relatively well.  I was aware that she had been diagnosed with

24  gender dysphoria and had met with the multidisciplinary team

25  back in I think it was 2020 and had been working at NCF --

1    which is another facility, had worked fairly extensively over

2    time.  Quite a few records in the system.  Also -- also knew

3    that she had been diagnosed borderline personality disorder.

4    So those were the two diagnoses that I was focused on.

5    Q.    Doctor, do you have what's been admitted as Exhibit 78

6    in front of you?

7    A.    Yes.

8    Q.    It is your declaration --

9    A.    Yes, sir.

10   Q.    -- and two attachments?

11   A.    I do.

12        MR. DAVIS:  Alex, could I have Exhibit 78, page 7?

13   BY MR. DAVIS:

14   Q.    Doctor, if you could please turn to page 7 of

15   Exhibit 78.  Are these the notes that you took at your

16   May 8th, 2023, session?

17   A.    Yes.  Yes, they are.

18        MR. DAVIS:  Alex, can I see page 8?

19   BY MR. DAVIS:

20   Q.    Now, if you turn to page 8, Doctor, I'll direct you to

21   goals, objectives, and interventions addressed today.  Can you

22   describe Ms. Richardson's mental state when you first met with

23   her?

24   A.    Yes.  I was -- I was somewhat convinced that she was in

25   a relatively improved place from -- you know, as compared to

FARQUHAR - DIRECT/DAVIS

1    the past.  She -- she made statements such as -- and she's

2    been through a battle, no doubt.  She made statements of -- or

3    discussed sort of a history of suicidality and self struggle

4    and sort of a gender -- gender identification struggle and

5    attempted suicides in the past.  But I remember she

6    specifically said -- very articulate about it, that she was at

7    peace now, and I was happy to see that she was coming

8    basically to the end of her sentence.  She's been in prison, I

9    think, since 2001, I believe, or roughly in that period.  And

10   she was looking at the possibility of being released.  It was,

11   you know, starting to approach -- that release date was

12   starting to approach, and she seemed to be in a relatively

13   positive optimistic frame of mind at that time.

14   Q.    Did you two discuss the possibility of surgery at the

15   time?

16   A.    We did.  We had a good discussion about it, I recall.

17   It was at a point prior to the -- I think the change in policy

18   at the higher level.  At that point, we had heard from kind of

19   the higher -- from Centurion, I guess you could say my

20   leadership, that there was talks about reversal in terms of

21   possibility of having surgery.  We discussed that.  I remember

22   she said that something to the effect of I'm okay.  I'm used

23   to disappointments.  If I can't -- if I can't get the surgery

24   done in here, I'll try to do it on the outside.  I'm at peace

25   now.  And it seemed like she was acceptable to either way that

1 ball may have bounced and seemed to be kind of -- and

2 obviously had been discussing it with other people, I think,

3 prior to our discussion.  Seems that she knew, I think, the

4 direction that the policy was going.

5 Q.    At the time of the May visit, how stable was

6 Ms. Richardson's gender dysphoria?

7 A.    I feel, based on her statements and based on our

8 discussion, that she had really battled through and come to

9 terms with it.  And I might add that when I look at the

10 condition of gender dysphoria, the dysphoria is related to the

11 conflict within to the gender -- within I think related to the

12 gender identification.  Now, I believe that she had come a

13 long way to accept her gender, but I would be the first to say

14 I think that she had been through quite a battle over the

15 years in terms of getting to that I think more peaceful place.

16 Q.    Did she exhibit any signs of suicidal ideations at that

17 first visit?

18 A.    No.  In fact, was confident to say that she had been

19 through a struggle with suicide in the remote past and records

20 sort of -- that was -- that would be a key factor that I

21 looked at.  Her suicidality was, you know, quite remote, and

22 there was no indications of anything in the recent years so --

23 and with her positive presentation and the confidence that I

24 think she exuded, that she had been through that and overcome

25 it, I felt relatively good about her safety.

1   Q.    And did she express any desire to self-harm?

2   A.    Not at all.

3   Q.    Doctor, did you correct Ms. Richardson's chart anytime

4   after the May 8th session?

5   A.    I did.  I went back through, I think it was about two

6   weeks later, and made a correction.  I wanted to clarify --

7   and just to -- just to state because of the visibility of --

8   really, the political -- I think the politics surrounding the

9   transgender community, I went back through and realized that I

10  made a mistake that -- that she had not been approved for

11  transgender surgery.  She had been taking hormones for four

12  years.  So I wanted to make it clear in the records that she

13  had not been approved for the transgender surgery at that

14  time.

15  Q.    You mentioned that she had been taking hormones.  Were

16  you aware of her treatment history?

17  A.    In terms of hormones, sir?

18  Q.    What treatments were you aware that she was receiving at

19  the time?

20  A.    Oh, okay.  Okay.  Well, she had just transferred from

21  NCF to Branchville and had a fairly extensive history of

22  interacting with mental health over the years -- over many

23  years, and I remember specifically she said to me that she had

24  not been taking any psychotropic medications for years, but

25  she enjoyed the process of therapy because it helped her I

1   think learn and develop herself.  So she -- she was, I think,

2   quite experienced in psychotherapy and had, in a remote sense,

3   at one time interacted with the psychiatrist in terms of

4   taking psychotropic medications.  But it painted quite a

5   picture of stability that she had not been taking any

6   psychotropic medications for years when she arrived at

7   Branchville.

8   Q.    How effective did you believe her current course of

9   treatment had been controlling her symptoms of gender

10   dysphoria?

11  A.    I believe that she'd come a long way in terms of

12  overcoming the dysphoria element of her gender identity.  I

13  was aware that she had been diagnosed as a borderline

14  personality disorder, and so anytime you see that, there's

15  always red flags.

16         So, you know, one presentation doesn't usually paint,

17  you know, a complete picture.  So I was concerned.  I wanted

18  to -- I scoured, I think, through the -- through the records

19  to make sure that I had a sense of, you know, her medical

20  history.  And she seemed to have come a long way.

21         But, of course, anytime you move someone from one

22  prison to another, that's quite an adaptation.  They have to

23  adapt, and so there's always, you know -- you know, the new

24  kid on the block, so to speak, can go through some difficult

25  times, so we wanted to make sure that we had a good eye on

1    her, I think.

2    Q.    Now, in that May 21st, 2023, correction in

3    Ms. Richardson's chart, did you express an opinion regarding

4    her eligibility for surgery?

5    A.    I did, yes, sir.  I had spoken to Dr. Heather Vernon, my

6    direct supervisor, that I had received Ms. Richardson, and I

7    basically stated that I didn't think she was a candidate for

8    possible gender transition surgery because of the diagnosis of

9    borderline personality disorder, which I believe is consistent

10   with a serious mental illness, and that was my justification

11   for that determination.

12   Q.    We'll come back and discuss the borderline personality

13   disorder in more detail.  But did any possible Department of

14   Correction policy changes regarding surgery influence your

15   opinion as to her eligibility for surgery?

16   A.    No.  And with hindsight, I knew that that could go

17   either way.  So that was not really a consideration.  It was

18   really just based on clinical information that I made that

19   decision.

20   Q.    When was the second time that you visited with

21   Ms. Richardson?

22          MS. PACTOR:  I'm going to object here on the grounds

23   of relevance.  He had already rendered his opinion about

24   gender affirming surgery as of the May visit, so there's no

25   possible relevance to a subsequent visit that had nothing to

1    do with gender dysphoria.

2            THE COURT:  Mr. Davis?

3            MR. DAVIS:  Your Honor, the contents of his notes and

4    of the June 19th session will give the Court more insight into

5    the fact that borderline personality disorder has on the

6    plaintiff and its relation to her gender dysphoria.

7            MS. PACTOR:  Judge, he's not been qualified as an

8    expert.  He can only testify as to the facts that went into

9    his decision about his opinion regarding surgery on May 21st,

10   the date of his opinion.

11           THE COURT:  I'll go ahead and allow it.  I may not

12   consider it later on, but I'll allow it at this point.

13           MR. DAVIS:  Of course, Judge.  Thank you.

14   BY MR. DAVIS:

15   Q.    Doctor, when was that second visit with Ms. Richardson?

16   A.    Sir, that was June 19th, 2023.

17   Q.    And can you describe how Ms. Richardson presented at

18   that session?

19   A.    Yes.  The -- as I recall, the social workers kind of

20   told me before I met that she was sort of in an emotional

21   state so I met with her.  And -- should I go into the details?

22   Q.    Yes.

23   A.    Okay.  So it was a different interaction.  She was

24   visibly distressed.  She had received some information from a

25   friend.  As I understand, she had met somebody online.  I

1    don't believe that she had ever met this young woman.  There

2    was a 19-year-old girl that she had met online, and she

3    received information that -- well, they -- the young woman had

4    a surrogate.  She was pregnant through a surrogate.  And

5    Autumn and her had agreed that he would be the father of the

6    child once -- you know, once it was born.  Once he got out, I

7    think they had plans to try to co-parent.

8         And he was very distressed that day that she had

9    recently found out that she had a miscarriage and that she was

10   hospitalized and suicidal at the time, and he was quite

11   distressed.  He was in a tough place.  He was visibly crying.

12   He was in tears, and he was hurting.  It was a complicated

13   sort of situation because when you think of the history of his

14   crime, you know, he committed murder back in the early 2000s,

15   and he basically asphyxiated his daughter, his child.

16        I believe -- and this is just somewhat speculative --

17   but I believe it makes sense that he -- he thought of the

18   prospect of being a father with a new family as sort of a

19   second chance, a second chance to possibly, you know, be a

20   good father and do the right thing and overcome the guilt of

21   what he had probably been dealing with for 20 years.  And so I

22   felt like it was an extremely complex case, you know, sort of

23   a very difficult issue to deal with.  But -- you know, so on

24   one hand, I think he was going through, you know, that -- that

25   struggle to deal with.

1      I don't know if he thought of it as a punishment or

2  just another letdown in life.  There are probably some that

3  would argue that he'd never met the girl, and so some would

4  probably say that that might be a bit of an extreme reaction

5  to -- you know, to a very sad circumstance for sure.

6      It's tough to know what was in his -- you know, in

7  his psyche at the time, but he was very, very distressed.  But

8  during the course of the session, I was impressed that he --

9  you know, he was able to -- I felt like it was good for him to

10  talk about it, get it off his chest and have somebody that he

11  felt like he could sort of discuss this with.

12      You know, it seemed like through the -- and we talked

13  for quite a while.  I think we talked for at least an hour,

14  and it seemed like when he -- once we went through the

15  session, he was in a relatively, I think -- you know,

16  considering the circumstances, he expressed that he was okay,

17  that he's been through worse, that type of thing.  And I think

18  he has been through worse.  So I didn't get a sense that he

19  was overly -- that he was suicidal at the time.

20      The social workers did sort of take him in and we --

21  I think that Mr. Sowery was able to talk with his case manager

22  and get him off work for a couple days so they could kind of

23  try to work through this and talk -- you know, talk it

24  through.  But that was the basics of that second interaction.

25  Q.   Let's discuss in greater detail -- you mentioned the

1    plaintiff's borderline personality disorder diagnosis.  Can

2    you briefly describe for the Court what borderline personality

3    disorder is?

4    A.    Yes.  I think the essential elements of it are there's

5    an identity disorder.  There's frantic elements of real and

6    perceived abandonment, a pattern of kind of chronic and

7    unstable interpersonal relationships.  Impulsivity, I would

8    say more than the norm as I think demonstrated in his case by

9    multiple sexual abuse allegations over the years.  I could go

10   into detail on that.  It's very uncommon to see multiple

11   allegations of sexual abuse over the years.  Once in a while

12   you'll see one.  Very, very seldom, but sometimes, you'll see

13   two, but in his case, there were multiple allegations.

14        Recurrent history of suicidal behavior, gestures,

15   threats, self mutilations, chronic feelings of emptiness,

16   transient sort of feelings of paranoia, sometimes dissociative

17   symptoms.  These are kind of the key elements.  But I would

18   say -- if I were to sum that up, I would say overwhelming

19   strong emotional personality.  They're the kind of person that

20   gets really angry or very depressed frequently and often

21   anxious, and they have -- as a result of that kind of neurotic

22   and sometimes psychotic sort of presentation, they have a real

23   difficult time maintaining stable relationships with other

24   people because it's difficult to deal with people that are

25   that emotional.  And so I think that's sort of the essence of

1    the borderline personality disorder.

2    Q.    Can you explain how borderline personality disorder

3    might affect someone's self image or identity?

4          MS. PACTOR:  I'm going to -- I'm sorry.  I have to

5    object again.  This is not an expert witness.  He is a fact

6    witness about Ms. Cordellioné.

7          THE COURT:  Sustained.

8    BY MR. DAVIS:

9    Q.    Doctor, can you describe why Ms. Richardson's borderline

10   personality disorder diagnosis in your opinion disqualified

11   her from receiving surgery?

12   A.    Yes.  It is a severe -- personality disorder is a severe

13   mental illness.  It's sadly very, very resistant to treatment.

14   You can -- for example, if I might, there's a lot of

15   literature demonstrating that even for people who have gone

16   through an intensive outpatient program --

17         MS. PACTOR:  I'm sorry to interrupt.  I have to

18   object.  He is not an expert witness, and he testified that

19   she was stable when they met.  He can't testify about

20   borderline personality disorder generally if it doesn't apply

21   to the plaintiff.

22         THE COURT:  Mr. Davis?

23         MR. DAVIS:  Your Honor, I can rephrase the question,

24   but I asked him with regard to the plaintiff.

25         THE COURT:  I'll sustain the objection.  Rephrase it.

1  BY MR. DAVIS:

2  Q.    Doctor, what about Ms. Richardson's presentation during

3  your sessions led you to believe that her diagnosis of

4  borderline personality disorder meant she wasn't eligible for

5  surgery?

6         MS. PACTOR:  I'm going to object here as well.

7  There's only one relevant session before he rendered his

8  opinion about the borderline personality disorder, May 8th.

9         THE COURT:  Rephrase.

10 BY MR. DAVIS:

11 Q.    Doctor, during the May 8th session, did you observe any

12 behaviors consistent with borderline personality disorder?

13 A.    I did not observe any behaviors, but the history and the

14 medical records demonstrated very consistent behavior with

15 borderline personality disorder, and during the second

16 session --

17         MS. PACTOR:  I'm going to object.

18 A.    -- it confirmed --

19         MS. PACTOR:  That session is not relevant.

20         THE COURT:  Show that stricken.

21 BY MR. DAVIS:

22 Q.    Doctor, based on your discussions with Ms. Richardson,

23 did you believe that her course of treatment was relieving her

24 dysphoria?

25 A.    Her course of treatment was relieving her dysphoria?

1   No.

2   Q.   Didn't you testify --

3   A.   Let me try to clarify.  I believe that her presentation

4   is consistent with borderline personality disorder as a deeper

5   structural manifestation of her personality.  I believe that

6   she -- her gender dysphoria, she had largely overcome, but I

7   do believe that she endures borderline personality disorder.

8   Q.   Okay.  At any time during your treatment of

9   Ms. Richardson, did she express any suicidal ideations?

10  A.   No, she did not.

11  Q.   Did she express any desire to self-harm?

12  A.   No.

13  Q.   Did she express any distress at the prospect of not

14  receiving surgery?

15  A.   No.  She seemed to be accepting of the possibility that

16  it may not work out in the Indiana Department of Correction.

17  Q.   Based on your sessions with her, was she -- is she an

18  appropriate candidate for surgery?

19          MS. PACTOR:  Objection, Your Honor.

20          THE COURT:  Sustained.

21          MR. DAVIS:  No further questions, Your Honor.

22          THE COURT:  Ms. Pactor?

23                    **CROSS-EXAMINATION**

24  Q.   Good afternoon, Doctor.  Can you hear me okay?

25  A.   Yes, ma'am.

1    Q.    Okay.  During the May 8th meeting with

2    Ms. Cordellioné -- with Autumn that we've been discussing, did

3    you describe her thought process as logical?

4            THE COURT:  As illogical?

5            MS. PACTOR:  Logical.

6    BY MS. PACTOR:

7    Q.    And you can refer to the exhibit if you'd like, if you

8    need to.

9    A.    Yes.

10   Q.    Did you describe her thought content as within normal

11   limits?

12   A.    During that first session, yes.

13   Q.    In your current assessment, did you state "Patient does

14   not present any mental health issues at this time"?

15   A.    Yes.

16   Q.    And as to that telehealth visit on May 8th -- you

17   described this earlier as an intake visit; is that correct?

