UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| AUTUMN CORDELLIONÉ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:23-cv-00135-RLY-CSW |
| | ) | |
| COMMISSIONER, INDIANA DEPARTMENT | ) | |
| OF CORRECTION in her official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

**Order Granting Motion for Preliminary Injunction**

Plaintiff Autumn Cordellioné, whose birth name is Jonathan Richardson, is an adult transgender female prisoner confined in a male institution within the Indiana Department of Correction ("IDOC").[1] She filed this lawsuit against IDOC Commissioner Christina Reagle in her official capacity ("Defendant" or "IDOC"), challenging the constitutionality of Indiana Code § 11-10-3-3.5(a), which bans gender-affirming surgery for transgender inmates with gender dysphoria. She alleges that the total ban on gender-affirming surgery violates her right to be free from cruel and unusual punishment under the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment. She seeks injunctive and declaratory relief.

The court held a hearing on Ms. Cordellioné's motion for preliminary injunction on March 26, 2024. Dkt. 78. Having considered the evidence presented at that hearing and the voluminous evidence in the record, the court concludes that Ms. Cordellioné has established that (1) gender-confirming surgery is a medically necessary treatment option for some individuals

---

[1] Consistent with the court's ordinary practice, it will refer to Ms. Cordellioné by her preferred name and pronouns. *See Balsewicz v. Pawlyk*, 963 F.3d 650, 652 n. 1 (7th Cir. 2020) (using feminine pronouns in a manner "consistent with the district court's order and the parties' briefing in this case"); *see also Dyjak v. Wilkerson*, Nos. 21-2012 and 21-2119, 2022 WL 1285221, at *1 (7th Cir. Apr. 29, 2022) (explaining federal courts' "normal practice of using pronouns adopted by the person before [them]").

with gender dysphoria; and (2) Ms. Cordellioné is an individual for whom this procedure is medically necessary. Accordingly, she has established that she is entitled to the sought-after preliminary injunctive relief.

## I.       Evidentiary Issues

Before the court delves into the merits of the motion, it resolves outstanding objections raised to exhibits and testimony that were raised at the preliminary injunction hearing and in Ms. Cordellioné's motion *in limine* to partially exclude the testimony of Dr. Stephen Levine.

The following exhibits were admitted without objection at the hearing:

| | | | |
|---|---|---|---|
| Exhibits 1-7 | Exhibits 33-43 | Exhibits 61-65 | Exhibits 82-83 |
| Exhibits 12-13 | Exhibit 46 | Exhibit 69 | Exhibits 85-97 |
| Exhibits 15-16 | Exhibit 48 | Exhibits 71-72 | Exhibits 100-101 |
| Exhibits 18-31 | Exhibits 51-56 | Exhibits 75-79 | Exhibits 105-106 |

Dkt. 83 at 7, 12−13 (Preliminary Injunction Hearing Transcript).[2] After the hearing, the court admitted exhibits 109 and 110 without objection. Dkts. 90, 90-1, 90-2, 90-3, 91.

**Exhibits to which Plaintiff has objected**

The court proceeds to evaluate Ms. Cordellioné's objections to various exhibits.

***Exhibits 67, 68, 70, 84, 102, and 108***

Exhibits 67 (Dkt. 54-51), 68 (Dkt. 54-52), 70 (Dkt. 54-55), 84 (Dkt. 54-78), and 102 (not filed electronically) are various articles that were published in professional journals, and Exhibit 108 (Dkt. 76-3) is a declaration of one of Defendant's attorneys purporting to authenticate these articles. Ms. Cordellioné objected to these exhibits because they were not cited by any of the parties' expert witnesses in their reports, nor were any of them authenticated through the

---

[2] When citing to the exhibits, the court will generally refer first to the docket number where the exhibit is found on CMECF, and second to the exhibit number wherever doing so is helpful to the reader. Further, where the cited exhibit is a deposition, the court will first cite to the page number as it appears in the PDF, and then to the page of the deposition within parentheses.

experts' depositions. Dkt. 83 at 11. The court preliminarily overruled Ms. Cordellioné's objection to these exhibits, subject to further examination "[w]hen the time comes for those exhibits to be presented." *Id.* at 12. But at no point during the hearing did Defendant present any of these exhibits to any of the witnesses or otherwise rely on the exhibits. For professional publications to be relied on as evidence, a court must have a basis for concluding that "experts in the particular field would reasonably rely on those kinds of [materials] in forming an opinion on the subject." Fed. R. Evid. 703. In the absence of expert testimony regarding or relying on these materials, IDOC has not made the requisite showing, and therefore the objection is **sustained**, and the court **strikes** exhibits 67, 68, 70, 84, 102, and 108 from the record.

### *Exhibit 81*

Exhibit 81 (Dkt. 54-56) is a demonstrative exhibit prepared by IDOC that purports to describe perceived "limitations" in 22 different studies before the court. One of these studies (Exhibit 34) was introduced during the deposition of IDOC's expert witness, and the other 21 studies were cited by Ms. Cordellioné's expert witnesses in support of their opinions. Not one of the 22 studies was cited in the expert report of IDOC's expert witness. (*See, e.g.*, Dkt. 83 at 158). The plaintiff objects to Exhibit 81 as an improper use of a demonstrative exhibit.

A party "may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. Defendant's chart, however, does not prove the contents of the 22 studies; instead, it presents the opinions of IDOC's counsel (rather than an expert), who synthesized the information about various articles that are not in evidence. The court therefore **sustains** the objection and **strikes** Exhibit 81 from the record.

### *Exhibit 80*

Exhibit 80 (Dkt. 54-75) is the Declaration of Linda Thomas, Ms. Cordellioné's former spouse and the mother of the victim of her criminal offense. Ms. Cordellioné objected to the relevance of this declaration. The declaration has some, albeit limited, relevance, insofar as Ms. Thomas expressed fear that Ms. Cordellioné's identity could be concealed upon release due to her change in appearance, dkt. *id.* at ¶ 15, so the objection is **overruled**.[3]

### *Exhibit 107*

Exhibit 107 (Dkt. 76-2) is a Motion for Alternative Placement that Ms. Cordellioné filed, pro se, in her criminal case on January 4, 2024. She objected on the basis of the timeliness of its disclosure and its relevance. Dkt. 83 at 13. She, however, indicated that she would remove her objection to the exhibit if this court took "judicial notice of the fact that it was denied by the state court on January 19th." *Id.* The court takes judicial notice of the docket of Ms. Cordellioné's criminal case in Indiana Case number 82D02-0110-CF-00738, available at mycase.in.gov, which reflects that the motion was indeed denied on January 19, 2024. Thus, the objection is **overruled**.

### *Exhibits 32, 73, and 74*

Exhibits 32 (Dkt. 54-19), 73 (Dkt. 54-58), and 74 (Dkts. 54-59 through 54-62) are, respectively, the expert report of Dr. Levine, an e-mail from Dr. Levine to one of IDOC's attorneys, and the transcript of Dr. Levine's deposition. Although IDOC inadvertently failed to move to admit Exhibit 74 at the preliminary injunction hearing, the parties have agreed that it should be deemed to have done so. Dkts. 88, 89. Dr. Levine has been designated by the IDOC as

---

[3] Ultimately, this affidavit had no bearing on the outcome of Ms. Cordellioné's motion for injunctive relief. First, Ms. Thomas did not testify at trial, so there is no evidence that she in fact could not recognize Ms. Cordellioné. Second, most of Ms. Cordellioné's physical changes have resulted from the treatments that IDOC *does* permit for transgender inmates—namely social transitioning and hormone therapy.

an expert witness in this case, and Ms. Cordellioné has separately filed a motion to partially exclude Dr. Levine's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Dkt. 60, which will be addressed below.

In addition to her *Daubert* objections, Ms. Cordellioné objected to both Exhibit 32 and Exhibit 73 insofar as neither exhibit is verified. Dkt. 83 at 15. She further objected to Exhibit 74 as an untimely attempt to supplement the expert report of Dr. Levine. *Id.* During the hearing, Dr. Levine affirmed that the previously unsworn testimony in his expert report (Exhibit 32) is true. *Id.* at 133. He offered no similar testimony about the e-mail at Exhibit 73. "Unsworn expert reports do not qualify as affidavits or otherwise admissible evidence . . . and may be discarded by the court." *Remediation Prods., Inc. v. Adventus Americas Inc.*, 2009 WL 4612290, at *1 (W.D.N.C. Dec. 1, 2009) (cleaned up). The objection to the e-mail at Exhibit 73 is **sustained**, and the court **strikes** Exhibit 73 from the record.

The court **admits** Exhibits 32 and 74 consistent with its rulings on the *Daubert* motion.