18   A.    Yes, ma'am.

19   Q.    And it lasted for 20 minutes; is that correct?

20   A.    It was fairly short.  It was -- it was a fairly short

21   intake.  I'd say 20, 30 minutes, possibly longer.

22   Q.    Would the timestamps indicated in your -- in the medical

23   chart be accurate to reflect the length of that session?

24   A.    Yes, generally so.

25   Q.    And you told her during that session that DOC had

1    determined not to move forward with surgery; is that correct?

2    A.    I did.

3    Q.    And at that time --

4    A.    Well, at that point, I -- I tried to clarify that in the

5    second note that I -- I was trying to be clear for posterity

6    for times such as this that DOC at that moment in time had --

7    had not made a decision one way or the other.  It looked like

8    they were moving toward stopping the surgeries, but it was not

9    definitive.  So what we discussed, Autumn and I, was the

10   possibility that it may or it may not go forward, and I

11   believe he was -- he was okay with either direction.

12   Q.    So your note indicates writer informed her that IDOC has

13   decided not to go further with transgender surgery.  Was your

14   notation there incorrect?

15   A.    It was incorrect.  I clarified it I think in the

16   May 21st note.

17   Q.    But as of that meeting in May 2023, the statute had

18   already been passed prohibiting DOC from performing

19   gender-affirming surgeries; is that correct?

20   A.    That, I did not find out until later.  At that point --

21   at that day, I did not know if it was -- we had met I think a

22   couple weeks earlier there with leadership, and they were

23   talking about the direction that it may go, but I did not know

24   at that point that it was official.

25   Q.    And you know that now?

1   A.    Yes.  Yes, ma'am.

2   Q.    Did you tell Ms. Cordellioné -- or did you indicate to

3   her during that first intake meeting you were evaluating her

4   for surgery?

5   A.    No.  That would not be my language.  I certainly --

6   that's -- that would be a medical doctor's decision.

7   Q.    Why would a surgical evaluation not be within your lane?

8   A.    Well, the -- as it's structured, a psychologist would

9   evaluate the -- for mental health stability, that particular

10  component, but the decision is actually made in what they call

11  a multidisciplinary team meeting.  It's composed of a

12  psychiatrist, basically the leadership of the mental health

13  department.  I'm very aware that mine was quite a small part

14  of that process.

15  Q.    And what standard of care did you reference or use to

16  determine that surgery would not be appropriate for Autumn?

17  A.    I would not have made such a decision.  I mean, in terms

18  of whether or not she received surgery or not would not be --

19  you know, my basic role would be to determine whether or not

20  the person is psychologically stable enough to make a decision

21  of that magnitude.

22  Q.    And as of May 8th, as we just discussed, you determine

23  that her mental health was stable?

24  A.    Oh, forgive me, ma'am.  Speak -- say again.  I did not

25  hear.

1    Q.    Yeah.  As we discussed earlier, as of May 8th, you

2    determined that her mental health was stable?

3    A.    Well, there was the diagnosis of borderline personality

4    disorder that was in the record, very documented, and had been

5    for sometime by professionals that knew her a lot longer than

6    I did.

7    Q.    Can someone have an active mental health diagnosis and

8    be stable?

9    A.    Absolutely.  Absolutely.  In fact, especially with

10   borderline personality disorder, it seems to -- they can be

11   stable and then they can erupt.  It's just -- you never know.

12   That's part -- that's part of the disorder.  It's just so --

13   it varies.

14   Q.    Were you aware that since the time that you met with

15   Ms. Cordellioné, her mental health code has been changed from

16   C to B?

17   A.    No, I did not -- not aware.

18          MS. PACTOR:  Okay.  No further questions.  Thank you.

19          THE COURT:  Mr. Davis?

20                **REDIRECT EXAMINATION**

21   BY MR. DAVIS:

22   Q.    Doctor, is there a difference between a formal

23   evaluation by the Gender Dysphoria Review Committee and basic

24   mental health treatment that you were providing?

25   A.    I believe it's fair to say that the MDT, the formal

1  committee, is dependent upon the clinical psychologists at the

2  sites to provide their input as to the psychological stability

3  or instability of the transgender person.  And so there is a

4  difference in terms of the -- certainly a difference between a

5  normal psychological intake as compared to my role on the

6  first time that I met Autumn, which was to evaluate for --

7  with the idea that this information is going to go to the MDT.

8  Q.    Just one final question, Doctor, do you think that the

9  Department of Corrections has adequately provided the

10 plaintiff -- or excuse me, has provided the plaintiff with

11 adequate treatment for her gender dysphoria?

12         MS. PACTOR:  Objection.  This is a fact witness and

13 he stopped working for the DOC.

14         MR. DAVIS:  I can rephrase, Your Honor.

15         THE COURT:  Sustained.

16 BY MR. DAVIS:

17 Q.    Doctor, at the time you were with DOC, do you believe

18 that the plaintiff was receiving adequate treatment for her

19 gender dysphoria?

20         MS. PACTOR:  Objection.

21         THE COURT:  Sustained.

22         MR. DAVIS:  No further questions, Your Honor.

23         MS. PACTOR:  Nothing further, Judge.  Thank you.

24         THE COURT:  Thank you very much, Doctor, for your

25 testimony.  We're finished up with you for today.

BEDFORD - DIRECT/DURHAM

```
 1              THE WITNESS:  Okay.  Thank you, sir.

 2         (Witness excused.)

 3              THE COURT:  Next witness.

 4              MR. CARLISLE:  We would call Adrienne Bedford.

 5    ADRIENNE BEDFORD, M.D., DEFENDANT'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7    Q.   Hello, Dr. Bedford.  Can you hear me all right?

 8    A.   I can.  Can you all hear me okay?

 9    Q.   Yes, we can.  Thank you.

10         Can you state your full name for the record, please?

11    A.   Andrienne Michelle Bedford.

12    Q.   And where do you work, Dr. Bedford?

13    A.   I worked for the Indiana Department of Correction.

14    Q.   What is your position there?

15    A.   I am the chief medical officer.

16    Q.   How long have you held that position?

17    A.   I have been working with the department since August of

18    2023.

19    Q.   Let's talk about your background just briefly.  Where

20    did you get your medical degree?

21    A.   The University of Louisville School of Medicine.

22    Q.   And where did you do your residency?

23    A.   Community Health Network in Indianapolis, Indiana.

24    Q.   When did you finish that residency?

25    A.   2009.
```

BEDFORD - DIRECT/DURHAM

```
 1   Q.    And where did you work after that?

 2   A.    With the Marion County Health Department.

 3   Q.    How long were you there?

 4   A.    -- under Dr. Virginia Cane.  For about a year.

 5   Q.    And what did you do after that?

 6   A.    I was offered a deputy chief medical officer position

 7   with Indiana Health Services.

 8   Q.    And how long did you work there?

 9   A.    For, I believe, about two years.  Two to three years.

10   Q.    And where did you work after that?

11   A.    I worked for -- as the chief medical officer for Shalom

12   Health Centers in Indianapolis, Indiana.

13   Q.    How long were you there?

14   A.    Three years.

15   Q.    And where did you work after that?

16   A.    I worked for Meridian Health Services, and I was with

17   them for four years.

18   Q.    And where was that?

19   A.    They have offices all over the state, but my home office

20   was New Castle, Indiana.

21   Q.    And where did you go after Meridian?

22   A.    I worked for Eskenazi Health, Indianapolis, Indiana.

23   Q.    And after that?

24   A.    I ended -- I worked for Centurion Health Services.

25   Q.    And what did you do for Centurion?
```

1   A.    I was the site medical director at the Indiana women's

2   prison.

3   Q.    And where did you go after that?

4   A.    Then I was offered this position here with the Indiana

5   Department of Correction as the chief medical officer.

6   Q.    So Dr. Bedford, for how long have you been working with

7   patients who are incarcerated?

8   A.    I would say it's probably about two years now, two or

9   three years.

10  Q.    And now you're the chief medical officer; is that

11  correct?

12  A.    Yes.

13  Q.    What are your duties in that position?

14        MR. FALK:  Your Honor, excuse me.  I'm going to

15  object just for the sake of time.  We did a deposition of

16  Dr. Bedford.  It's in evidence.  It's Exhibit 100.  All of

17  this is in there.  This is a preliminary injunction hearing

18  so, in essence, we're repeating testimony that's already in

19  the record.  I know that we're all interested in saving time.

20        MS. DURHAM:  I can move on, Your Honor.

21        THE COURT:  Okay.  Very good.

22  BY MS. DURHAM:

23  Q.    Dr. Bedford, in your role as chief medical officer, are

24  you familiar with DOC's policies and procedures for treating

25  patients with a variety of conditions?

1   A.    Yes, I am.

2   Q.    Do you play a role in creating those policies?

3   A.    I do.

4   Q.    What is that role?

5   A.    I am responsible for reviewing the policies and

6   procedures annually and making changes as needed.

7   Q.    In your experience as chief medical officer, are you

8   familiar with DOC's policies and procedures for treating

9   gender dysphoria?

10  A.    I am.

11  Q.    Is gender dysphoria a mental disorder?

12  A.    Currently it is found in the DSM-V, IV.  So currently it

13  is stated in the DSM-V.

14  Q.    How is an incarcerated individual diagnosed with gender

15  dysphoria?

16  A.    Well, according to the Department of Correction, when a

17  patient identifies as being transgender, they are

18  automatically referred to the primary care physician who will

19  do an evaluation, and secondary, they will be referred to a

20  mental health professional who will also do an evaluation.

21  From there, they will convene as a team with the patient for

22  what's called -- for what's called the transgender evaluation

23  committee, and the case will be studied at that point and

24  discussed --

25  Q.    And what's this meeting --

1    A.    -- at a multidisciplinary committee.

2    Q.    Sorry.  Go ahead.  That's what I was going to ask you.

3    What is that committee?

4    A.    Well, that committee consists of the patient, the mental

5    health professionals, which are the psychologists, the

6    regional mental health doctor, the primary care physician, and

7    the psychiatrist.

8    Q.    And does that committee determine treatment for an

9    incarcerated individual with gender dysphoria?

10   A.    Well, that committee --

11         MR. FALK:  Your Honor, excuse me.  I'm going to

12   interrupt again.  We're -- I can quote -- I can read the

13   deposition to the Court now where we went over all of this,

14   and this has to do at this point with diagnosing gender

15   dysphoria, and Ms. Cordellioné was diagnosed in 2020.  It's

16   duplicative of the evidence that's already in the record.

17         MS. DURHAM:  Your Honor, I can go through this more

18   quickly.  Just trying to get some foundation for what she's

19   going to testify about later.

20         Alex, can you pull up Exhibit 5?

21   BY MS. DURHAM:

22   Q.    Dr. Bedford, are you familiar with a DOC policy titled

23   Health Care Services Directive 2.17A?

24   A.    Yes.

25   Q.    Can you see that on your screen?

1    A.    I can.

2    Q.    Is that -- what's on your screen, is that the policy of

3    2.17A that you're familiar with?

4    A.    Yes.

5    Q.    Does this policy outline DOC policy and procedure for

6    care of transgender individuals?

7    A.    Yes.

8    Q.    Is this policy currently in effect?

9    A.    It is.

10   Q.    Is this policy currently under review?

11   A.    It is, yes.

12   Q.    Has that review been conducted?

13   A.    It is currently in review, so we are in the process of

14   reviewing right now.

15   Q.    So as we stand here today, those changes are not final?

16   A.    Correct.

17   Q.    Can you tell the Court what steps remain on that review?

18   A.    Right now, the review is in the --

19         MR. FALK:  Your Honor, I'm going to object.  The

20   policy speaks for itself, and what it may or may not be

21   changed to in the future is unknown and speculative at this

22   point.  The policy speaks for itself.

23         MS. DURHAM:  Your Honor, this is relevant as to DOC's

24   current treatment for transgender patients and ongoing

25   treatment for transgender patients.

BEDFORD - DIRECT/DURHAM

1          MR. FALK:  Your Honor, the policy specifically allows

2     for surgery.  That's what the policy says.  That's the policy

3     that is in effect today.  It's been in effect since the law

4     was passed a year ago.  It was, quote, unquote, under review

5     when we did Dr. Bedford's deposition back in the end of

6     November of 2023.  We can talk about it being under review,

7     but that's not relevant.  The policy today in the DOC -- which

8     is why this case is so remarkable.  The policy in effect today

9     for the DOC explicitly says -- and I will bring this out if

10    counsel doesn't -- in this policy, it explicitly says there

11    can be surgery, and there has been surgery.  Two DOC prisoners

12    have been approved for surgery.  That's the policy.  That's

13    what's relevant.

14          THE COURT:  Sustained.

15    BY MS. DURHAM:

16    Q.    Dr. Bedford, what treatment options does DOC make

17    available to transgender patients right now?

18    A.    Currently, psychotherapy, hormone replacement treatment

19    and that is -- that's all that's available under the law that

20    we can make available to our patients with gender dysphoria.

21    Q.    Does DOC offer gender neutral products from the

22    commissary that incarcerated individuals can purchase?

23    A.    Yes, we do.

24    Q.    Does DOC offer social transition assistance for

25    incarcerated individuals?

```
 1              MR. FALK:  Your Honor, again, this isn't relevant to

 2    whether Ms. Cordellioné has a medical necessary need for

 3    surgery.  We'll object on grounds of relevance.

 4              THE COURT:  Ms. Durham?

 5              MS. DURHAM:  Your Honor, this is relevant because it

 6    shows what the DOC can and is doing to treat individuals with

 7    gender dysphoria on a case-by-case basis.

 8              MR. FALK:  Your Honor, we're not concerned about

 9    individuals with gender dysphoria.  We're concerned with

10    Ms. Cordellioné.  She testified as to what she is being given

11    today.  That's what she's being given today.

12              THE COURT:  I'll allow it.  Overruled.

13    BY MS. DURHAM:

14    Q.   Dr. Bedford, you testified that a DOC makes hormones and

15    psychotherapy available to inmates with gender dysphoria; is

16    that correct?

17    A.   Yes.

18    Q.   Are there any other types of therapy that DOC makes

19    available?

20    A.   That's pretty much -- they're able to see the

21    psychiatrist.  They're able to see the qualified mental health

22    professional, and they're able to speak with our primary care

23    physician at the facilities.

24    Q.   Is there any time limit on how long individuals can

25    receive psychotherapy or hormone treatment from DOC?
```

1    A.    No, there's no time limit.

2    Q.    What about housing?  How does DOC make determinations on

3    that for patients with gender dysphoria?

4    A.    So during the Transgender Review Committee meetings,

5    that is discussed with our classifications officer and

6    recommendations are made with the team, with the committee,

7    and with the patient present through what would be the safest

8    and what would be in the best interest of the patient.  So

9    it's kind of like an individual type of situation case by

10   case.  So that is one of the main topics that is discussed at

11   that Transgender Review Committee.

12   Q.    So would it be fair to say that DOC evaluates

13   transgender patients for treatment on a case-by-case basis?

14   A.    Correct.

15   Q.    And that's based on input from mental health

16   professionals and other physicians?

17   A.    Yes.  Mental health professionals, primary care,

18   classifications, security, yes.

19   Q.    And does DOC policy direct affirmation of transgender

20   patients in their preferred gender?

21   A.    Can you repeat the question?

22   Q.    Sure.  Does DOC policy encourage affirmation of

23   transgender patients in their preferred gender?

24   A.    So -- well, they respect if a patient -- the patient's

25   pronouns.  So if a patient wants to be referred to as he, she,

1   or they, that is respected.  So we -- I would say in that

2   case, yes, we do.

3   Q.    And has that been true since July 1st, 2023?

4   A.    Yes.

5   Q.    Dr. Bedford, do you know what happens to incarcerated

6   individuals who have received DOC medical care after they're

7   released?

8   A.    Well, we do have a transitional health team set up

9   within DOC that assists patients when they are released with

10  follow-up appointments and medication.  We strive for

11  continuity of care.  So when the patient is released, we do

12  set up an appointment with them with a doctor on the outside,

13  and we make sure that they have medication until they are able

14  to be seen by that physician on the outside.

15  Q.    So after that appointment that you set up, do you have

16  any further contact with them, them being the incarcerated

17  individual?

18  A.    We don't unless they're -- unless they're on parole.

19  Q.    Do you know what medical care they receive after

20  release?

21  A.    We just know of the medical care that we set up for them

22  after release, but after that initial appointment with the

23  outside physician, we don't know.

24  Q.    So after that, are they responsible for obtaining their

25  own care?

1  A.    Yes.

2  Q.    And do they have to pay for it?

3  A.    Yes.

4  Q.    I want to move just from DOC policies generally into

5  some specifics real quickly about the plaintiff in this case.

6        Have you received the medical records of the

7  plaintiff in this case?