**The parties' objections under *Daubert* and its progeny**

*Legal Standard*

Federal Rule of Evidence 702 requires the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The proponent of expert testimony bears the burden of demonstrating its admissibility. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The court must engage in a three-step analysis when fulfilling its "gatekeeping obligation" under Rule 702 and determine: "whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett–Packard Co.*,

877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990)). Accordingly, "simply because a doctor has a medical degree does not make him qualified to opine on all medical subjects." *Id.* at 617 (citation omitted).

To determine whether a witness is qualified to render an expert opinion, this court must "consider [the] proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Dr. Levine has been a licensed psychiatrist for over 50 years. Dkt. 83 at 124. He characterizes his area of expertise as pertaining to what he calls "human sexual concerns"— which he deems to include "love relationships that manifest with sexual life and sexual problems, sexual dysfunction, marital relationships, [or] sexual identity issues." Dkt. 54-59 at 13 9 (Levine Dep., Vol. I) [Ex. 74]. He is not a surgeon. Dkt. 54-60 at 29 (Levine Dep., Vol. 2).

 Dr. Levine has treated transgender patients since he completed his residency, and he runs a clinic that has treated about 315 patients with gender identity issues. Dkt. 83 at 125. In 2007, Dr. Levine began consulting for the Massachusetts Department of Corrections as to the treatment of transgender prisoners; he has remained a consultant for 17 years. *Id.* Of the hundreds of patients with gender dysphoria Dr. Levine has treated, most have considered whether to seek gender-affirming surgery. *Id*. at 126-27.

 When a patient discusses an interest in gender-affirming surgery, Dr. Levine views his

professional role as conducting a psychiatric evaluation, including taking a developmental history and discussing the patient's motivation for seeking surgery. *Id.* at 127. He also believes that he must participate in the informed consent process insofar as he wants to ensure that any patient he recommends for surgery has the mental and intellectual capacity to understand the consequences of the surgery. *Id.* at 127−28. Thus, over the course of his career, he has read medical literature about gender-affirming surgery, attended conferences at which surgeons have presented, and has written two papers on informed consent. *Id.* at 129−30.

Ms. Cordellioné raises three objections to Dr. Levine's testimony. First, she states that because Dr. Levine is not a surgeon, he is not qualified to testify about the nature, rate, or severity of surgical complications. His only source of "expertise" on these subjects is his review of medical literature. "Courts are suspicious of purported expertise premised solely or primarily on a literature review." *McConnie-Navarro v. Centro de Fertilidad del Caribe, Inc.*, 2007 WL 7652299, at *13 (D.P.R. May 31, 2007) (collecting cases). There is no doubt that Dr. Levine has experience treating patients for gender dysphoria or that his treatment includes consulting with his patients about the risks associated with gender-affirming surgery. On the other hand, he is not an expert in the nitty gritty of the nature, rate, or severity of surgical outcomes as those are not part of his practice. The motion in limine is **granted in part and denied in part**, and the objection is **overruled** to the extent that the court will not exclude Dr. Levine's testimony concerning his concerns about surgical complications, but it gives those opinions very little weight.

Second, Ms. Cordellioné objects based on the fact that Dr. Levine's opinions about the safety and efficacy of gender-affirming surgery are based on cherry-picked excerpts of scientific articles. Speculation may not make up the deficiency in an expert's opinion where

the expert fails to "bridge the analytical gap" between the data and his ultimate conclusion. *See, e.g.*, *Gopalratnam*, 877 F.3d at 786. And "[c]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data because such an approach does not reflect scientific knowledge, is not derived by the scientific method, and is not good science." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) (internal citations and quotations omitted); *see also, e.g.*, *Crain v. McDonough*, 2022 WL 611292, at *7 (S.D. Ind. Feb. 28, 2022) ("[E]xperts who engage in cherry-picking of the evidence fail to satisfy the scientific method and *Daubert*.") (citation omitted), *aff'd*, 63 F.4th 585 (7th Cir. 2023). In her own expert reports, Ms. Cordellioné's experts cited dozens of studies specifically concerning the safety and efficacy of gender-confirming surgery; additional studies are cited in the Standards of Care published by the World Professional Association for Transgender Health ("WPATH"). The majority of this research is ignored by Dr. Levine, and much of the literature he does cite is at best tangentially related to the efficacy of gender-confirming surgery. The court agrees that Dr. Levine's conclusions are not rooted in reliable scientific methodology. Thus, the motion in limine is **granted** to the extent that the portions of Dr. Levine's report that discuss the "six outcome parameters" to determine the safety and efficacy of gender-affirming surgery are **stricken**, and the court has disregarded his testimony about the same.

Finally, Ms. Cordellioné objects to the part of Dr. Levine's report that discusses whether prisoners are capable of providing informed consent to gender-affirming surgery. The court **grants** the motion as it relates to this part of his report. Dr. Levine has recommended gender-affirming surgery as medically necessary for at least four inmates. Dkt. 83 at 175. Thus, his position that inmates are incapable of proving such consent is not well taken.

Finally, the court addresses IDOC's argument that if the court excludes Dr. Levine's opinions about gender-affirming surgery, it must do the same with respect to Dr. Ettner, who is a psychologist. Dr. Ettner has evaluated, diagnosed, and treated 3,000 individuals with gender dysphoria and mental-health issues related to gender variance, has evaluated several hundred of those persons for surgery, and has published extensively in the area (including specifically on the benefits of surgery). Dkt. 37-1 at 1; Dkt. 83 at 184. She also has extensive experience working with patients following gender-affirming surgery, providing treatment and post-operative care to hundreds of them. Dkt. 70-7 at 19 ¶ 35 (Ex. 103, Expert Rebuttal of Dr. Ettner). She is qualified to opine on the benefits and efficacy of gender-affirming surgery, and she does not attempt to opine about the nature, rate, or severity of surgical complications. Thus, the objection to her testimony on this is **overruled**.

Finally, IDOC's objection to any testimony from Dr. Loren Schechter, a board-certified plastic surgeon, about the mental health benefits of gender-affirming surgery is **overruled**. Dr. Schechter's expertise includes academic writing and his contribution to the Seventh Version of WPATH's Standards of Care focused on "the relationship of the surgeon with the treating mental health professional" in addition to several articles about interdisciplinary approaches between surgeons and mental health professionals treating patients with gender dysphoria. Dkt. 37-2 at 3, 11, 16, 19, 33 (Dr. Loren S. Schecter, M.D., Expert Declaration). He is qualified to opine on the mental health benefits of gender-affirming surgery.

## II.    Findings of Fact

The following facts are found by the Court to be true based on the stipulated facts (dkt. 66) and the testimony and documents presented during the preliminary injunction evidentiary hearing. Any finding of fact is deemed to be a conclusion of law to the extent

necessary and appropriate.

### A. The Parties' Experts

Ms. Cordellioné has presented expert testimony from Dr. Randi Ettner, Ph.D., and Dr. Loren Schechter, M.D. Dkt. 37-1 (Ex. 98, Expert Report of Dr. Ettner); Dkt. 83 at 183-190; Dkt. 37-2 (Ex. 99, Expert Declaration of Dr. Schechter); Dkt. 70-7 (Ex. 103, Expert Rebuttal Report of Dr. Ettner); Dkt. 70-8 (Ex. 104, Rebuttal Declaration Dr. Schechter).

Dr. Ettner is a clinical and forensic psychologist with extensive experience in the diagnosis and treatment of gender dysphoria. Dkt. 37-1 at 1. She has published four books related to the treatment of gender dysphoria, including the first and second editions of the medical text *Principles of Transgender Medicine and Surgery*, and numerous peer-reviewed articles. Dkt. 37-1 at 1, 7-10. She is the co-author of both the seventh and eighth versions of the WPATH Standards of Care and served as co-lead author on the eighth version's chapter on the "Applicability of the Standards of Care to People Living in Institutional Environments." *Id.* at 1. She trains medical professionals on healthcare for transgender prisoners and serves as a psychologist at the Weiss Memorial Hospital Center for Gender Confirmation Surgery. *Id.* at 1, 30. During her career, she has diagnosed and treated more than 3,000 persons for gender dysphoria and gender variance and has evaluated hundreds of them for surgery. Dkt. 83 at 184; dkt. 70-7 at 18-19 ¶ 35. She also has extensive experience working with patients following gender-affirming surgery, providing treatment and post-operative care to hundreds of them. Dkt. 70-7 at 19 ¶ 35. She works collaboratively with surgeons and other medical professionals to determine the appropriate care, including surgical and post-operative care, for transgender persons. *Id.* She has evaluated over 100 transgender prisoners in 20 different states and has evaluated 20% to 25% of those for surgery. Dkt. 54-67 at 32 (81) (Ex. 76, Ettner Dep.). She has frequently testified as an

expert concerning gender dysphoria and the need for and efficacy of gender-affirming surgery. Dkt. 37-1 at 2 (listing cases).