8  A.    Yes.

9  Q.    Are you aware that the plaintiff was diagnosed with

10 gender dysphoria in April of 2020?

11       MR. FALK:  Objection, leading.

12 A.    Yes.

13       MR. FALK:  If I could ask a preliminary question?

14       THE COURT:  You may.

15       MR. FALK:  Doctor, good afternoon.  During our

16 deposition, we established that you have never treated anyone

17 for -- who has gender dysphoria; is that correct?

18       THE WITNESS:  Correct.

19       MR. FALK:  And, in fact, in your total career, you

20 had one transgender patient, and you saw that patient for a

21 quick visit for an acute issue that had nothing to do with

22 their gender identity, correct?

23       THE WITNESS:  Correct.

24       MR. FALK:  Your Honor, I would object to the witness

25 talking at all about Ms. Cordellioné's conditions or drawing

1    any conclusions from them.  Her medical records are already in

2    evidence, Your Honor.  That's the best evidence.  Her talking

3    about what the medical records show add nothing.  She has no

4    expertise.  She hasn't been qualified as an expert.  Thank

5    you.

6              THE COURT:  Ms. Durham?

7              MS. DURHAM:  Your Honor, I only have a few questions

8    about this, but she's the chief medical officer for the

9    Department of Correction.  She's qualified to talk about the

10   medical conditions of the people she oversees.

11             THE COURT:  I'll allow it.  Goes to her weight.

12   BY MS. DURHAM:

13   Q.   After her diagnosis of gender dysphoria -- after the

14   plaintiff's diagnosis, Dr. Bedford, what treatments were made

15   available to the plaintiff?

16   A.   The plaintiff was offered hormone replacement therapy.

17   Q.   Were there any other treatments that were made

18   available?

19   A.   And psychotherapy.

20   Q.   Were there any other treatments that were made

21   available?

22   A.   Not that I am aware of.

23   Q.   Was the plaintiff permitted access to female canteen

24   products from the commissary?

25   A.   Yes.

1    Q.    And are DOC staff instructed to use the plaintiff's

2    preferred pronouns?

3    A.    Yes.

4    Q.    Dr. Bedford, in your opinion, has DOC adequately treated

5    the plaintiff's gender dysphoria?

6            MR. FALK:  Objection, Your Honor.  She knows nothing

7    about gender dysphoria.  I'm not criticizing the doctor at

8    all, but she doesn't have the expertise to render that

9    opinion.

10            THE COURT:  Overruled.  Goes to the weight.

11    BY MS. DURHAM:

12    Q.    You can answer, Dr. Bedford.

13    A.    According to current medical consensus, I do feel that

14    the patient is being treated adequately.

15    Q.    Thank you, Dr. Bedford.  I just have a couple more

16    questions for you.

17            When we talk about sex reassignment surgery, what

18    specific types of surgery are we talking about?

19            MR. FALK:  Your Honor, again, she has no expertise

20    whatsoever.

21            THE COURT:  Rephrase your question.

22    BY MS. DURHAM:

23    Q.    Dr. Bedford, are you familiar with surgery known as a

24    vaginoplasty?

25    A.    I'm familiar with it, yes.

BELFORD – DIRECT/DURHAM

1    Q.    Is it your understanding that a vaginoplasty creates a

2    vagina in a person who otherwise would not have one?

3    A.    Yes.

4    Q.    What are the circumstances when DOC would provide that

5    surgery to an incarcerated individual?

6    A.    Normally when there is a life-threatening diagnosis or

7    there is, I guess, for example, a patient that might have a

8    diagnosis of cancer, that if that was -- if surgery was an

9    option, we would definitely consider it.  Surgery is normally

10   not the first tool that we reach for when we are treating

11   patients.

12   Q.    Doctor, are you familiar with a procedure known as an

13   orchiectomy?

14   A.    Yes.

15   Q.    Is it your understanding that that procedure removes the

16   testicles of an incarcerated individual who would have it?

17   A.    Yes.

18   Q.    What are the circumstances where the Department of

19   Correction would provide that type of surgery to an

20   incarcerated individual?

21   A.    Again, an emergency situation such as a testicular

22   torsion or testicular cancer, that surgery would be an option.

23   Q.    And would DOC provide these surgeries to -- a

24   vaginoplasty and an orchiectomy to any individual who met

25   those criteria of need that you laid out?

1  A.   Yes.

2  Q.   Would DOC ever provide a surgery of that kind to an

3  individual absent a physical indication of disease or damaged

4  tissue?

5  A.   I would say no.  We -- again, surgery is pretty much

6  limited to extreme situations, life or death, cancer

7  situations, so -- but, again, it's really up to provider

8  discretion.

9       MS. DURHAM:  Thank you, Dr. Bedford.  That's all the

10 questions I have for you right now.

11      THE COURT:  Thank you.  Mr. Falk?

12      MR. FALK:  Thank you.

13                     **CROSS-EXAMINATION**

14 Q.   Hi, Doctor.

15 A.   Hi.

16 Q.   So you just indicated that the DOC will provide

17 vaginoplasty if it was medically necessary to do so; is that

18 correct?

19 A.   Well, I believe I said if there is a life threatening or

20 tissue pathology or cancer.

21 Q.   But if it's medically necessary, correct?

22      MS. DURHAM:  Objection, Your Honor.  That misstates

23 her testimony.

24 BY MR. FALK:

25 Q.   I'm asking a question.  You would provide it if it's

1    medically necessary; is that correct?

2    A.    I would -- we would provide it, again, under certain

3    circumstances if it was life threatening or if there was a

4    diagnosis of cancer, and so those -- those items are of

5    medical necessity.

6    Q.    Right.  And we've stipulated in this case, Doctor, and

7    you agreed during your deposition that the DOC provides

8    medically necessary medical care and medically necessary

9    surgery, correct?

10   A.    Correct.

11   Q.    Okay.  Good.  And we also talked in our deposition about

12   the fact that prior to the passing of the law that's at issue

13   in this case, the DOC approved two prisoners for medically

14   necessary gender-affirming surgery, correct?

15   A.    Correct.

16   Q.    And those were both transgender females who were

17   approved for orchiectomies and vaginoplasties; is that

18   correct?

19   A.    Can you repeat that?

20   Q.    Yeah.  Those were both two transgender female prisoners

21   who were approved for orchiectomies and vaginoplasties; is

22   that correct?

23   A.    Yes.  Correct.

24   Q.    And that was pursuant to the policy which was

25   introduced, which is Exhibit 5, the Health Care Services

1    Directive 2.17A; is that correct?

2    A.    Correct.

3    Q.    And that policy, which is still in effect, defines

4    gender dysphoria as "A condition in which an incongruence

5    between one's sex assigned at birth and one's gender identity

6    results in psychological distress."  Is that correct?

7    A.    Correct.

8    Q.    And, in fact, you agreed at page 100 of your deposition

9    that gender dysphoria can result in clinically significant

10   distress that causes severe anxiety, depression, self-harm,

11   and suicidality; is that correct?

12   A.    Yes.

13   Q.    And, in fact, page 1 of Exhibit 5, the Health Care

14   Services Directive, which remains in effect says, "Individuals

15   who experience gender dysphoria may pursue multiple domains of

16   gender affirmation which includes social, legal, medical,

17   and/or surgical interventions."  That's DOC policy, correct?

18   A.    Correct.

19   Q.    Okay.  And, in fact, at page 3 of Exhibit 5, the current

20   policy, it provides that the WPATH standards of care

21   "articulate a professional consensus about the psychiatric,

22   psychologist, medical, and surgical management of gender

23   dysphoria and help professionals understand the parameters

24   within which they may offer assistance to those with these

25   conditions"; is that correct?

1    A.    According to WPATH.

2    Q.    Well, according to -- I'm talking about the policy.

3    That's what your policy says currently, correct?

4    A.    Yes.  Correct.

5    Q.    And we've stipulated in stipulation number seven that

6    WPATH recognizes, quote, surgical interventions designed to

7    align primary and secondary sex characteristics with person's

8    gender identity.  You are aware of that agreement, correct?

9    A.    Yes.

10    Q.    Okay.  And at page 36 of your deposition, I'd asked you

11    that the PATH standards recognize that there are situations

12    where persons with gender dysphoria may benefit from medical

13    and/or surgical intervention; is that correct?

14            Answer:  Yes.

15            Question:  And the DOC recognizes the WPATH

16    standards, correct?

17            Answer:  Yes.

18            Do you remember that?

19    A.    Yes.

20    Q.    And that's correct, isn't it?  That is your testimony,

21    correct?

22    A.    Yes, yes.

23    Q.    Okay.  And then I also asked you in your deposition are

24    you aware of any correctional medical setting that does not

25    comply with or does not follow the WPATH standards for

1    treatment of transgender prisoners?  And the answer was no.

2    Do you remember that?

3    A.    Yes.

4    Q.    And you testified truthfully, correct?

5    A.    Yes.

6    Q.    And you discussed in your direct testimony that there's

7    a gender dysphoria committee which discusses medical options

8    for gender dysphoric transgender prisoners, correct?

9    A.    Yes.

10   Q.    And this is the current policy, and the current policy

11   provides -- and this is at page 6, but I'm sure you know the

12   policy -- provides for psychotherapy, social change in gender

13   expression, hormones, and gender affirmation therapy.  That's

14   what the policy currently says, correct?

15         Do you want me to bring it up?  I can bring it up.  I

16   can't bring it up.  I have no competence to bring it up, but

17   there's someone in this courtroom who probably could.

18   A.    Those are options.

19   Q.    Okay.  And, in fact --

20   A.    Those are all options.

21   Q.    -- under gender-affirmation surgery on page 6 of

22   Exhibit 5, it says, "Although individuals may live

23   successfully as transgender persons without surgery,

24   gender-affirming surgery, if medically necessary to alleviate

25   gender dysphoria, may be appropriate for some.  The Gender

1    Dysphoria Review Committee shall follow WPATH standards of

2    care and consider on a case-by-case basis."  And this is

3    current DOC policy, correct?

4    A.    Correct.

5    Q.    And I asked you at page 43 of your deposition, At least

6    prior to the time of the statute, the DOC recognized that

7    gender-affirming surgery could be medically necessary on a

8    case-by-case basis.

9          Answer:  Yes.

10         Do you remember that?

11   A.    Yes.

12   Q.    Yes?  I'm sorry?

13   A.    Yes.

14   Q.    Okay.  I'm sorry.  And that was truthful, of course,

15   correct?

16   A.    Yes.

17   Q.    And in your deposition, you also indicated that DOC

18   stood by its policies and follows PATH.  At page 53 I asked at

19   line 6:  Okay.  And you agree looking at Exhibit 5, the

20   policy, that the PATH standards are utilized by the DOC,

21   correct?

22         Correct.

23         And you agree the policy indicates -- and I read what

24   it said about PATH -- you don't -- and I said at the end, you

25   don't disagree with that policy, do you?  And you said, I

BISARD - CROSS/FALK

1    stand by our DOC policy, correct?

2    A.    Yes.

3    Q.    And, in fact, during our deposition, we talked about

4    Exhibit 7, which are the standards -- position statements of

5    the National Commission on Correctional Health Care.  Do you

6    remember our discussion on those standards?

7    A.    Yes.

8    Q.    And I think just to get through this, we'll say NCCHC.

9    And I asked you if the DOC complied with National Commission

10   standards at page 70 of your deposition.  My question was, And

11   the DOC has indicated and you've indicated that you comply

12   with the National Commission on Correctional Health Care

13   Standards, correct?

14              Answer:  Correct.

15              Do you remember that?

16   A.    Yes.

17   Q.    And, in fact, we've been talking all along about DOC

18   providers, but there aren't DOC providers.  Currently they're

19   provided by Centurion who is your medical health care

20   contractor, correct?

21   A.    Yes.

22   Q.    And in your position as a chief medical officer, you

23   supervise the contract, correct?

24   A.    Yes.

25   Q.    And the contract, which I have a copy of, is very long,

1   but at some point in it, I noticed that -- and I asked you

2   about this.  Under the contract, the medical provider has to

3   file these National Commission on Correctional Health Care

4   Standards; is that correct?

5   A.    Yes.

6   Q.    That's part of the contract.  And, in fact, Exhibit 7,

7   at page 10 of this NCCHC standards says, "Evaluations to

8   determine the medical necessity of gender-affirming surgical

9   procedures will be performed on a case-by-case basis applying

10  a careful risk benefit and alternative analysis.

11  Gender-affirming procedures will be provided when determined

12  to be medically necessary for a patient according to accepted

13  medical standard."

14         And you recognize that's what the National Commission

15  Standards say, correct?

16  A.    Yes.

17  Q.    And in your deposition, I asked you at page 37, And this

18  is a policy statement the DOC abides by; is that correct?  And

19  you answered yes.  Correct?

20  A.    Yes.

21  Q.    And, in fact, you indicated during our deposition that

22  to prepare for it, you reviewed a PowerPoint that you had --

23  at a conference you had gone to that had been put on by a

24  subsidiary of the National Commission on Correctional Health

25  Care.  Do you remember that conversation?

BEDHARD - CROSS/FALK

1  A.    Yes.

2  Q.    And I didn't review the PowerPoint, but you said that

3  the PowerPoint recognized gender-affirming surgery for

4  prisoners could be medically necessary on a case-by-case

5  basis; is that correct?

6          MS. DURHAM:  Your Honor, I'd object.  (Inaudible.)

7          THE COURT:  You're going to have to speak up.

8          MS. DURHAM:  Your Honor, I object.  We've established

9  what DOC policy is (inaudible).

10          THE REPORTER:  I'm sorry.  I still can't hear you.

11  Can you turn on your microphone?

12          MS. DURHAM:  We've established what DOC policy is and

13  this is getting repetitive.  That's my objection.

14          MR. FALK:  My question was on a separate PowerPoint

15  that she'd reviewed, but that was my last question on this,

16  Your Honor.

17          THE COURT:  Overruled.

18  BY MR. FALK:

19  Q.    And as we established at the beginning of your

20  testimony, there have been two prisoners who have been

21  approved for medically necessary gender-affirming surgery by

22  the Department of Correction going through the procedures that

23  are outlined in Exhibit 5; is that correct?

24  A.    Correct.

25  Q.    And it's my understanding -- again, we're talking about

1    DOC performing surgery -- the DOC and its medical provider

2    does not perform the surgery.  Gender-affirming surgery is

3    performed by an outside surgeon generally at Eskenazi Hospital

4    at Indianapolis; is that correct?

5    A.    Yes.

6    Q.    So the DOC process, going through the DOC employees and

7    the contractor, is to say we give our thumbs up for this

8    person, and then the person is reviewed -- the person is sent

9    to the surgeon who then talks to the patient and makes

10   decisions as to surgery based on his or her schedule and going

11   through the informed consent process and everything surgeons

12   do; is that correct?

13   A.    Yes.

14          MR. FALK:  I have no further questions, Your Honor.

15          THE COURT:  Anything further of this witness,

16   Ms. Durham?

17          MS. DURHAM:  Just a couple of questions.

18          THE COURT:  Sure.

19                      **REDIRECT EXAMINATION**

20   Q.    Hello, Dr. Bedford.  Can you hear me?

21   A.    Hello.  Yes.

22   Q.    Dr. Bedford, counsel for the plaintiff asked you about

23   past DOC offenders who had been approved for sex reassignment

24   surgery.  Do you remember that?

25   A.    Yes.

*BEDFORD - REDIRECT/DURHAM*

1    Q.    To your knowledge, were there approvals for sex

2    reassignment surgery given pursuant to litigation?

3              THE COURT:   I didn't hear the --

4    BY MS. DURHAM:

5    Q.    To your knowledge, were those approvals for surgery

6    given pursuant to litigation?

7    A.    I'm not sure what you mean.

8    Q.    Were there lawsuits regarding those incarcerated

9    individuals' eligibility for surgery?

10   A.    I don't believe so.

11   Q.    Dr. Bedford, we talked a lot about current DOC policy,

12   specifically with regard to the WPATH standards.  Is DOC

13   reconsidering its policy with regard to that specific element?

14             MR. FALK:   Again, Your Honor, I'm going to object to

15   what DOC may or may not be reconsidering, especially since

16   this law has been in effect a year, Your Honor.  It went into

17   effect July 1st, but it was passed, I believe, in --

18             THE COURT:   Sustained.

19             MR. FALK:   -- March or April.

20             THE COURT:   Sustained.

21   BY MS. DURHAM:

22   Q.    Dr. Bedford, does the Indiana Department of Corrections

23   follow the law?