Plastic surgeon Dr. Schecter has specialized in gender-affirming surgeries for over 20 years. Dkt. 37-2 at 1, 3 ¶¶ 2, 8. In the past seven years, he has performed about 150 gender-confirming surgeries every year, including on an individual incarcerated by the U.S. Bureau of Prisons and five individuals incarcerated within the Illinois Department of Correction. *Id.* at 3, ¶ 8. He is also a professor of Surgery and Urology at the Rush University Medical Center in Chicago, and he trains other surgeons in performing gender-affirming surgery. *Id.* at 3-5, ¶¶ 7, 13-14. He has published extensively on the subject of gender-affirming surgery, including articles, textbook chapters, and textbooks, including the first reference guide for surgeons on how to perform the surgery. *Id.* at 4, ¶ 11. He also wrote the section in the seventh version of the WPATH Standards of Care on the relationship of the surgeon with the patient's mental health professionals and the doctor prescribing hormone therapy, and in the eighth version he served as the co-lead author of the chapter on surgical and postoperative care. *Id.* at 3-4, ¶ 9. He has repeatedly testified as an expert on issues concerning the nature, necessity, and efficacy of gender-affirming surgery. *See, e.g., C.P. ex rel. Pritchard,* 2022 WL 17092846, \*2; *Fain v. Crouch*, 618 F. Supp. 3d 313, 321 (S.D.W. Va. 2022), *aff'd sub nom. Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 948 (W.D. Wis. 2018).

The court finds that Dr. Ettner and Dr. Schechter have expertise in the nature, necessity, and efficacy of gender-affirming care, including gender-affirming surgery, for persons suffering from gender dysphoria. The court further finds that Dr. Ettner has expertise in the evaluation, diagnosis, and treatment of gender dysphoria.

IDOC relies on the testimony of Dr. Stephen B. Levine, M.D. Dkt. 54-19 (Ex. 32, Expert Report Dr. Levine); Dkt. 83 at 124−83. Dr. Levine has practiced as a psychiatrist, licensed in Ohio, since the early 1970s. Dkt. 54-59 at 12−14 (Ex. 74, Dep. of Dr. Levine). In 1973 or 1974, Dr. Levine founded the Case Western Reserve Gender Identity Clinic in Cleveland, although in 1993 that clinic dissociated from Case Western Reserve University. *Id.* at 14−17. In the three decades since this disaffiliation, the clinic has diagnosed fifty or sixty patients (a total of less than two a year) with gender dysphoria. *Id.* at 34−35. Over the past decade or so, at any one time, Dr. Levine has had about four gender dysphoric patients. *Id.* at 36.

Beginning in or around 2007, Dr. Levine has also served as a consultant to the Massachusetts Department of Correction. Dkt. 54-60 at 1 (51) (Ex. 74, Dep. of Dr. Levine, Vol. 2). In this role, he has consulted on the treatment of 200 to 300 transgender individuals. Dkt. 83 at 125. He has also consulted on the treatment of a maximum of eight gender dysphoric prisoners in other states. Dkt. 54-60 at 6-7 (56-57).

The court finds that Dr. Levine has expertise in the evaluation, diagnosis, and treatment of gender dysphoria.

### B. Gender Dysphoria and Its Treatment

"Gender identity" is the term that refers to a person's sense of belonging to a particular gender. Dkt. 66 at ¶ 1 (Stipulation of Facts). A person who is cisgender has a gender identity—an internal sense of gender—that aligns with his or her birth-assigned sex, while a person who is transgender has a gender identity that does not. *Id.* at ¶ 2. Some transgender individuals are diagnosed with gender dysphoria, a psychiatric condition recognized by the current, fifth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders,* and its text revision (DSM-V-5 and DSM-5-TR). *Id.* at ¶¶ 3−5.

Gender dysphoria in adolescents and adults is defined by the DSM-5-TR as:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following.

    1.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

    2.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

    3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.

    4.    A strong desire to be the other gender (or some alternative gender different from one's assigned gender).

    5.    A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

    6.    The strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Dkt. 66 at ¶ 5.

The WPATH Standards of Care are the internationally recognized guidelines for the treatment of persons with gender dysphoria. Dkt. 37-1 at 6. They are endorsed by the American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, and the American Society of Plastic Surgeons. *Id.*

The WPATH Standards are also supported by the National Commission of Correctional Health Care, an organization that creates authoritative standards that are used throughout the country by various correctional authorities, including IDOC. Dkt. 70-7 at 12, ¶ 23; dkt. 37-3 at 16. Indeed, IDOC's policies before 2024 recognized that WPATH's Standards of Care "articulate a professional consensus about the psychiatric, psychological, medical and surgical management of gender dysphoria." Dkt. 37-3 at 102 (Rule 30(b)(6) Deposition of Dr. Adrienne Bedford).

Notably, Dr. Levine was once a member of WPATH's predecessor body before disassociating with the organization over professional disagreements. Dkt. 83 at 129−30. Dr. Levine characterizes the WPATH Standards not as a standard of care, but more properly as a guidance document because it does not meet the rigorous standards required for standards of care. Dkt. 54-19 at 36 *et seq.* Dr. Levine notes that WPATH has been "recognized as biased, inherently contradictory, consensus-based, and erroneously claiming to be evidence-based." *Id.* at 36-70, ¶ 70. On this point, other courts have recognized that Dr. Levine has become an "outlier in the field of gender dysphoria." *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018), *vacated in part on other grounds*, 935 F.3d 757 (9th Cir. 2019); *see also Fain v. Crouch*, 618 F. Supp. 3d 313, 329 (S.D.W. Va. 2022) (describing Dr. Levine's opinions regarding gender dysphoria as "inconsistent with the body of literature on this topic"), *aff'd sub nom. Kadel v. Folwell*, 100 F.4th 122, (4th Cir. 2024); *Hecox v. Little*, 479 F. Supp. 3d 930, 977 n.33 (D. Idaho 2020) (citing *Edmo*). Given the widespread acceptance of WPATH's Standards of Care by other professional medical bodies as well as the National Commission of Correctional Health Care, the court finds that the Standards of Care are credible and reliable and will rely on them in reaching its conclusions in this matter.

14

WPATH's Standards of Care provide for various treatment for individuals with gender dysphoria including social transition (living in a manner consistent with one's gender identity with respect to clothing, names/pronouns, etc.), counseling and psychotherapy, hormone therapy, and surgical interventions designed to align primary and secondary sex characteristic with the person's gender identity. Dkt. 66 at ¶ 7. Treatment of a transgender person suffering from gender dysphoria is determined based on an individualized assessment of the person's needs. Dkt. 37-1 at 7−8.

While some transgender persons are able to be comfortable with their gender identity without surgery, for some, nonsurgical treatments are not sufficient to relieve their severe gender dysphoria; the WPATH Standards of Care recognize that surgical intervention, *i.e.*, genital reconstruction, is necessary to modify these persons' primary sex characteristics. Dkt. 37-1 at 9; dkt. 37-2 at 10, ¶ 28.

When gender dysphoria remains marked and sustained, it is medically necessary to provide the surgery. Dkt. 37-2 at 14, ¶ 39. Without such surgery, a gender-dysphoric person may suffer increasingly debilitating symptoms of anxiety, depression, hopelessness, suicidal ideation, and other manifestations of psychological decompensation and may resort to suicide. Dkt. 37-1 at 15-16. Transgender females may resort to self-surgery by removing their testicles and penis. *Id.* at 15. For these individuals, surgery is medically necessary and is recognized as such by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American College of Obstetricians and Gynecologists, and the World Health Organization, among others. Dkt. 37-1 at 7, 10-11.

The WPATH Standards of Care recognize that surgery to change primary or secondary sex characteristics is care that may be necessary for gender dysphoria. Dkt. 37-1 at 7.

While there are various surgical procedures available to align a transgender person's anatomy and physical appearance with his or her gender identity, relevant to this case is an orchiectomy, removal of the testes, and a vaginoplasty, surgery that constructs a vagina. Dkt. 37-2 at 10-11, ¶ 30. Genital reconstruction surgery for transgender women serves two therapeutic purposes: removal of the testosterone-producing testicles and allowing the person to attain congruence with their gender identity by having genital structures that appear and function as are typical for cisgender women. Dkt. 37-1 at 10.

IDOC contends that there is disagreement as to whether there is widespread medical consensus that gender-affirming surgery is "a safe and effective course of treatment for gender dysphoria such that a state's prohibition of [gender-affirming surgery] is a substantial departure from accepted professional judgment, practice or standards." Dkt. 94 at 23. IDOC relies largely on Dr. Levine's Expert Report that questions the need to provide incarcerated individuals with gender-affirming surgery. *See generally* Dkt. 54-19. The court finds, however, that the widespread medical consensus is that gender-affirming surgery is a medically necessary form of care for some individuals with gender dysphoria. *See* Dkt. 37-1 at 7, 10-11. Dr. Levine's own skepticism regarding the need to make such surgery available to incarcerated individuals with gender dysphoria is not credible given his own recommendations that certain incarcerated individuals receive such surgery and his rejection of WPATH's Standards of Care despite their widespread acceptance.