24   A.    Yes.

25             MS. DURHAM:   Thank you.  That's all my questions.

 1              THE COURT:  Mr. Falk?

 2              MR. FALK:  Nothing further, Your Honor.  Thank you.

 3              THE COURT:  Doctor, thank you very much for your

 4    testimony.  You're free to resume your day.

 5              THE WITNESS:  Thank you very much.

 6         *(Witness excused.)*

 7              MR. FALK:  Your Honor, as an officer of the Court, I

 8    do believe that one of the two prisoners whose surgery was

 9    approved was pursuant to litigation; although, I think the

10    litigation ended before the formal approval, but the second --

11    I do not believe the second one was.  I didn't want to leave

12    that out there.  I apologize.  There is no Court Order

13    ordering surgery.

14              THE COURT:  Sure.  Okay.  All right.  Okay.  We've

15    been going quite some time.  What's left here?  Do we

16    want to --

17              MR. CARLISLE:  We've got Dr. Levine, Your Honor.  I

18    expect him to take some time.

19              THE COURT:  Okay.  All right.  Gavin?

20              MR. ROSE:  Judge, we're all in favor of going

21    straight through, but before we call him, I was going to ask

22    for a quick five or ten minute break.

23              THE COURT:  Why don't we take -- I've got a court

24    reporter here and other staff that are entitled to a little

25    break.  I know we all like to push forward on these things.

1  Many times time gets away from me and all of a sudden we've

2  been sitting here three hours and -- so why don't we take --

3  that clock is wrong.  It's still on wintertime.  It's quarter

4  to 2:00.  So why don't we come back, oh, 2:30, 2:40, something

5  like that.  Grab a bite to eat and relax a little bit.  I

6  think it's a pretty nice day outside.  Get some fresh air.

7  We'll go from there.

8            MR. ROSE:  Thank you.

9            MR. CARLISLE:  Thank you, Judge.

10           THE CLERK:  All rise.  Court is in recess.

11       *(Recess taken 1:41 p.m. to 2:48 p.m.)*

12           THE CLERK:  All rise.  Court is in session.  Please

13  be seated.

14           THE COURT:  All right.  Well, we're back from our

15  lunch break and ready to continue on.

16           Mr. Carlisle, call your next witness.

17           MR. CARLISLE:  The defendant calls Dr. Stephen

18  Levine.

19           MR. ROSE:  Judge, before Dr. Levine is sworn in, we

20  have obviously filed a *Daubert* motion that I understand the

21  Court is taking under advisement.  I don't plan on jumping up

22  and down, but for the sake of a clean record, we will state a

23  continuing objection to his testimony based on the reasons in

24  our *Daubert* motion.

25           THE COURT:  Very good.

1      **STEPHEN LEVINE, M.D., DEFENDANT'S WITNESS, SWORN**

2                    **DIRECT EXAMINATION**

3    BY MR. CARLISLE:

4    Q.    Good afternoon, Dr. Levine.  How are you?

5    A.    Fine.  Thank you.

6    Q.    Can you hear me okay?

7    A.    I can.

8    Q.    All right.  Doctor, I want to start by discussing your

9    qualifications.  You'll recall that we submitted your CV in

10   this case as Exhibit 31, correct?

11   A.    Yes.

12   Q.    All right.  You are a licensed clinical psychiatrist?

13   A.    Yes.

14   Q.    And do you have an M.D.?

15   A.    M.D.

16   Q.    When did you receive that M.D.?

17   A.    1967.

18   Q.    And how long have you been practicing in psychiatry?

19   A.    I began my residence in 1970.  I finished my residency

20   three years later.  So if we don't count residency, 50 years.

21   Q.    You understand that the plaintiff has challenged your

22   qualifications to opine as to the complications, risks, and

23   long-term outcomes of sexual reassignment surgery?

24   A.    I understand that, yes.

25   Q.    And do you understand that the plaintiff is not

1   challenging your qualifications to opine as to the mental

2   health treatment of gender dysphoric individuals?

3   A.    Yes.

4   Q.    Doctor, how many gender dysphoric patients have you

5   evaluated, diagnosed, treated in your career?

6   A.    Well, I began seeing transgender patients one month

7   after I finished my residency.  I started a transgender or

8   gender identity clinic within five months, and I have been

9   continuously involved with patients who are thinking about

10  their atypical gender identities and what to do about them

11  since that time.

12         Probably in -- beginning about 1980, we began keeping

13  track of the patients we saw at that clinic, and we -- between

14  1979 and 1980, we accumulated 315 patients, but I -- we moved

15  our gender identity clinic, and we continued to see patients

16  at a different location, and I'm continuing to see patients.

17         In 2007, I was hired by the Massachusetts Department

18  of Corrections to be a consultant to the treatment of

19  transgender prisoners in their various prisons, and I have

20  continuously been the consultant there, and I would say over

21  the course of the 17 years in that role, I must have been

22  involved with the consideration of at least 200, if not, 300

23  additional prisoners with trans identities.

24  Q.    And, Dr. Levine, of the hundreds of patients with gender

25  dysphoria you just described, some of them have expressed a

LEVINE DIRECT/CARLISLE

1   desire for a sexual reassignment surgery to you, correct?

2   A.    Yes.  People often have fantasies of having a complete

3   what they call sex change and -- but there is some people who

4   I've seen who just wanted something short of sex reassignment

5   surgery.  Genital confirming surgery.  The term sex

6   reassignment surgery, that's an old term.  The more modern

7   term is gender conforming or confirming surgery.

8   Q.    Okay.  And do you understand when I say surgery or

9   sexual reassignment surgery, I'm referring to

10  gender-confirming surgery as if they were the same?

11  A.    I presume that since we're talking about a biologic male

12  issue that we're only talking about surgery for males.

13  Q.    Okay.  How many of the hundreds of patients would you

14  say have expressed a desire for some type of surgery?

15  A.    I'm sorry.  Did you ask what percentage?

16  Q.    How many would you estimate?

17  A.    Well, if we can assume just 500 patients, at one time or

18  another, most all of them have said that they are thinking

19  about it.  They're not sure they want it.  They're thinking

20  about it.  And even some of the prisoners who told us in the

21  beginning of our contact with them that they weren't

22  interested in surgery, some of them two years later, three

23  years later expressed an interest in it.  So I kind of think

24  that when one is transgender, one thinks about that.  Whether

25  one, you know, forcefully insists upon it, drives themselves

*LEVINE - DIRECT/CARLISLE*

127

1    towards it, is another story.

2    Q.    Doctor, when a patient you are seeing expresses a desire

3    for surgery, what is your role in that?

4    A.    Well, I -- my role generally is a psychiatric

5    evaluation, take a developmental history, and in particular

6    about what is the motivation for wanting surgery at this point

7    and how has that changed.  I'm looking for the predisposing

8    factors to the wish for surgery and the precipitating factors

9    and the factors that maintain the wish to have sex

10    reassignment surgery.

11          So I can't do this in a setting at one meeting.  This

12    is a process that happens within a relationship over time, and

13    so I really don't believe anyone could do a comprehensive

14    psychiatric evaluation in a short period of time.

15    Q.    Of course.  When a patient expresses a desire for

16    surgery, do you have any role in informed consent for that

17    patient?

18    A.    Well, informed consent is a huge ethical issue.  Someone

19    has to have the mental competence to understand.  Lay people

20    often do not understand medical diseases, medical

21    complications, and so these things have to be explained in lay

22    language and the patient has to be made sophisticated about

23    different types of complications and different eras of --

24    different complications that show up at different eras after

25    surgery.

*LEVINE* - *DIRECT/CARLISLE*

1    So ideally the process informed consent, like the

2  process of psychiatric evaluation, it's not a one time thing,

3  and it's certainly not checking lists on a form.  It requires

4  someone having the mental competence and the motivation to --

5  the mental competence to understand and the motivation to

6  understand the risks for benefits, and the risks at various

7  stages in the process of the postsurgical era.

8    So rushing people into surgery or having them sign a

9  form or having knowledge -- you know, being able to parrot

10 back what the major complications are, it's not exactly

11 informed consent.

12 Q.   So, Doctor, if I understand you correctly, your role as

13 a psychiatrist when a patient expresses a desire for surgery

14 is in part to ensure that patient has informed consent; is

15 that accurate?

16 A.   Yes.  And the subsections of that concept is that they

17 have the mental capacity, the intellectual capacity, and they

18 have -- they have the patience to consider what they hope for,

19 the list of the benefits that they're hoping for and -- and

20 the consequences at various time periods, like, you know, the

21 postoperative period, after three months, after a year, after

22 ten years, five years, and so forth.

23 Q.   Okay.  And in order to ensure your patients have

24 informed consent as to surgery, have you become versed in the

25 complications, risks, long-term data as to surgery?

1    A.    I think I have, yes.

2    Q.    So would you agree that your experience in this field

3    has given you special knowledge regarding complications and

4    risks of sexual reassignment surgery?

5             MR. ROSE:  I'll object just to the leading nature of

6    these questions, Judge.

7             THE COURT:  I didn't hear that.

8             MR. ROSE:  Objection, leading.

9             THE COURT:  Rephrase.

10   BY MR. CARLISLE:

11   Q.    Do you have -- would you describe yourself as having

12   specialized knowledge regarding the complications and risks of

13   surgery?

14   A.    I would describe myself in that way, yes.

15   Q.    And can you tell the Court about how you obtained that

16   knowledge about sexual reassignment or gender-confirming

17   surgery?

18   A.    Well, as I've been involved with the field since almost

19   the beginning of the field, I attended meetings of the Harry

20   Benjamin Gender Dysphoria Association.  That was the early

21   name for what is today WPATH.  I've been reading the

22   literature since that time in the early '70s.  I've been

23   presenting at these -- at conferences, and that's been a

24   continuous process in my academic specialty in human sexuality

25   in particular in this branch of human sexuality.  And in order

*LEVINE - DIRECT/CARLISLE*

1  -- in 2016 and 2022, I wrote papers on the informed consent

2  process.  And in order to write those papers, I've had to read

3  the literature and be somewhat -- somewhat conversant with

4  what is going on in the published field.  I've also attended,

5  you know, conferences listening to surgeons talk.

6           So, you know, it's hard for me to answer that in an

7  explicit way because there's so many different facets of my

8  involvement that have kept me mindful.  After all, if someone

9  wanted to have surgery and I had to help them understand the

10  informed consent process, I had to -- I had to teach them what

11  I knew about the limitations of knowledge in this area.  And

12  they needed to understand the limitations of knowledge and to

13  contrast -- in psychotherapy and these psychotherapeutic

14  conversations, they had to contrast their hope for benefits

15  with what the field knows.

16           Many people think they're going to be cured of their

17  gender dysphoria, and they're going to live happily ever

18  after, and I need to create a much more realistic sense about

19  what we know and what we don't know.

20           In fact, anyone who is providing an informed consent

21  is obligated to not only talk about what is known and what is

22  not known but what the doctor himself or herself believes.  So

23  there are three things, what the doctor believes, what is

24  known scientifically, and what is not known scientifically.

25  Those are the aspects of the informed consent.

1    Q.    And to summarize, it is your role as the psychiatrist

2    treating people with gender dysphoria who express a desire for

3    surgery, that they are aware of all these things you just

4    described?

5    A.    Yes.  That's my job.  That's the ethical job of the --

6    of the person who is involved in care of these patients.

7    Q.    Very good.  Now, to be sure you're not claiming a

8    specialized knowledge in all general areas of surgery,

9    correct?

10   A.    Well, I'm a physician and, you know, if I'm going to

11   send somebody -- if someone wants to have a different kind of

12   surgery and I have any knowledge about that, I will share the

13   knowledge that I have about that, but I'm not -- I have no --

14   if you would be willing to consider me a specialist, I am a

15   specialist only in the direction -- only in the arena of the

16   literature of the surgical outcomes.

17   Q.    Okay.  Now, is it accurate to say that you have ever

18   recommended patients for sexual reassignment surgery?

19   A.    Well, I've long made a distinction since I didn't know

20   what the outcome of sex reassignment surgery was ever going to

21   be -- I didn't know it in the '70s.  I didn't know it in the

22   '80s.  I don't know it today for any individual patient.  So

23   what I do is -- and what I have my staff do is create certain

24   requirements.  Like, we discuss this for a number of times in

25   psychotherapy, and then if the patient -- if the patient is

 1    the age of majority and we think the patient has reasonable

 2    cognizant capacities and is not driven by some intense

 3    psychiatric issue other than identity, then what we do is not

 4    recommend surgery, is we write a letter to the surgeon

 5    explaining our relationship to the person, what we have done

 6    with the person, what we know about the person's current life

 7    and background, and we say the patient wants to have sex

 8    reassignment surgery, and we're not standing in the way of

 9    that at all.

10            I don't consider that a recommendation.  I consider

11    that sort of telling the surgeon what I've done and letting

12    the surgeon make the final decision whether it's ethically

13    appropriate in his or her view to perform sex reassignment

14    surgery.

15    Q.    All right.  Thank you, Doctor.

16            Now, Doctor, you have in front of you two binders of

17    exhibits, correct?

18    A.    I do.

19            MR. FALK:  And I'll represent to the Court those are

20    the same exhibits we have submitted today.

21    BY MR. FALK:

22    Q.    And your expert report in this case has been marked as

23    Exhibit 32, correct?

24    A.    Yes.

25            MR. CARLISLE:  Brad, if you could put up that on the

1   screen.

2   BY MR. CARLISLE:

3   Q.    Is this a true and accurate copy of your report?

4   A.    Yes, it is.

5   Q.    Okay.  And while you're in front of the judge, do you

6   swear or affirm that the testimony in that report is true?

7   A.    Yes.

8   Q.    Okay.  Let's talk about your literature review methods

9   that you took to write this report.  Can you describe your

10  literature review methods to the Court?

11  A.    I use PubMed, which is -- which is a database run by the

12  government, National Library of Medicine.  It generally

13  contains most high-level journals on every subject in medicine

14  and surgery.  And I re- -- I just looked up male to female

15  surgery, vaginoplasty, and it comes up about 11,000 articles.

16         So what I looked at is the articles in the last five

17  -- I would say since 2015, occasionally earlier.  But you need

18  to understand, I've been acquainted with this literature and

19  its evolution since the early '70s.  But for this particular

20  case, I used PubMed and looked at journal articles on that

21  topic that had anything to do with measuring the outcomes of

22  the genital surgery.

23  Q.    Okay.  So if I'm understanding you, your expert report,

24  Exhibit 32 in this case, you base that on your past experience

25  since the 1970s in this field and on your recent literature

1    review search for, let's say, more recent articles; is that

2    accurate?

3    A.    That's accurate.

4    Q.    And when you search for articles on PubMed, do you use

5    search terms?

6    A.    Yes.  That's how we do it.

7    Q.    And what are you searching for?

8    A.    Male to female genital -- male to female transgender

9    surgery, gender-conforming surgery, but I'm trying to restrict

10   it to biologic males who are trans females.  So in particular,

11   I'm researching vaginoplasty or sometimes orchiectomy comes

12   up, you know, without -- just plain orchiectomy, but generally

13   speaking, most of the articles are about what is known as

14   vaginoplasty.

15   Q.    Okay.  And how do you determine which studies to read?

16   A.    Whatever is there.  Whatever is there recent.  And it's

17   not simply about some other kind of surgery or it's not just

18   about how to do the surgery.  I'm not interested.  I don't --

19   I mean, I've looked at the pictures and the descriptions of

20   how to do the surgery.  I have no expertise in the actual

21   surgical operation, nor interest in the details of that.  I'm

22   only interested in the complication rates and whether the

23   benefits that are hoped for or the benefits that are often

24   claimed by the surgeons have been objectively verifiable and

25   what are the limitations of those studies.

LEVINE - DIRECT/CARLISLE

1   Q.    Okay.  And so is it accurate to say you do not

2   discriminate when you review the literature?

3   A.    I don't -- well, of course, I have done discrimination.

4   Q.    Based on -- let me clarify that.  Based on your previous

5   statement that you just read anything that seems responsive.

6   You don't discriminate in that sense.

7   A.    Right.  I don't just read the articles that would

8   confirm to a previous impression I may have.  I'm reading the

9   literature as a student.  I'm reading the literature to inform

10  myself about how it is that we're -- when we say something is

11  safe, what do we mean by safe?  Safe in terms of what?  And

12  when we say it's effective, I ask myself what is the evidence

13  in this study that it's effective?  What is it -- what is

14  being measured as an indication of effectiveness.  Since the

15  whole idea of gender-conforming surgery is to ameliorate a

16  genital dysphoria, but ultimately gender dysphoria.  I'm

17  asking myself -- I'm reading discriminatingly what is the

18  evidence -- what is the nature of the evidence that bears on

19  the fact that this is helping genital dysphoria and what is

20  the evidence that it's helping gender dysphoria.