Indeed, extensive research from the past three decades establishes that gender-affirming surgery is a safe, therapeutic, and effective treatment for gender dysphoria and is medically necessary for the treatment of some individuals with severe gender dysphoria. Dkt. 37-1 at 11-13; dkt. 37-2 at 16-21, dkt. 70-7 at 6-7, 14-17. This research includes, among other things,

surveys and studies of thousands of transgender individuals, with one study indicating that 97%

of these who underwent at least one gender-affirming surgery reported improved life satisfaction;

another indicating that those who underwent surgery had significantly less psychological distress

and suicidal ideation than those with no history of surgery; and yet another indicating that

gender-affirming surgery positively affects well-being, sexuality, and quality of life in general.

Dkt. 70-7 at 14-16.

While all surgery carries risks, gender-affirming surgeries are safe, and surgeons

performing them use many of the same procedures used to treat other medical conditions.

Dkt. 37-2 at 16, ¶ 42; dkt. 70-8 at 2, ¶ 6. Surgery may be medically necessary despite attendant

risks. Dkt. 70-8 at 2-3, ¶¶ 6, 12. IDOC focuses on the fact that gender-affirming surgery sterilizes

the individual and is irreversible. Dkt. 94 at 51. While true, a patient seeking gender-affirming

surgery would not be approved of such surgery without undergoing the informed consent

process, which is in place to ensure that she is able to make the appropriate choice after being

informed of the risks and benefits of the surgery. Dkt. 70-8 at 2, ¶ 6. Many people undergo

sterilizing procedures for a variety of medical reasons, and the court finds no reason to treat these

surgeries any different so long as the patient provides informed consent.

The criteria for gender-affirming genital surgery in male-to-female transgender adult

patients are:

1.  Gender incongruence is marked and sustained;

2.  Meets diagnostic criteria for gender incongruence prior to gender-affirming surgical intervention in regions where a diagnosis is necessary to access health care;

3.  Demonstrates capacity to consent for the specific gender-affirming surgical intervention;

4.  Understands the effect of gender-affirming surgical intervention on

> reproduction and they have explored reproductive options;

> 5. Other possible causes of apparent gender incongruity have been identified and excluded;

> 6. Mental health and physical conditions that could negatively impact the outcome of gender-affirming surgical intervention have been assessed, with risks and benefits hav[ing] been discussed;

> 7. Stable on their gender affirming hormonal treatment regime (which may include at least 6 months of hormone treatment or a longer period if required to achieve the desired surgical result, unless hormone therapy is either not desired or is medically contraindicated).

Dkt. 70-7 at 17, ¶ 31.

Having a coexisting mental health diagnosis does not disqualify a person from receiving medically necessary gender-affirming surgery if the mental illness is stable and does not interfere with a person's ability to provide informed consent. Dkt. 70-7 at 9-10, 17 ¶¶ 19, 31; Dkt. 70-8 at 4 ¶¶ 14-15; Dkt. 54-67 at 42-43 (91-92). This includes the diagnosis of a personality disorder, which is considered to be lifelong, and like other mental health diagnoses does not preclude gender-affirming surgery if the condition is well-controlled. Dkt. 70-7 at 10 ¶ 20.

In order to assess the readiness and eligibility of a person for gender-affirming surgery, the mental health professional must have experience with gender dysphoria, and not just general mental health experience. Dkt. 70-7 at 18 ¶ 32. They must, if new to the field, receive supervision from a person with expertise, and demonstrate the ability to distinguish comorbidities from gender dysphoria. *Id.* This is a subspecialty that requires experience and training. *Id.*

The surgeon is responsible for going through the informed consent process with a patient before surgery. Dkt. 83 at 120. The informed consent process (for all surgeries) involves discussing the specifics of a surgical procedures and the risks. Dkt. 54-63 at 9-10.

The National Commission on Correctional Health Care recognizes that gender-affirming surgery should be provided when determined to be medically necessary for transgender prisoners. Dkt. 37-3 at 38. Transgender prisoners in a number of jurisdictions may receive gender-affirming surgeries. Dkt. 37-1 at 15. These include prisoners within the federal Bureau of Prisons and a number of state correctional institutions including at least those in Illinois, Washington, Idaho, California, and Massachusetts. *Id.*; Dkt. 37-2 at 21 ¶ 53. The assessment process for the appropriateness of surgery is the same as the process for those who are not incarcerated. Dkt. 37-2 at 21, ¶ 52. Incarceration does not render a person incapable of providing informed consent. Dkt. 54-63 at 29−31.

### C. Ind. Code § 11-10-3-3.5(a) and IDOC's Policies Related to Healthcare for Transgender Inmates

IDOC is responsible for providing medical and mental health care to its prisoners. Dkt. 66 at ¶ 8. IDOC has currently contracted with Centurion Health Services ("Centurion") to provide medical and mental health care for its prisoners, although IDOC retains the ultimate authority to ensure prisoners receive healthcare. *Id.* at ¶ 9. IDOC limits medical care to what is deemed to be medically necessary, including medically necessary surgical services. *Id.* at ¶¶ 12, 14. The IDOC's Policy and Administrative Procedure 01-02-101 limits the scope of the medical care it provides to "adequate Health Services necessary to address serious medical conditions," requiring "clinical staff [to] distinguish between care that is necessary (and should be provided) and care that is desirable and not necessary (and should not be provided)." *Id.* at ¶ 13. In the contract that the IDOC has executed with Centurion, Centurion agrees to follow the standards established by the National Commission on Correctional Health Care, as does the IDOC itself. Dkt. 37-3 at 16, 21-23.

IDOC recognizes that gender dysphoria can result in clinically significant distress that

causes severe anxiety, depression, self-harm, and suicidality. *Id.* at 35. Before the passage of Indiana Code § 11-10-3-3.5(a), IDOC promulgated IDOC Health Care Services Directive 2.17A (April 1, 2022) ("HCSD 2.17A (2022)"), titled "Health Services for Transgender and Gender Diverse Patients." Dkt. 54-1 at 1. That policy contemplated that inmates with gender dysphoria could "pursue multiple domains of gender affirmation which include social, legal, medical, and/or surgical interventions." *Id.* Under HCSD 2.17A (2022), the treatment provided to gender dysphoric IDOC prisoners was determined by the independent professional judgment of mental health professionals. Dkt. 66 at ¶ 19. A gender review committee reviewed certain decisions made by mental health professionals, such as the decision to diagnose a prisoner with gender dysphoria. *Id.* Inmates seeking gender-affirming surgery would have to be evaluated by two mental health professionals who would make a recommendation to the Gender Dysphoria Review Committee, which would then decide if surgery was warranted. *Id.* at ¶ 20. Before July 1, 2023, two IDOC prisoners were approved for gender-affirming surgery. *Id.* at ¶ 21. The surgeries were not provided by the IDOC's medical provider but rather by an outside surgeon at Eskenazi Hospital in Indianapolis. Dkt. 83 at 119-20.

Indiana Code § 11-10-3-3.5(a) went into effect on July 1, 2023. Dkt. 66 at ¶ 20. This statute provides that "[t]he department [of correction] may not authorize the payment of money, the use of any state resources, or the payment of any federal money administered by the state to provide or facilitate sexual reassignment surgery to an offender patient."

"Sexual reassignment surgery" is defined by Indiana Code § 11-10-3-1(6) as:

performing any of the following surgical procedures for the purpose of attempting to alter the appearance of, or affirm the offender patient's perception of, his or her gender or sex, if that appearance or perception is inconsistent with the offender patient's sex:

(A) Surgeries that sterilize, including castration, vasectomy, hysterectomy,

oophorectomy, orchiectomy, and penectomy.

(B) Surgeries that artificially construct tissue with the appearance of genitalia that differs from the offender patient's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(C) Removing any healthy or non-diseased body part or tissue.

In 2024, IDOC modified HCSD 2.17A to reflect the passage of § 11-10-3-3.5(a). Dkt. 90-1 (March 31, 2024, Executive Directive #24-10). The updated version of the policy ("HCSD 2.17A (2024)") provides that IDOC inmates may still engage in psychotherapy, social transitioning, and hormonal therapy. Dkt. 90-2 at 5−6. As it relates to surgery, HCSD 2.17A (2024) now states, "Gender Affirmation Surgery ('GAS'): Individuals may live successfully as transgender persons without surgery. The Department will adhere to all State laws and regulations and will provide the most comprehensive care available." *Id.* at 6.