21        Is the Court clear about the distinctions between

22  those two terms?

23  Q.    Well, I cannot speak for the Court, Doctor, but we will

24  get into that part of your report later.

25        Over the years, can you provide an estimate of how

1  many studies about the complications and risks of sexual

2  reassignment surgery you've read?

3  A.    Well, again, you're asking me to estimate.  So I would

4  say over the course of 50 years, probably 100 studies.

5  Q.    Okay.  Would other -- excuse me.  Would other experts in

6  this field rely on the same type of studies that you reviewed

7  and cited in your report?

8  A.    I would hope so.  Even the studies that I quoted often

9  are very positive in their conclusions that are in the

10  abstract of the study.  But if you look at their limitation

11  section where -- and sometimes the discussion section, you can

12  see that there -- that even the authors of the study are aware

13  of the limitations of their conclusions.  There's this strange

14  phenomenon that goes on in this field where the title of the

15  article or the conclusions of the article are very positive

16  but the discussion in the data are not nearly as positive as

17  the conclusions, and so that's why I think that anyone reading

18  this study, whether they're, you know, skeptical or an

19  advocate of sex reassignment surgery for everyone, once -- I

20  think everyone should be looking at the same -- look at the

21  same information and have a certain caution about it because

22  the authors themselves sometimes are aware of the limitations

23  of their study and certainly the review articles, that is the

24  surgical teams that -- that review ten studies --

25             MR. ROSE:  Your Honor, I'm going to object.  There's

1  no longer a question pending before the witness, and I would

2  very much like to not be here all week.

3        THE COURT:  Sustained.

4  BY MR. CARLISLE:

5  Q.    Do you understand that the plaintiff alleged that you

6  cherry-picked studies to include in your report?

7  A.    I don't think that's correct.  Cherry picking really is

8  an informal term for confirmation bias, that they only -- that

9  I only find studies that -- that share my view of caution

10 when, in fact, even the studies that other people -- that I

11 didn't cite, they also have limitation sections, and they also

12 have this kind of positive conclusion and sort of leave out

13 the long-term complication rates --

14        MR. ROSE:  Judge, I'm going to object --

15 A.    -- especially they leave out --

16        MR. ROSE:  -- to the extent --

17 A.    -- the lack of information about the --

18 Q.    One second, Doctor.  There's an objection.

19        MR. ROSE:  I'm sorry.  Judge, I'm going to object to

20 the extent that the doctor is starting to testify about

21 reports that in his own admission are not in his expert

22 report.  The law, as I said, is quite clear that he has to

23 disclose everything he wants to talk about.

24        THE COURT:  Sustained.

25 BY MR. CARLISLE:

1   Q.    Doctor, how did you decide which studies to cite in your

2   report?

3   A.    The ones that I found -- the ones that I found that were

4   relevant to the question of the outcome, either the

5   psychosocial outcome, the emotional outcome or the physical

6   outcomes of genital surgery.

7   Q.    All right.  Thank you, Doctor.

8         Do you -- would you agree that you fairly and

9   accurately quoted the literature in your report?

10  A.    Yes.

11  Q.    Doctor, you understand that the plaintiff has claimed

12  you miscited some of the studies you reviewed.

13  A.    Well, I don't claim to be perfect, but I was unaware

14  that I misquoted studies.  Oftentimes people take a fact and

15  they spin it in one direction or another.  That's not the same

16  as misquoting.

17  Q.    So do you disagree with the allegation that you miscited

18  some of the studies you reviewed?

19  A.    Yes, I disagree.

20  Q.    And are you aware of the particular studies the

21  plaintiff points out being the following, Almazan, Heylens,

22  Cardosa da Silva, Littman, and Dhejne?

23  A.    Yes, I'm aware of those studies and that they claim that

24  I misunderstood them or misquoted them.

25  Q.    And have you reviewed the defendant's response in

1    opposition to the plaintiff's motion to partially exclude your

2    testimony?

3    A.    I did.

4    Q.    And in the section where the defendant responds to those

5    allegations as to those specific studies, is there anything

6    you want to add or clarify about the defendant's discussion of

7    those studies?

8    A.    Actually, I can't recall the specific things that they

9    say I misquoted.  I certainly have reread those studies

10   recently and -- but I didn't reread them in an attempt to

11   refute whatever they said about me.  I know when I -- I mean,

12   it sounded like reading them that I was this stupid man and --

13   and evil man, and, you know, it was hard -- it was hard to pay

14   attention to the various many, many criticisms they had of my

15   being.

16   Q.    Well, let me ask you this, Doctor.  After rereading

17   those studies that we just mentioned, are you of the opinion

18   that those studies support the propositions for which you

19   cited them in your expert report?

20   A.    Absolutely.  We can take them one by one if you'd like.

21   I'd be happy to talk about them.

22   Q.    Sure.  Let's start with Alamazan.

23   A.    Okay.

24   Q.    Is Almazan, the way you cited it, consistent with the

25   study?

1    A.    Well, number one, the Almazan study is one of a series

2    of studies that has been based upon --

3            MR. ROSE:  Objection, Your Honor.  That was a yes or

4    no question.

5    BY MR. CARLISLE:

6    Q.    Yes or no, Doctor.  Is that consistent with how you

7    cited it?

8    A.    Yes.

9    Q.    And can you explain to the Court why that is?

10   A.    Well, I'm aware of the limitations of the database that

11   upon this study was made, and I was also aware of the

12   contradictions in the findings.  I think when you think about

13   Almazan and other studies that you use this database, you need

14   to understand the best sample.  You need to understand that

15   other people have -- not Levine.  Other people have looked at

16   this and have said this is not -- this is not a really -- the

17   basis of any scientific conclusion.

18           And so if we wanted to talk about just the

19   conclusion, you know, the -- these two -- these two authors,

20   if you read the article, while making a strong fervent pitch

21   to increase access to surgical care, and they feel like they

22   have proved, based on their study, the efficacy of this, and

23   if you look at the data, the data don't prove the efficacy at

24   all and -- for example, there's less suicidal ideations in the

25   last year but there was more suicide attempts in the last

1    year.  And you go and try to put those two things together,

2    you see?

3            And when they looked at the improved -- improvements

4    in the sample -- included in one of the charts here that they

5    have -- among the -- so there are figures that -- comparing

6    the mental health among respondents who did and did not

7    undergo genital surgery.  Even among the people who underwent

8    genital surgery, there was 22 percent of people who had severe

9    distress, and there was 28 percent or 25 percent of people

10   that passed -- past month binge drinking and -- and about the

11   same percentage were still smoking and past year suicidal

12   ideations of people who had surgery was closer to 33 percent,

13   and -- and there was twice -- almost two and a half times the

14   number of suicides in people who had surgery.  But that's not

15   -- that's the conclusion that the authors are making.  They're

16   showing that people looking back --

17           MR. ROSE:  Judge, there's no longer a question

18   pending before the witness.

19   BY MR. CARLISLE:

20   Q.    Okay.  So, Dr. Levine, is the way you describe that

21   study indicative of how you went about reading these studies?

22   In other words, did you focus on more than the conclusions?

23   Did you look at all the data and the findings of the studies?

24   A.    But that's -- yes, I'm looking at the data itself, and

25   I'm looking at the -- the author's awareness of the

1    limitations of the study.  Even the authors admit that this is

2    a nonrepresentative sample and -- and the authors admit that

3    this is a correlation study and any -- any basic student of

4    science knows that correlation cannot be equated with

5    causation.  You see?  But this is a correlation study.  They

6    are making conclusions of one thing causes the other.  They're

7    not justified in doing that by any scientific parameter used.

8    Q.    Okay.  All right.  Doctor, let's move on to one final

9    area of your qualifications and methodology.  Do you

10   understand that the plaintiff has claimed that you have

11   generalized as to prisoners' abilities to provide informed

12   consent?

13   A.    Yes.  I'm saying they can't --

14   Q.    One second.

15   A.    It's not --

16   Q.    One second, Doctor.  Let me ask a follow-up question.

17   So what informs your opinions regarding the transgender prison

18   population?

19   A.    Well, number one, I've worked with the transgender

20   prison population for 17 years, and I -- and I think anybody

21   who has extensive experience with prison inmates, transgender

22   or not, understands that they do not trust the DOC and their

23   representatives, and they're very careful what they say and

24   what they don't say.  Many of them in the trans world have

25   horrendous developmental backgrounds.  This particular person

1    has -- it's hard to even put into words how terrible this

2    boy's --

3           MR. ROSE:   Objection, Your Honor.   We're well beyond

4    the question again.

5    BY MR. CARLISLE:

6    Q.    Dr. Levine, you -- this particular person you mentioned,

7    you're talking about the plaintiff?

8    A.    I'm talking about the plaintiff.   But I -- but you asked

9    me in general about -- about prisoners.   And what I'm saying

10   is that in my extensive experience, over 17 years with trans

11   people, trans prisoners, inmates, I think my opinion about

12   that is really based on the opinion of everyone that I've

13   worked with about this and everyone who has written about

14   this.   It's -- it's that -- they're not necessarily highly

15   educated.   They -- they want this intensely sometimes and --

16   and they're not -- they don't tell the truth about their

17   histories.   Their pre-prison histories are generally not

18   documented -- documentable, and it's a matter of trust.   And

19   so intellectually, we need to -- we need to ask ourselves

20   whether they have the capacity to understand, and if they do

21   have the capacity to understand, we have to -- we have to ask

22   ourselves, what say about the complication rates?   For

23   example, I don't -- I've had --

24   Q.    Doctor, so if I could clarify your opinions regarding

25   the transgender population as expressed in your report are

*LEVINE - DIRECT/CARLISLE*

144

 1    based on your 17 year experience with the trans prison

 2    population, and it sounds like your review of other studies

 3    regarding this particular population; is that accurate?

 4    A.    Yes.

 5            MR. CARLISLE:  Your Honor, at this time the defendant

 6    offers Stephen Levine as an expert in the field of transgender

 7    medicine and moves the Court to find him qualified to testify

 8    as to all opinions in his report, Exhibit 32, including

 9    opinions related to the risk, complications, and long-term

10    harms and benefits of sexual reassignment surgery.

11            THE COURT:  Mr. Rose?

12            MR. ROSE:  As I say, Judge, we stand by a *Daubert*

13    motion.  We'll file a reply brief in a timely fashion.  It's

14    our understanding that the Court will take the issue under

15    advisement.

16            THE COURT:  Continue under advisement.

17            MR. CARLISLE:  Thank you, Your Honor.

18            Brad, if you could put -- go to paragraph 1 of

19    Dr. Levine's report, please, Exhibit 32.

20    BY MR. CARLISLE:

21    Q.    Dr. Levine, in paragraph 1 of your report you opine that

22    there is significant debate within the medical community,

23    based on existing evidence, whether these desired effects of

24    sexual reassignment surgery on gender dysphoria, mental

25    health, and social-vocational function are often realized; is

1    that correct?

2    A.    That's correct.

3    Q.    And if you look at the following paragraph, paragraph 2,

4    you opine that the rate, degree, and duration of long-term

5    harms and benefits remain uncertain after 50 years of genital

6    surgery on trans women; is that correct?

7    A.    It's correct, only it should be 60 years.

8    Q.    60 years.  I think that's my fault.  Thank you.

9          Now, Dr. Levine, you have the exhibit binders before

10   you, correct?

11   A.    I do.

12   Q.    And considering that record as a whole, does the record

13   support your opinions expressed in paragraphs 1 and 2 of your

14   report?

15         MR. ROSE:  Judge, I will object to the extent that

16   the record includes many, many materials that are not cited in

17   the doctor's report.  It sounds like the question is trying to

18   get him to opine on stuff that he has not discussed in his

19   report and may not be from the report.

20         THE COURT:  Rephrase your question.

21   BY MR. CARLISLE:

22   Q.    Dr. Levine, of the materials you have reviewed that are

23   in the exhibit binders, do those materials support your

24   opinions regarding -- as expressed in paragraphs 1 and 2 of

25   your report?

1          MR. ROSE:  Judge, I have the same objection simply

2     because it has not been established whether the doctor has

3     reviewed any materials in the exhibit binders other than those

4     in his report.  If counsel wants to ask the same question

5     about materials cited in Dr. Levine's report, I will have no

6     objection to that question.

7          THE COURT:  Rephrase.

8     BY MR. CARLISLE:

9     Q.    Dr. Levine, do you know sitting here which of the

10    exhibits in the exhibit binders you have reviewed?

11    A.    Yes.

12    Q.    And did you review all of them or some of them?

13    A.    I reviewed the majority of them.  What I didn't review

14    -- it's easier to say what I didn't review than what I did

15    review.  There are 102 items in these two binders, and the

16    articles I've -- the articles related to female -- trans

17    female surgeries I reviewed.  I didn't review the depositions

18    of every expert on the other side, and I didn't re-review the

19    extensive notes from the inmate's chart.  But I did go through

20    over the last few days the vast majority of these items.

21         MR. ROSE:  Judge, I'm so sorry for keeping on

22    interrupting.  It sounds like Dr. Levine is being prepared to

23    testify about materials that were not in his report.  To the

24    extent that he is attempting to offer an opinion about

25    anything not in his report, that is obviously completely

1    inappropriate.  There's an abundance of case law that says as

2    much and the prejudice to us is off the chart.  I did not

3    review materials not cited in his report with an eye toward

4    his deposition or to cross examining him today.  I will let

5    him testify about what's in his report.

6         THE COURT:  Well, he can't testify to anything that's

7    not in his report.

8    BY MR. CARLISLE:

9    Q.    Dr. Levine of the materials you reviewed related to your

10   report, do those support the opinions you express in

11   paragraphs 1 and 2 of your report?

12   A.    Strongly.

13   Q.    Is it your opinion there is a good faith debate in the

14   medical community as to the safety and efficacy of sexual

15   reassignment surgery as a treatment for gender dysphoria?

16   A.    I can say yes for a number of reasons.

17   Q.    And what are those reasons, Doctor?

18   A.    Well, it's not -- because I think we have an ethical

19   responsibility to define for patients what safety -- what safe

20   means in terms of ultimate physiologic functioning of the body

21   -- of the new body, the new genital body.  So glib

22   pronouncements, rhetorical pronouncements that the operation

23   is safe, to me, that's not -- that's not ethically acceptable.

24         We have to ask ourselves in terms of what and for how

25   long.  We need to have those things -- those questions

*LEVINE DIRECT/CARLISLE*

1   answered explicitly and evident that is safety post surgically

2   one month, three months, one year, thereafter.

3          And when it comes to efficacy, I've already explained

4   in my expert opinion report, we want to distinguish between

5   efficacy in terms of the genital dysphoria, hopefully it goes

6   away when the genitals -- when the male genitals are removed,

7   from the persistence of gender dysphoria, which is a

8   psychological sense of myself not feminine enough, and I'm not

9   really a woman over time that plagues people.  And mental

10  health outcomes and functional outcomes in terms of vocation

11  and relationship problems, and finally, when you think about

12  what is the meaning of the consistent finding from -- in five

13  different countries, in five independent studies of premature

14  mortality among these populations.

15         So effective -- we really need to define what

16  effective means.  And so that's why I stand behind it because

17  I think glib rhetorical statements that something -- some

18  genital operation is both safe and effective, it implies -- it

19  doesn't come to grips with the reality of the experience of

20  the lived postsurgical patient.

21  Q.   Okay.  Thank you, Doctor.  And I believe you just

22  described in general terms the six parameters that you believe

23  the efficacy of surgery should be measured by; is that

24  accurate?

25  A.   Right.

1  Q.    And you can find those at page 14 of your report.  And

2  we're not going to restate your report here, but just to give

3  the Court an overview, do those parameters include the impact

4  on genital dysphoria, the impact on gender dysphoria, the

5  impact on mental health, the impact on social and vocational

6  function, the impact of sexual and urinary function, and

7  all-cause mortality?

8  A.    Yes.  Those are -- those are what I think the relative

9  parameters of assessment.  And in order to assess those

10  things, we need a validated, agreed upon single instrument --

11  psychometric instrument.  And this is what is lacking

12  throughout the field.

13         We have all these thousands of studies that many of

14  them use very different idiosyncratic non-psychometrically

15  validate, that is unscientific questionnaires, and they reach

16  these profound conclusions without any awareness of the

17  limitations of questionnaires that have not been

18  psychiatrically validated and are not sure what they're

19  exactly measuring.

20         Everyone needs to understand, there is no

21  questionnaire that evaluates gender dysphoria.  It's all

22  shared for gender dysphorias.  60 years of curing -- of

23  promising cure for gender dysphoria --

24         MR. ROSE:  Judge, I'm sorry.  Once again, we're very,

25  very far afield.