IDOC will provide surgical services for cisgender prisoners that under § 11-10-3-3.5(a) would be banned as gender-affirming care for transgender prisoners. Dkt. 37-3 at 29. For example, cisgender IDOC prisoners may have hysterectomies, testicular removal, fallopian tube removal and ovary removal if deemed medically necessary. *Id.*

At the preliminary injunction hearing, Dan Mitchell, the warden at Branchville Correctional Facility, testified that there is a transgender review committee at the facility that meets monthly to discuss the needs of transgender prisoners from various professional perspectives. Dkt. 83 at 63−64. He also testified that the prison staff is trained in suicide prevention measures and about the suicide watch protocol at that facility. *Id.* at 64−66; dkt. 55−74 at ¶ 8 (Ex. 79, Mitchell Decl.). While the court appreciates that Warden Mitchell took time to testify at the hearing, the evidence related to the care of transgender and/or suicidal

inmates at Branchville has no bearing on this court's decision, as Ms. Cordellioné is now housed at New Castle Correctional Facility. Dkt. 85 (Notice of change of address).

### D. Ms. Cordellioné's Background

Ms. Cordellioné was born in 1982 and is 41 years old. Dkt. 66 at ¶ 24. She was born with anatomy traditionally associated with males. *Id.* at ¶ 25. Ms. Cordellioné has been incarcerated in the IDOC since 2002. Dkt. 66 at ¶¶ 26−27. She is in prison for murdering her infant stepdaughter and was 19 at the time of the crime. *Id.* at ¶¶ 26-27. Her earliest possible release date is December 31, 2027. *Id.* at ¶ 28.

Ms. Cordellioné knew from an early age that she was a girl, but she did not learn about transgender people and possible treatment until she had been imprisoned for some time. *Id.* at ¶ 33. In 2020, Ms. Cordellioné was diagnosed with gender dysphoria by the Gender Dysphoria Review Committee. *Id.* at ¶ 35. Beginning in July 2020, Ms. Cordellioné was prescribed estradiol, an estrogen supplement, and spironolactone, and androgen blocker that lowers the amount of testosterone that her body would otherwise produce, and she has consistently received those medications since that time. *Id.* at ¶¶ 36−37. As a result of the hormone therapy, Ms. Cordellioné's body has changed so that, among other things, she has developed breasts, and her body fat has redistributed in a manner more consistent with the body of a woman. *Id.* at ¶ 38. In addition to hormone therapy, Ms. Cordellioné has used her chosen name as much as possible; has been allowed to purchase female items from commissary (including bras, panties, form-fitting clothing, and make-up); and has been seen by mental health staff. *Id.* at ¶¶ 40−42, 45−46.

Ms. Cordellioné has a lengthy history of being medicated with psychotropic medication, but under the supervision of medical professionals has not been on any psychotropics or other mental health medications since 2010 or 2011. Dkt. 83 at 56; Dkt. 66 at 6, ¶ 32.

Ms. Cordellioné has a history of self-harm and suicide attempts. Dkt. 66 at ¶ 30. These attempts include overdosing on prescription medication, trying to hang herself, lighting her cell on fire, and burning two fingers off in boiling water in an attempt to get gangrene. Dkt. 54-70 at 27−31 (76−80) (Cordellioné Dep.). She engaged in self-harm due to her inability to express her female gender identity, but she did not tell her mental health providers that because she did not understand her transgender identity the time, and she did not want to be placed on suicide watch. *Id.* at 26−27 (75−76).

Ms. Cordellioné has lied to mental health providers, or avoided telling them about her urges to self-harm, in order to avoid being placed on suicide watch. *Id.* at 27 (76); dkt. 83 at 56. While on suicide watch, she was placed in a "rubber room," a suicide cell where a prisoner is placed without clothing, with no mat, and with a hole in the floor to use for the bathroom. Dkt. 83 at 56-57. In that room, she lacked access to toilet paper or the ability to wash her hands. *Id.* The experiences of being placed in suicide watch conditions were very painful for Ms. Cordellioné. *Id.* at 58.

As part of her gender dysphoria, Ms. Cordellioné experiences distress due to her genitals. Dkt. 39-1 at ¶ 16 (Cordellioné Decl.). At times she has soiled herself rather than use the restroom to avoid looking at her genitals, and she often wears underwear in the shower. *Id.* at ¶¶ 16−17. Ms. Cordellioné cannot stand the testicles and penis on her body. Dkt. 54-70 at 36 (85). She has attempted surgical self-treatment by ligation on multiple occasions by putting rubber bands around her genitals, but it was too painful for her to tolerate to accomplish castration. *Id.* at 33, 36-37 (82, 85−86). She also cut her genitals with a razor blade in 2008, but she stopped because the excessive amount of blood caused her to fear that she would be placed on suicide watch. *Id.* at 37-38 (86−87). Ms. Cordellioné does not have the urge to feel pain, but her self-harming

behavior is a way to control her overwhelming emotions. *Id.* at 42−43 (91−92). Dr. Ettner explained that attempts at self-treatment through attempted ligation or genital cutting should not be considered a sign of "uncontrolled mental illness; on the contrary, such behavior represents a rational intention to eliminate testosterone by removal of the androgen-producing target organ. Ideation and attempts to perform self-surgery are *a priori* evidence of inadequate or insufficient care for gender dysphoria." Dkt. 37-1 at 23 n.4. This form of self-harm indicates that hormones are insufficient to treat an individual's gender dysphoria. Dkt. 54−67 at 45−46 (94−95).

Ms. Cordellioné was placed in a single cell in a restrictive housing unit ("RHU") in February 2024 after another inmate stabbed her after she refused to have sex with him. Dkt. 83 at 47−50. In the RHU, she lacked access to most of the accommodations for her gender dysphoria. She could not shave regularly, so hair grew back, and she was forced to wear large clothing. *Id.* at 50−51. This caused the symptoms of her gender dysphoria to increase, and she tried to commit suicide by taking Melatonin pills. She also tried to ligate her penis. *Id.* at 46−47, 50−51. This was the first time she had attempted suicide since she stopped taking mental health medications in 2011. *Id.* at 46.

In addition to her gender dysphoria, Ms. Cordellioné has active diagnoses of borderline personality disorder and recurrent major depressive disorder. Dkt. 66 at 7, ¶ 43. Prisoners within IDOC are given mental health codes ranging from A to F, with an A code meaning the prisoner has no mental health issues, no diagnosis, and no history of mental health issues; a B code meaning that the prisoner may have mental health issues but they are stable and are not causing any significant problems; a C code meaning the prisoner may have moderate to severe issues, is likely on medication, and is likely seen at least every 90 days; and D through F indicating

progressively more severe mental health issues. Dkt. 83 at 54−55. Ms. Cordellioné's mental
health code was recently changed from "C" to "B." *Id.* at 55−56.

Evidence of improved mental health functioning does not mean that surgery is not needed
if the person's symptoms of gender dysphoria remain severe or non-remitting. Dkt. 37-1 at 20.

**E.  Ms. Cordellioné's efforts to obtain gender-affirming surgery**

When Ms. Cordellioné was diagnosed with gender dysphoria and prescribed hormones,
she did not know that gender-affirming surgery was possible while she was still incarcerated.
Dkt. 83 at 31−34. Thus, she told her mental health providers that she would like surgery at the
earliest opportunity upon her release. Dkt. 54-70 at 8 (57).

When Ms. Cordellioné learned that IDOC provided gender-affirming surgery to eligible
transgender inmates, she submitted a healthcare request form in June of 2022 that said, "I would
like to request gender reassignment surgery for my gender dysphoria." Dkt. 39-1 at ¶ 22. When
she received no response, she submitted additional request forms in November 2022, January
2023, and February 2023. *Id.* at ¶¶ 25−26. After the February 2023 request, a healthcare staff
member told Ms. Cordellioné that she was on the list for evaluation. *Id.* at ¶¶ 25−26.

On May 8, 2023, Ms. Cordellioné had a telehealth mental health visit with psychologist
Dr. Michael Farjellah. Dkt. 54-73 at ¶¶ 6−7. During this visit, Dr. Farjellah informed Ms.
Cordellioné that "IDOC has decided to not go further with transgender surgery." *Id.* at ¶ 7. This
telehealth visit did not constitute an evaluation for surgery. Dkt. 37-3 at 59, 62 (Dep. of Dr.
Adrienne Bedford). Indeed, Ms. Cordellioné has never been evaluated by IDOC or its contracted
medical provider for gender confirmation surgery. *Id.* at 58, 62−63.