1    A.    -- and no means of evaluating them.

2    BY MR. CARLISLE:

3    Q.    And, Doctor, in light of the fact that the field box of

4    validated measurement of gender dysphoria, what effect does

5    that have on the medical community's understanding of whether

6    sexual reassignment surgery treats gender dysphoria?

7    A.    Well, this is a belief system, you see.  Many people in

8    the medical community and the surgical community believe that

9    this is a treatment for gender dysphoria.  And in the early

10   years -- I don't think it's happening in the last four or

11   five years as much, but in early years, people were using the

12   word cure for gender dysphoria.  I think they were confusing

13   genital dysphoria for gender dysphoria.  It's very clear that

14   gender dysphoria is not cured by genital surgery.  It may be

15   improved and temporarily people can be very happy that they

16   rid their male genitalia -- rid themselves of their male

17   genitalia, but gender dysphoria has to do with a sense of

18   myself -- this is my body and -- and there are many indicators

19   of maleness in bodies who've had female genitals made for

20   them.  And so the evidence that people are not cured of gender

21   dysphoria is -- they're multifold evidences -- sources of

22   evidence that gender dysphoria is not cured for too many

23   people.

24   Q.    And what are some of the indications in the literature

25   that gender dysphoria is not cured?

1    A.    Well, because after genital surgery, people say they're

2    happy with gender -- genital surgery, they're looking for

3    other surgeries.  They're looking for breast augmentation.

4    They're looking for something to round out their buttocks.

5    They want -- they want laryngeal surgery.  They want facial

6    feminization surgery.  So they want -- they want hair

7    transplants.  So, you know, the sense that I'm not a complete

8    woman, which is -- which is the underpinning of gender

9    dysphoria, you see, I'm not satisfied with my womanliness, it

10   is evidenced by the quest for further surgeries.  But that's

11   -- that's not all.

12   Q.    Are there any other indications?

13   A.    Well, you know, occasionally someone comes back to the

14   surgeon and wants to have their male genitals restored.

15   That's a very rare thing, but it's a very well-known thing.

16          We have people who are admitted to psychiatric

17   hospitals at a greater rate after sex reassignment surgery,

18   and, of course, we have elevated rates of suicide after sex

19   reassignment surgery, and now we have a bunch of young people

20   who had surgeries who are de-transitioning -- so we have

21   people -- in the last four years, we suddenly became aware of

22   the many people who are de-transitioning after various

23   affirmative interventions, hormones or hormones and surgery,

24   and now they're de-transitioning and returning to their male

25   role.  And then we have a few people who are suing doctors for

1   inadequate psychiatric evaluation and pushing them quickly to

2   hormones and quickly to surgery.

3           So these are five different sources of information

4   about -- about -- we're not -- we shouldn't be saying -- we

5   shouldn't be telling any trans person that we can cure gender

6   dysphoria.

7   Q.   Okay.

8   A.   Or at least we should tell them about these five sources

9   of evidence so that they can think more clearly about their

10  decision.

11  Q.   Okay.  Thank you, Doctor.  And those -- these five

12  sources you just described, you are testifying about those

13  from your personal -- or your professional experience; is that

14  accurate?

15  A.   Oh, yes.  My academic experience, my clinical

16  experience, my writings.

17  Q.   Doctor, what about all-cause mortality?  What does the

18  literature say about all-cause mortality as it relates to

19  sexual reassignment surgery?

20  A.   No, it doesn't relate to sex reassignment surgery.  It

21  relates to being transgender.  So many of the people who died

22  had had sex reassignment surgery, but the all-cause mortality

23  comes from five different studies, each have found elevated

24  rates of premature death.

25          You know, I wish the studies would separate the trans

*LEVINE - DIRECT/CARLISLE*

1  people who just have an identity of trans who don't have

2  hormones from those who take hormones from those who had

3  genital surgery and from those who had multiple surgeries

4  after the genital surgery, but that's not the kind of data

5  that's available.  It's about if you're trans and you're

6  registered in some system, you have a risk of having premature

7  mortality.  And it's not like an extra year.  It's usually 10

8  to 20 years early.

9  Q.    Okay.  And, Doctor, you're familiar with some European

10  studies who have studied this population; is that accurate?

11  A.    Yes.

12  Q.    And are you aware that some of those European studies

13  reference a register base type system for this population?

14  A.    Yes.  The --

15  Q.    And -- excuse me, Doctor.  Describe to the Court what

16  that register base type system that is referred to in some of

17  these European studies is.

18  A.    Well, certainly European -- the Scandinavian studies --

19  the Scandinavian countries in particular for a very long time

20  have recorded all kind of medical interventions and social

21  interventions in national databases.  And so registration

22  study, for example, one that was published in 2011 was able to

23  look at everyone in Sweden who had sex reassignment surgery

24  over a 30-year period.

25          So if you notice all these American studies and most

1    other studies, the European studies as well, have enormous

2    loss to follow up rate.  The registration studies are -- the

3    strength is that they don't have loss to follow up or their

4    loss to follow up rate is miniscule.  Like Denmark had

5    98 percent of the people had sex reassignment surgery in their

6    study.

7    Q.    Okay, Doctor.

8    A.    So --

9    Q.    Thank you, Doctor.

10   A.    -- the Europeans are way ahead of us.

11   Q.    So Doctor, I want to clarify.  The registration base

12   system of some of these European countries you're describing

13   does not exist in the United States, correct?

14   A.    No.  We have 50 states, and we have -- we don't even

15   have registrations within a state.

16   Q.    And as a result of the lack of that register base

17   system, you're saying that many of the studies out of the

18   United States experience this loss to follow up phenomenon; is

19   that accurate?

20         MR. ROSE:  I'll object to the leading nature.  And

21   also I think he is far beyond the opinion he's actually voiced

22   in his report.  I don't see anything in the report where he --

23         THE COURT:  I'll sustain the objection as to leading.

24   BY MR. CARLISLE:

25   Q.    Doctor, you opine about this loss to follow up issue in

1    your report, correct?

2    A.    I do.

3    Q.    And tell the Court what this loss to follow up problem

4    means.

5    A.    Well, let's just take an example of one study.  Dr. Ann

6    Lawrence was able to get --

7         MR. ROSE:  Objection, Your Honor.  The doctor does

8    not cite any of Dr. Lawrence's studies in his own expert

9    report.  They are in evidence, but I think it is mentioned

10   through Dr. Ettner.  They're not mentioned in his report.

11        MR. CARLISLE:  Can I ask a couple foundation

12   questions?

13        THE COURT:  Sure.

14   BY MR. CARLISLE:

15   Q.    Dr. Levine, the Lawrence study you just mentioned, have

16   you reviewed that at some point in time?

17   A.    Yes.

18   Q.    When?

19   A.    I reviewed it when it came out.  I reviewed it in

20   anticipation of today's meeting.  But I don't have to talk

21   about that.

22   Q.    Well, Doctor, let me ask a question.  Does that study

23   inform your opinions in this case?

24        MR. ROSE:  Judge, I'm still going to object.  If a

25   study informed his opinions, he needs to say so in his report,

1    and this study is not there.

2          THE COURT:  If it's not in his report, he can't

3    testify about it.

4          MR. CARLISLE:  All right.  We'll move on.  Thank you.

5    BY MR. CARLISLE:

6    Q.    Doctor, let's talk about evidence-based medicine.  You

7    reference evidence-based medicine in your report, correct?

8    A.    Yes.

9    Q.    Can you tell the Court what you mean by evidence-based

10   medicine?

11   A.    Well, doctors have an ethical responsibility to make

12   their interventions based upon scientifically valid

13   information.  The history of transgender surgery did not come

14   from -- it came from an innovative concept that we should take

15   these people who wanted it and try -- try to have surgery.

16   Give them surgery and see what happens.

17          And this is not exactly -- so then the evidence was

18   what happened to these people.  And that brings us back to

19   loss to follow up because in many of the studies that cause

20   people to continue the fashion of giving surgery to people who

21   said that they wanted it, we had up to 70 percent loss to

22   follow up rates.  And so when you have such a huge loss to

23   follow up rate, you don't know whether the person is living

24   happily and doesn't want to participate anymore.  You don't

25   know whether the person is miserable and angry and that's why

LEVINE DIRECT/CARLISLE

1    they don't want to participate.  You don't know whether

2    they're dead from an automobile accident or dead from suicide.

3    You just don't know.

4         Nobody really in science would say a 70 percent loss

5    to follow up rate gives you conviction about the conclusion of

6    the 30 percent who did answer the questionnaire.  They may

7    have answered the questionnaire because they're happy.  Right?

8    And they're grateful.  But it may very well be that many of

9    the 70 percent are not happy and are not grateful or not even

10   alive.

11   Q.    Okay.

12   A.    And so that's why loss to follow up is important.

13   Q.    All right.  Thank you, Doctor.  Is it your opinion that

14   medical consensus should be grounded in evidence-based

15   medicine?

16   A.    Yes, it should.  If we're going to have standards of

17   care, if we're going to -- it's not just consensus of those

18   who do surgery or those who have long believed that this is --

19   this is the right thing to do or this is the best thing to do.

20   In order to conclude this is the best thing to do, we've had

21   to try other things and see if they work.  But that's not how

22   this has evolved over the last 60 years.

23        We have people who believe that surgery is useful, it

24   cures gender dysphoria, and so they've been doing it.  And

25   what's happening sociologically around the world is that more

1    and more people are trans identified and, therefore, surgeons

2    have waitlists.

3              MR. ROSE:  Judge, this is long past the question

4    again.

5    BY MR. CARLISLE:

6    Q.    Okay.  All right.  Dr. Levine, let's --

7              MR. CARLISLE:  Brad, if you could put up Exhibit 81,

8    please.

9    BY MR. CARLISLE:

10   Q.    Dr. Levine, I'm going to show you what's been marked as

11   Exhibit 81.

12             MR. ROSE:  Judge, this is a demonstrative exhibit

13   that we discussed at the very outset of today's hearing.

14   Objections to the demonstrative nature of it were discussed

15   previously.  It talks about 12, 15, 20 different studies.  Not

16   one of the studies in this demonstrative exhibit is cited in

17   Dr. Levine's report.  All but one of them were cited in either

18   Dr. Schechter or Dr. Ettner's report, but not one is cited in

19   Dr. Levine's report.  And so we object to any testimony from

20   this witness.

21             MR. CARLISLE:  I think I can ask an appropriate

22   question that will not -- this is more just a tool to

23   establish foundation for the questions I'm going to ask.  I'm

24   not asking him about the --

25             THE COURT:  You can ask the question.

1  BY MR. CARLISLE:

2  Q.    Dr. Levine, in this exhibit -- in the column discussing

3  methodological limitations of studies, do you see that?

4  A.    Yes.

5  Q.    Would you agree in general terms that the things listed

6  there are methodological limitations of studies in this field?

7  A.    Yes.  And the things listed in this column are the kinds

8  of things that have been listed in the studies that are in my

9  report.

10        THE COURT:  Objection sustained.  Let's move on.

11  BY MR. CARLISLE:

12  Q.    Dr. Levine, when it comes to determining medical

13  consensus, what is the problem with surgical case studies?

14  A.    Would you repeat that?

15  Q.    Yeah.  When it comes to the question of whether medical

16  consensus exists as to sexual reassignment surgery, what is

17  the issue with surgical case studies?

18  A.    Well, we can get a room of surgeons who would all work

19  in this area, and they reach a consensus that this is the best

20  treatment and the results are safe and effective.  We're

21  trying to establish the wisdom of a particular intervention,

22  and we want to look as systematic- -- we systematically want

23  to look at data.

24        We don't allow a group of people who benefit

25  career-wise and economically-wise and emotionally from doing

1   this surgery.  We want a group of people who are trained in

2   methodology who are not necessarily surgeons at all, who want

3   to look at the data.  And so if we just do case report, case

4   report, case report, and we don't look at systematic evidence,

5   we don't -- we don't get an objective appraisal.  We get a

6   subjective appraisal.

7         In order to do surgery on a person and change their

8   normal anatomy --

9         MR. ROSE:  Your Honor, objection.

10  A.    -- and physiology --

11  BY MR. CARLISLE:

12  Q.    Dr. Levine, there's an objection.

13        Dr. Levine, I'm going to ask a different topic.  What

14  is the limitation of retrospective reviews?

15        MR. ROSE:  Judge, I'm going to voice an objection.

16  We're going to give the doctor some leeway when it comes to

17  talking about gender confirmation surgery and its effects, but

18  he's being asked right now to testify on an expert of study

19  methodology.  I don't think he qualifies as an expert on study

20  methodology.  While he does criticize a couple of individual

21  studies in his report, I don't think -- I think he is

22  testifying far beyond the report when he goes into entire

23  categories of studies.

24        MR. CARLISLE:  Your Honor, I think his experience

25  that he testified about earlier, treating gender dysphoria

 1  patients who request sexual reassignment surgery, his role in

 2  informed consent before they decide to undergo surgery, and

 3  his experience with both the prison population and the

 4  non-prison population have given him specialized knowledge,

 5  and the literature and whether it is -- whether it does have

 6  anything to say at all about the effects, the complications of

 7  surgery, and if so, the extent of those effects.

 8              MR. ROSE:  Judge --

 9              THE COURT:  Is it in his report?

10              MR. CARLISLE:  The word retrospective I believe is in

11  the report, so I can ask him where -- you know, if that's true

12  and then --

13              MR. ROSE:  The overarching criticism of the overall

14  methodology is not.  If counsel wants to ask about specific

15  studies and what's wrong with them that he cites in this

16  report.  That's obviously fair game.

17              THE COURT:  Yeah.  We need to just stick to the

18  report.  I mean, that's what reports are all about, to give

19  the other side a heads up as to what's going to be testified

20  to.  If you start testifying to things that aren't in the

21  report, then what good is a heads up.

22              MR. CARLISLE:  Well, can I ask him whether he

23  mentions retrospective reviews in his report?

24              THE COURT:  You can ask him that.

25  BY MR. CARLISLE:

1    Q.    Dr. Levine, anywhere in your report, do you mention the

2    concept retrospective review?

3    A.    I not only mention that, I also talk about what surgeons

4    agree upon would be the ideal treatment -- the ideal method

5    would be prospective study.  Retrospective studies have

6    distinct limitations, and they have a very high loss to follow

7    up rate.  So they also have --

8             MR. ROSE:  Your Honor, I have the same objection.

9    He's starting to testify about methodology in general rather

10   than specific studies.

11            THE COURT:  All right.  Let's move on.

12   BY MR. CARLISLE:

13   Q.    All right.  Thank you, Doctor.  Let's go to Exhibit 64,

14   please.  And this is the 2016 CMS study.

15   A.    Yes.

16   Q.    And you are familiar with this study, correct, Doctor?

17   A.    I am.

18   Q.    And can you summarize for the Court what this CMS study

19   found?

20   A.    The case started with over 100 studies and then selected

21   33 studies to look at in order to make a determination whether

22   there should be a national Medicare policy to support or not

23   support sex reassignment surgery for trans identified people.

24   And they reviewed these 33 studies in great detail and every

25   one of those studies had the methodologic limitations of those

*LEVIN - DIRECT/CARLISLE*

1    studies and the conclusion of this very long report was that

2    they could not make a national -- they would not make a

3    national recommendation.  They wanted to refer the decision to

4    the individual states or the individual insurance companies

5    that had to do this, and they said the evidence was not

6    compelling, that there was evidence of improvement, and there

7    was evidence of deterioration and that it should be on a

8    case-by-case basis, and they would not -- they would not

9    support the insurance coverage across the United States for

10   Medicare recipients.

11   Q.    Okay.  Doctor, thank you.  Obviously this study was for

12   the purpose of whether the Medicare population should receive

13   a national coverage determination.  You would agree with that,

14   right?

15   A.    Yes.  But the significance of that --

16   Q.    One second, Doctor.  And so -- but the CMS study, the

17   same types of studies that would apply to the non-Medicare

18   population?

19   A.    Because insurance companies follow Medicare's decisions.

20   Q.    I'm sorry.  Did you answer yes to that?

21   A.    Yes, because insurance companies follow the

22   recommendations of Medicare.

23         MR. CARLISLE:  Okay.  If we can pull up Exhibit 85.

24   BY MR. CARLISLE:

25   Q.    Doctor, I'll direct you to Exhibit 85.

*LEVINE DIRECT/CARLISLE*

1   A.    Yes.

2   Q.    All right.  Doctor, is this the Lindqvist study you cite

3   in paragraph 46 of your report?

4   A.    It is.

5   Q.    All right.  And can you explain to the Court why you

6   cited this study?