After Ms. Cordellioné learned that that she couldn't receive surgery due to the passage of
§ 11-10-3-3.5, she told a healthcare professional that she wanted her hormones increased so she

could have surgery when she left prison. Dkt. 83 at 39-40. But this was not because she did not want surgery while in prison; she was hoping that her hormones levels were at correct levels in case she won her litigation so that she could be ready for surgery as soon as possible. *Id.*

Ms. Cordellioné wants surgery while she is incarcerated in the IDOC, and as soon as possible, because her gender dysphoria is getting worse. *Id.* at 43. She believes that having gender-affirming surgery (in the form of an orchiectomy and a vaginoplasty) would alleviate her gender dysphoria and allow her to live without constant thoughts of harming or killing herself. *Id.* at 20−21, 54. Ms. Cordellioné agrees that the treatment she has received for her gender dysphoria has allowed her to feel better about her gender identity, but she is not complete and suffers daily. Dkt. 54-71 at 2 (102). She understands that removing her penis and having a vaginoplasty will not solve all her problems, but it will reduce her pain. *Id.* at 32−33 (132−33).

Having reviewed her deposition testimony and observed Ms. Cordellioné during the preliminary injunction hearing, the court finds Ms. Cordellioné to be credible. That is, the court believes that Ms. Cordellioné feels great distress concerning her genitalia and credits her belief that gender-affirming surgery would alleviate some of the pain she experiences from her gender dysphoria and would reduce the likelihood that she engages in self-harm or tries to commit suicide.

The parties' experts and Dr. Farjellah opined about whether Ms. Cordellioné was a good candidate for gender-affirming surgery.

Dr. Farjellah testified that Ms. Cordellioné was not a good candidate for surgery due to her diagnosis of borderline personality disorder. Dkt. 83 at 84. The court does not find this testimony persuasive. Dr. Farjellah does not have any specialization in treating gender dysphoria or conducting evaluations for surgery. *See, e.g. id.* at 94 (acknowledging that when he met with

Ms. Cordellioné in May 2023, he was not using any standard of care to assess her appropriateness for surgery). His short telehealth appointment was not for the purpose of evaluating Ms. Cordellioné as a candidate for gender-affirming surgery. And his conclusion that she was a poor candidate due to her borderline personality disorder is contradicted by his finding after that visit that she exhibited no signs of major mental illness.

Dr. Levine opined that Ms. Cordellioné was not a good candidate for several reasons. Dkt. 54-19. He thinks that more therapeutic efforts should be spent exploring Ms. Cordellioné's sublimated masochism, underexplored erotic life, and willingness to manipulate and mislead doctors (all theories he reached based on his review of her medical records alone). *Id.* at ¶¶ 27−28. Dr. Levine believes that IDOC's other treatments of Ms. Cordellioné have adequately and effectively treated her gender dysphoria, and that IDOC's cautious approach has been appropriate given Ms. Cordellioné's later-in-life disclosure as a transgender person and her vulnerability to sexual exploitation in prison. *Id.* at ¶ 79. The court gives Dr. Levine's opinion as to Ms. Cordellioné's suitability for gender-affirming surgery no weight. Dr. Levine has never spoken with Ms. Cordellioné or conducted an evaluation of her. Dkt. 54-61 at 39-40. In other litigation, Dr. Levine testified that it would not be appropriate under professional ethical standards to render an opinion on whether an inmate was an appropriate candidate for surgery because he had not evaluated her in 22 months. Dkt. 70-9 at 19 (174) (Excerpts from Dep. of Dr. Levine in *Clark v. Quiros*). In his own clinical practice, he meets with clients several times, totaling "at least four to six hours," before determining whether they are a candidate for surgery. Dkt. 54-59 at 40-41. During the preliminary injunction hearing, Dr. Levine indicated that he was unaware that Ms. Cordellioné's mental health code had been upgrade from a C to a B. Dkt. 83 at

178. Given his lack of personal interaction with Ms. Cordellioné, the court finds his opinions about her eligibility for surgery to be completely unpersuasive.

Dr. Ettner is the only mental health professional who has personally evaluated Ms. Cordellioné for appropriateness for gender-affirming surgery. Dkt. 37-1 at 16-26. Dr. Ettner reviewed all of Ms. Cordellioné's medical and mental health records and met with her, via videoconference, for two hours. *Id.* at 3, 16). Dr. Ettner took a thorough history of Ms. Cordellioné and performed a typical mental status exam. Dkt. 54-67 at 24 (73); Dkt. 83 at 187. During the evaluation, Dr. Ettner administered four statistically reliable and valid psychometric tests—the *Beck Depression Inventory-II*, the *Beck Anxiety Scale*, the *Beck Hopelessness Scale*, and the *Traumatic Symptom Inventory-II*—to corroborate her clinical assessment and to provide current and objective information concerning the presence and severity of Ms. Cordellioné's symptoms. Dkt. 37-1 at 16. Dr. Ettner found Ms. Cordellioné to be straightforward and honest during the evaluation, and one of the psychometric tests that Dr. Ettner administered to Ms. Cordellioné has a validity component that detects such things as malingering, fabrication, and dishonesty. Dkt. 54-67 at 23−24 (72−73).

Dr. Ettner made several conclusions based on her evaluation. First, she concluded that after years of taking hormones, Ms. Cordellioné has been "hormonally reassigned," meaning that she has the same circulating sex steroid hormones as her female peers. Dkt. 37-1 at 22. Ms. Cordellioné has also socially transitioned as female to the extent possible given her incarceration. *Id.* Despite her hormonal treatment and social transition, Dr. Ettner concluded that "Ms. Cordellioné continues to suffer from severe gender dysphoria that causes significant distress and prompts thoughts of surgical self-treatment." *Id.* at 22. Thus, Dr. Ettner opined that IDOC was not providing sufficient treatment for Ms. Cordellioné. *Id.* Important to that

conclusion was Ms. Cordellioné's experience that her genitals are "wrong" and her inability to resolve her agony about having male genitalia. *Id.* at 23. Dr. Ettner determined that based on the persistence and severity of Ms. Cordellioné's gender dysphoria, the anatomical dysphoria associated with her genitals from which she suffers, and the information from her medical records, gender-affirming surgery is medically necessary for Ms. Cordellioné. *Id.* at 22. Surgery would attenuate the depression, anxiety, and hopelessness that Ms. Cordellioné experiences with her gender dysphoria. *Id.* at 23.

Based on a review of Ms. Cordellioné's medical records and her evaluation, Dr. Ettner further concluded that Ms. Cordellioné meets the WPATH Standards of Care criteria for surgery including the fact that her gender incongruence is marked and sustained; she demonstrates the capacity to consent to surgery; mental health and physical conditions that could negatively impact surgical outcomes have been assessed; she is stable on her gender-affirming hormone treatment; and other possible causes of her gender incongruity have been identified and excluded. Dkt. 37-1 at 23–26.

Dr. Ettner opined that Ms. Cordellioné's borderline personality disorder and depression would not preclude her from being a good candidate for surgery because she is currently stable, has not been on any psychotropic medications since 2011, has a high Global Assessment of Functioning,[4] and has recently been noted as being free of any major mental health concerns besides her gender dysphoria. Dkt. 83 at 186–87; dkt. 66 at 6, 7 ¶¶ 32, 43–44. Having other mental health diagnoses is not a reason to deny necessary medical treatment if the conditions are well controlled, as are Ms. Cordellioné's borderline personality disorder and depression. Dkt. 83 at 186–87. Rather, the denial of gender-affirming surgery to Ms. Cordellioné places her at risk of

---

[4] Global Assessment of Functioning ("GAF") is a measure of how much a person's mental health symptoms affect their day-to-day life on a scale of 0 at the low-functioning end to 100 at the high functioning end of the scale. In 2022, Ms. Cordellioné's GAF was 72. Dkt. 37-1 at 19-20 and n.3.

increasing physical and emotional harm. Dkt. 37-1 at 27. In Dr. Ettner's opinion, the surgery should not be delayed because Ms. Cordellioné is suffering now. Dkt. 83 at 189−90. Denying Ms. Cordellioné surgery may lead to emotional decompensation, attempts to remove her genitals, or suicide or suicide attempts. *Id.*

The court finds Dr. Ettner's testimony and conclusions concerning Ms. Cordellioné's need for gender-affirming surgery to be credible and persuasive. The court finds that gender-affirming surgery at this time is medically necessary for Ms. Cordellioné, and without it she faces a substantial risk of harm to her health.

### III.    Conclusions of Law

#### A.  Standing

Standing is a threshold issue that determines whether the court has jurisdiction over this matter. For the reasons set out by separate Order, the court finds that Ms. Cordellioné has standing to challenge Indiana Code § 11-10-3-3.5(a). That is, she has shown that (1) she is suffering from an injury; (2) that injury was caused by the defendant; and (3) the injury can be redressed by the requested judicial relief. *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638−39 (7th Cir. 2023).