7   A.    This is a study, whatever its limitations are, that

8   showed that in the long run, the quality -- the questionnaire,

9   the SF 90 -- I'm sorry.  The SF 36 showed some statistical

10  improvement at one year, but it did not show any significant

11  improvement at five years.

12  Q.    And so is it accurate that the study found that within

13  five years after surgery, the quality of life participants

14  declined to the baseline measurement?

15  A.    Right.  But, you know, one of the reasons I cited that

16  in my report was the title of the study.

17  Q.    And what do you mean by that?

18  A.    The title of the study says the quality of life improves

19  after sex gender reassignment surgery in transgender women.

20  But the study itself shows that it only improved at one year

21  and it deteriorated back to baseline at year five.

22        So a more complete title would be -- would reflect

23  the fundamental findings.  But you see, when people read --

24  when they read a title or they read an abstract and they can't

25  read the whole study, which most doctors don't read the whole

1    study, they just get the wrong impression.  And so I cited

2    this in my report about how we need to be more critical of

3    studies, and there is this bias that's bedded in publication

4    where the title reflects the positive findings but not all of

5    the findings.  That's why I cited it.

6    Q.    Thank you, Doctor.  If I could ask you to look at

7    paragraph 3 of your report Exhibit 32.

8    A.    All right.

9    Q.    All right.  Doctor, in paragraph 3, you opine that a

10   refusal by a treating provider or an institution to offer

11   sexual reassignment surgery is an acceptable difference of

12   medical opinion within the appropriate standard of care for

13   treating individuals with gender dysphoria in or outside of

14   prison; is that accurate?

15   A.    Yes.

16   Q.    And why is that your opinion?

17   A.    It's my opinion because it's scientifically uncertain

18   whether people have a long-term benefit from these treatments.

19   The studies haven't been done to demonstrate it.  There is

20   enormous belief and political impetus behind doing these

21   surgeries.  But when it comes to safety and long-term

22   efficacy, it's uncertain.

23          And when it comes to inmates, inmates' backgrounds

24   are often so horrendously different -- so horrendous and so

25   different from the people that we get to see in the community

1  that I think when prisons have a policy to attend to, to

2  recognize the transgender inmates and they have accommodations

3  to those inmates to do what they can short of -- short of

4  changing the body that is uncertain, I think this is often for

5  many -- for the vast majority of trans inmates are fine.  It's

6  an acceptable treatment.  It's a compassionate treatment, and

7  it seems to quiet some of these people down, but the trouble

8  is other people incites the need to go further.

9  Q.    Okay.  And, Doctor, does your opinion in paragraph 3, is

10  that informed by the availability of alternative treatment

11  options for gender dysphoria in prison?

12  A.    Well, the alternative treatment options include

13  continuing psychotherapy or counseling and planning for

14  discharge realistically and even planning for sex reassignment

15  surgery after discharge if the patient wants it -- still wants

16  it.

17         So the prisons, as far as I can see, at least what I

18  know about your state's prison, has made accommodations to

19  transgender people.  They've just created a limit on the

20  genital surgery at this point.

21  Q.    And, Doctor, just to be clear, your opinion is not that

22  it's permissible for DOC to decline to treat gender dysphoria

23  altogether, correct?

24  A.    You asked me if this -- if the state's policy is to

25  decline treatment altogether for these people?

LEVINE - DIRECT/CARLISLE

1    Q.    Let me repeat the question.  Your opinion today is not

2    that it is permissible for DOC to decline to treat gender

3    dysphoria altogether, correct?

4    A.    No, that's not my opinion.

5    Q.    And you would agree that the medical standard of care

6    requires DOC to provide adequate alternative treatments to

7    prisoners?

8    A.    Yes.

9    Q.    And specific to the Indiana Department of Correction,

10   Doctor, are you aware what treatment options DOC has made

11   available to this plaintiff?

12   A.    I think all -- I think all the recommendations that are

13   generally available in prisons now have been made available to

14   this particular inmate.  So he's had hormones.  He's had

15   showering privileges, has access to female canteen items, is

16   referred to with female pronouns, and has access to

17   psychotherapy counseling and help in his/her general

18   personality dysfunctions.

19   Q.    Okay.  And are these treatment alternatives considered

20   to be safe and effective within the medical community to treat

21   gender dysphoria?

22   A.    You mean within the prison system or just --

23   Q.    Correct?

24   A.    -- in the community.  I think these are considered to be

25   safe and compassionate and caring and effective treatments for

*LEVINE - DIRECT/CARLISLE*

1    gender dysphoria in prisons.

2    Q.    And you understand that the Indiana law being challenged

3    in this lawsuit restricts DOC from using government resources

4    to provide surgeries that would sterilize a prisoner if

5    they're performed on healthy tissue?

6           MR. ROSE:  I'm going to object.  Counsel has inserted

7    several facts into that, and the question is leading on top of

8    it.

9           THE COURT:  Rephrase your question.

10   BY MR. CARLISLE:

11   Q.    Are you aware, Doctor, that the Indiana law being

12   challenged in this litigation prohibits DOC from using

13   government resources towards the surgical treatment option for

14   gender dysphoria?

15   A.    I have been so informed, yes.

16   Q.    And given what you've reviewed of the plaintiff's

17   medical records and in light of that surgery restriction in

18   the law, is it your opinion that DOC's alternative treatment

19   options for gender dysphoria fall within the appropriate

20   medical standard of care?

21   A.    Yes.

22   Q.    Doctor, you are -- you have reviewed the plaintiff's

23   medical chart, correct?

24   A.    I have.

25   Q.    You have watched her videotaped deposition?

1    A.    No.  I read her deposition.  I didn't watch her

2    deposition.

3    Q.    I see.  You watched a PREA video?

4    A.    Yes.

5            MR. CARLISLE:  Brad, if you could put up Exhibit 97,

6    please.

7    BY MR. CARLISLE:

8    Q.    Doctor, do you have Exhibit 97 in front of you?

9    A.    I do.

10   Q.    Have you seen this document?

11   A.    I have.

12   Q.    And I'll represent that this is a list written by

13   plaintiff describing all the procedures she believes will help

14   reach her ideal self.  What do you make of this list?

15   A.    Well, the list reminds me of what I said about genital

16   surgery not curing gender dysphoria, and there is a lifelong

17   quest to improve one's feminine appearance in order to settle

18   down this internal world where I'm not comfortable with myself

19   and my male indicia, the things that indicate my maleness

20   bother me.  And so you're looking at this list of someone who

21   is predicting that genital surgery won't be enough, that I

22   need this and I need that and I need all these things.  So

23   this is about fantasy, you see, about hope for wishes that --

24   it's about increasing my feminine -- my sense of my

25   femininity.

1          So, again, I go back to genital dysphoria cured by or

2     helped at least 80 percent, 90 percent of people who have this

3     surgery.  Gender dysphoria continues.  We never want to say

4     anymore that this is a cure for gender dysphoria.  This is

5     evidence about the mind seeking more and more and more

6     reassurance that I'm actually a woman because there's

7     something about living in a male body that tells you that

8     you're not a woman.

9     Q.    Thank you, doctor.  And, finally, given what you know

10    about the state of medical literature in this field, can we

11    say for certain that surgery would be an effective or safe

12    treatment option for this plaintiff?

13    A.    I cannot say that.

14          MR. CARLISLE:  Thank you, Doctor.  Thank you.

15          THE COURT:  Mr. Rose?

16          MR. ROSE:  Thank you, Judge.

17                      **CROSS-EXAMINATION**

18    BY MR. ROSE:

19    Q.    I apologize.  We have a number of papers at our table

20    right now.

21          Good afternoon, Dr. Levine.  Can you hear me okay?

22    A.    Yes.  Could you tell me your name, please?

23    Q.    I'm sorry.  Gavin Rose.  We met during your deposition.

24    A.    I can't see you very well.  My -- yeah.  All right.

25    Thank you.

1    Q.     Can you hear me okay, Dr. Levine?

2    A.     Yes, I hear you fine.

3    Q.     Okay, Doctor.  I don't anticipate keeping you here that

4    much longer today.  I want to start by describing a

5    hypothetical prisoner to you.  Okay?

6          I want you to imagine a prisoner who has a

7    long-standing diagnosis of gender dysphoria dating to

8    adolescence or even earlier, someone who has been an inmate

9    and who has been receiving hormones for years and years and

10   has been receiving psychotherapy from a person experienced in

11   gender identity issues but who despite this continues to be in

12   clinically significant distress from their gender dysphoria.

13         I want you to assume that this inmate will remain an

14   inmate for the foreseeable future.  They're a long-term

15   inmate, but they have no medical or psychological

16   comorbidities that would counsel hesitation in the

17   consideration of gender-affirming surgery and that they have

18   demonstrated a mature understanding of the risks and benefits

19   of surgery that convinces you that they can provide informed

20   consent.

21         Do you understand the prisoner I am describing?

22         MR. CARLISLE:  Object to the form of the question.

23   It calls for speculation.

24         MR. ROSE:  He's an expert, Judge.  He's here to

25   speculate.

1           THE COURT:  Cross exam.  Overruled.

2    BY MR. ROSE:

3    Q.    Dr. Levine, assuming that this hypothetical prisoner

4    desires surgery, do you agree that it is possible that the

5    person I have just described should have available to them a

6    pathway to obtain surgery in the reasonably foreseeable

7    future?  Yes or no, please.

8    A.    If I have to say yes or no -- you must understand that I

9    have profound questions about your hypothetical given the fact

10   that I've spent 17 years with prisoners and I have --

11   generally speaking, the absence of psychopathology is not a

12   characteristic of prisoners.  But if you push me to answer

13   that question as you are doing, I guess considering what I've

14   done in the past, the answer is there can be a path to genital

15   reconstructive surgery.  There can be.

16   Q.    Thank you, Doctor.  And you understand right now that if

17   that inmate were an inmate in Indiana, they would be

18   prohibited from the law we have challenged in this case from

19   actually obtaining that surgery, correct?

20           MR. CARLISLE:  Objection.  It calls for a legal

21   conclusion.

22   A.    That's my understanding of the meaning of the recent law

23   that went into effect in July.

24   BY MR. ROSE:

25   Q.    Okay.  Doctor, at the time that you were -- not right

ELLIS - CROSS/ROSE

1  now, but at the time that you were retained in this case by

2  the state of Indiana, were you aware that Indiana had a law

3  that completely prohibited gender-affirming surgery to

4  prisoners?

5  A.    I can't remember when I was retained.

6  Q.    Let me ask you this.  Is it fair to say that you first

7  learned of that in the preparation for your deposition in this

8  case?

9  A.    I'm sorry.  Could you repeat that?  Somebody just gave

10  me a message that distracted me.

11  Q.    I'm sorry, Doctor.  Is it fair to say that you first

12  learned of that fact as you were preparing for your deposition

13  in this case?

14  A.    Oh, no, no.

15  Q.    Doctor, you agree -- we discussed this in your

16  deposition, but you agree that gender dysphoria is a

17  diagnosable mental health disorder, correct?

18  A.    Correct.

19  Q.    And in your clinical practice to determine whether to

20  diagnose someone with gender dysphoria, you apply the criteria

21  in the DSM-V or its text revision, right?

22  A.    That's part of the diagnostic process.  It's not all of

23  it.

24  Q.    Okay.  And you spoke a little bit on direct examination

25  as well as in your report about genital dysphoria, and I know

1    from your deposition that in a transgender woman, this term

2    refers specifically to distress associated with having a

3    penis, scrotum, or testes, correct?

4    A.    Correct.

5    Q.    And you agree that in the right person, genital surgery

6    such as vaginoplasty can actually cure gender dysphoria,

7    right?

8    A.    It can relieve it, yes.  In psychiatry, we're kind of

9    hesitant to use the word cure.

10   Q.    It can relieve the distress.

11   A.    It can release certain aspects of the distress of gender

12   dysphoria.  I like to make this distinction because, as I

13   pointed out before, Mr. Rose, that gender dysphoria is much

14   more comprehensive suffering than genital dysphoria and most

15   people who say that they're suffering --

16   Q.    Thank you very much, Doctor.  We are past the question I

17   asked at this point.

18         Doctor, in the role consulting for various prison

19   systems, you've previously recommended that specific prisoners

20   either receive surgery or have a pathway to surgery in the

21   reasonably foreseeable future, correct?

22   A.    Yes.  Pathway to surgery, yes.

23   Q.    And I count four of them; am I right?  Michelle Kosilek

24   and Katheena Soneeya in Massachusetts?

25   A.    I'm sorry.  What was the first part of that question?

1    Q.    I count four inmates at least that you have made that

2    recommendation for, and I want to make sure that I'm right in

3    those.

4          You mentioned in your deposition Michelle Kosilek was

5    someone that you testified should have surgery, correct?

6    A.    Yes.

7    Q.    And you --

8    A.    Eventually.

9    Q.    And you also testified that another Massachusetts inmate

10   named Katheena Soneeya was medically appropriate and, in fact,

11   surgery was medically necessary for her, right?

12   A.    I -- again, I thought that it would be a reasonable

13   thing that she would psychologically benefit from surgery,

14   yes.

15   Q.    And in your deposition, you mentioned an inmate in

16   Virginia that might not have been in litigation but where you

17   consulted with the prison system and concluded that the

18   prisoner should have access to surgeries; is that correct?

19   A.    Eventually, yes.

20   Q.    And then there was a case in California where you

21   recommended surgery but the prisoner was released before they

22   could have the surgery?

23   A.    I think that's true, yes.

24   Q.    Okay.  And in your clinical practice, you have had

25   patients with gender dysphoria who have had affirmation

1    surgery, correct?

2    A.    Years ago, yes.

3    Q.    And you have written letters to surgeons saying at the

4    very least this prisoner desires surgery and is not

5    contraindicated from a mental health perspective?

6    A.    Well, I didn't use those words but -- I didn't use it's

7    medically necessary either.  I think I previously explained

8    how I think about this.

9    Q.    You've written letters to surgeons saying that if this

10   person desires surgery, from my perspective, there's no reason

11   they can't have it; is that fair?

12   A.    What I try to do is to help the surgeon understand the

13   -- the pluses and minuses.  I am turning over to the surgeon

14   the ethical issue.  If you know this person as I know and you

15   talk and interview this person and if you think this is the

16   right thing to do and if the patient still, after consultation

17   with you, wants to do this, then, fine.  You have my letter.

18   You need to --

19   Q.    Before -- I'm sorry, Doctor.  I didn't realize you were

20   in the middle of a sentence.

21   A.    All right.  So you need to understand that I've had the

22   experience of writing such a letter and having the person go

23   to a surgeon, then decide not have a sex reassignment surgery.

24   I've had that at least once.

25   Q.    And before you decide to write one of those letters, you

*KIRA  –  CROSS/ROSE*

1   meet with the patient multiple times I remember from your

2   deposition?

3   A.    Yes.

4   Q.    Multiple times over an extended period of time, correct?

5   A.    Correct.

6   Q.    And I think you mentioned that you spend at least four

7   or six hours with the patient?

8   A.    Well, my standard psychiatric evaluation of a new

9   patient is four to six hours with me or -- yeah, with me.

10  Q.    And --

11  A.    But that isn't -- that is not to provide sex

12  reassignment surgery.  That's to understand what's going on

13  with the patient, and oftentimes, my recommendation is not

14  surgery because I only knew the person for four to six hours.

15  My recommendation is that we should -- here's what we know.

16  Here's what we find.  Here's the comorbidities.  Here's the

17  struggle, and let's see what we can do over time to help you

18  suffer less.

19  Q.    There are times where it will take longer than four to

20  six hours to decide whether or not surgery is appropriate for

21  a patient; is that fair?

22  A.    That's very fair and that's usual.

23  Q.    And, Doctor, this was true in your deposition.  It is

24  correct to say that you have never met Autumn Cordellioné,

25  correct?

```
 1   A.      Personally, no.

 2   Q.      And you have never spoken with her?

 3   A.      Correct.  Correct.

 4   Q.      Doctor, what is your understanding of how many times

 5   since the beginning of 2023 Ms. Cordellioné has been seen by

 6   mental health staff at the facility?

 7   A.      Right now, without looking that up, I don't know the

 8   answer.

 9   Q.      Okay.  In your deposition, you testified that you

10   thought she was seen monthly.  Is that a correct summary of

11   your understanding?

12   A.      Thank you for reminding me.  Right.

13   Q.      Doctor, what is your understanding of the last time that

14   she received any mental health medications other than

15   gender-affirming hormones?

16   A.      Psychiatric medicines like antidepressants or

17   antipsychotics?

18   Q.      Any mental health medicines.  Not Tylenol, obviously.

19   A.      A long time, years.

20   Q.      And, Doctor, are you aware that Ms. Cordellioné's mental

21   health code with the facility has recently been changed?

22   A.      No.  Can I ask you what recently means because maybe the

23   answer is -- maybe I didn't answer that right.

24   Q.      I am not in a position to answer that question.

25           MR. ROSE:  Judge, may I have one moment to confer
```

1    with counsel?