#### B.  Preliminary Injunction Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). The plaintiff first must show that "(1) without this relief, [she] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [she] has some likelihood of prevailing on the merits of [her] claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). Ms. Cordellioné bears the burden of proving each element by a preponderance of the

evidence. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If she makes this showing, "the court then must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.*

In the balancing phase, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018).

Under the Prison Litigation Reform Act ("PLRA"), "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The PLRA's limit on remedies reinforces the rule "that prison administrators have substantial discretion over the institutions they manage." *Rasho v. Jeffreys,* 22 F.4th 703, 711 (7th Cir. 2022).

### C.  Ms. Cordellioné's Eighth Amendment Claim

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "It is well established that the Constitution's ban on cruel and unusual punishment does not permit a state to deny effective treatment for the serious medical needs of prisoners." *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021).

"Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

There is no dispute that gender dysphoria is a serious medical condition under the objective prong. *See* dkt. 94 at 48 (IDOC's Proposed Findings of Facts and Conclusions of Law, citing *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019)). Thus, the issue is whether Ms. Cordellioné has shown that IDOC has been deliberately indifferent to her by denying her access to gender-affirming surgery.

Deliberate indifference is present if a "defendant's chosen 'course of treatment' departs radically from 'accepted professional practice.'" *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (quoting *Pyles v. Fahim*, 711 F.3d 403, 409 (7th Cir. 2014)). "[T]he blanket, categorical denial of medically indicated surgery on the basis of an administrative policy . . . is the paradigm of deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014); *see also Roe v. Elyea*, 631 F.3d 843, 862−63 (7th Cir. 2011) (blanket policy denying Hepatitis C treatment is "precisely the kind of conduct that constitutes [deliberate indifference]"). Deliberate indifference may be shown if a defendant persists "in a course of treatment known to be ineffective" or "chooses an easier and less efficacious treatment without exercising professional judgment." *Petties v. Carter*, 836 F.3d 722, 729−30 (7th Cir. 2016) (cleaned up). Thus, even when some treatment is provided to an inmate, deliberate indifference can be demonstrated if the treatment "stop[s] short of what is medically necessary." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 794 (9th Cir. 2019) (per curiam).

In 2011, the Seventh Circuit upheld a district court's injunction of a Wisconsin statute that banned both hormone therapy and surgery for inmates suffering from gender dysphoria (referred to in that opinion as gender identity disorder). *Fields*, 653 F.3d at 556. In that case, the plaintiffs were seeking to treat their gender dysphoria with hormones; they were not seeking surgery. In upholding the injunction, the Seventh Circuit stated, "Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture." *Id.* The Court concluded that the plaintiffs had proven the subjective prong of the deliberate indifference analysis by adducing evidence "that plaintiffs could not be effectively treated without hormones." *Id.*

That case expanded what treatment was deemed to be medically necessary for the treatment of gender dysphoria at that time. When evaluating claims under the Eighth Amendment, the court must consider "'the evolving standards of decency that mark the progress of a maturing society.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)). Since 2011, courts both in and outside the Seventh Circuit have concluded that gender-affirming surgery may be medically necessary to treat inmates with severe gender dysphoria. As the Ninth Circuit explained in affirming a district court's injunction that prison authorities take all steps necessary to provide a plaintiff with gender-affirming surgery:

> We apply the dictates of the Eighth Amendment today in an area of increased social awareness: transgender health care. We are not the first to speak on the subject, nor will we be the last. Our court and others have been considering Eighth Amendment claims brought by transgender prisoners for decades. During that time, the medical community's understanding of what treatments are safe and medically necessary to treat gender dysphoria has changed as more information becomes available, research is undertaken, and experience is gained. The Eighth-Amendment inquiry takes account of that developing understanding.

33

> We hold that where, as here, the record shows that the medically necessary treatment for a prisoner's gender dysphoria is gender confirmation surgery, and responsible prison officials deny such treatment with full awareness of the prisoner's suffering, those officials violate the Eighth Amendment's prohibition on cruel and unusual punishment.

*Edmo*, 935 F.3d at 781.

In *Campbell,* the Seventh Circuit concluded that qualified immunity was available to defendants where a prisoner had been denied surgery where there were other alternatives available to the prisoner and not because there was an absolute ban on such surgery. 936 F.3d at 540−41. However, on remand, in deciding the prisoner's injunctive claim, the district court concluded that surgery was in fact medically necessary and ordered that it be provided as "sex reassignment surgery is the only effective treatment" for her "severe unremitting anatomical gender dysphoria." *Campbell v. Kallas*, 2020 WL 7230235, at *6, *8 -*9 (W.D. Wis. Dec. 8, 2020). Other cases in the Seventh Circuit recognize that, if medically necessary, the denial of gender-affirming surgery represents deliberate indifference to a serious medical need. *Monroe v. Meeks,* 584 F. Supp. 3d 643, 680, 685-87 (S.D. Ill. 2022) (granting a preliminary injunction); *Iglesias v. Fed. Bureau of Prisons*, 2021 WL 6112790, *22 (S.D. Ill. Dec. 27, 2021) (granting a preliminary injunction).

In *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir 2013), the court of appeals reversed the dismissal of a transgender prisoner's lawsuit seeking surgery. The court found that although the prison had provided her *some* treatment in the form of hormone treatment, therapy, and some social transitioning, "it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *Id.* at 526 (emphasis in original).[5]

---

[5] The only circuit-level case that has approved a blanket denial of gender-affirming surgery for prisoners is *Gibson v. Collier*, 920 F.3d 212, 215 (5th Cir. 2019). That case is of limited utility as the court reached its decision "based on a lack of record evidence," *Campbell*, 936 F.3d at 553 (Wood, C.J., dissenting), and

Like the aforementioned courts, this court readily concludes that Indiana Code § 11-10-3-3.5's blanket denial of access to gender-affirming surgery evinces deliberate indifference because it denies medically necessary care to those inmates suffering from severe forms of gender dysphoria. Notably, IDOC had previously recognized that gender-affirming surgery was medically necessary care for some individuals with gender dysphoria. *See* Dkt. 54-1 at 1, HCSD 2.17A (2022). When IDOC updated the policy in 2024, *see* dkt. 90-2 (HCSD 2.17A (2024)), Commissioner Reagle said the purpose was to "reflect legislation passed by the Indiana General Assembly and signed by the Governor." Dkt. 90-1. That is, it was not because there was a shift in the *medical* community that gender-affirming surgery was not medically necessary care for some people with gender dysphoria. There has been no such shift. Rather, WPATH's Standards of Care continue to recognize that gender-affirming surgery is medically necessary for some individuals with gender dysphoria, including those who are incarcerated. Indiana Code § 11-10-3-3.5 therefore violates the Eighth Amendment as it requires deliberate indifference to what the IDOC has admitted, and the evidence demonstrates, is a serious medical need.

Additionally, Ms. Cordellioné has established by a preponderance of the evidence that she is an individual with gender dysphoria for whom gender-affirming surgery is medically necessary. Thus, she has shown a reasonable probability of success on her Eighth Amendment claim. She has established that IDOC has chosen a less efficacious course of treatment by denying her gender-affirming surgery. Although the treatment IDOC has provided—hormone therapy, psychotherapy, and social transitioning—has afforded Ms. Cordellioné some relief, it has "stopped short" of what is necessary to alleviate her pain and urges to commit self-harm. *Edmo*, 935 F.3d at 794; *Fields*, 653 F.3d at 556.

---

the record was "devoid of witness testimony of evidence from professionals in the field—compiled by a *pro se* plaintiff," *Edmo*, 955 F.3d at 794 (cleaned up).

Ms. Cordellioné has also shown that she is at a substantial risk of irreparable injury absent injunctive relief. Without the surgery, she is at the risk of engaging in self-harm, either in the form of another attempt to castrate herself or to die by suicide. *See Edmo*, 935 F.3d at 797-98, 800 ("It is no leap to conclude that Edmo's severe, ongoing psychological dress and the high risk of self-castration and suicide she faces absent surgery constitute irreparable harm."). Traditional legal remedies, such as money damages, are insufficient to provide Ms. Cordellioné the medical care she requires. *Orr v. Schicker*, 953 F. 3d 490, 502 (7th Cir. 2020).

In summary, with respect to Ms. Cordellioné's claim, the court concludes that Indiana Code § 11-10-3-3.5 violates the Eighth Amendment insofar as it prohibits medically necessary care for inmates for whom gender-affirming surgery is medically necessary, and Ms. Cordellioné has demonstrated that gender-affirming surgery at the earliest opportunity is medically necessary for her and is the only effective treatment for her condition. The IDOC's denial of surgery to her because of the challenged statute denies her effective and necessary treatment for her serious medical need and represents deliberate indifference to her serious medical need.