2         THE COURT:  Yes.

3    BY MR. ROSE:

4    Q.    Okay.  Doctor, you were asked about a Medicare study

5    that is in the record in this case.  Do you recall those

6    questions?

7    A.    The 2016 study?

8    Q.    That's correct?

9    A.    It's actually not a study.  It's a review.

10   Q.    You recall those questions though correct?

11   A.    I do.

12   Q.    You understand that the outcome of that review was that

13   individual -- local administrators could approve

14   gender-affirming surgery on a case-by-case basis as medically

15   appropriate, correct?

16   A.    Correct.

17   Q.    Now, Doctor, you have actually recommended an

18   alternative way of studying the efficacy of gender-affirming

19   surgery other than randomized controlled studies; is that

20   correct?

21   A.    Yes.

22   Q.    And you believe that there should be a long-term study

23   of a population where few people are likely to be lost to

24   follow up.  Is that a fair summary?

25   A.    Well, that's only one aspect of my recommendation, yeah.

HEATH - CROSS/ROSE

1   Q.    But it is one aspect of your recommendation, correct?

2   A.    It's much more complicated than just that one aspect.

3   Q.    Okay.  But what you've actually recommended is that

4   long-term prisoners be used as that study group.  Is that a

5   fair summary?

6   A.    No, that is not a fair summary.

7   Q.    You have not recommended that -- you have not testified

8   in another deposition that you have -- one thing you've said

9   about prisoners is that many of these prisoners who request

10  sex reassignment surgery are prisoners for life and that

11  provides us for the chance to have to -- when clinical

12  judgment is made that this prisoner should have sex

13  reassignment -- could have sexual reassignment surgery and

14  they're to be in prison for the rest of their life, we have an

15  opportunity to study what happens to these people?  You did

16  not testify to that in --

17  A.    No, no.  I'm sorry.  You're right, but that's not what I

18  had in mind when you asked me the question.

19  Q.    Does that refresh your recollection?  You have in other

20  litigation recommended that long-term prisoners be studied to

21  determine the efficacy of gender confirmation surgery,

22  correct?

23  A.    Yes, that was my hope that would happen, yeah.

24  Q.    And you agree that any prisoner who participates in that

25  study would have to give informed consent to do so, correct?

1    A.    They would have to get informed consent to have the

2    surgery and to participate in the study, yes.

3          MR. ROSE:  You anticipated my final question, Doctor.

4    Thank you very much.  I have nothing further.  Thank you,

5    judge.

6          THE COURT:  Anything else, Mr. Carlisle?

7          MR. CARLISLE:  Briefly, Your Honor.

8                     **REDIRECT EXAMINATION**

9    BY MR. CARLISLE:

10   Q.    Dr. Levine, are there any reliable studies as to the

11   long-term effects of sexual reassignment surgery specific to

12   the prison population?

13   A.    No.  No, absolutely not.  It's only in relative recent

14   years that any prisoner has had genital surgery, and it's my

15   understanding is that there's a federal law preventing

16   experimentation on prisoners.  And so my idea that was just

17   articulated, I think it can't be done because it's an

18   experiment, but it is a natural history experiment, and it is

19   a shame because this is -- this is unexplored territory,

20   giving surgery to inmates, especially those inmates who've had

21   horrendous backgrounds and their mental health is forever

22   compromised.

23          So I just think that we need to understand that while

24   it -- the prisoners are a unique population.  They're not to

25   be equated simply with what's going on in the community.

LEVINE - REDIRECT/CARLISLE

1    What's going on in the community is not necessarily

2    evidence-based medicine, it's fashion-based medicine.  But I

3    do think we need to understand that if you grant one prisoner

4    sex reassignment surgery, you're breaking -- you're breaking

5    into a whole new area, and the outcomes are not clear,

6    especially the outcomes of people that are going to be

7    discharged from prison and you won't even know what happened

8    to them, you see.

9         So you do this on the faith that this is going to be

10   good for them and you have no way of knowing whether you were

11   right or wrong, and you don't know whether they suicide or

12   whether they are model citizens and live happy ever after.

13   You just don't know.

14   Q.    All right.  Thank you, Doctor.  And is that why you've

15   opined that providing sexual reassignment to the plaintiff in

16   this case would be an experiment of one?

17   A.    Yes, and it would be -- if we did a prisoner in Alabama

18   or Texas or Arizona, it would be an experiment of one.  And

19   the question is what is the justification for the experiment.

20   Some doctor says it's medically necessary.  That's an opinion.

21   But what's informing the doctor's opinion?  What does the

22   doctor know about this?  And what does WPATH know about this,

23   actually, because they made this -- they made this policy in

24   1988 before anyone had sex reassignment surgery.

25        MR. CARLISLE:  Thank you, Dr. Levine.  I appreciate

ETTNER - DIRECT/FALK

 1   your time.

 2          THE COURT:  Mr. Rose, anything else?

 3          MR. ROSE:  Nothing further, Judge.  Thank you.

 4          THE COURT:  Doctor, thank you very much for your

 5   testimony.  You're free to go about your day.

 6          THE WITNESS:  Thank you very much.

 7      (Witness excused.)

 8          THE COURT:  Mr. Carlisle, anything else?  Any other

 9   witnesses?

10          MR. CARLISLE:  No.  We'll rest.

11          THE COURT:  Okay.  All right.  Mr. Falk?

12          MR. FALK:  Your Honor, I'd like to call Dr. Randi

13   Ettner for literally I think ten minutes and then we'll be

14   done.

15          **RANDI ETTNER, Ph.D., PLAINTIFF'S WITNESS, SWORN**

16                    **DIRECT EXAMINATION**

17   BY MR. FALK:

18   Q.   Good afternoon, Dr. Ettner.

19   A.   Good afternoon.

20   Q.   I promised I would keep you for a very brief period of

21   time.

22          THE COURT:  Now it's changed.  It was ten minutes a

23   few minutes ago.  And now he's saying --

24          MR. FALK:  I'm going to go under ten minutes just so

25   I can show that I can do it.

 1              THE COURT:  Take as much time as you need.

 2    BY MR. FALK:

 3    Q.    Doctor, how many persons have you diagnosed and treated

 4    for gender dysphoria and gender variance in the course of your

 5    career?

 6    A.    3,000.

 7    Q.    And how many have you evaluated for surgery?

 8    A.    Several hundred of those.

 9    Q.    And have you found that some cannot have surgery because

10    of mental illness or mental incapacity?

11    A.    Yes, I have found that.

12    Q.    And under what general circumstances?

13    A.    Florid psychosis, schizophrenia that's not in remission,

14    and ineligibility because they haven't met the WPATH standards

15    of care.  Those would be some examples.

16    Q.    And what is borderline personality disorder?

17    A.    Borderline personality disorder is a characterological

18    disorder.  It's thought to be lifelong; although, it does tend

19    to mellow with age.  It's characterized by impulsivity,

20    inconsistency in relationships, and there are other abnormal

21    aspects that will -- I'm sorry?

22    Q.    No.  My fault.  I apologize.  I was just going to say

23    can it be stable?

24              MR. CARLISLE:  Objection, Your Honor.  The previous

25    reason the plaintiff objected to Dr. Farjellah's testimony, I

1    don't think.  Dr. Ettner has been qualified as an expert in

2    borderline personality disorder.

3         MR. FALK:  Your Honor, I think her affidavit and

4    deposition are in evidence.  She's been a psychologist for

5    years.  She's treated 3,000 persons with gender dysphoria.

6    She obviously has had to make a decision as to whether or not

7    surgical candidates are appropriate because of their mental

8    illness or lack of capacity.  She clearly is an expert.  I can

9    move to formally qualify her.  I don't think that's necessary

10   given that her expertise has been recognized by numerous

11   courts and is apparent from her CV and from her report.

12        THE COURT:  Well, you better qualify her.

13        MR. FALK:  I'll move to qualify Dr. Ettner as a

14   psychological expert who has the ability to discuss various

15   mental health disorders and how they may affect gender

16   dysphoria and the ability to consent or not for things like

17   gender surgery.  I'll move her in.

18        MR. CARLISLE:  Renew our objection.  No foundation

19   has been laid as to her experience treating patients with

20   borderline personality disorder.  That's the specific

21   objection.

22        MR. FALK:  Your Honor, we have in evidence her

23   report.  She has interviewed 3,000 persons.  She's a

24   psychologist since, I believe, 1979.  She has treated

25   thousands of gender dysphoric patients as well as other

1    patients as well.  I can ask her for her qualifications, but

2    Your Honor, she's a world recognized psychologist.

3            THE COURT:  Well, obviously, I haven't read her

4    report.  I'll go ahead and overrule the objection, and she can

5    testify.

6            MR. FALK:  Thank you.

7    BY MR. FALK:

8    Q.    Is someone disqualified from receiving gender-affirming

9    surgery because of borderline personality disorder?

10   A.    Not if it's well controlled.

11   Q.    And is borderline personality something that many

12   Americans suffer from?

13   A.    50 percent of Americans will be diagnosed at some point

14   with a mental condition.  Some of those individuals, about 3

15   percent, will be diagnosed with borderline disorder.  Having a

16   diagnosis, carrying a diagnosis is not a reason to deny

17   necessary medical treatment if, as stated before, that

18   condition is well controlled.

19   Q.    And you're aware that Ms. Cordellioné was diagnosed with

20   borderline personality disorder in 2010?

21   A.    I am aware of that.

22   Q.    You reviewed her medical record?

23   A.    I've reviewed her medical records, and I've interviewed

24   her, yes.

25   Q.    And does that diagnosis preclude her from obtaining

1    gender-affirming surgery in your opinion?

2    A.    Currently it does not, no.

3    Q.    Why is that?

4    A.    She's stable.  She hasn't been on any medication since

5    2010.  She has a very high score in global assessment of

6    functioning.  She has been -- in her clinical context, she has

7    been noted to be free of any mental concerns at the time -- at

8    this time.  Her depression is mild, and she is stable.

9    Q.    And you mentioned that you did evaluate Ms. Cordellioné;

10   is that correct?

11   A.    Yes.

12   Q.    And what did you do during that evaluation?

13   A.    I did a complete sex and gender history, and I

14   administered psychological testing, and I also interviewed her

15   during a typical mental status exam, et cetera.

16   Q.    Now, can any mental health professional do an evaluation

17   for surgery for someone with gender dysphoria?

18   A.    I'm sorry.  Did you say can any --

19   Q.    Yes.

20   A.    -- mental professional?

21   Q.    I'm sorry.  Yes.

22   A.    No.  In order to be qualified to assess and prepare a

23   person, if applicable, for reconstructive surgery in this

24   specialized area of medicine, according to the standards of

25   care, an individual has to have certain competencies

*FALK - DIRECT/FALK*

1  regardless of credentials or competencies they may have in a

2  related field.

3          So, for example, the standards of care state that

4  they need to have continuing education or supervision with

5  someone known to have expertise in this area.  They need to

6  understand the diversity of this population and to have -- be

7  able to differentiate between gender dysphoria and other

8  co-occurring conditions.  And those criteria for what the --

9  the standards of care consider qualified mental health

10  professional are delineated in the standards of care.

11  Q.    And the standards of care you're referring to are the

12  WPATH standards of care, correct?

13  A.    Yes.

14  Q.    Version 7 and 8?

15  A.    Correct.

16  Q.    And you have indicated in your report, which is before

17  the Court, that gender-affirming surgery is medically

18  necessary for Ms. Cordellioné; is that correct?

19  A.    Yes.

20  Q.    Why is that?

21  A.    She's been on gender-affirming cross-sex hormones for

22  over four years, which has not -- which have not attenuated

23  her gender dysphoria.  She still has severe gender dysphoria

24  and extreme anatomical dysphoria around her genitals.

25          She actually wears undergarments in the shower so she

1    doesn't have to view her genitals.  In detecting one's

2    genitals and wanting to be rid of them and to have the primary

3    and secondary sex characteristics of the affirmed gender is

4    one of the diagnostic criteria of gender dysphoria.

5          Additionally, surgery for Ms. Cordellioné would

6    remove the testosterone from her body by eliminating those

7    target organs, the testes.  And it is the testosterone, the

8    androgens that fuel gender dysphoria.  So she would have

9    anatomy that was functional and typical in appearance.

10   Q.    Now, she has admitted that she is not truthful with

11   mental health personnel in the past.  Is that a concern for

12   you as an evaluator?

13   A.    Not in her case because I'm aware that very often

14   prisoners don't want to reveal certain things which might have

15   very unpleasant consequences for them.  For example, admitting

16   to suicide ideation or attempts to harm or remove their own

17   genitals could cause them to end up in segregation, so very

18   often, they don't reveal those kinds of events.

19   Q.    Do you see any contraindications for her having surgery

20   at this point?

21   A.    I do not.

22   Q.    And what's -- she's going to be released in December of

23   2027.  What's the harm in waiting?

24   A.    Well, she's suffering now.  Gender dysphoria intensifies

25   with time -- that's a known fact -- going to the secretions of

1   cortisol in the brain as people age.  And when gender

2   dysphoria is inadequately treated, typically, we see three

3   trajectories in people who are incarcerated.  Emotional

4   decompensation, surgical self-treatment, the intention of

5   removing their own genitals or suicide attempts or

6   occasionally completed suicides.  So Ms. Cordellioné has a

7   resilience, but resilience inevitably erodes over time.

8          MR. FALK:  Thank you.  I have no further questions,

9   Your Honor.

10          THE COURT:  Thank you.  Mr. Carlisle?

11          MR. CARLISLE:  Briefly, Your Honor.

12                        **CROSS-EXAMINATION**

13   BY MR. CARLISLE:

14   Q.    Hello, Dr. Ettner.  Good to see you again.

15   A.    Likewise.

16   Q.    Is it possible that gender dysphoria can diminish over

17   time?

18   A.    With treatment?  Yes.

19          MR. CARLISLE:  Thank you.

20          THE COURT:  Mr. Falk?

21          MR. FALK:  Nothing, Your Honor.

22          THE COURT:  Doctor, thank you very much for your

23   testimony.  You're free to go about your day.

24          THE WITNESS:  Thank you.

25       *(Witness excused.)*

1          THE COURT:  Any other witnesses, Mr. Rose?  Mr. Falk?

2          MR. FALK:  No, Your Honor.

3          THE COURT:  Ms. Pactor?

4          MS. PACTOR:  No, Your Honor.

5          THE COURT:  Anything further, Mr. Carlisle?

6          MR. CARLISLE:  No, Your Honor.

7          THE COURT:  Okay.  All right.  Very good.  Wish to

8    make a brief final comment?

9          MR. FALK:  I don't think so, Your Honor, giving that

10   we're going to be filing proposed findings.  And I would

11   suggest that we be given two weeks -- two weeks after the

12   transcript is done to submit our proposed findings and

13   conclusions to the Court.

14         THE COURT:  Mr. Carlisle, do you wish to give any

15   final comment?

16         MR. CARLISLE:  No, Your Honor.  That's fine.

17         MR. FALK:  Your Honor, my colleague asked for maybe

18   three weeks, so we would --

19         THE COURT:  I was just going to ask, are you sure two

20   weeks is -- how about this?  Proposed findings and conclusions

21   due 30 days after receipt of the transcript.

22         MR. CARLISLE:  Thank you, Your Honor.

23         And Anne told you about citing on exhibits, and if

24   you've got any further questions, you can talk to her about

25   that.

1          It's been a pleasure working with you today and

2    always good to get in a courtroom and see good lawyers do

3    their job.  It's part of the -- the fun part of my job anyway

4    and one of the gratifying parts of my job.

5          So safe travels back to Indianapolis.  And

6    Ms. Cordellioné, good working with you as well here today.

7          MS. CORDELLIONÉ:  Thank you, Judge.

8          THE COURT:  Thank you all very much and we'll be in

9    touch.

10         THE CLERK:  All rise.  Court is adjourned.

11       (Proceedings adjourned at 4:42 p.m.)

12                 ***************************

13

14             CERTIFICATE OF COURT REPORTER

15   I, Elizabeth Taylor Culiver, RPR, certify that the foregoing

16   is a correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19   S/s Elizabeth Taylor Culiver    April 5, 2024
     ELIZABETH TAYLOR CULIVER, RPR
20   Official Court Reporter
     Southern District of Indiana
21   Evansville Division

22

23

24

25