The court further finds that the balance of harms weighs in Ms. Cordellioné's favor. The evidence shows that she faces serious risks of severe bodily and psychological harm absent injunctive relief. IDOC would suffer minimal hardship—it would be compelled to provide a form of medical care that it has previously provided, and in doing so, it would uphold its obligation to comply with the Constitution. *United States v. Raines*, 362 U.S. 17, 27 (1960) ("There is the highest public interest in the due observance of all the constitutional provisions.").

**D. Ms. Cordellioné's Fourteenth Amendment Claim**

The Equal Protection clause of the Fourteenth Amendment provides that "[n]o state shall. . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. am XIV.

Both the Seventh Circuit and the Supreme Court have recognized that discrimination based on transgender status is sex discrimination. *Bostock v. Clayton County*, 590 U.S. 644 (2020); *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1051 (7th Cir. 2017), *abrogation on other grounds recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

For example, in *Whitaker ex rel. Whitaker*, the Seventh Circuit, in the context of affirming a preliminary injunction, held that a school policy denying a transgender boy the use of boys' restrooms violated equal protection as unlawful sex discrimination. *Id.* at 1051. While cisgender boys were able to use the boys' restrooms, the plaintiff, a transgender boy, was not. This differential treatment represented sex discrimination because "transgender individual[s] do not conform to the sex-based stereotypes of the sex . . . assigned at birth." *Id.* at 1048. In other words, forcing a transgender person to follow rules inconsistent with their gender identity "punishes that individual for his or her gender non-conformance." *Id.* at 1049.

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court concluded in the context of a Title VII case that discrimination against transgender individuals constituted sex discrimination. The Court reasoned that when "a person identified as male at birth" is penalized "for traits or actions that [are] tolerate[d] in [a person] identified as female at birth," the person's "sex plays an unmistakable" role. *Id.* at 660. Because of that, the Court held, "it is impossible to

discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.*

All sex-based classifications are subject to heightened scrutiny, requiring the government to demonstrate "an exceedingly persuasive justification" for their differential treatment. *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 533 (1996). The government bears the burden of demonstrating that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives" *Id.* at 524 (quotation and citation omitted). In order to survive this elevated scrutiny, the burden is on IDOC to show a "close means-end fit" between the challenged law and important governmental interests. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

Indiana Code § 11-10-3-3.5 violates the Equal Protection Clause because it prevents transgender inmates from accessing medically necessary care while cisgender inmates still have access to such care. In fact, many of the surgeries labelled as prohibited "sexual reassignment surgeries," by Indiana Code § 11-10-3-1(6) are nevertheless available to IDOC prisoners who are not transgender and who have a medical need for them.

In *Kadel v. Folwell*, the Fourth Circuit recognized that allowing certain surgeries for cisgender individuals while classifying them as gender-affirming surgeries that were denied to transgender individuals was "textbook sex discrimination" as "we can determine whether some patients will be eliminated from candidacy for these surgeries solely from knowing their sex assigned at birth" and "conditioning access to these surgeries based on a patient's sex assigned at birth stems from gender stereotypes about how men or women should present." 100 F.4th at 153 (citing *Bostock*, 590 U.S. at 660-74). IDOC counters that cisgender inmates are also unable to access surgeries on healthy tissue. This argument is disingenuous, as the IDOC cites no examples

of what type of surgery a cisgender individual might seek that is *medically* necessary (and not just cosmetic) that is listed in Indiana Code § 11-10-3-1(6). That the statute doesn't call out transgender inmates explicitly does not mean that the statute was not intended to prohibit their access to medical care.

Indiana Code § 11-10-3-3.5 therefore mandates sex discrimination, and the denial of gender-affirming surgery to Ms. Cordellioné represents discrimination on the account of sex and is accordingly subject to heightened scrutiny. *VMI*, 518 U.S. at 533.

IDOC argues that three legitimate interests are served by the statute. "First, the state has an interest in ensuring that the public is kept safe from dangerous prisoners who enter prison with one identity and sex and seek to come out with another identity and sex." Dkt. 94 at 61. This argument is not well taken. IDOC provides transgender inmates with hormones and social transition that change a transgender inmate's outward appearance. An orchiectomy and vaginoplasty do not alter an inmate's outward appearance.

Second, IDOC argues that it has an interest in protecting inmates "from invasive, irreversible, and sterilizing genital surgeries with unknown risks." Dkt. 94 at 62. As the court has discussed at length above, gender-affirming surgery is a medically necessary surgery for some individuals with gender dysphoria, and it has been proven to be a safe and effective treatment.

Finally, IDOC argues that allowing inmates to receive gender-affirming surgery counters the State's interest in prisoner rehabilitation and reintegration into society because it is not clear that an inmate will be able to adjust to his or her new body and successfully reintegrate upon release. This argument is neither persuasive nor supported by evidence. Gender-affirming surgery is necessary for certain gender dysmorphic inmates whose mental health is greatly harmed by the lack of access to surgery.

Thus, the IDOC has failed to carry its burden of demonstrating "the close means-end fit" between Indiana Code § 11-10-3-3.5 and important governmental interests. *Sessions*, 582 U.S. at 68. Ms. Cordellioné is likely to prevail on her claim that the statutory ban on gender-affirming surgery for prisoners, Indiana Code § 11-10-3-3.5, violates equal protection both on its face and as applied to her. As the court has weighed why the factors favor granting injunctive relief to Ms. Cordellioné as to her Eighth Amendment claim, it need not repeat them here.

### E.  Terms of the Preliminary Injunction

Ms. Cordellioné has shown that injunctive relief is necessary. Despite the language of Federal Rule of Civil Procedure that specifies that a preliminary injunction will not issue without a bond, "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c). Indigence is such a circumstance." *Wayne Chemical, Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977). Ms. Cordellioné is an indigent person, dkt. 39-1 at 5, and the IDOC has not requested the posting of a bond. Therefore, the injunction will issue without any bond.

The PLRA requires that injunctive relief must be narrowly drawn and the least intrusive means to correct a constitutional harm. 18 U.S.C. § 3626(a)(2). Moreover, 18 U.S.C. § 3626(a)(2) provides that any preliminary injunction automatically expires 90 days after its entry unless the Court makes findings that it continues to meet the standards set out in 18 U.S.C. § 3626(a)(1) for prospective relief, namely "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." In making this determination, "the court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."

Any prospective relief, whether permanent or preliminary, must respect the principles of comity set by 18 U.S.C. § 3626(a)(1)(B), which provides that:

> [t]he court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless --
>
> > (i) Federal law permits such relief to be ordered in violation of State or local law;
> >
> > (ii) the relief is necessary to correct the violation of a Federal right; and
> >
> > (iii) no other relief will correct the violation of the Federal right.

As the Court noted in *Norsworthy v. Beard*, 87 F. Supp.3d 1164 (N.D. Cal. 2015), in granting a preliminary injunction order that the plaintiff prisoner receive gender-affirming surgery (referred to in the decision as SRS for "sex reassignment surgery"), the plaintiff

> has established that she is likely to succeed on the merits of her Eighth Amendment claim, that she is likely to suffer irreparable harm without an injunction, that the balance of the equities tips in her favor, and that an injunction is in the public interest. An injunction granting her access to adequate medical care, including referral to a qualified surgeon for SRS, is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. See 18 U.S.C. § 3626. There is no evidence that granting this relief will have "any adverse impact on public safety or the operation of the criminal justice system." 18 U.S.C. § 3626(a)(2).

*Id.* at 1194-95.

The same is true here. Inasmuch as Ms. Cordellioné has received a full evaluation of her need for gender-affirming surgery from Dr. Ettner and inasmuch as surgery is medically necessary to alleviate the serious and debilitating symptoms of her gender dysphoria, it is appropriate for the court to order at this point that this surgery be provided to her at the earliest opportunity. This relief is narrowly drawn, extends no further than necessary to correct the violation of Ms. Cordellioné's constitutional rights, and is the least intrusive means available and necessary to correct this ongoing violation. There is no evidence that this preliminary injunction

41

will have any adverse impact on either public safety or the operation of the criminal justice system.

The court understands that the surgery may take time as it will be provided by a surgeon who is not affiliated with either IDOC or its contracted medical provider. It is therefore the court's intention, given 18 U.S.C. § 3626(a)(2), to renew this preliminary injunction every 90 days until the surgery is provided.

### IV.    Conclusion

For the foregoing reasons, Ms. Cordellioné's motion in limine, dkt. [60], is **granted in part and denied in part**. Ms. Cordellioné's motion for preliminary injunction, dkt. [10], is **granted**. Pursuant to Federal Rule of Civil Procedure 65(d)(1) and *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922 (7th Cir. 2019), the court will enter the terms of the preliminary injunction set forth in a separate document.

**IT IS SO ORDERED.**

**Date:  September 17, 2024**

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record